CIVIL ACTION #

| | |
|---|---|
| EDWARD JONES | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) |
| COMMONWEALTH OF MASSACHUSETTS, | ) |
| EXECUTIVE OFFICE OF PUBLIC SAFETY, | ) |
| DANIEL BENNETT, | ) |
| DEPARTMENT OF CORRECTION, | ) |
| CAROL HIGGINS-O'BRIEN, | ) |
| THOMAS TURCO, | ) |
| CHRISTOPHER FALLON, | ) |
| LISA MITCHELL, | ) |
| DOUGLAS L. BOWER, | ) |
| MICHAEL DEVINE, | ) |
| JOHN F. CAMELO, | ) |
| SCOTT J. STEEVER, | ) |
| HANK L. LAVALLEY, | ) |
| MARTA LEON, | ) |
| MASSACHUSETTS PARTNERSHIP FOR | ) |
| CORRECTIONAL HEALTH, | ) |
| NEIL NORCLIFFE, | ) |
| TODD DERBYSHIRE, | ) |
| DEFENDANTS. | ) |

COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action under Federal and State Civil Rights Act and the statuatory and common laws of the Commonwealth of Massachusetts. Filed by Edward Jones (herein after "Plaintiff") a state mentally ill prisoner. Seeking damages and injunctive relief under **42 U.S.C § 1983,** for **Protection And Advocacy For Individuals With Mental Illness ("PAMII")** under **42 U.S.C. § 10801-10851** and **Americans With Disabilities Act ("ADA") 42 U.S.C. § 12131 etc. seq., 42 U.S.C. § 1981, Conspiracy** under **42 U.S.C. § 1985 and Negligence** under **M.G.L.c. 258 etc. seq.**

## INTRODUCTION

This complaint alleges the denial of "Plaintiff's" rights to protection from sexual harassment(s); physical and mental harm; adequate mental health care, for serious mental health needs; intimidation; retaliation; conspiracy to violate Federal and State laws; all, in violation of the **Eighth** and **fourteenth Amendments** to the **United States Constitution.** Occuring as a direct result of the Department of Correction (herein after "Defendant DOC") Defendant's and Massachusetts Partnership For Correctional Health (herein after "Defendant MPCH") Defendant's failure to protect "Plaintiff" from unwanted sexual advances; and, thier failure to follow "Defendant DOC" **Sexually Abusive Behavior Prevention And Intervention Policy/regulations** in reporting, documenting, and, conducting **"PREA"** investigations after receiving "Plaintiff's", staff-persons and contractors' substantiated and reported alligations of sexual harassment(s)

2

against "Plaintiff". Defendant's failure to follow Keep-A-Way orders, policies and reccommendations (from mental health contractors and "Defendant DOC" staff-persons) to protect "Plaintiff", ultimately resulting in a physical altercation where "plaintiff" was seriously injurred. This complaint also alleges Defendant's failure to follow "Defendant DOC" **Sexually Abusive Behavior And Intervention Policy/regulations** when they retaliated against "Plaintiff" for reporting sexual harassment(s); and, failed to document or follow "genral procedures" in reporting alligations of sexual abuse/harassment(s), or, conducting **"PREA"** investigations against "Plaintiff", based on alligations Defendant's knew to be false.Defendant's, further, use of abusive lanquage, crisis lock-up, awaiting action ("A.A") status, and, segregation to intimidate and retaliate against "Plaintiff" for appropriately reporting climate issues; thier violation of Federal and State laws when they intervened, and, conspired to stop "Plaintiff" (a victim of sexual abuse) from contacting a **Sexual Abuse Victim Confidential Support Services Hotline** for support services related to sexual harassment(s) and sexual abuse; they violated Federal and State laws when they failed to generate state documents, and entered into a conspiracy to unlawfully remove documents from "Plaintiff's" institutional file, and/or deprive "Plaintiff" of legally entitled to information for legal uses, and, they violated due process of law when they failed to provide "Plaintiff" a disciplinary hearing choosing instead to dismiss a disciplinary matter, but, refusing to grant "Plaintiff" earned good-time credits as a direct result of the disciplinary

3

incident occuring. In direct violation of **103 DOC 426 etc. seq.;**
**103 CMR 430 etc. seq.; 103 CMR 482 etc. seq.; 103 CMR 157 etc.**
**seq.; M.G.L.c. 124 § 1; M.G.L. c. 127 etc. seq.; M.G.L. c. 268**
**§ 6A; M.G.L. c. 274 § 2 thru 6 and M.G.L. c. 233 § 20J** constitute
a failure to protect, and, deliberate indifference to "Plaintiff"
serious mental health and safety.

1.    This court has jurisdiction over "Plaintiff's" Federal
claims pursuant to **28 U.S.C.A § 1331 and 1343(a)(3); 28 U.S.C.A.**
**§ 2201 and 2202; 5 U.S.C.A. § 702 and M.G.L. c. 127 etc. seq.**

2.    This court has jurisdiction over "Plaintiff's" State law
claims pursuant to **28 U.S.C.A. § 1367 and M.G.L. c. 127 etc.seq.**

3.    "Plaintiff" has exausted **all** available administrative
remedies regarding the matters described in this complaint. On
September 24, 2015 "Plaintiff" filed institutional grievance
#83803 **(See Exhibit #4)**; on October 15, 2015 "Defendant Mitchell"
denied appeal **(See Exhibit #6)**. On November 16, 2015 "Plaintiff"
filed institutional grievance #84990 **(See Exhibit #15)**; although
"Defendant Lavalley" failed to provîde a formal response,
"Defendant Mitchell's" December 4, 2015 corresspondence **(See**
**Exhibit #38)** acknowledge grievance #84990 being approved. On
December 5, 2015 "Plaintiff" filed institutional grievance
#85374 **(See Exhibit #27)**; on December 17, 2015 "Defendant
Mitchell" denied appeal **(See Exhibit #28)**. On December 2, 2015
"Plaintiff" filed medical grievance #85236 **(See Exhibit #74)**;

4

on or about December 10, 2015 appeal was denied **(See Exhibit #74).**
On December 5, 2015 "Plaintiff" filed institutional grievance
#85375 **(See Exhibit #29);** on January 22, 2016 "Defendant Mitchell"
denied appeal **(See Exhibit #30).** On December 8, 2015 "Plaintiff"
filed medical grievance #85348 **(See Exhibit #26);** as a result of
receiving no response (in the required ten (10) days "Plaintiff"
took up appeal on December 24, 2015 **(See Exhibit #49),** grievance
coordinator submitted a response considering the appeal as "non-
grievable" following a "temporary housing assignment" being made
**(See Exhibit #26 - page #4).** On December 11, 2015 "Plaintiff"
filed medical grievance #85437 **(See Exhibit #45);** as a result of
receiving no response in the required ten (10) days, "Plaintiff"
took up appeal on December 24, 2015 **(See Exhibit #50),** grievance
coordinator submitted a resonse considering the appeal as "non-
grievable". On May 6, 2016 "Plaintiff" filed institutional
grievance #88650 **(See Exhbit #81);** on May 27, 2016, acting
Superintendent Mr. Joseph M. Murphy, approved grievance #88650
**(See Exhibit #**82).

<h2 align="center">THE PARTIES</h2>

**4.** "Plaintiff", Edward Jones (herein after "Plaintiff"), at all
times relevant described in this complaint, is incarcerated at
the Old Colony Correctional Center (herein after "O.C.C.C.") 1
Administration Road, Bridgewater, Massachusetts 02324.

5. Defendant, Commonwealth of Massachusetts is a sovereign state within the United States.

6. Defendant, Executive Office of Public Safety And Security is a political subdivision of the Commonwealth of Massachusetts with an office located at **One Ashburton Place (Suite #2133), Boston, Massachusetts 02108,** whose subordinate agencies include the Department of Correction.

7. Defendant, Daniel Bennett (herein after "Defendant Bennett") at all times relevant to this complaint, is the secretary of the Executive Office of Public Safety And Security, a with an office located at **One Ashburton Place (Suite #2133), Boston, Massachusetts 02108.**

   **"Defendant Bennett"** is named in his individual and official capacities. As secretary, "Defendant Bennett" is/was responsible for the administration and oversight of the operations of the Department of Correction. Said responsibilities include, in particular but not in limitation, the pre-employment screenings of prospective management and correction officers, the preparation and or implementation of policies and procedures governing the duties and performance of supervisory and non-supervisory personnel and independent contractors, the supervision of supervisory and non-supervisory personnel and independent contractors. The management and maintnance of Old Colony Correctional Center, and the treatment, care, and, safety of persons incarcerated and/or confined in the Old Colony Correctional Center.

8. Defendant, Department of Correction is an agency of the Commonwealth Of Massachusetts with an office located at **50 Maple Street (Suite #3), Milford, Massachusetts 01757.** The Department of Correction confines and provides medical care to persons incarcerated within the Commonwealth of Massachusetts.

9.  Defendant, Carol Higgins-O'Brien (herein after "Defendant Higgins-O'Brien"), at all times relevant to this complaint, is/was the Commissioner of the Department of Correction with an office located at **50 Maple Street (Suite #3), Milford, Massachusetts 01757.** The Department of Correction incarcerates persons with the Commonwealth of Massachusetts. "Defendant Higgins-O'Brien" is named in her individual and official capacities.

10. Defendant, Thomas A. Turco (herein after "Defendant Turco"), at all times relevant to this complaint, is/was the Commissioner of the Department of Correction with an office located at **50 Maple Street (Suite #3), Milford, Massachusetts 01757.** The Department of Correction incarcerates persons within the Commonwealth of Massachusetts. "Defendant Turco" is named in his individual and official capacities.

    **"Defendants Higgins-O'Brien and Turco",** as Commissioner(s), is/was responsible for the administration and oversight of the operations of the Department of Corrections. Said responsibilities include, in particular but not in limitation, the pre-employment screening of prospective management and correction officers, the training of management and correction officers, the preparation and implementation of policies and procedures governing duties and performance of supervisory and non-supervisory personnel and independent contractors, the supervision of supervisory and non-supervisory personnel and independent contractors, the management and maintnance of the Old Colony Correctional Center, and the treatment, care and safety of persons incarcerated and/or confined in the Old Colony Correctional Center.

7

11. Defendant, Christopher Fallon (herein after "Defendant Fallon"), at all times relevant to this complaint, is Director of Communications for the Department of Correction, with an office located at **50 Maple Street (Suite #3), Milford, Massachusetts 01757.** "Defendant Fallon" is named in his individual and official capacities.

12. Defendant, Lisa Mitchell (herein after "Defendant Mitchell"), at all times relevant to this complaint is/was the Superintendent of the Old Colony Correctional Center, with an office located at **Old Colony Correctional Center, 1 Administration Road, Bridgewater, Massachusetts 02324.** "Defendant Mitchell" is named in her individual and official capacities.

13. Defendant, Douglas L. Bower (herein after "Defendant Bower"), at all times relevant to this complaint is/was the Deputy Superintendent of Operations at Old Colony Correctional Center. With an office located at **Old Colony Correctional Center, 1 Administration Road, Bridgewater, Massachusetts 02324.** "Defendant Bower" is named in his individual and official capacities.

   **"Defendants Mitchel and Bower",** as Superintendent and Deputy Superintendent, is/was responsible for the administration and oversight of the operations and conditions of treatment and confinement in the Old Colony Correctional Center. Said responsibilities include, in particular but not in limitation, the pre-employment screening of prospective supervisory and non-supervisory personnel, the adoption and implementation of policies, procedures and regulations

8

necessary for the care and safety of incarcerated and
confined persons at the Old Colony Correctional Center, the
training of supervisory and non-supervisory personnel, the
preparation and implementation of policies, procedures and
regulations governing the duties and performance of
supervisory and non-supervisory personnel and independent
contractors, the supervision of supervisory and non-
supervisory personnel and independent contractors, the
maintnance of Old Colony Correctional Center, and the care,
treatment and safety of persons incarcerated and/or confined
in the Old Colony Correctional Center.

**14.** Defendant, Michael Devine (herein after "Defendant Devine"),

at all times relevant to this complaint, is/was Deputy

Superintendent and **"PREA" Manager** of Old Colony Correctional

Center, with an office located at **Old Colony Correctional**

**Center, 1 Administration Road, Bridgewater, Massachusetts**

**02324.** "Defendant Devine" is named in his individual and

official capacities.

**"Defendant Devine"**, as **"PREA" Manager** is/was responsible

for implementing and monitoring the **Sexually Abusive**

**Behavior Prevention And Interventiion Policy,** and

coordinates the Department of Corrections compliance with

the **Prison Rape Elimination Act of 2003.** "Defendant Devine's"

duties as **"PREA" Manager** include oversight and implementation

of the **"PREA"** initiative.

As Deputy Superintendent, "Defendant Devine" is/was
resonsible for the administration and oversight of the
operations and conditions of treatment of persons
incarcerated and/or confined at Old Colony Correctional
Center. Said responsibilities include, in particular but not
in limitation, the pre-employment screening of prospective
supervisory and non-supervisory personnel, the adoption and
implementation of policies, procedures and regulations
necessary for the safety, care and treatment of persons
incarcerated and/or confined at Old Colony Correctional
Center, the training of supervisory and non-supervisory

personnel, the preparation and implementation of policies, procedures and regulations governing the duties and performance of supervisory and non-supervisory personnel and independent contractors, the supervision of supervisory and non-supervisory personnel and independent contractors, and the safety, care and treatment of persons incarcerated and/or confined at the OLd Colony Correctional Center.

15. Defendant, John F. Camelo (herein after "Defendant Camelo"), whos address is unknown to the "Plaintiff", was at all times relevant to this complaint, a correctional officer/captain at Old Colony Correctional Center. At all times material to this complaint, "Defendant Camelo" was acting within the scope of his employment and under color of state law. he is sued in his individual and official capacity as a correctional officer/captain of **Old Colony Correctional Center, 1 Administration Road, Bridgewater, Massachusetts 02324.**

16. Defendant, Hank L. Lavalley (herein after "Defendant Lavalley"), whos true address is unknown to the "Plaintiff", was at all times relevant to this complaint, a correctional officer/leutenant at Old Colony Correctional Center. At all times material to this complaint, "Defendant Lavalley" was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity as a correctional officer/leutenant of **Old Colony Correctional Center, 1 Administration Road, Bridgewater, Massachusetts 02324.**

17.   Defendant, Scott J. Steever (herein after "Defendant
      Steever"), whose true address is unknown to the "Plaintiff",
      was at all times relevant to this complaint, a correctional
      officer at Old Colony Correctional Center. At all times
      material to this complaint, "Defendant Steever" was acting
      within the scope of his employment and under color of state
      law. He is sued in his individual and official capacity as
      a correctional officer of **Old Colony Correctional Center,
      1 Administration Road, Bridgewater, Massachusetts 02324.**

18.   Defendant, Massachusetts Partnership For Correctional Health
(herein after "Defendant MPCH"), is an independent contractor
providing medical and mental health services to patients/inmates/
prisoners at the Old Colony Correctional Center, with an office
located at **110 Turnpike Road (Suite #308), Westborough,
Massachusetts 01581.** "Defendant MPCH" is named in his/her
individual and/or corporate capacities.

19.   Defendant, Neil Norcliffe (herein after "Defendant
      Norcliffe") is a supervising medical/mental health clinician
      providing medical and/or mental health services to patients/
      inmates/prisoners at the Old Colony Correctional Center,
      with an office located at **Old Colony Correctional Center, 1
      Administration Road, Bridgewater, Massachusetts 02324.**
      "Defendant Norcliffe" is named as a defendant in his
      individual and/or corporate capacites.

                                11

20.    Defendant, Todd Derbyshire (herein after "Defendant
       Derbyshire") is a medical/mental health clinician providing
       medical and mental health services to patients/inmates/
       prisoners at Old Colony Correctional Center, with an office
       located at **Old Colony Correctional Center, 1 Administration
       Road, Bridgewater, Massachusetts 02324.** "Defendant
       Derbyshire" is named in his individual and/or corporate
       capacities.

       At all times of the events described in this complaint,
"Defendant's Norcliffe and Derbyshire" were employees of
"Defendant MPCH", a private corporation under contract with
"Defendant's Higgins-O'Brien and Turco" in accordance with **M.G.L.
c. 124 § 1(m)** to provide adequate mental health care to needed
state prisoners within the "DOC" in accordance with **103 DOC 650.
01 etc. seq.; 103 DOC 630; 103 DOC 207.04(2)** and **103 CMR 761.07
(10); M.G.L. c. 124 § 1; M.G.L. c. 30A § 1-A-8; M.G.L. c. 127 §
38E - 38H; M.G.L. c. 124 § 1(c); M.G.L. c. 30 §36(a); ACA
standards: 3-4336, 4337, 4342, 4349, 4362, 4367, 4368, 4369;
Prison Rape Elimination Act of 2003 Public Law 108-79 ("PREA");
103 DOC 519** and **NCCHC standards.**

21.    Defendant, Marta Leon (herein after "Defendant Leon"), whose
       true address is unknown to the "Plaintiff", was at all times
       relevant to this complaint, is/was Records Manager at Old
       Colony Correctional Center. At all times material to this

                                    12

complaint, "Defendant Leon" was acting within the scope
of her employment and under color of state law. She is sued
in her individual and official capacity as Records Manager
of **Old Colony Correctional Center, 1 Administration Road,
Bridgewater, Massachusetts 02324.**

## FACTS

22.   On approximately March 25, 2013, "Plaintiff", Edward Jones
      (herein after "Plaintiff") was sentenced out of the Norfolk
      Superior Court to serve a seven (7) year term of
      incarceration; with a concurrent sentence of ten (10) to
      twelve (12) years out of the Suffolk Superior Court, imposed
      on April 8, 2013, along with other concurrent sentences.

23.   Said sentences imposed above was imposed to be served within
      the Massachusetts Department of Correction, MCI-Cedar
      Junction, in accordance to/with **Massachusetts General Laws.**

## MENTAL HEALTH AND CHILD SEXUAL ABUSE HISTORY

24.   As a result of severe trauma from being victimized by a
      significant history of sexual, physical, and, emotional

abuse as a child mental health psychiatrists, psychologists and doctors from the following hospitals, mental health and psychiatric treatment facilities (**Massachusetts General Hospital, Boston Medical Center, Cooley Dickerson Mental Health Hospital, Bridgewater State Hospital, Psychological Services, Inc. of Massachusetts, Court Clinic Programs of** Boston, and, **Department Of Correction Mental Health Services: Exhibits 39, 40** and **41; See also Psychiatric Evaluation(s) Reports from Psychiatrists, Psychologists** and **Doctors)** clinically diagnosed "Plaintiff" as a person suffering from **Post Traumatic Stress Disorder** (herein after **"PTSD"); Major/ Severe Depression; Severe Anxiety; Major Depressive Disorder; Psychosis NOS; Suicide Ideation** (at times); **Constant Recurring Nightmares; Self Injury** (history); **and, Polysubstance Dependence.**

25.   As a result of severe trauma from being victimized by a significant history of sexual, physical and emotional abuse as a child, **Psychological Testing** (from psychiatrists, psychologists and doctors) from hospitals and mental health treatment facilities (mentioned above in para. **#24**) revealed that "Plaintiff" further suffered from **Borderline** and **Antisocial Personality Disorder (See Exhibit(s) #39, page #8).**

26.   As a direct result of such clinical diagnoses and psychological testing, "Plaintiff" has at points in

"Plaintiff's" life, been on the following prescribed psychiatric and psychotropic medications **Prozac; Tegretol; Zoloft; Prozasin; Remron; Vistaril; Elavil; Doxipin; Lorazepam; Seroquel; Klonopin; Wellbutrin; Clonodine; Geodon; Risperdol; Trazodone** and **Neurotin.**

27.    The above medications has, at points in "Plaintiff's" life, been prescribed off and on to combat clinical diagnoses and psychological test revelations (set out above in para. **#24** and **#25).**

28.    As a result of such clinical diagnoses (set out above in para. **#24**); psychological test revelations (set out above in para. **#25**); and, medications prescribed (as set out above in para. **#26**) Mental Health Psychiatrist **Ph. D. Anna Myers** of Bridgewater State Hospital, and, Department of Correction MCI-Cedar Junction Mental Health Clinician **Ms. Katherine V. King (LICSW) (See: Exhibit #41 - Clinician King' Residential Treatment Unit Referral)** on June 4, 2013 reccommended and referred "Plaintiff" to be placed in one (of three) of Department of Correction's **Residential Treatment Units** (herein after **"RTU")** for required mental health treatment to develope goals and skills to decrease clinical diagnoses (set out above in para. **#24** and **#25):** The **"RTU"** is a separate mental health treatment unit that houses prisoners with serious/severe mental health issues - it is

equipped with its own mental health clinician and psychiatrists whose treatment goals are to work specifically (on a daily basis) with those prisoners within the **"RTU"** (See: Exhibit #43 - **Department of Correction's "RTU" Program Goals And Objectives**).

29. As a result of clinical diagnoses (set out above in para. #24); psychological test revelations set out above in para. #25); and, reccommendations and referrals from **PH. D. Anna Myers** of Bridgewater State Hospital and **Ms. Katherine King (LISW)** of Department of Correction's MCI-Cedar Junction (as set out above in para. **#28**), Department of Correction officials (at MCI-Cedar Junction) classified "Plaintiff" (on June 13, 2013) to the **"RTU"** at Old Colony Correctional Center (herein after "O.C.C.C.").

30. Upon entering "O.C.C.C.'s" **"RTU"** "Plaintiff" was assigned "Plaintiff's" own/personal mental health clinician, who, within eighteen (18) months, and, the help of prescribed medications (set out above in para. **#26**) initiated several goal oriented treatment plans that assisted "Plaintiff" in developing goals and skills towards working to decrease clinical diagnoses (set out above in para. **#24** and **#25**) as well as coping with suicide death of one (1) **"RTU"** clinican staff (in November of 2014); the deaths of three (3) of "Plaintiff's" close family members (Great Aunt in December of 2012; Cousin in April 2014; and, Aunt in January 2015).

31. Documented mental health medical records support that after about two (2) years of treatment in the **"RTU"** at "O.C.C.C.", on daily high doses of mental health psychiatric medications (as set out above in para. #26), per request of "Plaintiff" mental health clinicians, psychologists and doctors agreed to lower "Plaintiff's" medication doses over a period of months to a point in May 2015 when "Plaintiff" was able to begin managing "Plaintiff's" mental health diagnoses without the need of medication at all.

32. "Plaintiff's mental health diagnoses of "PTSD"; Severe Depression, Severe Anxiety; Flashbacks; and, Nightmares had subsided, until on or about June 2015, when Department of Correction (herein after "DOC") administrative officials classified and placed inmate/prisoner Vernon Thompson (herein after "inmate Thompson") in the **"RTU"** at "O.C.C.C.".

**DELIBERATE INDIFFERENCE; NEGLIGENCE; MENTAL ANQUISH; EMOTIONAL DISTRESS**

33. On or about June 2015 thru August 2015 "Plaintiff" on numerous occaisions reported to "Plaintiff's" mental health **"RTU"** clinicians (Ms. Vanessa Martino-Fleming; Ms. Amanda Pacheco; Ms. Erin Stuart; Ms. Shauna Smith; and, Ms. Mariah Hill) of "Plaintiff" being sexually targeted by "inmate

17

Thompson" whom Superintendant, Ms. Lisa Mitchell (herein after "Defendant Mitchell"); Deputy Superintendant, Mr. Michael Devine (herein after "Defendant Devine"); and, Captain, John F. Camelo (herein after "Defendant Camelo") housed next door to "Plaintiff" in cell #21 on the bottom tier of unit A-1 ("Plaintiff" was housed in cell #20 on the same tier, and right next door to "Inmate Thompson").

34. On or about June 2015 thru August 2015 "Plaintiff" particularly reported to mental health **"RTU"** clinicians (named above in para. #33) and psychiatric doctors of "inmate Thompson" repeatedly coming and returning to Plaintiff's" cell (#20) stating "I saw a fifty three (53) year old man lick a little baby girls pussy"; "I know an uncle who rapes his twelve (12) year old neice"; "I know three (3) brothers who rapes thier fifteen (15) year old sister"; "I know men who have sex with little boys and girls": "I like men who has sex with men"; etc...

35. On or about early August 2015 "Plaintiff" particularly reported to "Plaintiff's" own personal mental health clinician (Ms. Vanessa Martino-Fleming) -by way of one on on one mental health session- of "inmate Thompson" coming and repeatedly returning to "Plaintiff's cell stating "I don't know why you acting so tuff that's why you be having sex with other men".

18

36.    On or about August 2015 (in another of "Plaintiff's" one-
       on-one hour long mental health sessions) "Plaint iff reported
       to mental health "RTU" clinician (Ms. Vanessa Martino-
       Fleming) of "Plaintiff" having to tell "Inmate Thompson"
       three (3) times to "get out of my cell" after "Inmate
       Thompson" kept coming and repeatedly returning to
       "Plaintiff's" cell stating "I know you'll like having sex
       with me".

37.    Each received and reported complaint from "Plaintiff" of
       sexual harassment(s) and sexually il licit statements
       involving children (as set out above in para. #s 34, 35
       and 36) by "Inmate Thompson", mental health "RTU" clinicians
       (named above in para. #33) in-turn reported to "DOC"
       "O.C.C.C." administrative officials "Defendant Mitchell;
       "Defendant Devine, who is also "DOC" "O.C.C.C." **Prison Rape
       Elimination Act "Manager" (herein after "PREA" Manager)**;
       "Defendant Camelo", who is the Captain in charge of the
       mental health **Residential Treatment Unit in Unit A-1**; and,
       Neil Norcliffe (herein after "Defendant Norcliffe"), who is
       the Director of Mental Health at "O.C.C.C.": Weekly meetings
       are held every Monday, Wednesday and Friday between mental
       health **"RTU"** clinician/staff and "DOC" "O.C.C.C." officials,
       to discuss progress, goals and problems with **"RTU"** inmates.[1]

---

1.  **"RTU"** clinicians also reported, at these weekly meetings,
    "Plaintiff" not being the only **"RTU"** inmate complaining of
    receiving sexual statements from "Inmate Thompson"; minutes
    and separate **"RTU"** triange (minutes) document complaints
    being reported.

19

38.  "Defendant's Mitchell, Devine and Camelo" refused to
     follow, adher to, or, comply with Department of Correction
     rules, regulations, guidelines or procedural policies placed
     in **Sexually Abusive Prevention And Intervention Policy** set
     out in **"103 Department of Correction 519"** (herein after **"103
     DOC 519")** promulgated by way of **legislative grant of power**
     and emplemented through the **Final Rule of The Department of
     Justice** and the **Prison Rape Elimination Act Commission** -
     when they failed to report, investigate, or, document
     "Plaintiff" and mental health **"RTU"** clinicians (who is
     considered to be a "DOC" staff-person or contractor or
     volunteer) received and reported complaintis of sexual
     harassment(s) against "Plaintiff" (as set out above in para.
     **#s 33 thru 37).**

39.  "Defendant's Mitchell, Devine and Camelo" refused to adher
     to, follow, comply with Department of Correction rules,
     guidelines, or, procedural policies placed in **Sexually
     Abusive Behavior Prevention And Intervention Policy** set
     out in **"103 DOC 519"** promulgated by way of **legislative grant
     of power** and emplemented through the **Final Rule Of The
     Department Of Justice** and the **Prison Rape Elimination Act
     Commission** - when they failed to report, investigate,

                              20

document, or, **notify outside authority agencys of reported complaints of criminal sexual abuse involving children under the age of fifteen (15)** (as set out in para #34).

40. "Defendant's Mitchell, Devine and Camelo" refused to adher to, comply with, or, embrace **Prisons And Jails National Standards To Prevent, Detect, and, Respond to Prison Rape Under The Prison Rape Elimination Act ("PREA") (28 C.F.R. part 115, Docket No. OAG-131, RIN 1105-A B34 (May 17, 2012))** when they failed to report, investigate, and, document "Plaintiff" and mental health **"RTU"** clinicians' (named above in para. #33) -who is considered to be a "DOC" staff-person, or contractor or volunteer- received and reported complaints of sexual harassment(s) and sexual abuse involving children under the age of fifteen (15).

41. "Defendant's Mitchell, Devine and Camelo" refused to follow, adher to, comply with, or, embrace the standards set forth by the **National Prison Rape elimination Commission and The Americal Correctional Association For All State Correctional Jurisdictions** when they failed to document, report, or, investigate "Plaintiff" and mental health **"RTU"** clinicians (named above in para. #33) -who is considered to be a "DOC" staff-person, or contractor or volunteer- received and reported complaints of sexual harassment(s) against "Plaintiff".

21

**DELIBERATE INDIFFERENCE; NEGLIGENCE; MENTAL ANQUISH; EMOTIONAL DISTRESS**

42. By mid August 2015, an emotional and distraut "Plaintiff" informed mental health **"RTU"** clinicians (Ms. Vanessa Martino-Fleming, Ms. Amanda Pacheco, Ms. Shauna Smith and Ms. Mariah Hill), and, psychiatric doctors that "Inmate Thompson's" repeated and continuous sexual harassment(s) against "Plaintiff" and sexually illicit statements involving children (as set out above in para. **#s 33 thru 37**) was interfering with "Plaintiff's" mental health treatment, progress, goals and stability.

43. An emotional and distraut "Plaintiff" informed mental health **"RTU"** clinicians (named above in para. **#42**), and, psychiatric doctors of "Inmate Thompson's" repeated and continuous sexual harassment(s) against "Plaintiff" and sexually illicit statements involving children (as set out above in para. **#s 33 thru 37**) was beginning to cause "Plaintiff" reoccuring episodes of **"PTSD"; "Nightmares"; "flashbacks" (of being molested as a child); "anxiety", "Excessive Depression"; "Excessive Stress"; "Anger" and "fear".**

44. On numerous occaisions (between July 2015 and August 2015) "Plaintiff" pleaded with mental health **"RTU"** clinicians

named above in para. **#33**), mental health director "Defendant Norcliffe", and, "Defendant Camelo" to discontinue housing "Inmate Thompson" near "Plaintiff".

45. Although "Plaintiff's" pleas to Defendant's Norcliffe and Camelo" went ignored, attempts were made to protect "Plaintiff" from unlawful and unwanted sexual harassment(s) from "Inmate Thompson" by mental health **"RTU"** clinicians (named above in para. **#33**) who on numerous occaisions (between July 2015 and August 2015) would exercise the only authority afforded them by initiating a mental health **medical order** instructing Unit A-1 correctional officers (herein after "C/O") to remove "Inmate Thompson" from the A-1 **"RTU"** Unit and escort "Inmate Thompson" to "O.C.C.C." Hospital Security Unit (herein after "HSU"): "Inmate Thompson" would than be locked in a mental health secured cell (in seclusion from **all** inmate/prisoners at "O.C.C.C."); where "Inamte Thompson" would be housed/celled -in crisis- for up to three (3) to ten (10) days, on fifteen (15) minute (twenty four (24) hour) eye-ball watch until mental health **"RTU"** clinicians (named above in para. **#33**) could meet with "Defendant's Mitchell, Devine, Camelo and Norcliffe" to discuss and re-evaluate "Inmate Thompson's" status as an **"RTU"** inmate/prisoner.[2]

---

2. Only "DOC" "O.C.C.C. administrative officials has the authority to remove, place, or. house/cell inmate/prisoners; but, mental health **"RTU"** clinicians, can, **for mental health medical reasons,** order an inmate/prisoner celled on **crisis watch** for a specific period of time.

46.  Dispite "Plaintiff" and mental health **"RTU"** clinicians'
     (named above in para. **#33**) repeated requests to
     discontinue housing/celling "Inmate Thompson" in close
     proximity to "Plaintiff" "Defendant's Mitchell, Devine
     and Camelo" would, still, house/cell "Inmate Thompson"
     near "Plaintiff" where "Inmate Thompson" could continue
     sexually harassing "Plaintiff" and make sexually illicit
     statements involving children to "Plaintiff".

47.  Upon one of "Inmate Thompson's" returns from a **mental
     health medical ordered watch** "DOC" "O.C.C.C." administrative
     officials housed/celled "Inmate Thompson" on the same tier
     as "Plaintiff" and directly next door -again- in cell **#21**
     ("Plaintiff's" cell was cell **#20**).

48.  Upon another of "Inmate Thompson's" returns from a **mental
     health medical ordered watch** "DOC" "O.C.C.C." administrative
     officials housed/celled "Inmate Thompson" on the same tier
     as "Plaintiff" -but only- two (2) cells down in cell **#22**
     "Plaintiff's" cell was cell **#20**).

49.  On or about August 13 thru 16, 2015, upon another of
     "Inmate Thompson's" returns from a **mental health medical
     ordered watch** "DOC" "O.C.C.C." administrative officials
     **attempted** to house/cell "Inmate Thompson" on the same tier
     as "Plaintiff" and directly across cells in cell **#25**

-unitl "Plaintiff" went to the "C/O" desk, and complained to "C/O" Francisco- "C/O" Francisco in-turn made a phone call and "Inmate Thompson" was than housed/celled in cell **#27**, still, across cells but only two (2) cells down from "Plaintiff" -on the same tier again- and in very close proximity ("Plaintiff's" cell was cell **#20**) to sexually harass and make sexually illicit statements involving children (as set out above in para. **#s 33 thru 36**) to "Plaintiff".

50.  Although minutes, and, **"RTU"** triange minutes of meetings held three (3) times a week between mental health **"RTU"** clinicians and "DOC" "O.C.C.C." "Defendant's Mitchell, Devine, Camelo and Norcliffe"[1] will reflect mental health **"RTU"** clinicians (named above in para. **#33**) reporting "Plaintiff's" received complaints to "Defendant's Mitchell, Devine, Camelo and Norcliffe" - in August 2015 "Plaintiff" began making complaints of being sexually harassed and receiving sexually illicit statements involving children from "Inmate Thompson" directly to "DOC" "O.C.C.C." "C/O's" and administrative officials personally, and, documenting such reported complaints.

51.  On August 19, 2015, at approximately **6:30 P.M.** "Plaintiff" approached Unit **A-1** "C/O" Terry Moreland (herein after "C/O Moreland") and reported and complained that "while

25

["Plaintiff"] was laying down in "Plaintiff's" cell (**#20**)
watching t.v. "Inmate Thompson" began sexually harassing
"Plaintiff" and making sexually illicit statements involving
children".

52.     On August 19, 2015, at approximately **6:30 P.M.** "Plaintiff"
        reported and complained to unit **A-1** "C/O Moreland", that,
        "Inmate Thompson" came to "Plaintiff's" cell **#20** and stated
        "I can tell you like having sex with men, but you know what,
        I know this uncle who has sex with his fifteen (15) year old
        neice"; "and, Adam Parker's bitch ass rapped and killed a
        little girl, I better not ever catch Adam Parker's bitch ass
        around my children" - "Plaintiff" complained to unit **A-1**
        "C/O Moreland that "Inmate Thompson's" statements of sexual
        harassments and sexually illicit statements involving
        children and others was putting "Plaintiff" in fear, making
        "Plaintiff" angry, and, interfering with "Plaintiff's"
        mental health treatment, stability and goals; "plaintiff",
        further, demanded that "Plaintiff's" complaints be noted in
        an incident report.

53.     Upon receipt of reported complaints (stated above in para.
        **#s 51 and 52**) "C/O Moreland" approached "Inmate Thompson"
        who in-turn admitted to sexually harassing "Plaintiff";
        making sexually illicit statements involving children to
        "Plaintiff"; and, further, admitted making -untruthful-

                                26

statements involving Inmate Adam Parker (as set out above in para. #52).

54.   In light of all information set out above (in para. #s 51 thru 53) "C/O Moreland" wrote an incident report and referred the matter to Inner Perimiter Security (herein after "IPS") investigation correctional officer O'neil for investigation.

55.   On August 19, 2015, at approximately **7:00 P.M.**, "IPS" investigative "C/O O'neil" questioned "Plaintiff" in depth regarding "Inmate Thompson's" sexual harassment(s) and sexually illicit statements involving children.[3]

56.   During questioning, by "IPS" investigative "C/O O'neil", "Plaintiff" reported and complained that for the past six (6) or so months "Plaintiff" had been sexually harassed and received sexually illicit statement involving children (as set out above in para. **#s 33** thru **36, 46, 51** and **52**) on a daily basis from "Inmate Thompson".

57.   "Plaintiff", further, complained and reported to "IPS" investigative "C/O O'neil", that the sexual harassment(s) and sexually illicit statements involving children from

---

3. Inmate Adam Parker was escorted to new-man area lock-up and questioned by "IPS" investigative "C/O O'neil" in depth also (See: Exhibit **#16** - **Affidavit Of Adam Parker**).

"Inmate Thompson" was negatively affecting "Plaintiff's" mental health, and, was causing "Plaintiff" undue and reacuring symptoms of **"PTSD"; "Nightmares"** (of being raped and molested as a child); **"Flashbacks"** (of being raped and molested as a child); **"Anger"** (towards "Inmate Thompson"); and, **"Bad Spiritual Vibes"**.

58. "Plaintiff", further, informed "IPS" investigative "C/O O'neil" of "DOC" "O.C.C.C." administrative officials' failure to prevent "Inmate Thompson" from unlawful and unwanted sexual harassment(s) (as set out in para. **#s 33 thru 36, 46, 51 and 52**) against "Plaintiff".

59. "Plaintiff", further, informed "IPS" investigative "C/O O'neil" of "DOC" "O.C.C.C." administrative officials' failure to protect "Plaintiff" from unlawful and unwanted sexual harassment(s) by "Inmate Thompson" (as set out above in para. **#s 33 thru 36, 46, 51 and 52**).

60. On August 19, 2015, at approximately **8:00 P.M.**, "IPS" investigative "C/O O'neil" questioned "Inmate Thompson", and, under questioning, "Inmate Thompson" admitted sexually harassing "Plaintiff" and making sexually illicit statements involving children to "Plaintiff" (as set out above in para. **#s 33 thru 36, 46, 51 and 52**).

61. On August 19, 2015, as a result of "Inmate Thompson's" admitting sexually harassing "Plaintiff", "IPS" investigative "C/O O'neil" placed in effect a **Keep-A-Way Order** instructing all "DOC" "O.C.C.C." employees, contractors and volunteers that "Inmate Thompson" was to be **kept-a-way** from "Plaintiff" at all times.[4]

62. Dispite "Inmate Thompson's" admitting sexually harassing "Plaintiff" (as set out above in para. **#s 33 thru 36, 46, 51 and 52**) "DOC" "O.C.C.C." administrative "Defendants Mitchell, Devine and Camelo" refused to follow, adher to, comply with, or, embrace **"103 DOC 519 etc. seq.''Sexually Abusive Behavior Prevention And Intervention Policys''General Procedures"** as set out in policy.

63. As a result of "IPS" investigative "C/O O'neil's" **Keep-A-Way Order** being put in place and information obtained from "Plaintiff" and investigative reports (as set out above in para. **#s 33 thru 37, 42 thru 44 and 51 thru 61**); on or about August 21, 2015, mental health **"RTU"** clinicians emplemented the only other authority they posessed to protect "Plaintiff" (and others) from unlawful and unwanted sexual harassment(s), and reccommended, referred, and, had "Inmate Thompson" transferred to the Bridgewater State Hospital for psychiatric treatment and evaluations.

---

4. "IPS" investigative "C/O O'neil" placed in effect a **Keep-A-Way Order** keeping "Inmate Thompson" away from Inmate Adam Parker also, on the same date and time.

## FALSE "PREA" ALLIGATIONS; DELIBERATE INDIFFERENCE; NEGLIGENCE MENTAL ANQUISH; EMOTIONAL DISTRESS

64. Based on information obtained from "Defendant Camelo" on or about September 2015, and, prior to "Inmate Thompson's" departure to the Bridgewater State Hospital; in retaliation for "Plaintiff" reporting the sexual harassment(s) and sexually illicit statements and abuse to children (as set out above in para. #s 33 thru 37, 42 thru 44 and 51 thru 61), "Defendant's Mitchell, Devine, Camelo and Norcliffe" allowed "Inmate Thompson" to provide knowingly false "PREA" alligations against "Plaintiff" and another inmate/prisoner Alex Cruz (herein after "Inmate Cruz").

65. On August 26, 2015, "Plaintiff" was instructed to report to new-man lock-up area, where "Plaintiff" was than detained/ locked-up and interrogated by "DOC" "O.C.C.C." "PREA" investigative "C/O Silva", relating to a "PREA" report falsely claiming "Inmate Cruz" was sexually abusing "Plaintiff".

66. On August 26, 2015, while under such interrogation and questioning "Plaintiff" was forced to answer crudely indecent, vulgar, false and deflamatory questions concerning incidents of sex between "Plaintiff" and "Inmate Cruz".

67. On August 26, 2015, following interrogation by "PREA"
    investigative "C/O Silva", "Plaintiff" was forced to
    undergo a medical and mental health examination by
    medical and mental health staff.[5]

68. On August 26, 2015, "Plaintiff" was forced to meet with
    mental health LICSW Daniel Bradley and nurse "Julie" "Per
    DOC Crisis Referral related to a "PREA" Report" (See
    Exhibit #s 2 and 3) where "Plaintiff" was forced to answer
    more crudely indecent, vulgar, false and inflamatory
    questions concerning incidents of sex between "Plaintiff"
    and "Inmate Cruz".[6]

69. During questioning on August 26, 2015 by mental health
    LICSW Daniel Bradley, "Plaintiff" made it clear to mental
    health LICSW Daniel Bradley "Plaintiff's" mental and
    emotional frustrations, anger and stress at being forced
    to undergo such examinations and processes based on false
    alligations (See: Exhibit #s 2 and 3 - **Mental Health LICSW
    Daniel Bradley's Progress Notes/Mental Health Evaluation**).

---

5.  "Plaintiff" was told by "PREA" investigative "IPS" "C/O
    Silva" that "Plaintiff" would not be allowed to leave,
    and, would continue to be detained/locked-up, until
    "Plaintiff" participated in such medical and mental health
    examinations.

6.  "Inmate Cruz" was seen, also, on the same date by mental
    health LICSW Daniel Bradley (See: Exhibit #22 - **2pages**).

70. On August 26, 2015, upon meeting nurse "Julie",
    "Plaintiff" refused to allow nurse "Julie" to Physically
    examine "Plaintiff", and, "Plaintiff" emotionally and
    angrily made it clear to nurse "Julie" of the sexual
    abuse alligations being false; to which nurse "Julie"
    responded by stating "I have to follow "PREA" protocol".

71. Following August 26, 2015 mental health and medical
    examinations, "Plaintiff" was finally released to return
    back to the **Residential Treatment Unit (A-1)** to the same
    cell (**#20**) that "Plaintiff" was housed in prior to such
    "PREA" processes taking place.[7]

72. On August 26, 2015, upon returning back to the **Mental Health
    Residential Treatment Unit (A-1)**, "Plaintiff" approached the
    daily **"RTU"** officers ("C/O Francisco, Moore, and, Bochman"),
    who are trained to watch and observe **"RTU"** inmate/prisoners;
    "Plaintiff" inquired if they were aware or had been informed
    regarding sexual alligations of abuse involving "Plaintiff"
    and "Inmate Cruz" - to which all responded "NO" and that
    "the first [they] heard of such alligations were from you"
    ["Plaintiff"].

73. On August 27, 2015, "Plaintiff" went to the mental health
    **"RTU"** clinicians' office and explained the processes (set

---

7. "Inmate Cruz" was allowed to return back to his original cell
   (**#22**) also - two cells down from "Plaintiff".

forth in para. **#s 65 thru 72)** "Plaintiff" was forced to undergo, "Plaintiff" specifically spoke with "Plaintiff's" mental health **"RTU"** clinician (Ms. Vanessa Martino-Fleming) of mental and emotional thought of knowing the processes (set out above in para. **#s 65 thru 71)** "Plaintiff" had been subjected to was supose to have happened when "Plaintiff" was raped and sexually abused as a child.

74.     On August 27, 2015, mental health **"RTU"** clinicians (named above in para. **#33)** responded by telling "Plaintiff" that no-one had informed them that such was going to take place and that they were just "as surprised when they came to work that morning and read in the Inmate Management System (herein after "IMS") the sexual abuse alligations between "Plaintiff" and "Inmate Cruz".

75.     On August 28, 2015 "Plaintiff" took the false "PREA" alligations and investigative concerns to **"RTU"** Unit A-1 "Defendant Camelo", who, replied by telling "Plaintiff" "don't lose any sleep over it"; "Plaintiff" replied by telling "Defendant Camelo", "I've already lost sleep over being put through such process".

76.     On or about August 30, 2015, "Plaintiff" approached **"RTU"** Unit A-1 "Defendant Camelo" again and inquired about who would present such false sexual alligations against

"Plaintiff" and why; "Defendant Camelo" responded by telling "Plaintiff" that "Inmate Thompson" was the person who provided the false "PREA" alligations against "Plaintiff" (that led to the "PREA" investigation taking place) and "Defendant Camelo" assured "Plaintiff" that "Inmate Thompson" would not return back to "O.C.C.C." from Bridgewater State Hospital, as long as "Plaintiff" was housed at "O.C.C.C.".

77. On August 26, 2015, "Plaitntiff" wrote a letter to "DOC" "O.C.C.C." "Defendant's Mitchell and Deputy Superintendant Of Security, Bower" requesting all information, reports, letters, documents, pictures and referrals related to the August 26, 2015 "PREA" investigation that took place against "Plaintiff" (See: Exhibit #1 -Pages 2 thru 4- Letter To "Defendant's Mitchell and Bower").

78. In such August 26, corresspondence to "Defendant's Mitchell and Bower", "Plaintiff" demanded "that the person who falsified and frabricated the "PREA" alligations that led to the "PREA" investigation taking place be **criminally prosecuted** for falsifying information under the **Prison Rape Elimination Act** (See: Exhibit #1 -Pages 3 and 4- Letter To "Defendant's Mitchell and Bower").

79. On or about September 1, 2015, a response from "Defendant Bower" informed "Plaintiff" that "Plaintiff" had "not been

named in any "PREA" investigation initiated on or about the date of August 26, 2015" (See: Exhibit **#1 Page 1-** "Defendant Bower's" Response).

## UNDOCUMENTED "PREA" INVESTIGATION; MENTAL ANQUISH; NEGLIGENCE EMOTIONAL DISTRESS

**80.** Had it not been for mental health LICSW Daniel Bradley's mental health evaluation report, which documented "Plaintiff" having to be examined by Bradley "Per DOC Referral related To A "PREA" Report" (See: Exhibit **#s 2** and **3** - **Mental Health LICSW Daniel Bradley's Mental Health Evaluation Report**), "Plaintiff" would not have been able to prove that "Defendant's Mitchell, Devine, Bower, camelo and Norcliffe" had ordered and allowed "Plaintiff" to be placed in an undocumented "PREA" investigation that was contrary to (and did not comform) to the requirements set forth in **103 DOC 519 Sexually Abusive Behavior Prevention And Intervention Policy.**

**81.** The actions of Defendant's Mitchell, Devine, Bower and Camelo" in ordering and allowing "Plaintiff" to be subjected to crudely and vulgar and false and inflamatory questioning, mental health and medical examinations, under the **Prison Rape Elimination Act** harmed "Plaintiff" psychologically and mentally, and, as noted by mental

35

health psychologists, psychiatrists and clinicians brought "brought back **Flashbacks, Nightmares, Recurrent Intense Thoughts and Paranois, Stress, Anxiety, Depression and Relapse of Symptoms of PTSD".**

### SUBSTANTIAL RISK OF HARM; DELIBERATE INDIFFERENCE; NEGLIGENCE VIOLATION INMATE CONFLICT POLICY "103 DOC 426"

82. There was an August 19, 2015 **Keep-A-Way Order** in place.

83. Mental Health **"RTU"** clinicians (named above in para. **#33**) saw reason to protect "Plaintiff" (and others) by having "Inmate Thompson" transferred from "O.C.C.C." to the Bridgewater State Hospital.

84. "Defendant Camelo" assured "Plaintiff" (on or about August 30, 2015 that "Inmate Thompson" would not be returning to "O.C.C.C." as long as "Plaintiff" was housed at "O.C.C.C.".

85. There was a risk of harm for "Plaintiff's" safety by not keeping "Plaintiff" and "Inmate Thompson" separated.[8]

86. Mental health **"RTU"** clinicians (named above in para. **#33**) "expressed thier concerns [to "Defendant's Mitchell, Devine, Camelo and Norcliffe"] for ["Plaintiff"] and ["Inmate Thompson's"] safety... [also] expressed on previous case

---

8. There was a risk of harm to "Inmate Thompson's" safety also.

conferences concerns with not separating ["Plaintiff"] and ["Inmate Thompson"] by institutions" (See: Exhibit **#69** - **Mental Health Progress Notes/Evaluation**).

86. Dispite being aware of risks of harm, safety concerns, and, potential dangers (set out above in para. **#s 82** thru **86**), on or about September 24, 2015, "Defendant's Mitchell, Devine, Camelo and Norcliffe" acted with deliberate indifference and negligence towards "Plaintiff" when they allowed "Inmate Thompson" to be transferred back to "O.C.C.C." from the Bridgewater State Hospital.

87. On September 24, 2015, "Plaintiff" discovered that "Inmate Thompson" had arrived at "O.C.C.C."; was in booking area of the facility; and, was to be housed -again- in the A-1 **"RTU"** Unit, and, on the same tier but only three (3) cells down from "Plaintiff" in cell **#17** ("Plaintiff's" cell was cell **#20**).

88. On September 24, 2015, upon discovering information set out above in para. **#87**, "Plaintiff" immediately sought out "Defendant Camelo" and informed "Defendant Camelo" of mental health risks of harm, safety concerns, and, potential dangers that was likely to result from "Inmate Thompson" being housed at "O.C.C.C." with "Plaintiff".

89.  On September 24, 2015, "Defendant Camelo" resonded by
     telling "Plaintiff" that "Inmate Thompson" could not be
     housed at any other facility due to enemy situations, and
     that, "O.C.C.C." was the only facility "Inmate Thompson"
     could be housed at.

90.  On September 24, 2015, inmate/prisoners Randy Williams,
     Adam Parker, James Murphy, Alex Cruz and Danilo Lopes (all
     **"RTU"** inmate/prisoners) along with "Plaintiff" -together-
     took thier concerns (about safety issues of harm with
     "Inmate Thompson" being housed at the same facility as
     "PLaintiff") directly to mental health **"RTU"** clinicians
     Ms. Vanessa Martino-Fleming and Ms. Mariah Hill.[9]

91.  On September 24, 2015, inmate/prisoners Randy Williams,
     Adam Parker, James Murphy, Alex Cruz, Danilo Lopes and
     "Plaintiff" informed mental health **"RTU"** clinicians (named
     above in para. **#90**) specifically about the safety and
     potential danger that would eventually result from
     housing "Inmate Thompson" not only near "Plaintiff", but,
     around or near any of them.

---

9.  After "Defendant Camelo" failed to acknowledge the potential
    dangers. These inmate/prisoners convinced "Plaintiff" to
    support and accompany them in addressing the situation
    to **"RTU"** mental health staff.

92. On September 24, 2015, after listening to the concerns of inmate/prisoners Randy Williams, Adam Parker, James Murphy, Alex Cruz, Danilo Lopes and "Plaintiff", mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming got directly on the phone and informed "Defendant Camelo" of the existing safety and danger concerns with housing "Inmate Thompson" at "O.C.C.C." while "Plaintiff" was being housed at that facility.

### RETALIATION; UNLAWFUL SECLUSION

93. On September 24, 2015, seconds after mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming ended her call to "Defendant Camel", "Defendant Camelo" ordered Leutenant Cunhia to remove -ONLY- "Plaintiff" from the mental health **"RTU"** office and escort "Plaintiff" to new-man area lock-up where "Plaintiff" was detained and escorted to "Plaintiff's' cell and placed on Awaiting Action Status lock-up for "appropriately reporting frustration and anger (within appropriate limits) with climate issues and with being placed on A.A as a result" (See: Exhibit **#64 - Mental Health Progress Notes of Mental Health Clinician Daniel P. Bradley).**

94. "Plaintiff" remained unlawfully locked in, and fed, in cell contrary to **"103 CMR 430** without the initiation of any disciplinary processes to follow.

95. As a result of such unlawful, illegal, and constitutional violations set forth in para. #s 33 thru 94, on or about September 24, 2015, "Plaintiff" filed grievance #83803 (See: Exhibit #4 - **Grievance**) requesting 1. Criminal and disciplinary action be brought against person ("Inmate Thompson") for providing false information that resulted in... "Plaintiff" being traumatized: 2. That "Inmate Thompson" be kept away from... "Plaintiff"; 3. That "Plaintiff" immediately be taken off [lock-up] Awaiting Action Status; 4. That all documents, reports, referrals related to August 26, 2015 "PREA" incident be immediately provided to "Plaintiff"; and, 5. That any funds or good time or job position... lost as a result of matter be restored and reimbursed.

96. On or about October 1, 2015 Grievance Officer, Leutenant Hank L. Lavalley (herein after "Defendant Lavalley") rendered a decision in grievance #83803 (Exh. #4) stating, "your grievance is partially approved - this issue with "Inmate Thompson" is being handled administratively" (See: Exhibit #5 - **"Defendant Lavalley's" Written Response To Grievance #83803**).

97. As a result of "Plaintiff" not receiving any of the documents requested (in ref. to Exhibit #4, pg. #6, remedy para. #4) and "Defendant Lavalley" not specifying what part

what part of grievance **#83803** was "partially approved",
"Plaintiff" approached "Defendant Lavalley" and inquired
into what parts of grievance **#83803** was actually approved
and what parts were not.

**INTIMITATION; VIOLATION M.G.L. c. 127 §32 etc. seq.**

98.  "Defendant Lavalley" responded by yelling and screaming at
     "Plaintiff" the following, "who the fuck are you to question
     me"?, "I told you the shit was being handled administratively",
     "now get the fuck out of here"; "Defendant Lavalley", than,
     slammed the window of upper control in "Plaintiff's" face.[10]

99.  On or about October 2, 2015, "Plaintiff" appealed "Defendant
     Lavalley's" decision in grievance **#83803** to "Defendant
     Mitchell" (See: Exhibit **#6** - **"Plaintiff's Appeal In
     Grievance #83803**).

100. In such appeal "Plaintiff" noted that **a:** "The decision...
     provided [did] not state what parts of grievance remedy was
     partially approved"; **b:** The reports, documents, referrals
     and investigative information had not been provided to
     ["Plaintiff"]; and, **c:** "Inmate Thompson" had not been
     criminally or disciplinarily charged for presenting false
     "PREA" alligations against ["Plaintiff"]" (See: Exhibit **#6** -
     **"Plaintiff's" Appeal In Grievance #83803**)

---

10. This reponse was witnessed by inmate/prisoner Adam Parker.

41

102.    On or about October 27, 2015, "Defendant Mitchell" rendered
        a decision in grievance #83803 appeal that simply stated
        "Denied. Not entitled to information requested." (See:
        Exhibit #6 - **Decision By Superintendant "Defendant
        Mitchell"**).

**DELIBERATE INDIFFERENCE; VIOLATION INMATE CONFLICT POLICY 103 DOC 426;
NEGLIGENCE**

103.    On September 25, 2015, "Plaintiff" wrote directly to
        "Defendant Mitchell" requesting that as a result of risks
        of harm and potential dangers of victimization and sexual
        harassment(s) that "Inmate Thompson" "not be housed near
        or around... ["Plaintiff"] (See: Exhibit **#11 - September
        25, 2015 Corresspondence From "Plaintiff" To "Defendant
        Mitchell"**). [11]

104.    On or about September 30, 2015, "Plaintiff" received a
        reply, to such September 25, 2015 corresspondence referred
        to above in para. **#103**, from "Defendant Mitchell" which
        stated that "Plaintiff's" "alligations against Vernon
        Thompson have been reviewed and will be addressed pursuant
        to **103 DOC 426 Inmate Conflict Policy**" (See: Exhibit **#11
        (pg. #1) - "Defendant Mitchell's Reply**).

_____

11. Corresspondence also addressed the fact, that, out of atleast
    five (5) other inmate/prisoners addressing thier fears and
    "uncomfortability regarding "Inmate Thompson". "Plaintiff"
    was the only one placed on Awaiting Action Status Lock-up.

105. On or about September 27, 2015, "Plaintiff" was notified to report to new-man area lock-up; upon arrival "Plaintiff" was met by "IPS" Sgt. Butler and Ltn. Cotton, who informed "Plaintiff" "that "Defendant Mitchell" had instructed them to speak with "Plaintiff" and inform "Plaintiff" that because of enemy situations throughout the prison system "Inmate Thompson" could not be housed at any other facility except "O.C.C.C.".

106. During such September 27, 2015 conversation (between "Plaintiff" and "IPS" Sgt. Butler and Ltn. Cotton) "Plaintiff" informed both "IPS" Sgt. Butler and Ltn. Cotton that as a result of sexual harassment(s), risks of harm, and, fear "Plaintiff" "did not want "Inmate Thompson" housed near or around "Plaintiff".

107. On or about September 29, 2015, "IPS" Sgt. Butler sought out "Plaintiff" while "Plaintiff" was working (in the main-line kitchen) and requested that "Plaintiff" speak with him ("IPS" Sgt. Butler) alone in the main dinning hall area.

108. Upon arrival to the main dinning hall area (alone with Sgt. Butler) "IPS" Sgt. Butler -again- reiterated to "Plaintiff" the fact of "O.C.C.C." being the only facility "DOC" could house "Inmate Thompson" at; "IPS" Sgt. Butler assured "Plaintiff" that "although "Inmate Thompson" would be

**43**

housed at "O.C.C.C." "Inmate Thompson" would not be housed in the same unit as "Plaintiff" or **have any contact with "Plaintiff"**.[12]

109. Dispite being notified by **"RTU"** mental health team staff of concerns with "Inmate Thompson" and "Plaintiff's" safety; "Defendant's Mitchell, Devine, Camelo and Norcliffe" on or about October 1, 2015 released "Inmate Thompson" to the general population at "O.C.C.C." knowing "Inmate Thompson" would have direct contact with "Plaintiff".

110. Dispite being aware of "Plaintiff's" mental health backround, and, being notified by "Plaintiff" of concerns with "Inmate Thompson" sexually harassing , traumatizing and victimizing "Plaintiff"; "Defendant's Mitchell, Devine, Camelo and Norcliffe" on or about October 1, 2015 allowed "Inmate Thompson" to be released to the general population at "O.C.C.C." knowing "Inmate Thompson" would have direct contact with "Plaintiff".

111. Dispite objections from mental health **"RTU"** clinicians and "Plaintiff" to releasing "Inmate Thompson" to the general population at "O.C.C.C." with "Plaintiff", on or about

12. Since "Inmate Thompson's" Sept. 24, 2015 arrival back to "O.C.C.C."; mental health **"RTU"** clinicians had ordered "Inmate Thompson housed in "HSU" on mental health ordered lock-up status in fear of safty concerns between "Inmate Thompson" and "Plaintiff".

October 1, 2015, "Defendant's Mitchell, Devine, Camelo and Norcliffe" came to a decision and released "Inmate Thompson" to the general population at "O.C.C.C." knowing "Inmate Thompson" would have direct contact with "Plaintiff".

112. Dispite knowing "Inmate Thompson's" institutional history and backround, and, dispite objections from **"RTU"** mental health clinicians (who put "Defendant's" on notice of "Inmate Thompson's" mental health backround) "Defendant's Mitchell, Devine, Camelo and Norcliffe" released "Inmate Thompson" to the general population at "O.C.C.C." with "Plaintiff" knowing safety and risk concerns existed.

113. On or about October 2015, and prior to "Inmate Thompson's" release to general population at "O.C.C.C.", "Defendant's Mitchell and Devine" authorized "Defendant Camelo" to draft a memo and place a copy of such memo in units **A-1** and **A-2** security control booths, instucting units **A-1** and **A-2** correctional officers that "Inmate Thompson" was not to be allowed to come in contact with "Plaintiff" for no reason at all. [13]

---

13. The memo was signed by Captain "Defendant Camelo" and it also instructed that prior to any medication being dispensed "Inmate Thompson" was to be escorted to retrieve his medication first, and, after "Inmate Thompson" was escorted back to unit **A-2;** than, units **A-1** and **A-2** were to be released together for medcatioh call". The memo instructed that "Inmate Thompson" be kept away from "Plaintiff".

114. Although such memo (mentioned above in para. **#113**) was posted in units **A-1** and **A-2** security control booths, administrative "Defendant's Mitchell, Devine, Camelo and Norcliffe, still, allowed "Inmate Thompson" to make contact with "Plaintiff" and sexually harass "Plaintiff".

115. Dispite what the memo (mentioned above in para. **#113**) ordered[13], "Inmate Thompson" was still allowed to make it a point to come in direct contact with "Plaintiff" and not be disciplinarily held accountable for it; contact was made **in the medication line; at medication time; and, in the dinning hall (breakfast, lunch and dinner).**

116. during one of "Plaintiff's" (mid October 2015) one-on-one weekly mental health sessions with **"RTU"** mental health clinician Ms. Vanessa Martino-Fleming, "Plaintiff" addressed the issue of "Inmate Thompson" going out of "Inmate Thompson's" way to make "Plaintiff" acknowledge "Inmate Thompson"; **"RTU"** mental health clinician Ms. Vanessa Martino-Fleming documented such reports.

**VIDEO RECORDING INCIDENT OF "PLAINTIFF" BEING SEXUALLY HARASSED CONTINUOUSLY; PHYSICALLY ASSAULTED WITH FOLK; NEGLIGENCE**

117. On October 24, 2015, while "Plaintiff" was in the dinning hall eating dinner "Inmate Thompson" made it a point to leave the dinner table (where "Inmate Thompson" was sitting)

46

and walk over to a table where "Plaintiff" was eating (such incident is documented by video recording of dinning hall cameras).

118.   Upon "Inmate Thompson's" arrival, "Plaintiff" immediately got the attention of "C/O Moreland" and requested that "C/O Moreland escort "Inmate Thompson" back to the table "Inmate Thompson" was sitting at.[14]

119.   "Inmate Thompson" refused several direct orders from "C/O Moreland" to return to the seat and table "Inmate Thompson" was originally sitting at (no disciplinary reports was issued to "Inmate Thompson" for refusing several direct orders to return to the seat "Inmate Thompson" was originnaly sitting at).

120.   "C/O Moreland" than ordered "Inmate Thompson" to leave the dinning hall; upon being instructed to leave the dinning hall, "Inmate Thompson" bacame angry and began to sexually harass "Plaintiff" by yelling throughout the dinning hall (in front of other inmate/prisoners, and, in front of "C/O Moreland and other posted "C/O's" also) sexual obsenities at "Plaintiff" along with stating "I had you  falsely investigated for three men sucking on your nipples", etc...

---

14. "C/O Moreland" occaisionally worked unit A-1, and, was aware of the contents of the memo (mentioned above in para. #113) posted in units A-1 and A-2 security control booths; that notified all "DOC" staff that "Inmate Thompson" was not to have any contact with "Plaintiff".

121.    Upon being sexually harassed and receiving sexual
        accusations and obsenities, in a dinning hall full of
        other inmate/prisoners and "C/O's", "Plaintiff" jumped
        out of "Plaintiff's" seat and approached "Inmate
        Thompson".

122.    Upon "Plaintiff" approaching "Inmate Thompson", "Inmate
        Thompson" threw his hands in the air in an aggressive
        manner taking an aggressive stance and a physical
        altercation occurred with "Inmate Thompson"; in which
        "Plaintiff", upon acknowledging bleeding from a stab
        wound received with a folk from "Inmate Thompson",
        "Plaintiff" knocked "Inmate Thompson" to the ground and
        last thing "Plaintiff" remembered was seeing alot of
        blood coming from "Plaintiff's" hand and stepping on
        "Inmate Thompson" over and over again while thinking and
        remembering being raped and sexually abused as a child.

123.    On October 24, 2015, and, directly following the
        altercation (set out above in para. #s 117 thru 122) with
        "Inmate Thompson", "Plaintiff" was rushed to the "HSU"/
        infirmary where "Plaintiff" received three or more
        surtures to the palm of "Plaintiff's" right hand - to
        close the stab wound "Plaintiff" received from "Inmate
        Thompson".

## DELIBERATE INDIFFERENCE; MENTAL ANQUISH; EMOTIONAL DISTRESS

124.    After receiving sutures, and, directly as a result of all
        the stress, depression, flashbacks, anxiety, nightmares
        and PTSD symptoms that reaccured directly relating to
        para. #s 33 thru 123 above, "Plaintiff" was cuffed and
        escorted to a single cell in "HSU" stripped of all
        "Plaintiff's" clothing, placed in a turtle suite and
        "Plaintiff" was kept on mental health crisis medically
        ordered fifteen (15) minute watch; at which time "Plaintiff"
        refused to eat or speak to anyone , or, take required
        insulin or other needed heart and other medication for days.

125.    An October 24, 2015 medical report documents "Plaintiff"
        being "involved in a physical altercation in chow hall"
        with "Inmate Thompson"; and, further, notes "Plaintiff"
        "presents with deep (approx 2-3 mm) laceration to palm...
        ["Plaintiff"] placed on 15 min - around the clock- mental
        health watch RN Jeremy Perry called to suture lac on palm,
        laceration 4-5 mm deep, laceration sutured at 6:30 P.M.".

126.    On or about October 27, 2015, "Plaintiff" was hand-cuffed,
        taken out of such crisis watch single cell, and, escorted
        to a room in "HSU" with a window in the wall with cell
        bars separating thr room from another room; in the other
        sat "Defendant Devine".

127.   A conversation with "Defendant Devine" resulted in
       "Defendant Devine" telling "Plaintiff" that once
       "Plaintiff" was medically released from such mental
       health crisis watch status, "Plaintiff" would be going
       to segregation unit where "Plaintiff" would serve
       segregation time for fighting with "Inmate Thompson".

128.   On October 27, 2015, upon "Plaintiff" informing "Defendant
       Devine" that video recording, other inmate/prisoners, and,
       "C/O's" (who were present in the dinning hall) being able
       to present evidence of "Plaintiff" minding "Plaintiff's"
       own business and trying to eat his food when "Inmate
       Thompson" began sexually harassing and screaming sexual
       harassment statements at "Plaintiff" throughout the
       dinning hall; "Defendant Devine" stated in return, that,
       "upon ["Plaintiff"] being medically released from mental
       health crisis watch you ["Plaintiff"] will be held
       accountable for your actions against vernon" [meaning
       "Inmate Thompson"].

129.   On October 27, 2015, upon "Plaintiff" requesting that
       "Defendant Devine" hold "Inmate Thompson" accountable
       for providing false "PREA" alligations against "Plaintiff";
       for continuous sexual harassment(s) against "Plaintiff",
       "Defendant Devine" responded "Vernon [meaning "Inmate
       Thompson"] is mentally ill".

130.    On October 27, 2015, "Plaintiff" requested that he
        ["PLaintiff"] be provided all documents related and
        pertaining to the August 26, 2015 "PREA" investigation
        that took place against "Plaintiff" "so that I
        ["Plaintiff"] could pursue criminal action against
        "Inmate Thompson" in a court of law (for providing false
        "PREA" alligations against "Plaintiff"); "Defendant
        Devine" responded by stating "No documents exist".

131.    On or about October 30, 2015, as a result of "Plaintiff"
        finally eating, speaking, and, taking required insulin and
        heart and other medications mental health psychiatric team
        released "Plaintiff" from mental health crisis watch
        status in the "HSU".

132.    On or about October 30, 2015, upon mental health
        psychiatric team medically releasing "Plaintiff" from
        crisis watch status, "Plaintiff" was cuffed, shackled
        and escorted directly to segregation unit.

133.    Upon "Plaintiff's" October 30, 2015 arrival to segregation
        unit "Plaintiff" was issued Disciplinary Report #350398
        which charged "Plaintiff" with being "involved in a
        physical altercation with "Inmate Thompson" along with

an outrageous abundance of other offenses" (See: Exhibit
**#8 - Disciplinary Report And Charges In #350398).**[15]

**VIOLATION DUE PROCESS**

134.    Upon receipt of Disciplinary Report **#350398**, "Plaintiff"
        immediately sought out representation from Harvard Prison
        Legal Assistance Project (herein after "Harvard PLAP")
        student attorneys; who, will decide to represent inmate/
        prisoners in certain disciplinary matters.

135.    On November 23, 2015, "Plaintiff" was visited by Ms. Kathryn
        Yukervich and Mihal Ansik, student attorneys from "Harvard
        PLAP", who, after hearing the unusual chain of events (set
        out above in para. **#s 22 thru 134**) decided that "Plaintiff"
        was in fact a situation in need of "Harvard PLAP's"
        assistance; and, Ms. Kathryn Yukervich agreed to
        represent "Plaintiff" in Disciplinary Report **#350398** (See:
        Exhibit **#33 - Client Services Agreement Between "Harvard
        PLAP's" Ms. Kathryn Yukervich And "Plaintiff")**

136.    The first step "Harvard PLAP" student attorney Ms. Kathryn
        Yukervich took in representing "Plaintiff" was to file a
        **Motion For Dismissal;** the second step, was to **Motion For**

_____

15.    The same reporting officer who wrote Disciplinary Report
       **#350398**, also wrote "Inmate Thompson" a disciplinary report
       for fighting as well; but, "Inmate Thompson" was never sent
       to segregation.

consolidation of all charges; and, the third step, was to move for **Discovery** (in re. to **Wolf v. McDonnel 418 U.S. 539 (1974)** (See: Exhibit #34 - **Consolidation Motion For Dismissal, Motion For Discovery: Filed By Ms. Kathryn Yukervich**).

137. As a result of Disciplinary Officer Sgt. Christopher Anderson's refusal to confirm, with "Harvard PLAP's" student attorney Ms. Kathryn Yukervich, a date and time for her to appear at a disciplinary hearing to represent "Plaintiff"; on January 5, 2016, "Harvard PLAP" student attorney Ms. Yukervich requested that "the subject disciplinary report either be dismissed, or, in the alternative administratively closed" (See: Exhibit #58 - **Via E-Mail Corresspondence From "Harvard PLAP" S/A Ms. Yukervich To Disciplinary Officer Anderson**).

138. On or about January 27, 2016, Disciplinary Officer Anderson E-Mailed "Harvard PLAP" student attorney Yukervich stating that he [Disciplinary Officer Anderson] "was working on discovery" relating to disciplinary report #350398 (See: Exhibit #71 - **Corresspondence From "Harvard PLAP" Student Attorney Yukervich To "Plaintiff"**).

139. A February 10, 2016 phone conversation between "Plaintiff" and "Harvard PLAP" student attorney Ms. Yukervich resulted

53

in Ms. Yukervich explaining to "Plaintiff" that she
[Ms. Yukervich] "provided Disciplinary Officer Anderson
nine (9) separate hearing dates in which Disciplinary
Officer Anderson failed to confirm even one date" (while
all the dates had come and gone).

140.  "O.C.C.C." administrative officials/"Defendant's" have
refused to provide "Plaintiff" a disciplinary hearing in
disciplinary report #350398 as law requires.

## UNLAWFUL DEPRIVATION OF EARNED GOOD-TIME CREDITS VIOLATION M.G.L. c. 127 §129D

141.  Although "Plaintiff" have not been found guilty in
disciplinary report #350398, "Defendant's Mitchell, Devine,
Camelo and Norcliffe" have still authorized a deduction
of five (5) days from "Plaintiff's" sentence for the
month of October 2015 (in the program catagory) without
a dsiciplinary sanction being imposed, and, contrary to
"Plaintiff" participating in **"RTU"** programing in October
2015.

142.  On November 17, 2015 "Plaintiff" addressed corresspondence
directly to Department Of Correction Commissioner, Ms.
Carol Higgins-O'Brien (herein after "Defendant Higgins-
O'Brien"), "Plaintiff" appealed to "Defendant Higgins-
O'Brien" for an investigation by "DOC" Internal Affairs

Unit into the unlawful and illegal actions by top ecelon officials ("Defendant's Mitchell, Devine, Camelo and Norcliffe") at "O.C.C.C."; "Plaintiff", further, requested that "Defendant Higgins-O'Brien dismiss disciplinary report #350398, or, in the alternative pursuant to **"103 CMR 430.06"** appoint a Special Disciplinary Hearing Officer to hear and oversee disciplinary matters in disciplinary report #350398 (See: Exhibit **#13 - Corresspondence From "Plaintiff" To "Defendant Higgins-O'Brien")**.

143. Dispite **"103 Commonwealth Massaachusetts Rule 430.06"** Inmate Disciplinary Regulation requiring the Commissioner Of Correction to appoint a **Special Hearing Officer** "to oversee any disciplinary matter or class of disciplinary matter (See: Exhibit **#75 - "103 CMR 430" Inmate Discipline**); a November 24, 2015 response from Director Of Communications Mr. Christopher Fallon (herein after "Defendant Fallon"), contrary to **"103 CMR 430.06"** Inmate Discipline regulations stated "the superintendent ["Defendant Mitchell"] is the appellate authority... and as such his/her decision is final" (See: Exhibit **#23 - "Defendant Fallon's" Responsive Corresspondence**).

144. "Plaintiff", again, on December 2, 2015, directed a second corresspondence to "Defendant Higgins-O'Brien" noting administrative at "O.C.C.C." refusing to document a "PREA"

invesatigation held against "Plaintiff"; thier failure
to initiate a "PREA" investigation in "Plaintiff's" behalf
(into alligations of sexual harassments administratives
knew to be true); thier refusal to notify outside
authorities of sexual abuse against children under the age
of fifteen (15); and, "Plaintiff" requested again, that
"Plaintiff's" concerns be forwarded to Internal Affairs
for investigation (See: Exhibit **#24 - "Plaintiff's"
December 2, 2015 Corresspondence To "Defendant Higgins-
O'Brien).**

145.    "Plaintiff's" December 2, 2015 corresspondence to
"Defendant Higgins-O'Brien" was rerouted and sent to
"Defendant Mitchell" for response; on January 11, 2016,
"Defendant Mitchell" responded by telling "Plaintiff"
that she ["Defendant Mitchell"] reviewed "Plaintiff's"
concerns and that "the incidents ["Plaintiff"]
referrenced in ["Plaintiff's"] corresspondence were
properly addressed..."; "Defendant Mitchell's" response
also informed "Plaintiff" that due to mental health issues
and "subsequent transfer of... ["Inmate Thompson"] to
Bridgewater State Hospital, no disciplinary action was
warrented against "Inmate Thompson" (See: Exhibit **#61 -
"Defendant Mitchell's" Response**).[16]

---

16. Corresspondence addressed to the Commisioner Of Correction
    requesting an investigation into "Defendant Mitchell's
    actions, is rerouted to "Defdnant Mitchell" to issue a
    response.

**146.** On September 1, 2015, during a one on one mental health weekly session with mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming, "Plaintiff" reported to mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming that the August 26, 2015 "PREA" investigation incident had "brought back many uncomfortable traumatic memories" and "anxiety that accompanied the ["PREA" investigation] incident" (See: Exhibit **#62 - Mental Health Progress Notes Of LMHC Ms. Vanessa Martino-Fleming).**

**147.** On September 1, 2015, during a one on one weekly mental health session with mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming, "Plaintiff" informed mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming that the August 26, 2015 "PREA" investigation incident had also severely "frustrated" "Plaintiff" by the way in which the "PREA" incident "was handled by security" to the point of "feeling like the devil was after him ["Plaintiff"]" (See: Exhibit **#62 - Mental Health Progress Noted Of LMHC Ms. Vanessa Martino-Fleming).**

**148.** Between September 2015 and October 2015, mental health **"RTU"** clinicians at "O.C.C.C." made it "abundantly clear to "DOC" "Defendant's Mitchell, Devine, Camelo and Norcliffe" "Plaintiff's" concerns with the return of "Inmate Thompson" back to "O.C.C.C.; thier belief that distraction techniques and problem solving thought patterns... not to appear likely

to lead to understanding which will contribute to improve mood and disposition of "Plaintiff"; and, thier clinical opinion of safety and risk concerns with housing "Plaintiff" and "Inmate Thompson" in the same facility altogether".

## MENTAL ANQUISH; EMOTIONAL DISTRESS

**149.** On or about September 25, 2015 and October 5, 2015, mental health **"RTU"** clinician Ms. Vanessa Martino-Fleming initiated a referral to "inform psychiatry" to examine "Plaintiff" for a need to prescribe psychiatric medication again (See: Exhibit **#65 - Mental Health Progress Notes Of LMHC Ms. Vanessa Martino-Fleming).**

**150.** On or about October 20, 2015, "Plaintiff" was seen and examined by psychiatric doctor Mr. Nagaraj Uddhandi who started "Plaintiff" on psychiatric medication **Tegretol** for reoccurances of "flashbacks"; "mood and irritation"; "Plaintiff", was also started on psychiatric medication **Prozasin** for "nightmares", Dr. Uddhandi, also, noted in medical notes "event ["PREA"]... aggrivating his "Plaintiff's"] PTSD symptoms further".

**151.** On October 20, 2015, Dr. Nagaraj Uddhandi noted "patient ["Plaintiff"] talks about another inmate [referring to "Inmate Thompson"] has been anoying by talking about sexual stuff that brought back his ["Plaintiff's"] childhood

memories"; "Plaintiff" "is getting frustrated, irritable, reoccurent flashbacks, nightmares"; "Plaintiff" is also frustrated about "DOC" "not giving him ["Plaintiff"] recent "PREA" investigation documents".

152.  Mental health Dr. Nagaraj Uddhandi also documents in an October 20, 2015 medical mental health report, that "recent event [referring to "PREA" incident]... was aggrivating ["Plaintiff's"] PTSD symptoms further".

153.  Between October 24, 2015 and November 2015, thoughts of the "PREA" investigation incident and sexual harassment(s) (as set out above in para. #s 33 thru 37 and 51 thru 52) caused "Plaintiff" severe reoccurances of "stress", "flashbacks", and, "nightmares" to the point that "Plaintiff" began to have nightmares of being raped and molested as a child causing "Plaintiff" to ejaculate on "Plaintiff's" self two (2) to three (3) times in one night while sleeping.

154.  A November 27, 2015 medical report, written by RN Ms. Darlene Rodriguez, documents a 5:30 A.M. mental health crisis situation being called so that "Plaintiff" could be removed from cell #20 and taken to "HSU" where "Plaintiff" could be able to clean "Plaintiff's" self and "Plaintiff's" underwear without "Plaintiff's" cell/room-mate watching on. [17]

17. Between Oct. 24 and Nov. 27, 2015 a mental health referral was submitted by M/H **"RTU"** clinician Ms. Martino-Fleming, to "Defendant Norcliffe", requesting "Defendant Norcliffe" provide "Plaintiff" a single cell order as a result of the ejaculation problem.

155. On November 27, 2015, as a result of such mental health crisis situation being called (at 5:30 A.M.) "Plaintiff" was forced to explain "Plaintiff's" rape and molestation history, and, wet dream episodes to a leutenant (Barrett) and another (Sargent) that was present.[18]

## RETALIATION

156. In retaliation for "Plaintiff" initiating a 5:30 A.M. November 27, 2015 crisis situation, "Plaintiff" was ordered locked in "HSU" in seclusion under the discuise of a mental health fifteen (15) minute around the clock mental health crisis eye-ball watch for six (6) straight days - constantly being told that there was no where to house "Plaintiff" until "Defendant Norcliffe" could review "Plaintiff's" mental health medical records and make a determination for a medically ordered single cell.[19]

157. On or about November 3, 2015, "Plaintiff" was told that if "Plaintiff" would agree to be housed in the same cell (#20) with the same cell/room-mate, "Plaintiff" would be taken off mental health fifteen (15) minute around the clock eye-ball watch; which "Plaintiff" was forced to agree just to be released from such status.

18. "Plaintiff was forced to provide medical/mental health information protected under PIPA laws.

19. Although fifteen minute around the clock mental health eye-ball watch is basically reserved for those prisoners at high risk to harm self or others, "Plaintiff's" situation did not fit those catagories of harm.

158.    Once released from such mental health ordered fifteen (15)
        minute around the clock crisis eye-ball watch/**seclusion**
        status, "Plaintiff" returned to unit **A-1** to cell **#20** with
        cell/room-mate Anthony Fowler, who, by "Defendant's Camelo,
        Devine, Mitchell and Norcliffe's" negligence "Plaintiff"
        was forced to explain "Plaintiff's" rape and molestation
        mental health history (to inmate Fowler), so that inmate
        Fowler would understand the reasons "Plaintiff" needed to
        wake up and clean and change underwear and sheets in the
        middle of the night.[18]

159.    Once released from such mental health ordered fifteen (15)
        minute around the clock crisis eye-ball watch/**seclusion**,
        "Plaintiff" returned to unit **A-1** and filed grievance
        **#85348** (See: Exhibit **#26 - Medical/Mental Health Grievance**);
        requesting a medical single cell order and need.

160.    Such December 4, 2015 medical grievance (**#85348**) noted the
        that upon "Plaintiff's" return back to unit **A-1**, unit **A-1**
        consisted of two (2) empty cells; these cells were empty
        during the whole time "Plaintiff" was locked-up under the
        discuise/unlawful **seclusion** of a mental health crisis
        watch, constantly being told that there was no place to
        house "Plaintiff" until a determination could be made by
        "Defendant Norcliffe" to approve "Plaintiff" for a single
        cell order and need.

                                    61

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;
## INSTITUTIONAL SEXUAL HARASSMENT

**161.** Once released from such mental health ordered fifteen (15) minute around the clock crisis eye-ball watch, and, upon the discovery of unit **A-1** containing two (2) empty cells; "Plaintiff" questioned unit **A-1** "C/O Stephen Olivera regarding how long the two (2) cells had been empty.

**162.** Upon the receiving questions regarding the two (2) empty cells, "C/O Olivera" asked "Plaintiff" "why do you ["PLaintiff"] care about the two (2) cells?"; "Plaintiff" responded by telling "C/O Olivera" that "Plaintiff" **"did not feel comfortable** with living in a cell with another inmate/prisoner and waking up from uncontrollable wet dreams of semen in the middle of the night, having to wash and clean self and underwear.

**163.** "C/O Olivera" waited, until "Plaintiff" left unit **A-1** to report to work; "C/O Olivera" than, under the instructions of "Defendant Camelo", drafted an incident report falsely claiming "Plaintiff" made a statement relating to having sexual intercourse with "Plaintiff's" cell/room-mate, and, totally different than what "Plaintiff" originally stated in para. **#162** above to "C/O Olivera".[20]

---

20. What exactly was written in the incident report, or, referral to initiate a second "PREA" investigation against "Plaintiff" was kept hidden and secret; and, never devulged to "Plaintiff" upon request.

164. "Defendant Camelo" took such false information and initiated another, second, "PREA" investigation against "Plaintiff".

165. "Plaintiff" was sought out in the kitchen where "Plaintiff" worked, by "IPS" "PREA" investigation "C/O Silva", and escorted to new-man area lock-up where "Plaintiff" was questioned and interrogated by "IPS" "PREA" investigation officers "C/O Silva and Morton".

166. During questioning and interrogation, "Plaintiff" reported to "PREA" investigative "IPS" "C/O Silva and Morton" exactly what "Plaintiff" stated to "C/O Olivera"; which was quote "as a result of being put through the August 26, 2015 "PREA" incident I am experiencing waking up from with uncontrollable wet dreams of semen which makes me **uncomfortable** with having to wake in the middle of the night washingmyself - my underwear and having to change mu underwear with my cell/room-mate being in the cell/room looking on" unquote.

167. "Plaintiff" was once again, forced to receive an examination by mental health clinician Todd Derbyshire (herein after "Defendant Derbyshire").

168. Dispite "Plaintiff's objections, "Plaintiff" was forced to meet with "Defendant Derbyshire" on December 3, 2015, who,

refused to accept "Plaintiff's" quoted version (as stated above in para. **#166** and noted in para. **#s 153** and **162**) and orderewd "Plaintiff" forcefully put on mental health crisis eye-ball watch/**unlawful seclusion** in segregation unit.

164. Upon arrival to segregation unit, on December 3, 2015, "Plaintiff" was placed in a cell and a "C/O" sat outside "Plaintiff's" cell for twenty four (24) hours watching "Plaintiff's" every move.

165. "Plaintiff" filed grievance **#85437** to document mental health forced crisis order being used as an **unlawful forced seclusion** (See: Exhibit **#45 - Grievance #85437**).

166. Upon arrival to segregation unit "Plaintiff" requested to be allowed to make a phone call to the **Boston Area Rape Crisis Center** (herein after **"BARCC"**) hotline **#844-774-7732** and or **#617-492-6434** which is an approved Department of Correction **"Sexual Abuse Confidential Support Services Hotline"**, where inmate/prisoners are suppose to be allowed to call outside victim advocates for emotional support services related to past or present sexual abuse or harassment(s) (See: Exhibit **#32 - "DOC" "BARCC" "PREA" Hotline Memo**)

167. Upon "Plaintiff" presenting the **"Sexual Abuse Victim Confidential Hotline"** numbers to "C/O Scott Steever (herein After "Defendant Steever") for calling, "Defendant Steever" came with the phone, but, told "Plaintiff" that "Defendant Camelo" had instructed "Defendant Steever" not to allow "Plaintiff" to call the **"BARCC"** hotline numbers provided in the "DOC" "BARCC" "PREA" memo; but, if "Plaintiff" wanted to make a call, "Plaintiff" would have to call an entirely different number provided by "Defendant Camelo".

168. "Plaintiff" argued the point with "Defendant Steever" about the numbers "Plaintiff" held was the actual numbers from the "DOC" "BARCC" "PREA" memo; "Plaintiff" also argued the point that "Plaintiff" should be allowed to call any numbers "Plaintiff" wished, seeing that "Plaintiff" was not in segregation for disciplinary reasons, and, was not restricted from phone calling.

169. According to "Defendant Steever", per order of captain/ "Defendant Camelo", "Plaintiff" could **only** call the number provided by "Defendant Camelo"; which turned out to be a number not answered on the receiving end.

170. "Plaintiff" filed grievance **#85374** as a result of "C/O Olivera writing an incident report misquoting and falsifying

what "Plaintiff" stated to "C/O Olivera"; "Plaintiff" requested as a remedy in said grievance that **a:** "Plaintiff" be provided with a copy of all reports and documents relating to said incident, and, **b:** that administratives "Please stop... sexually harassing me" (See: Exhibit **#27 - Grievance #85374**).

171. On or about December 6, 2015, "Plaintiff" received a decision in grievance **#85374**, where grievance officer Mark S. Fogaren denied the grievance in the "C/O Olivera" matter stating "this office does not have the authority to release any reports or records to you - **please have your attorney submit a written request to the Old colony Correctional Center asking that your records be released regarding this incident**" (See: Exhibit **#27 Page #1**- Institutional Grievance Officer Mark S. Gogaren's Decision).

172. On December 15, 2015, "Plaintiff" took up an appeal in grievance **#85374**, in such appeal "Plaintiff" made note of the fact that "the reports/records/documents relates directly to "Plaintiff" that a "C/O" wrote and "Plaintiff" should be allowed to know what was said about "Plaintiff" by a "C/O" that led to "Plaintiff" being questioned and investigated under "PREA"; "Plaintiff", also, made note of the fact that grievance Officer Mark S. Fogaren's decision did not assure that the sexual harassment(s)

against "Plaintiff" was going to stop. (See: Exhibit **#28** **-Page #1 of 2- "Plaintiff's" Appeal In Grievance #85374).**

173.    On December 17, 2015, "Defendant Mitchell" rendered a decision in grievance appeal #85374 that simply stated "Appeal denied." (See: Exhibit **#28 -Page #2 of 2- "Defendant Mitchell's" Response To Grievance Appeal #85374).**

174.    In reference to "Defendant's Steever and Camelo" refusing to allow "Plaintiff" to call/access a "DOC" approved "BARCC" "PREA" Hotline number (on December 3, 2015) "Plaintiff" filed grievance #85375, requesting as a remedy that "Plaintiff" "be allowed to access phones as law requires without interruptions" and that "officials at "O.C.C.C."... stop negatively targeting ["Plaintiff"] for false sexual illicit alligations" (See: Exhibit **#29 - Grievance #85375).**

## VIOLATION 103 CMR 482

175.    On December 30, 2015 (over twenty days past the lawful date to issue a response) "Plaintiff" received a decision in grievance #85375, from grievance officer Mark S. Fogaren, denying grievance #85375 stating "you were allowed access in accordance with **103 CMR 482** however the numbers you provided could not be verified - you were given a number that had been verified and you made one attempt to contact

that party in question but you were unsuccessful" (See: Exhibit #29 -Page 1 of 4- **Grievance Officer Mark S. Fogaren's Decision In Grievance #85375**).

176. On December 31, 2015, "Plaintiff" filed an appeal in grievance #85375, in such appeal "Plaintiff" provided a copy of the "DOC" internal "BARCC" "PREA" Hotline memo emplemented to **all "DOC" staff** directly by **Mr. Raymond Marchilli, Jr. Acting "PREA" Coordinator** for the "DOC" on July 27, 2015 (See: Exhibit **#32 - Sexual abuse Confidential Support Services Hotline Memo Containing The Numbers "Plaintiff" wished To Call**); "Plaintiff", further, a: made note of the fact that the numbers "Plaintiff" wanted to call had already been verified in the memo; **b:** "Plaintiff", also, made not of the fact that "Plaintiff" did not ask for the number "Plaintiff" was given and forced to call; "Plaintiff", also, made note of the fact that "Plaintiff" was not in segregation on segregation status and "should have been allowed to call any numbers that "Plaintiff" wished to call" (See: Exhibit **#30 -Page #3 of 3- Plaintiff's" Appeal In Grievance #85375**).

177. In such December 31, 2015 appeal in grievance #85375, "Plaintiff", also, warned "Defendant's" that a Federal Judge will soon be overseeing all grievance situations and decisions (See: Exhibit **#30 -Page 3 of 3- "Plaintiff's"**

178. On November 18, 2015, as a direct result of sustaining the right hand/palm stab wound injury (in the altercation with "Inmate Thompson"), "Plaintiff" suffered the effects of having to take an **AIDS/HIV** test administered by withdrawing blood with a needle; which caused "Plaintiff" two (2) weeks of emotional distress and mental anguish awaiting the return of **AIDS/HIV** test results (See: Exhibit **#73** – **Diagnostic HIV Laboratory Test Results**).

179. From on or about October 24, 2015 thru the filing of said complaint, "Plaintiff" began to experience continuous numbing, pain, weakness and loss of power in "Plaintiff's" right hand; such pain extended up the bottom part of "Plaintiff's" right wrist and lower forearm, directly as a result of the injury "Plaintiff" sustained in the altercation on October 24, 2015 with "Inmate Thompson".

180. The injury "Plaintiff" sustained on October 24, 2015, in the altercation with "Inmate Thompson", prevented and prevents "Plaintiff" from shaking hands, completing work tasks, writing letters, sleeping, working out and lifting objects.

**NEGLIGENCE; MENTAL ANQUISH; EMOTIONAL DISTRESS**

181. On or about February 17, 2016, mediacl reports document "Plaintiff" being prescribed additional medication **Tegretol** to eleviate nerve pain in "Plaintiff's" right hand; the direct cause of the nerve pain was caused by the stab wound/injury sustained in the altercation with "Inmate Thompson" on October 24, 2015.

182. On or about February 17, 2016, medical reports document "Plaintiff" being prescribed an order of physical therapy to eleviate nerve pain in "Plaintiff's" right hand; the direct cause of the nerve pain was the stab wound/injury sustained in the altercation with "Inmate Thompson" on October 24, 2015.

183. On March 9, 2016, medical reports document "Plaintiff" being seen (on "Plaintiff's" first physical therapy visit) by physical therapists, at "O.C.C.C.", who ordered "Plaintiff" receive a regiment of physical therapy exercises accompanied with ultrasound.

184. On March 24th, April 7th, April 14th, May 5th, May 12th and May 26 of 2016, "Plaintiff" was seen (again) by physical therapists at "O.C.C.C."; who, began "Plaintiff" on regiments of physical therapy exercises to relieve nerve

pain in "Plaintiff's" right hand; additionally followed by a regiment of ultrasound therapy, further ordering "Plaintiff" receive additional physical therapy appointments of exercises and ultrasound therapy to relieve nerve pain in "Plaintiff's" right hand that was directly caused as a result of receiving a stab wound/injury in the altercation with "Inmate Thompson" on October 24, 2015.

185.    The physical therapy exercises caused "Plaintiff" to suffer physical, emotional and mental pain.

186.    Medical and physical therapy reports document "Plaintiff" receiving a stab wound/injury that required sutures to "Plaintiff's" right hand, sustained in the altercation with "Inmate Thompson" on October 24, 2015; that, has caused "Plaintiff" continuous nerve pain/numbing of the palm, loss of energy and power to the right hand and lower right arm.

187.    As of the filing of said complaint, "Plaintiff" still experience physical pain, weakness in the right hand, loss of power in the right hand, and, difficulty with writing letters, pain when shaking hands with others and using "Plaintiff's" right hand to lift heavy objects.

188.    Psychiatric, medical, and, physical therapy reports

documents "Defendant's Mitchell, Devine, Camelo and Norcliffe's" failure to protect "Plaintiff" from sexual harassment(s), physical assaults, existing safety and danger concerns (as set out above in para. #s 33 thru 37, 42 thru 44, 46 thru 71, 81 thru 92, 103 thru 125, 146 thru 155, 178 thru 187) was contrary to law and "Plaintiff's" mental health and rape (as a child) history; and such, psychologically traumatized "Plaintiff" causing reoccurances of PTSD, flashbacks, nightmares, etc....

189.   The actions of "Defendant's Mitchell, Devine, Camelo, Norcliffe, Fallon, Derbyshire, Lavalley, Leon, Steever, Bower" (as set out in para. #s 33 thru 188) caused "Plaintiff" so much emotional distress, depression, mental anquish, stress and physical pain that special approval to prescribe a psychiatric medication had to be sought.

190.   Psychiatric reports document that on or about December 4, 2015 and March 2016 , "Plaintiff" was started on psychiatric medications **Geodon** "for relapse of psychiatric symptoms"; **Clonodine** "for relapse of anxiety" (which was later increased); and, **Tegretol** "for nerve pain to the right hand/palm.

**VIOLATION 103 CMR 157; CORI VIOLATIONS; CONSPIRACY TO DEPRIVE FEDERAL AND STATE CONSTITUTIONAL RIGHTS OR PRIVILEDGES**

191.   **The Department of Justices Final Rule Of The Prison Rape**

Elimination Act "requires that state entities that are responsible for investigating alligations of sexual abuse in adult prisons, ..., ..., and... follow thier own protocols", referring to "DOC" **Sexually Abusive Behavior Prevention And Intervention Policy "103 DOC 519"**, "in meeting it's own specific obligations of following, and, **documenting** of all incidents of sexual abusive behavior".

192.    On or about August 26, 2015 (as set out above in para. **#77**) "Plaintiff" requested that "Defendant's Mitchell and Bower" forward "Plaintiff" a copy of all information, reports, letters, documents, pictures, referrals, etc... related and pertaining to the August 26, 2015 "PREA" investigation that took place against "Plaintiff" (See: Exhibit **#1 -Pages 2 thru 4- Corresspondence To Def's Mitchell And Bower**).

193.    On or about September 1, 2015 (as set out above in para. **#79**) "Plaintiff" received a response from "Defendant Bower" falsely indicating that "Plaintiff" had "not been named in any "PREA" investigation initiated on or about that date of August 26, 2015" (See: Exhibit **#1 -Page #1- "Defendant Bower's Response**).

194.    On or about October 27, 2015, upon "Plaintiff" requesting from "Defendant Devine" (as set out above in para. **#130**)

to be provided a copy of **all** documents related and
pertaining to the August 26, 2015 "PREA" investigation
involving "Plaintiff"; "Defendant Devine", stated "No
documents exist".

195.    On or about October 12, 2015 "Plaintiff" submitted a
Criminal Offender Record Information (herein after **CORI**)
request/application to Correctional Program Officer
(herein after "CPO") Ms. Ashley Renshaw, requesting that
"O.C.C.C." records department turn over **all** information
on file related and pertaining to the August 26, 2015
"PREA" investigation conducted against "Plaintiff".

196.    As a result of "O.C.C.C." records departments refusal to
acknowledge "Plaintiff's" October 12, 2015 "CORI" request
(as set out above in para. **#195**) "Plaintiff" filed a second
"CORI" application/request directly to records department
stipulating such was in accordance with **Massachusetts**
**General Law** (herein after **"M.G.L."**) and the **Freedom Of**
**Information Act** (See: Exhibit **#15** -**Page #1**-).

197.    As a result of "O.C.C.C." records departments refusal to
acknowledge "Plaintiff's" second November 3, 2015 "CORI"
request (as set out above in para. **#196**) "Plaintiff" filed
grievance **#84990** requesting "that "Plaintiff" be formally
processed and provided information, or, in the alternative

"Plaintiff" receive a written response to why ["Plaintiff"] was being denied to view six-part records" (See: Exhibit #15 -Page #1- Inmate Grievance Form #84990).

198.    Although grievance records indicate "Defendant Lavalley" received and processed grievance #84990, as a result of "Defendant Lavalley's" failure to render a decision in grievance #84990 within the required ten (10) days as grievance guidelines/rules/regulations dictate; on December 8, 2015, "Plaintiff" filed an appeal in grievance #84990 requesting "Plaintiff" receive a written response as to why "Plaintiff" was being ignored and denied "CORI" sis-part records/folder information (See: Exhibit #37 - Inmate Grievance Appeal In #84990).

199.    In addition (by request and signed releases of "Plaintiff") "Harvard PLAP" student attorney Ms. Kathryn Yukervich, also, submitted necessary documents/written requests to "O.C.C.C." asking that "Plaintiff's" records [reports, referrals, documents, etc...] regarding and pertaining to the August 26, 2015 "PREA" investigation conducted against "Plaintiff" be released regarding that incident, to "Harvard PLAP" student attorney Ms. Kathryn Yukervich (See: Exhibit #77).[20]

---

20. Although "Plaintiff" was told by Grievance Officer Mark S. Fogaren, that the only way "Plaintiff" could receive "any reports or records" was by "having your attorney submit a written request to the Old Colony Correctional Center asking that your records be released REGARDING THIS INCIDENT"; the records were never released (See: Exhibit #27 -Page #1- Grievance Officer Fogaren's Decision)

**200.** "O.C.C.C." Records Manager, Ms. Marta Leon (herein after "Defendant Leon") and "Defendant's Mitchell, Devine, and, Camelo" entered into a conspiracy to unlawfully deprive "Plaintiff" and "Plaintiff's" attorney of legally entitled information, documents, reports, records, etc...; when they refused to forward to "Plaintiff" or "Harvard PLAP" student attorney Ms. Kathryn Yukervich reports, documents, records, referrals, waivers, case numbers, etc..., requested under law and by law (See: Exhibit #77 - **Written Request/"CORI To "O.C.C.C." From "Harvard PLAP" Student Attorney Ms. Kathryn Yukervich;** See: Exhibit #15 - **"Plaintiff's" Application To Review Evaluative Information/"CORI").** [20]

**201.** "O.C.C.C." Records Manager "Defendant Leon" and "Defendant's Mitchell, Devine and Camelo" entered into a conspiracy when they agreed to remove, contain, conceal or unlawfully kept in thier possession any records from the room where they are usually kept, or, altered, defaced, mutilated or destroyed such reports, records, documents, referrals, waivers, case numbers, etc...; when they told "Plaintiff" such reports, records, waivers, documents, referrals, case numbers, etc... were "non existent" after removing such from "Plaintiff's" institutional files prior to granting "Plaintiff" permission to inspect such institutional files on or about December 4, 2015 (See: Exhibit #38 -

Corresspondence From "Defendant Mitchell" Granting "Plaintiff" Permission To Inspect Institutional Files).

202. On or about December 2015, "Plaintiff" met with "Defendant Leon" to inspect such institutional file, and, prior to such inspection taking place "Plaintiff" informed "Defendantr Leon" that "Plaintiff" wished to view and inspect **all** material related and pertaining to:

   a. The name of the reporting officer who originally received a "PREA" alligation that led up to the August 26, 2015 "PREA" investigation involving "Plaintiff";

   b. All referrals to and from "IPS", "HSU", mental health, "DOC" "PREA" Coordinator, Deputy Commissioner, "O.C.C.C." Superintendent, "O.C.C.C." Deputy Superintendent, or, other "DOC" officials/staff involving "Plaintiff" related and pertaining to August 26, 2015 "PREA" investigation;

   c. All waivers signed by "Plaintiff" involving "Inmate Thompson";

   d. Case numbers related and pertaining to August 26, 2015 "PREA" investigation involving "Plaintiff";

e. Case numbers of **all** investigations conducted by
   "IPS" involving "Plaintiff" and "Inmate Thompson";

f. **all** memos involving "Plaintiff" and "Inmate
   Thompson";

g. **All** Keep-A-Way Orders involving "Plaintiff" and
   "Inmate Thompson";

h. The names/identity of **all** "DOC" staff persons or
   contractors or volunteers who wrote/filed incident
   reports involving "Plaintiff" and "Inmate Thompson";

i. The names/identity of **all** "DOC" staff persons or
   contractors or volunteers who made/filed any
   referrals to "IPS", "HSU", mental health, "O.C.C.C."
   "PREA" Manager, "O.C.C.C." Superintendent, "O.C.C.C."
   Deputy Superintendent, or, other "DOC" officials
   that involved "Plaintiff" and "Inmate Thompson", or,
   that involved the August 26, 2015 "PREA" alligation
   and investigation against "Plaintiff";

to which "Defendant Leon" informed "Plaintiff" that "no
such records, reports, referrals, documents, waivers, case
numbers, etc... exist" (See: Exhibit **#46 - 12-14-15**
**Corresspondence To Defdnant Leon**).

203.    On or about December 2015, "Plaintiff" met with "Defendant

        Leon" to inspect such institutional files, and, prior to

        such inspection taking place, "Plaintiff" informed

        "Defendant Leon" that "Plaintiff" wished to view and

        inspect **all** materials relating and pertaining to

        paragraphs **a.** thru **i** (as set out above in para. **#202**)

        held/contained in the Inmate Management System (herein

        after "IMS"); to which "Defendant Leon" informed "Plaintiff"

        that "no such records, reports, waivers, documents,

        referrals, etc... existed in the "IMS"" (See: Exhibit **#46 -**

        **12-14-15 Corresspondence To "Defendant Leon"**).


204.    On or about December 2015, "Plaintiff" was granted a

        lawful opportunity to view Criminal Offender Records

        Information and "DOC" Evaluative Information, and, to

        inspect "Plaintiff's" sis-part records files; at which

        time "Plaintiff" discovered that "Defendant's Leon, Devine,

        Mitchell, and Camelo" had conspired and unlawfully removed

        or destroyed **all** records, reports, documents, waivers,

        case numbers, referrals, etc... sought in para. **#202** and

        **#203** above) from "Plaintiff's" "DOC" institutional files

        in an attempt to unlawfully deprive "Plaintiff" of sought

        after lawful information.


205.  The actions and ommissions of "Defendant's Mitchell, Devine,

        Camelo, Norcliffe, Derbyshire, Lavalley, Leon, Steever,


                              78

Bower, Higgins-O'Brien and Turco" (as set out above in para. #s 33 thru 204) caused "Plaintiff" to contemplate suicide.

206. On or about April 2016, "Plaintiff's" "Harvard PLAP" student attorney Ms. Kathryn Yukervich sent corresspondence to "O.C.C.C." disciplinary officer (Anderson) requesting that "Plaintiff" be provided a disciplinary hearing in disciplinary report #350398.

207. As a result of "Plaintiff's" "Harvard PLAP" student attorney (Ms. Kathryn Yukervich) not receiving a response from "O.C.C.C." disciplinary officer (Anderson), on April 22, 2016, "Plaintiff" approached "O.C.C.C." disciplinary officer (Anderson) and requested that "PLaintiff" be provided a disciplinary hearing in disciplinary report #350398; at which time, "O.C.C.C." disciplinary officer (Anderson) informed "Plaintiff" that he ("O.C.C.C." disciplinary officer Anderson) would get back to "Plaintiff" regarding the matter.

208. On or about May 4, 2016, "Plaintiff" was informed, formally and in writing, that, disciplinary report #350398 had been dismissed against "Plaintiff". (See: Exhibit #35 -Page #2- Dismissal Of Disciplinary Report #350398)

209.    On or about May 6, 2016, "Plaitniff" filed two grievances,
        an institutional grievance and a medical grievance,
        requesting that the earned good-time credits of five (5)
        days be provided to "Plaintiff"; that was with-held as a
        result of the incident referred to in disciplinary report
        #350398.

210.    On May 16, 2016, "O.C.C.C." institutional grievance
        officer (Fogaren) denied grievance #88650 and reccommended
        "Plaintiff" write to "DOC" Central Records Unit - Data
        Computation Unit for the five (5) days earned good-time
        that was with-held as a result of the incident referred to
        in disciplinary report #350398 (See: Exhibit #81 -
        **Institutional Grievance Decision In #88650**)

211.    On May 19, 2016, "Plaintiff" filed an appeal in grievance
        #88650 to the superintendent (who was now Joseph Murphy),
        requesting the earned good-time of five (5) days be
        provided (See: Exhibit #82 - **Appeal In Grievance #88650**).

212.    On May 19, 2016, "Plaintiff" forwarded grievance #88650
        to "DOC" Central Records Unit - Data Computation Unit,
        att: Ms. Janice Hebert, 50 Maple Street, Milford,
        Massachusetts 01757, requesting that the five (5) days
        earned good-time be provided (See: Exhibit #83 -
        **Corresspondence To Ms. Hebert**).

213.    "Plaintiff" lost earned good time for the month of
        November 2015; and, pay for the month of November, as
        a result of "Defendant's" actions or omissions as set
        out in para. **#s 33** thru **212** above.

214.    Psychiatric reports document that on or about June 14,
        2016, another special approval was sought by, and granted
        to, mental health psychiatric Dr. Nagaraj Uddhandi to
        increase "Plaintiff's" doses (a second time) for
        psychiatric medication **Geodon** (from sixty (60) m.g. doses
        to eighty (80) m.g. doses); to combat relapse of psychiatric
        symptoms, occuring as a direct result of actions, and/or,
        omissions of "Defendant's" as set out above in para. **#s 33**
        thru **213.**

215.    The side effects from taking the medication **Geodon** causes
        "Plaintiff" continuous tensing of the muscles, clenched
        jaws, drwsiness, constant shaking, and, cloudy memory and
        poor concentration.

216.    Medical records and psychiatric reports document that on
        or about June 28, 2016 a second medical/mental health
        **"Request For Reasonable Accommodations"** was sought by, and
        granted to, "Plaintiff's" mental health clinician (Ms.
        Vanessa Martino-Fleming) to renew "Plaintiff's" prescribed
        medical/mental health single cell status for an additional

six (6) month period; so that "Plaintiff" could continue
to appropriately address "Plaintiff's" continued ejaculation
and wet dream/nightmare problems (as set out above in para.
#s153 thru 154) that had reoccured as a direct result of
"Defendant's" actions and omissions directly related to
"PREA" incidents (as set out above in para. #s 33 thru 36,
42, 43, 51 thru 73, 80, 81, 103 thru 125, 161 thru 170).[21]

217.    Medical records and reports document that on or about July
1, 2016 "Plaintiff" was prescribed a prescription of
**Ibuprophen** for the sole purpose of combating pain in
"Plaintiff's" right hand; such pain was, and is, the direct
result of sustaining a stab wound/injury on October 24,
2015 from "Inmate Thompson".

218.    On July 14, 2016 "Plaintiff" was seen, again, by physical
therapy and underwent excessive physical therapy exercises
and ultrasound treatments (to "Plaintiff's" right hand) to
combat diagnosed nerve pain in "Plaintiff's" right hand,
that is directly related and caused to the stab/injury
wound sustained on October 24, 2015 from "Inmate Thompson".[22]

21. During "Plaintiff's" entire terms of incarcerations, a **"Request
For Reasonable Accomodations"** for a single cell order never had
to be sought, that is, until the actions and omissions of
"Defendant's" as set out above in para. #s 33 thru 218 occured;
"Plaintiff" had always been able to appropriately manage with
a cell/room-mate.

22. Additional physical therapy appointments was scedualed.

219. In accordance with **M.G.L. c. 258 §4 Notice and Presentment of this Claim** was made to the Commonwealth of Massachusetts, by United States Certified Mail, Return Receipt dated January 15, 2016; although an acknowledgement of receipt is documented, more than six (6) months passed without a determination on the claim (See: Exhibit **#59 - Notice Of Intent**; See Also: exhibit **#7 2 - Commonwealth Acknowledgement Of Receipt)**.


**COUNT I: 42 U.S.C. §1983 VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, and, M.G.L. c. 127 §1A and 17A and M.G.L. c. 124:**

220. The "Plaintiff" hereby incorporates by reference the alligations contained in para **#s 1** thru **219** of this complaint.

221. "Plaintiff" encountered a serious risk of harm to mental health and physical safety when he was classified to     . "O.C.C.C." Residential Treatment Unit for care and treatment for his mental disability. Where "Defendants" failed to protect "Plaintiff" under conditions posing a substantial risk to "Plaintiff's physical and mental health.

222. The "Defendant's Commonwealth of Massachusetts, Executive Office Of Public Safety and Security, Bennett, Department of Correction, Higgins-O'Brien, Turco and Fallon,

Massachusetts Partnership For Correctional Health" failed in an intentional, reckless and/or callously indifferent manner to:

   **a.** Adopt and implement policies, procedures and regulations necessary for the safe treatment and confinement of persons confined at "O.C.C.C." Residential Treatment Unit;

   **b.** Insure that supervisory and non-supervisory personnel and independent contractors at "O.C.C.C." followed implemented policies, procedures and regulations of the Department of Correction, and, laws of the Commonwealth of Massachusetts and the United States in the performance of duties to ensure the safe management and care of the "Plaintiff", who is a mentally ill prisoner, classified to the Residential Treatment Unit;

   **c.** Adequately train supervisory and non-supervisory personnel for the management and care of "Plaintiff", who is a mentally ill prisoner at "O.C.C.C.", classified to the Residential Treatment Unit;

   **d.** Prepare, adopt and implement policies, procedures and regulations necessary for managing the duties and performance of supervisory and non-supervisory personnel and independent contractors at "O.C.C.C." to ensure the safe management and care of "Plaintiff", who is a mentally ill prisoner, classified to the Residential Treatment Unit;

   **e.** Supervise supervisory and non-supervisory personnel and independent contractors at "O.C.C.C." to ensure the safe management and care of "Plaintiff", who is a mentally ill prisoner, classified to the Residential Treatment Unit.

**COUNT II: 42 U.S.C. § 1983 VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, 103 DOC 519, 103 DOC 426 – FAILURE TO PROTECT/DELIBERATE INDIFFEERENCE:**

**223.** The "Plaintiff" incorporates by reference the alligations

contained in para. #s 1 thru 222 of this complaint.

224. The "Defendants Mitchell, Devine, Camelo, Bower and
Norcliffe" failed to protect "Plaintiff" from victimization
of sexual harassment(s), and, physical assault. Resulting
in long-term psychological and physical damage.
"Defendants", further, deliberately inflicted long-term
psychological damage when they initiated two undocumented
"PREA" investigations against "Plaintiff" (based on
knowingly false alligations) and falsified "PREA" reports
against "Plaintiff" contrary to Department of Correction
**Sexually Abusive Behavior Prevention And Intervention
policy** and **prison Rape Elimination Act Standards:**

225. As a result of the following by the "Defendants Commonwealth
of Massachusetts, Executive Office of Public Safety and
Security, Bennett, Department of Correction, Higgins-O'Brien
and Turco, and, Massachusetts Partnership For Correctional
Health", the following occured:

226. "Defendants Mitchell, Devine, Camelo and Norcliffe" acted
with deliberate indifference when they failed to protect
"Plaintiff" from documented sexual harassment(s) from
"Inmate Thompson".

227. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe"
acted with deliberate indifference when they failed to
document documented reports of sexual harassment(s) against
"Plaintiff" by "Inmate Thompson".

228. "Defendants Mitchell, Devine, Camelo and Bower" acted with
deliberate indifference when they failed to adher to and
comply with **"DOC"** **103 DOC 519** "PREA" policies in
investigating alligations of sexual harassment(s) made
by "Plaintiff" against "Inmate Thompson".

229. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe" acted with deliberate indifference towrads "Plaintiff's" safety when they failed to protect "Plaitniff" from physical assault and injury by "Inmate Thompson".

230. The actions of "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe" were intentional and/or callously indifferent and caused "Plaintiff" long-term physical and psychological injuries.

231. The "Defendants" are not immune from liability because thier actions violated clearly established regulatory, statutory and constitutional rights of which a reasonable person would have known.

232. As a proximate result of "Defendants" unconstitutional policies, practices, acts and omissions, "Plaintiff" suffered damages, including but not limited to, immediate and irreparable injuries, including physical, psychological and emotional injuries.

**COUNT III: 42 U.S.C. § 1983 VIOLATION OF EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION:**

233. The "Plaintiff" incorporates by reference the alligations contained in para. **#s 1** thru **232** of this complaint.

234. The "Defendants Mitchell, Devine, Camelo, Norcliffe and Derbyshire" deprived "Plaintiff" of the right to be free from cruel and unusual punishment and privileges and immunities to which he was entitled under the United States Constitution. Unlawful placement into forced seclusion, retaliation, and, intimidation:

235.   "Defendants Derbyshire and Norcliffe" deprived "Plaintiff" of a right to be free from cruel and unusual punishment when they ordered "Plaintiff" placed in unlawful forced seclusion, under disguise of crisis-watch, when "Plaintiff" did not pose a threat to "Plaintiff's" self or others.

236.   "Defendants Mitchell, Devine, Camelo, Norcliffe and Derbyshire" deprived "Plaintiff" of a right to be free from cruel and unusual punishment, when they ordered "Plaintiff" placed in segregation and unlawful forced seclusion, under disguise of crisis-watch, when "Plaintiff" did not pose a threat to "Plaintiff's" self or others, and, without disciplinary infractions.

237.   "Defendant Higgins-O'Brien" deprived "Plaintiff" of a right to be free from cruel and unusual punishment when she personaally failed to sign off on each use of unlawful and forced seclusion as required by law, committed by "Defendants Mitchell, Devine, Camelo, Norcliffe and Derbyshire".

238.   "Defendant Lavalley" deprived "Plaintiff" of a right to be free from cruel and unusual punishment, when he attempted to intimidate "Plaintiff" from appropriately accessing and pursueing **103 CMR 491 "Inmate Grievance"** policy remedies, by yelling and screaming abusive lanquage and use of intimidation gestures of violence directed towards "Plaintiff".


**COUNT IV: CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983, 42 U.S.C. § 1985, M.G.L. c. 268 § 6A, M.G.L. c. 66 § 15, M.G.L. c. 233 § 20J, 103 CMR 157 and 103 CMR 482:**

239. The "Plaintiff" incorporates by reference para. **#**s 1 thru **238** of this complaint.

240. The "Defendants Mitchell, Devine, Camelo, Lavalley and Leon" entered into a conspiracy to interfere with the civil rights of "Plaintiff", and, they deprived "Plaintiff' of rights and privileges "Plaintiff" was entitled to under law. "Defendant Camelo", furthered, such conspiracy when he conspired with one or more "Defendants" or persons to falsify "PREA" alligations against "Plaintiff":

241. "Defendant Camelo" directly deprived "Plaintiff" of equal protection of law when he conspired with one or more persons to cause the filing of a false "PREA" alligation report(s) against "Plaintiff" resulting in psychological injury.

242. "Defendants Mitchell, Devine, Camelo and Lavalley" obstructed justice when they conspired to deter, by intimidation and threats, "Plaintiff" from obtaining documentary evidence to lawfully pursue a matter in a United States court of law against "Inmate Thompson".

243. "Defendants Mitchell, Devine, Camelo and Leon" were complicit in a conspiracy to deprive "Plaintiff" of equal protections of CORI laws when they hid or removed documents from Department of Corrections inmate management system and "Plaintiff's" six-part institutional folder/records.

244. "Defendants Camelo and Steever" were complicit in a conspiracy to deprive "Plaintiff" of rights and privileges "Plaintiff" was entitled to when they deprived "Plaintiff" of acess and use of phones to contact a **Boston Area Rape Crisis Center (BARCC)** hotline for psychological support.

245. As a direct result and proximate cause of the conspiracys "Plaintiff" sustained emotional distress and psychological injury, and, deprivation of rights.


**COUNT V: 42 U.S.C. § 1983, 42 U.S.C. § 1981 VIOLATION OF EIGHTH AMENDMENTS and FOURTEENTH AMENDMENTS RIGHTS TO THE UNITED STATES CONSTITUTION, VIOLATION OF DUE PROCESS, M.G.L. c. 233 § 20J, 103 CMR 482:**

246. The "Plaintiff" incorporates by reference para. #s 1 thru 245 of this complaint.

247. The "Defendants Camelo and Steever" violated "Plaintiff's" rights when they deprived "Plaitniff" of liberty interests without due process of law:

248. "Defendants Camelo and Steever" unlawfully deprived "Plaintiff" of right of acess and use of telephone, to contact an already "DOC" approved hotline, to a **Boston Area Rape Crisis Center (BARCC) Sexual Assault Counselor.**

249. "Defendants Camelo and Steever" unlawfully deprived "Plaintiff" of acess to confidential communications with a sexual assault counselor pursuant to **M.G.L. c. 233 § 20J.**

250. As a direct result and proximate cause of the due process violations "Plaitiff" sustained emotional distress, psychological injury and deprivation of rights.

**COUNT VI: NEGLIGENCE, M.G.L. C. 258 etc. seq.:**

251. The "Plaintiff" incorporates by reference para. #s 1 thru 250 of this complaint.

252. "Defendants Commonwealth of Massachusetts, Executive
Office of Public Safety and Security, Bennett, Department
of Correction, Massachusetts Partnership For Correctional
Health, Higgins-O'Brien, Turco, Mitchell, Devine, Camelo,
Bower, Steever, Lavalley, Leon, Norcliffe and Derbyshire"
are negligent for injuries caused to "Plaintiff".

253. As a result of wrongful acts or omissions of "Defendants",
"Plaintiff" sustained physical and psychological injuries.

254. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe"
owed a duty as employees, and independent contractors, of
the Commonwealth of Massachusetts working at "O.C.C.C." to
protect "Plaintiff" from sexual harassment(s) and
psychological traumatization from "Inmate Thompson".

255. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe"
owed a duty as employees, and independent contrators, of
the Commonwealth of Massachusetts working at "O.C.C.C." to
protect "Plaintiff" from physical assault by "Inmate
Thompson".

256. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe"
failed to accept reccommendations from staff, mental health
clinicians, and, independent contractors to keep "Plaintiff"
and "Inmate Thompson" separated.

257. "Defendants Department of Correction, Commonwealth of
Massachusetts, Executive Office of Public Safety and
Security, and, Massachusetts Partnership For Correctional
Health" owed a duty to mental health patients and
prisoners to properly train and supervise Department of
Correction employees and independent contractors in the
intervention to stop sexual harassment(s) by prisoners
upon prisoners and patients.

258. "Defendants Department of Correction, Commonwealth of
     Massachusetts, Executive Office of Public Safety and
     Security, and, Massachusetts Partnership For Correctional
     Health" owed a duty to mental health patients and
     prisoners to properly train and supervise Department of
     Correction employees and independent contractors in the
     intervention to stop physical assaults by prisoners upon
     prisoners and patients.

259. As a direct and proximate result of the negligence of the
     "Defendants", "Plaintiff" suffered injuries, including but
     not limited to, concious pain, suffering, physical and
     psychological injuries and impairment to limb (right hand).

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, MENTAL ANGUISH, PSYCHOLOGICAL TRAUMATIZATION:

260. The "Plaintiff" incorporates by reference para. #s 1 thru
     259 of this complaint.

261. "Defendants Mitchell, Devine, Camelo, Bower, Norcliffe,
     Derbyshire, Lavalley, Steever, and, Leon" intended to
     inflict and did inflict emotional distress upon "Plaintiff".

262. The acts of "Defendants Mitchell, Devine, Camelo, Bower,
     Steever, Norcliffe, Derbyshire, Lavalley and Leon" did
     psycologically traumatize "Plaintiff", and, caused mental
     and emotional distress.

263. The acts the "Defendants" engaged in were extreme and
     outrageous, beyond all bounds of decency and utterly
     intolerable in a civilized community.

264. The actions of "Defendants Mitchell, Devine, Camelo, Bower, Norcliffe, Derbyshire, Steever, Lavalley and Leon" were intentional and/or callously indifferent and caused "Plaintiff" long-term psychological distress and damage.

265. "Defendants Mitchell, Devine, Camelo, and, Bower" intended to inflict and did inflict emotional distress, mental anguish and psychological damage upon "Plaintiff" when they failed to adher to "DOC" **103 DOC 519** "PREA" policies in accepting and investigating alligations of "PREA" against "Plaintiff".

266. "Defendant Camelo" intended to inflict and did inflict emotional distress, mental anguish and psychological damage upon "Plaintiff" when he intentionally falsified alligations of "PREA" against "Plaintiff".

267. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe" possessed a "need to know" authorization, as outlined in **103 DOC 607.05(3)**, and did intend to inflict and did inflict emotional distress, mental anguish and psychological damage upon "Plaintiff" when they failed to consult "Plaintiff's" Residential Treatment Unit mental health clinician and psychiatrist prior to consulting "Plaintiff" in "PREA" investigations.

268. "Defendants Mitchell, Devine, Camelo, Bower and Norcliffe" intended ti inflict and did inflict emotional distress, mental anguish and psychological damage upon "Plaintiff" when they disregarded an excessive risk of harm to "Plaintiff's" physical and psychological safety, by continuously housing "Inmate Thompson" near "Plaintiff" after being informed by staff and independent contractors that a serious risk of physical and psychological harm existed.

**269.** As a further result of "Defendants" wrongful conduct, the "Plaintiff" sustained emotional distress, mental anguish and psychological traumatization.

**COUNT VIII: 42 U.S.C. § 10801-10851 VIOLATION OF CONGRESSIONAL FINDINGS AND STATEMENT OF PURPOSE FOR INDIVIDUALS WITH MENTAL ILLNESS:**

**270.** The "Plaintiff" incorporates by reference para. #s 1 thru 269 of this complaint.

**271.** "Defendants Commonwealth of Massachusetts, department of Correction, Higgins-O'Brien and Turco, Executive Office of Public Safety and Security, Bennett, Massachusetts Partnership For Correctional Health, Mitchell, Devine, Camelo, Bower, Norcliffe, Lavalley, Steever, derbyshire and Leon" failed to establish and operate protection and advocacy system for "Plaintiff" (a mentally ill person) which nwould protect and advocate "Plaitniff's" rights through activities to ensure the enforcement of the Constitution and Federal and State statutes.

**COUNT IX: 42 U.S.C. § 12131 VIOLATION OF AMERICANS WITH DISABILITIES ACT ("ADA"):**

**272.** The "Plaintiff" incorporates by reference para. #s 1 thru 271 of this complaint.

**273.** "Defendants Commonwealth of Massachusetts, Department of Correction, Higgins-O'Brien and Turco, Executive Office of Public Safety and Security, Bennett, Massachusetts Partnership For Correctional Health, Mitchell, Devine,

Canmelo, Bower, Norcliffe, Lavalley, Derbyshire, Steever and Leon" violated the Americans With Disabilities Act through activities that did not ensure the enforcement of the Constitution and Federal and State statutes.

## PRAYER FOR RELIEF

Wherefore, the "Plaintiff", Edward Jones prays for judgement against "Defendants" jointly and severally, as follows:

1. An award of compensatory damages, allowed by law, an amount the court may deem just and proper.

2. An award of punitive damages, allowed by law, an amount the court may deem just and proper.

3. Attorney fees, filing fees, and, other court costs and expenses; including an award of prejudgement interest.

4. Order a judgement that all "PREA" related information and documentation be removed from "Plaintiff's" "DOC"/ institutional records and files; including "DOC" Inmate Management System.

5. Enter a preliminary injuction and permanent injuction ordering "Defendants" Department of Correction, Higgins-O'Brien and Turco, Massachusetts Partnership For Correctional Health, thier successors, agents, employees and all persons acting in concert with them, to continue prescribing and/or renewing single bunk cell

order for as long as "Plaintiff" suffers serious mental health illness of "PTSD" wet dreams and ejaculation episodes pursuant to **42 U.S.C. § 12131** and **§ 10801.**

**6.** Order such additional relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Edward Jones demands a trial by jury on all counts.

Signed under the pains and penalties of perjury this **1st** day of **August 2016. Signed** _Edward Jones_ .

_Edward Jones_
**Mr. Edward Jones (W-102323)**
**O.C.C.C.**
**Administration Road**
**Bridgewater, Mass 02324**