UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

EDWARD JONES
      Plaintiff

                                        CIVIL ACTION NO.

V.                                    16-11666-LTS

LISA MITCHELL, JOHN F. CAMELO
And MICHEAL DEVINE,
           Defendants

MEMORANDUM OF LAW

<u>IN SUPPORT OF MOTION FOR SUMMARY AND DECLARATORY JUDGMENT</u>

INTRODUCTION

-----------------

This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the **Constitution of the United States**. Filed by Edward Jones, a diagnosed mentally ill state prisoner seeking damages for violation of state and federal rights to be free from cruel and unusual punishment, failure to protect and deliberate indifference.

The instant case before this **Honorable Court** originally started out with a multitude of defendants and claims.

On February 16, 2018, **Honorable Judge Leo T. Sorokin** issued an

order reducing Defendants to three (3), and claims to two (2).

## BACKGROUND

**Original Complaint and Demand For Jury Trial:**

On August 15, 2016, pro-se Plaintiff, Edward Jones, a mentally
ill prisoner housed in the Mental Health Residential Treatment
Unit (RTU) at Old Colony Correctional Center. Filed a complaint
bringing nine (9) counts against three (3) groups of Defendants
(totaling thirteen people); including four entities i.e.
Commonwealth of Massachusetts, Department of Corrections, Executive
Office of Public Safety and Massachusetts Partnership for
Correctional Health. During a preliminary screeening pursuant to
28 U.S.C. 1915A, United States District Judge Leo T. Sorokin found
"the complaint... substantively deficient"; and ordered an amended
complaint be filed "curing the substantive and pleading
deficiencies".

**First Amended Complaint:**

Upon order of Court an amended complaint was filed November 18,
2016. The amended complaint sought six (6) counts against only
nine (9) of the Defendants: 1) "42 U.S.C. 1983", 2) "42 U.S.C.
1981", 3) "42 U.S.C. 12131", 4) "42 U.S.C. 1985", 5) "Article 26
of the Massachusettd Declaration of Rights", and 6) "Intentional
Infliction of Emotional Distress". Although pro-se Plaintiff failed
to include a separate count for **"Declaratory Judgement"**, he still

2

requested in paragraph **No. 1** of the amended complaint "this Court has jurisdiction over Plaintiff's Federal Claims pursuant to...' '28 U.S.C.A. 2201, 2202...' ". And in paragraph **No. 6** of **Prayer For Relief** Plaintiff prayed "Declare Defendants actions violated Plaintiff's right to be free from cruel and/or unusual punishment under the **U.S. Constitution** and **Massachusetts Declaration of Rights."** The amended complaint allege Jones, a clinically diagnosed mentally ill prisoner who suffers from Post Traumatic Stress Disorder (PTSD), major depression, stress, suicide and psychotic features as a result of a history of physical and sexual abuse as a child; was sentenced to a term of ten (10) to twelve (12) years. Upon arrival to state prison, as a result of psychological diagnoses, prescribed psychological medications and mental health treatment needs. Jones agreed to be classified to the Residential Treatment Unit (RTU) at Old Colony Correctional Center (OCCC). Where one, or all of the nine (9) Defendant's (together or separately), failed to protect Jones from sexual harassment, physical and psychological injury, intentionally inflicted emotional distress, conspired to cover up unnecessary PREA investigations; and, submitted Jones to crisis lock-up, awaiting action status, and, segregation to intimidate and retaliate against Jones for appropriately reporting climate issues. Defendant's failure to follow general procedures in Department of Corrrections **Sexually Abusive Behavior Prevention And Intervention Policy "(103 DOC 519")**. Failure to follow "active enemy conflict" procedures and reccommendations of RTU mental health clinicians,

3

and, DOC staff; contributed to Jones sustaining physical and psychological injuries.

## Appointment and Withdrawal of Counsel

On March 22, 2018, U.S. District Judge Leo T. Sorokin appointed Danielle Andrews Long, from the Law Office of Robinson & Cole, as Pro-Bono counsel for Jones. Jones has never met attorney Danielle A. Long, nor has attorney Long ever made a personal appeaeance in Court on behalf of Jones. Attorney Andrew W. Monthey, from the Law Office of Robinson & Cole, has been the attorney personally representing Jones' interest in this matter before the Court.

On approximately November 30, 2018 and December 7, 2018 Jones made it quite clear to counsel Monthey the importance of discovery. In addition, Jones further provided attorney Monthey a list of all discovery being withheld and Jones made it clear (in written corresspondence to attorney Monthey); Jones' wishes to extend the discovery deadline and not allow the discovery deadline to close prior to all discovery being requested and turned over (SEE: Exhibit No(s) 104 and 107 - Corresspondence To Attorney Monthey). Despite Jones' requests and wishes, attorney Monthey appeared before the Court on January 16, 2019 with defense counsel and informed the Court that discovery was completed. On March 1, 2019, Jones filed Motion In Opposition To Motion To Withdraw As Counsel, and, Request For Ex-Parte Hearing. Although the Court denied Jones' request for an Ex-Parte Hearing. At the hearing (on Motion To Withdraw As Counsel). Counsel's reasons for seeking withdrawal

actually concerned First and Fourth Amendment violations committed against Jones; by defense counsel during litigation. Whom unlawfully seized a February 21, 2019 email Jones wrote to a family friend (SEE: Exhibit No 99 - Email To Lenita Richardson), labeled the email "supplemental discovery" and turned such email over to Jones' Pro-Bono counsel without Jones' knowledge or approval; or, the knowledge or approval of the intended recipient of the email. During a hearing before Justice Sorokin on March 21, 2019, appointed Pro-Bono counsel compelled the Court to withdraw as counsel. The reason counsel gave for seeking withdrawal. Was due to defense counsel unlawfully intercepting and forwarding the email (Jones sent to a family friend asking the friend to forward the email to the Boston Globe, on January 4, 2019), to Jones' Pro-Bono counsel (SEE: Exhibit No 108 - Corresspondence From Pro-Bono Counsel). At the hearing Jones informed the Court that he did not authorize defense counsel to take possession of his personal outgoing mail, and, that, it was a violation of Department of Correction mail (CMR's) and a violation of Constitutional Protections, and, CORI for such to have occurred: Since such hearing administrative remedies were pursued and denied (SEE: Exhibit No(s) 103, 105 and 106 - Grievance/Appeal). Justice Sorokin, refused to address the First and Fourth Amendment Constitutional violations Jones requested be addressed; his reasons for not addressing such, was because Jones' concerned violations involved "Prison Mail CMRs", in which Justice Sorokin stated he was not familiar with. Jones now raises these issues at Summary Judgement;

and they must be considered at this stage. Seeing that such **Constitutional** violations occured in the process of litigation in this case. Directly involved discovery defense intends to introduce in this case (after discovery closing). Involves denial of discovery requested by Jones. Was applied in an arbitrary and impermissable fashion that resulted in Jones being forced to represent self. And, violated **Constitutional** rights further.

The **First Amendment** "embraces the right to distribute literature and necessarily protects the right to receive it." **Martin v. City of Struthers, 319 U.S. 141, 143, 63 S. Ct. 862, 87 L. Ed. 1313 (1943) (internal citation ommited)**. Nevertheless, "while prison walls may isolate their inhabitants from the rest of society, they do not necessarily separate them from the **Constitutional** protection afforded to all citizens." See **Turner v. Safely, 482 U.S. 78, 84, 107 S. Ct. 2254, 94 L. Ed. 2d 64 (1987)** ("Prison walls do not form a barrier separating prison inmates from the protections of the **Constitution**."). Jones had, and have, a **Fourth Amendment** right to not have his personal mail arbitrarily seized and disseminated by the defense. Courts should "not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary, unreasonable or inconsistent with the plain terms of the rule itself." **Finklestein v. Board of Registration in Optometry, 370 Mass. 476, 478, 349 N.E. 2d 346 (1976)**. "For example, prison officials can keep the media from conducting face to face interviews with prisoners, as long as prisoners have other ways (like by mail "or email") to communicate with the media." **Pell v.**

6

Procunier 417 U.S. 817 (1984). The **First Amendment** protects everybody's right to freedom of speech and association... The right to call or write to your family and friends, etc, etc... Without having those rights arbitrarily and unlawfully seized and disseminated; and, used to unlawfully deprive you of same **Constitutional** protections you are seeking.

## MEMORANDUM

Proceeding on the principle that trials are necessary only to resolve issues of facts. The Plaintiff (herein, Jones), makes the Court aware of the total absence of such issues. And, present facts-facts upheld by law; that, cannot be disputed. "The Court shall grant **Summary Judgement** if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." **Anderson v. Libby Lobby Inc.,** 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 202 (1986).

## QUALIFIED IMMUNITY:

As a reult of a failur to dispute material facts. Defendant's only hope, as being state correctional officials, is to run for the sh elter of qualified immunity. Not so here...

Followed by the guidance provided by the **U.S. District Court, Massachusetts.** A "three part test to determine whether an official is entitled to qualified immunity" is implemented. **Cordero v. Dickaut, 2014 U.S. Dist. Lexis 169082.** The threshold inquiry is

No 1. whether the Plaintiff's allegations, if true, establish a
**Constitutional** violation; **No 2.** whether the right was clearly
established at the time of the alleged violation (this inquiry is
necessary because officers should be on notice that their conduct
is unlawful before they are subject to suit); and, **No 3.** whether
a reasonable officer, similarly situated, would understand that
the challenged conduct violated that established right." Id.
**(citations and quotations ommited).**

(1) Threshold inquiry **No 1** – "Whether the Plaintiff's
alligations, –that are true–, establish a **Constitutional** violation"?
In light of all material facts presented in complaint; also, in
consideration with all depositions, interrogatories, admissions,
affidavits, documents produced, videos, exhibits, physical and
psychological reports, and other information the record entails.
Plaintiff, validly, present that Defendant's Mitchell, Devine and
Camelo failed to take reasonable steps to protect Plaintiff from
constant threats of violence, sexual harassment, physical and
psychological assault from Vernon Thompson. "An inmate does have
a right to be reasonably protected from constant threats of
violence and sexual assaults from other inmates." **Ramos v. Lamm,
639 F. 2d 559, 572 (10th Cir. 1980)**. Evidence clearly support that
all Defendant's were notified, and made aware that a substantial
risk of serious physical and psychological harm existed. For
example, grievances and letters from Plaintiff to Defendant
Mitchell evidence Mitchell being aware of a substantial risk of
harm existing. In a September 25, 2015 corresspondence, Jones

8

personally informed Mitchell that he was being sexually victimized, traumatized, abused and harassed:

> –"I refuse to, and fail to, allow inmate Vernon Thompson to victimize, traumatize, harass and abuse me verbally any longer" (Para No 4).

> –"Instead of stopping inmate Vernon Thompson from sexually victimizing, abusing, traumatizing and harassing myself..." (Para No 4).

> –"Allowing inmate Vernon Thompson to victimize, traumatize, harass and abuse myself... makes you complicit in what inmate Vernon Thompson is doing" (Para No 5).

> –"Failed to issue inmate Vernon Thompson disciplinary reports,... sanctions... and hold him accountable for his actions; or to deter him from sexually traumatizing, abusing, victimizing and harassing myself..." (Para No 4).

> –"All I want is to be able to complete my time in peace. Get the treatment I need without being subjected to victimization over and over again" (Para No 6).

See: Exhibit No 11 – September 25, 2015 Corresspondence To Mitchell from Jones). Defense would argue that Jones only complained of being verbally abused. This document, also, substantiate that Jones informed Mitchell, personally, that; he was being **sexually victimized, abused, traumatized and harassed** by Thompson. Jones, further made it known to Mitchell his fears:

> –"As a result of myself... addressing uncomfortability and **fear concerns** about Vernon Thompson to RTU Mental Health staff, Myself only, was... placed on awaiting action status lock-up."

See: Exhibit No 11 – September 24, 2015 Corresspondence To Mitchell

From Jones). Incident report of Mental Health Clinician document
who ordered Jones placed on A.A:

> −"On Thursday September 24, 2015, at approximately
> 2:40 P.M., I Mental Health Clinician Daniel
> Bradley interviewed I/M Edward Jones, W-102323 in
> the code 99 room per DOC referral of Capt.
> Camelo as a A.A screen."

(See: Exhibit No 113 − Incident Report of Daniel Bradley) Affidavit
of inmates document why Jones was placed on awaiting action status:

> −"Captain Camelo locked Edward Jones up for
> no reason." (Para No 2) All Edward was trying
> to do is appeal to Old Colony Correctional
> Center administrators to protect him from
> being sexually harassed by inmate Vernon
> Thompson, I have heard Vernon Thompson harass
> Edward on several occaisions. And I have
> witnessed Edward report such sexual harassment
> to mental health clinician Vanessa Martino−
> Fleming . And I have witnessed... Vanessa
> Martino−Fleming tell Edward and me; that she
> 'reported such crimes to Old Colony Correctional
> Center administration'."

(See: Exhibit No 20 − Affidavit of Inmate Randy Williams−Signed
Under Penalties of Perjury); such also, documents Camelo's
awareness of risk. Other inmates also documents Camelo's
awareness of risk:

> −"Me personally did not want to see Edward
> Jones get into trouble. And I told mental health
> clinicians that if they did not keep Vernon
> Thompson separated from Edward Jones,... that they
> would be creating a violent situation. Mental
> health clinician Vanessa Martino−Fleming notified
> prison authorities of our stand to keep Vernon
> Thompson away from us. And Captain Camelo ordered
> Only Edward Jones to be locked up eventhough all

of us was there. I personally witnessed
Edward Jones being locked up for nothing.
But telling prison authorities that he did
not want to be sexually harassed any more."

(See: Exhibit No 21 – Affidavit of Inmate Adam Parker–Signed Under

The Pains and Penalties of Perjury). Inmate affidavit:

–"Minutes later correctional officers came in
and escorted Edward Jones to lock-up.' 'On
October 24, 2015 while entering the dining/
chow hall. I witnessed Vernon Thompson
screeming at Edward Jones and saying men be
sucking on your nipples, You have sex with
men and other nasty stuff. These statements
was witnessed personally by correctional
officers... I also witnessed Edward Jones
call correctional officers over to tell them
to 'please make Vernon Thompson stop sexually
harassing me' as a result of correctional
officers failing to stop Vernon Thompson
from sexually harassing him. Edward Jones was
forced to stop Vernon Thompson by beating him
up for which Edward Jones was than locked up
for'."

(See: Exhibit No 52 – Affidavit of Inmate Danilo Lopes–Signed

Under the Penalties of Perjury). Grievances filed by Jones, further,

document Mitchell's awareness of such risks:

–"The actions of Vernon Thompson from beginning
six or more months ago to now has caused me
undue trauma and reopened sexual abuse wombs.
And is causing mental illness issues to inflame"
(Para No 1, Pg No 4 of 6).

–"Remedy Requested: No 2 **That Vernon Thompson be
kept away from me;** No 3 That I immediately be
taken off awaiting action status;..."

11

(See: Exhibit No 4 - Grievance No 83803). Although grievance officer "Partially Approved" grievance No 83803, stating:

>    -"Your grievance is partially approved; this
>    issue with inmate Thompson is being handled
>    administratively."

(See: Exhibit No 5 - Grievance Officers Decision). Administratively, according to CMR's and evidence in the record, Mitchell is the only administrative official at OCCC who reviews and decides grievance appeals. During the deposition of Mitchell; Mitchell falsely claimed she:

>    -"Did not review grievance forms filed by inmates"
>
>    -And that she never seen grievance No 83803 filed
>    by Jones." (Pg. No 23)

(See: Exhibit No 141 - Mitchell Deposition):

>    -Although Mitchell's name and signature is listed
>    as denying the appeal.

(See: Exhibit No 6 - Denial Of Appeal In 83803). Furthermore, in response to Jones' September 25, 2015 corresspondence, and, in recognition to grievance No 83803 Mitchell states:

>    -"Your letter dated September 25, 2015 has been
>    received. 'Your grievance of 9-24-15 has been
>    submitted. Your alligations against Vernon

12

Thompson have been reviewed and will be
addressed pursuant to **103 DOC 426 Inmate
Conflict Policy.** I trust this has
addressed your concerns..."

(See: Exhibit No 11, Pg. No 1 - Mitchell's Response To Sept. 25,
2015 Corresspondence). Mitchell stating "your alligations against
Vernon Thompson will be reviewed... **pursuant to 103 DOC 426
Inmate Conflict Policy".** Substantiate her awareness of a
substantial risk of harm existing. Furthermore, the grievance
package turned over by way of discovery. Clearly points to the
grievance officer telling Mitchell:

> -"Inmate Edward Jones (A-1) alleges that inmate
> Thompson W-96869 is creating a climate issue
> within the unit. He claims that he has told
> numerous RTU staff as well as security staff.
> According to RTU staff, this is an ongoing
> issue with inmate Thompson. <u>He had been placed
> on watches and transferred to (BSH) on 8-28-15
> due to this.</u> He returned to OCCC on 9-24-15 and
> barely made it into the unit before several
> inmates were in the RTU office. He has been on
> a 15 minute watch since. RTU feels that this is
> more of a security concern because BSH cleared
> him to come back.
> I can 'partially approve' this based on it being
> handled administratively."     Hank/"Perfect"

(See: Exhibit No 142 - Grievance Officers Email To Mitchell).
Mitchell further admit she was:

> -"familiar with Vernon Thompson's specific
> comments that were made by Vernon Thompson
> to Jones." (Pg No 28)

13

(See: Exhibit No 141 – Mitchell Deposition). Mitchell's awareness of a substantial risk of harm existing against Jones by Vernon Thompson is further acknowledged in her statements for not seeking and pursuing disciplinary action against Thompson for his actions. As an excuse for not pursuing disciplinary action against Thompson she states:

> –"Considering the mental health issues, and subsequent transfer of this inmate to Bridgewater State Hospital, disciplinary action was not warrented."

(See: Exhibit No 61 – Mitchell's Response To Plaintiff's Corresspondence To Commissioner Higgins-O'Brien): this same response was cc'd to Defendant Devine (showing his awareness to the risk also). Mitchell's response to Jones' corresspondence to Commissioner Higgins-O'Brien, documents her knowledge of a substantial risk of harm existing. Jones states in such corresspondence:

> –"My reasons for appealing to you is to request that you, please, insure that an outside and independent investigation be conducted into why laws, rules, regulations, policies and guidelines of Department of Corrections set out in 103 DOC 519, etc. seq were not followed" (Para No 2)

> –I also request that you, please, insure that an outside and independent investigator is appointed to investigate my death, in the event I commit suicide before you receive my corresspondence" (Para No 5)

-"I am constantly considering suicide..., and I can **not** understand, why since my childhood, I've been victimized and traumatized over and over again" (Para No 5)

-"My reporting, to the named mental health clinicians, one correctional officer (Mr. Terry Moreland), and, Institutional Perimiter Security (IPS) officer O'Neil of my being sexually harassed by already convicted sex offender Vernon Thompson" (Para No 4)

(See: Exhibit No 14 - Jones Corresspondence To Commissioner Higgins-O'Brien). Mental Health Triage Minutes document Devine and Camelo being party to numerous discussions, where RTU clinicians made them aware of substantial risks of harm to Jones:

-"Was extremely agitated yesterday when he was aware that another RTU inmate returned from BSH. Mr. Jones was endorsing increased irritability and flashbacks"

(See: Exhibit No 151 - RTU Triage Minute). Mental Health clinician Ms. Vanessa Martino-Fleming, documents herself and several other inmates reporting to administrators Mitchell, Devine and Camelo of Thompson being a substantial risk to Jones:

-"Inmate Vernon Thompson, who I beleive was residing at Bridgewater S/H (BSH) at the time, being returned to the Residential Treatment Unit at Old Colony Correctional Center. This was a cancer" (Pg No 1)

(See: Exhibit No 145, Pg No. 1 - Martino-Fleming's Response To the

15

Court's April 19, 2019 Order).Mental Health clinician Martino-
Fleming, document Mitchell and Devine being party to Inter
Facility Conference Call ("IFCC"); where Martino-Fleming and
Psych. Dr. Keelin Garvey MD, made them aware of risks of harm
existing, and, requested Mr. Thompson be placed in another
facility to alleviate risks:

> -"I specifically recall Keelin Garvey, MD. being
> on the call. At that time Dr. Garvey was the state
> wide Deputy Psychiatric Director, and was also Mr.
> Jones' treating psychiatrist. I beleive, but
> cannot confim, that Michael Devine and Lisa
> Mitchell participated in this IFCC (Inter Facility
> Conference Call). Someone from the Massachusetts
> Department of Corrections Classification
> Department was also on the call."

(See: Exhibit No 145, Pg 1 - Martino-Fleming Response To Court's
April 19, 2019 Order). Additional responses from Ms. Martino-
Fleming:

> -"Mr. Jones had already been triggered by Mr.
> Thompson's prior sexualized comments, and
> had experienced decompensation" (Pg. No 2)

> -"That if Thompson was returned from BSH and
> was placed back on the RTU at OCCC, it would
> likely lead to further deterioration of Mr.
> Jones' mental health symptoms." (Pg No 2, Para
> No 3)

> -"Informed sexualized comments triggered PTSD,
> significantly increased nightmares, flashbacks,
> anxiety... by making sexualized comments..."
> (Pg No 2, Para No 4)

> -"Prior to Mr. Thompson being transferred to
> Bridgewater State Hospital, I informed DOC

16

officials on numerous occaisions that Mr.
Thompson was antagonizing Mr. Jones. (Pg
No 2, Para No 2)

-"As a result of this, I recall suggesting
that Mr. Thompson be placed in another
facility" (Pg No 2, bottom Para No 3)

(See: Exhibit No 145 - Martino-Fleming Response To April 19, 2019 order). Mental health clinician, Ms. Martino-Fleming documents in her notes, of how she made **all** Defendant's aware of the pending substantial risks:

-"Writer reiterated that writer and all other
RTU staff had made it abundantly clear to the
DOC that there were numerous concerns with
placing this other inmate back on the unit."

-"Discussed that writer would speak with Mike
Devine to see if he would address inmates'
concerns."

-"Inmate stated he did'nt think that sending
the other inmate 'was a good idea' but he
would 'stay away from him'... Feels the DOC
'was setting them both up for failure.'
Writer reiterated that she had already and
continues to express concerns regarding this
to the DOC."

-"It should be noted that this writer and RTU
mental health team have been expressing their
concerns for this inmates safety. This writer
had expressed on previous case conference her
concerns with not separating inmates by
institution."

(See: Exhibit No(s) 65, 67, 68 and 69 - Mental Health Progress Notes of Vanessa Martino-Fleming). Defendant Camelo admits his knowledge of existing risks:

17

–"It just so happened that Mr. Jones was
the direct target of his (Vernon
Thompson's) verbal, you know, issues."
(Pg No 15)

–"Aware Mr. Jones was having increased
irritability and flashbacks." (Pg No 27)

–"Two inmates would be permanently
separated if an 'active conflict' exist."
(Pg No 25)

(See: Exhibit No 148 – Defendant Camelo Deposition). Defendant

Devine Admit his awareness of existing risks:

–"Vernon had 'lack of a filter', Jones came
to me saying Vernon was saying things that
were out of school." (Pg No 8)

–"Was informed Vernon was stressing Jones."
(Pg No 10)

–"Vernon could be a problem... **a threat to
anybody physically.**" (Pg No 15)

–"Informed about Mr. Jones decompensating
and knowing what that means: 'symptoms
exacerbated', 'very anxious'." (Pg No 16)

–"Informed at triage that PREA incident
decompensated Jones." (Pg No 17)

(See: Exhibit No 149 – Defendant Devine Deposition). Classification

Report of Jones document Defendant's knowledge of Vernon Thompson

being officially and formally classified as **"Active Enemy"** of

Jones on August 26, 2015:

–On 8-26-15 Thompson reported to staff at
Old Colony that he witnessed Jones engaging
in sexual acts with another inmate. It was
determined that there was no truth to
Thompson's statement but Jones is aware that

18

> Thompson lied and rerported the allegation.
> When Thompson was scheduled to return to
> the RTU Jones discussed with mental health
> his concerns with Thompson returning (Pg No
> 10, Para No 2)

(See: Exhibit No 89 - Classification Report of Edward Jones).

Classification Reports are administrative documents, that,

Defendant Devine as Deputy Superintendant (of classification) and

Defendant Mitchell as Superintendant; both review daily.

The above ensures all Defendant's being well aware, and, well

informed of the substantial risks of serious harm. Prior to harm

being initiated and taking place. As a result of Defendant's

ignoring notified threats; and, failing to take necessary and

reasonable steps to alleviate threats and protect Jones. Jones was

sexually harassed, assaulted, and, seriously injured.

"the actual extent of any physical injury, threats or

psychological injury is pertinent in proving a substantial risk of

serious harm." **Benefield v. McDowell, 241 F. 2d 1267, 2001 U.S.**

**App. Lexis 3338.** Pleadings, exhibits, depositions, and, other

factual evidence obtained by way of discovery. Clearly support

Jones being "incarcerated under conditions posing a substantial

risk of serious harm". **Id. (Citation and quotation omitted).**

Given the serious injuries Jones sustained as a result of the

stabbing, there is no real question regarding the first

requirement (of Jones being incarcerated under conditions posing

a substantial risk of serious harm) being met. The physical

injuries Jones sustained clearly surpasses the de minimus

standards. Medical records support the fact that a "numbing agent"

19

had to be administered "by way of syringe" to implant stitches in right palm of Jones' hand:

> -"On 10-24-15 at approximately 1800 I, Jeremy RN, evaluated inmate Jones, Edward (W-102323) following a physical altercation. He presented with a laceration to the palm of his right hand... The on-call suturist came in to suture the laceration on his palm."

(See: Exhibit No 115 - Incident Report of Jeremy Perry/Health Service). Medical records, further, support the fact that medical practitioners and doctors later determined such injury caused nerve damage. Now resulting in permanent physical pain, constant trimmers, failure to hold a cup, write, eat, or do minor activities with right hand (something as simple as just passing something to another) without shaking uncontrollably:

> -"1-28-16 Pt got into a fight on Oct. 24 2015 and got stabbed in R Palm w a folk ... has been having shooting pain + numbness, at times feels weak... Need review w/Phy therapy. R Wrist feels numb, sensation in the mid palm. Hand grip 5/5. Scar, painful ass/PH: 1 R mid palm sensation/post traumatic??? Stab w folk to palm on Oct. 24, 2015, etc..."

> -"2-17-16 rt hand trauma -on Tegretol- helps a little, needs dose increased to 400mg Bid, also consult to PT requested for his rt hand."

(See: Exhibit No 110 - Medical Progress Noted of K. Fran, MD). Also (See: Exhibit No 109 - Medical Progress Notes). The injury was so significant that over six (6) months of physical therapy,

ultrasound therapy, laborious exercises; and, prescribed
medications for pain were required and sustained:

> –"Diagnosis: Rt hand neuralgia significant
> PMH: Was stabbed in Rt hand Oct. 2015 Eval
> and treat: hand neuralgia is weak, pain,
> needs exercise to strengthen hand."

> –"Reason for Physical Therapy Consult: DOI
> Oct. 2015 stabbed in Rt hand attempted
> interventions: NSAID, Tegretol, Tylenol."

> –"Endpoint/Goals of rehab...: pain/strength."

> –"Pt visits for pulsed ultrasound to palmer
> right hand as well as manual therapy, patient
> education and instruction in an (1) exercise
> program."

(See: Exhibit No 111 – Physical Therapy Consult Form). (See Also:
Exhibit No 112 (Pg(s) 1-8) – Physical Therapy Progress Notes).
Validly surpassing the de minimus requirements to an Eighth
Amendment claim under the **Prison Litigation Reform Act section
1997e(e)**. "The physical injury need not be significant but must
be more than de minimus." **Hill v. Arpio**, 2007 WL. 1120305*3 (D.
Ariz. 2007). Simply put, a stab wound requiring the implementation
of stitches, causing nerve damage, resulting in six (6) months of
physical therapy. Meets the **PLA** requirement for physical injury.

This Court, must, be "in accord with **Justice Blackmun's** views
in **Hudson v. McMillian**, 503 U.S. 1, at 16–17 (Blackmun, J.
**concurring in judgement**), 'that the **Eighth Amendment** may be
implicated not only to physical injury, but also by the infliction
of psychological harm'." Significant sustained psychological
injuries must also be considered and acknowledged. In addition to

being **Constitutionally** liable for physical injuries sustained by Jones; Mitchell, Devine and Camelo are as well, **Constitutionally** liable, for psychological injuries sustained by Jones.

Medical reports and other evidence support the fact that Defendant's Mitchell, Devine and Camelo was well informed by Jones; Jones' RTU mental health team; and, contracting psychiatrists. That, the sexual harassment was "triggering Jones' PTSD and significantly causing nightmares, flashbacks, and, psychological decompensation". A psychiatry Progress Note of Dr. Naraj Uddhandi's assessment captures these facts on Pg No 1:

> –"Pt. reports that things have changed since last visit... Recently another inmate has been annoying, talking about sexual stuff, brought back his childhood memories."
>
> –"He is getting frustrated, irritable, recent falashbacks, nightmares."
>
> –"He is off medication but would like to get back on (Pg No 2)."
>
> _"Pt has extensive trauma history, recent events... aggravating his PTSD symptoms further... agree to try medication..."
>
> –"Plan: start Tegretol 200mg. and Benadryl 100mg."

(See: Exhibit No 102 - Psychiatry Progress Note of Dr. Uddhandi). Mental health progress note of Ms. Martino-Fleming captures her view:

> –"Inmate reported that the psychiatrist did give him medication and he was going to take it as prescribed."

22

(See: Exhibit No 69 – Mental Health Progress Note of Ms. Martino-Fleming):

> –"Patients mental health status was discussed in triage today with mental health team... Patient have been exhibiting an increase in these symptoms since May due to other RTU inmate making inappropriate sexual statements. Patient has been experiencing increased anxiety, nightmares, hyper vigilance and nocturnal emissions."

(See: Exhibit No 90 – Mental Health Progress Notes of Ms. Martino-Fleming). See also documentation in M/H Treatment Plan:

> –"Client has reported that this other inmate has been 'yalling sexualized comments to him... Mr. Jones has a long history of sexual abuse and up to this point has been able to manage his symptoms effectively... Client has been experiencing increased flashbacks, nightmares and anxiety since he was triggered by these events... Client had been reporting his concerns to the DOC... Mr. Jones and inmate were in an altercation in the chow hall due to Mr. Jones being the recipient of ongoing sexualized comments... Writer has increased her contact with client and will continue to monitor closely for further decompensation. (Pg No 3). Recently Mr. Jones has not been able to do this effectively due to PTSD symptoms triggered by other RTU inmate yelling sexualized comments."

(See: Exhibit No 54 (Pg(s) 1-4) – Mental Health Treatment Plan of Ms. Martino-Fleming). Defendant's awareness is well noted through depositions, exhibits, and, other documents contained in the record. Defendant's failure to even initiate a 2015 PREA investigation on behalf of Jones, into allegations, presented by Jones, until

February of "2019", into allegations reported in "2015", is further proof Defendant's ignored the risks. But, their further, violation of PREA - **"Sexually Abusive Behavior Prevention And Intervention Policy"** and their subjecting Jones to unnecessary and fraudulent PREA investigations psychologically traumatized Jones. Such is captured in 11-18-15 Mental Health Treatment Plan of Ms. Martino-Fleming:

> -"Client has been experiencing increased
> flashbacks, nightmares and anxiety...
> Mr. Jones is pursuing this with a lawyer
> because he feels that the DOC did not
> follow correct PREA protocol."

(See: Exhibit No 54 (Pg No4) - Mental Health Treatment Plan of Ms. Martino-Fleming). See also Mental Health Progress Notes of Ms. Martino-Fleming:

> -"Inmate reported that he was still frustrated
> with events that occurred with other RTU
> inmate and PREA allegation... Inmate reported
> that this incident has contributed to 'increased
> anxiety and depression'."

(See: Exhibit No 67 - Mental Health Progress Notes of Ms. Martino-Fleming). See also progress notes of Todd Derbyshire LMHC:

> -"Client was seen in HSU as a mental health
> watch check in. Client reports that his
> only concern at this time was with the
> administration bringing back the inmate that
> he has been having a **'conflict'** with and then
> telling this client that an investigation
> that was alleged by the other client was never
> made **and an investigation never happened.**

(See: Exhibit No 66 – Mental Health Progress Notes of Todd Derbyshire). "A prison official's deliberate indifference to a substantial risk of harm to an inmate violates the **Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828; 114 S. Ct. 1970; 128 L. Ed. 811 (1994).** The direct result of Jones being subjected to re-prescribed psychotropic medications; a decision being made to extend Jones' stay in the Mental Health Residential Treatment Unit (reversing a decision to graduate Jones), and, placing Jones back on psychotropic medications:

> –"On approximately 6-1-15 Psychiatric, Dr.
> Nagaraj Uddhandi MD, D/CD psych meds (Topemax
> and Tegretol) "feels safe not suicidal/
> homicidal."

> –"He wants to manage his issues without need
> for medication."

(See: Exhibit No 100 – Psychiatry Progress Notes of Dr. Nagaraj Uddhandi; See also, Exhibit No 101 – Psych Progress Notes of Dr. Uddhandi).

Valid proof of sustained psychological trauma is documented further in Dr. Uddhandi's Psychiatric Progress Notes:

> –"(Pg No 1) Last seen on 10-20-15. Pt has
> re-started on Tegretol... Recurrent
> flashback, and relapse of symptoms Geodon
> worked in the past. Plan: D/C Tegretol and
> Benadryl Re start Prozosin 2mg and Geodon
> 20mg."

(See: Exhibit No 113 – Psychiatry Notes of Dr Uddhandi (Pg No 1-2)). The psychological injuries Jones sustained clearly surpasses

the de minimus standards of psychological harm. herein, Jones
have shown "the kind of extreme and officially sanctioned
psychological harm that –does– support a claim for damages under
the **Eighth Amendment.**" **Doe v. Welborn,** 110 F. 3d 520, 524 (7th
Cir. 1997). There is no doubt, that, if the evidence determines
Jones' claims/facts are true. No doubt, several **Constitutional**
violations have been established. The Court can not ignore the
abundance of information that have been discovered by way of
respectful applications of discovery avenues and tactics (ie.
interrogatories, production of documents, depositions, exhibits,
admissions, video, etc...). Uncovering factual truth, coupled
with the Court "accepting as tru the well pleaded allegations of
the complaint and drawing all reasonable inferences therefrom in
Plaintiff's favor" (See: 2-16-18 **Memorandum And Order**);
**Constitutional** violations have been established. **Lachapelle v.**
**Berkshire Life Ins. Co.,** 142 F. 3d 507, 508 (**1st** Cir. 1998);
Thereby meeting the first threshold inquiry of establishing not
only one, but several physical and psychological **Constitutional**
violations.

The second inquiry, "Whether the right was clearly established
at the time of the alleged violation (this inquiry is necessary
because officers should be on notice that their conduct is
unlawful before they are subject to suit):
There is no doubt whatsoever, of the Plaintiff's right(s) to be
free from a substantial risk of physical and psychological harm,

26

"being clearly established at the time of the alleged violation."
."This inquiry is necessay because officers should be on notice
that their conduct is unlawful before they are subject to suit".
Cordero, 2014 U.S. Dist Lexis 169082; other case laws, Benefield
v. McDowall, 241 F. 3d 1267; 2001 U.S. App. Lexis 3338; Farmer v.
Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 811 (1994);
Reichle v. Howards, 566 U.S. 132 S. Ct. 2088, 2093, 182 L. Ed. 985
(2012), point out how "Qualified Immunity shields government
officials from civil damages liability, unless, the official
violates a statutory or constitutional right that was clearly
established at the time of the challenged conduct". A violation of
Department of Corrections policies, guidelines, procedures and
regulations; specifically 103 DOC 519: "Sexually Abusive Behavior
Prevention And Intervention Policy", and, 103 DOC 426: "Inmate
Conflict Policy" must hold prison officials liable under the
Constitution for inmate on inmate assault if prison officials had
reasonable opportunity to prevent it from happening in the first
place. "A finding of deliberate indifference necessarily precludes
a finding of qualified immunity." Hill v. Dekalb Regional Youth
Detention Center, 40 F. 3d 1176, 1186 (11th Cir. 1994). Not only
was Constitutional laws in effect. But Department of Corrections
guidelines, procedures, rules and regulations were also in effect;
and, wre not adhered to. For example, had Mitchell ordered a PREA
investigation (in accordance to 103 DOC 519) into the allegations
reported by jones, than, as she stated in deposition:

–"If a PREA investigation resulted in being
found, That, 1) Disciplinary Action sought;
2) Criminal Charges pursued; and 3) **Transfer
to another facility...**"

(See: Exhibit No 141 (Pg No 29) – Mitchell Deposition). Mitchell

also admit:

–"They are obligated to investigate **any**
allegation of sexual harassment or
sexual misconduct, under PREA, no
matter how severe."

(See: Exhibit No 141 (Pg No 17) – Mitchell Deposition). The moral

of the point is that had Mitchell, Devine or Camelo followed

policy upon receipt of an allegation of PREA made by Jones against

Thompson. It would have resulted in Thompson being transferred to

another facility. Another example, is by Mitchell, Devine and

Camelo not following **Inmate Conflict/Active Enemy procedures.** As

all three Defendant's stated in depositions:

–"Inmates are separated if there is a
significant security risk and safety
risk (Pg No 33 – Mitchell Deposition)."

–"The 'active conflcit' is specific to
those two individuals to keep them
separated by facility." (Pg No 35 –
Camelo Deposition)

–"Two inmates would be permanantly
separated if an 'active conflict' exist."
(Pg No 25 – Camelo Deposition)

Based on Defendant's own deposition testimony, it is a fact;

that, all Defendant's were aware of the laws, policies, rules,

regulations and guidelines being in effect at the time of their conduct. Defendant's own knowledge substantiate that they knowingly failed to adhere to policy, rules, guidelines or regulations. "Qualified immunity sweeps so broadly that all but the plainly incompetent or those who knowingly violate the laws are protected from civil rights suits for money damages." **Hagarty v. Somerset County, 53 F. 3d 1367, 1373 (1st Cir. 1995).** Qualified immunity is not for those who fail, or knowingly fail, to adhere to or follow their own agency's rules, regulations, policys, guidelines or procedures.

under the **Eighth Amendment** deliberate indifference is the appropriate standard for a prisoner to challenge "inadequate conditions of his confinement..., and the protection he is afforded against other inmates". **Estell v. Gamble, 429 U.S. 97 (1976); Lafaut v. Smith, 834 F. 2d 389, 391-392 CA4 (1987).** See also **Lopez v. Robinson, 914 F. 2d 486, 492 (CA4 1990); Givens v. Jones, 900 F. 2d 1229, 1234 (CA8 1990); Morgan v. District of Columbia, 263 U.S. App. D.C. 69, 77-78, 823 F. 2d 1049, 1057-1058 (1987).** "A prison official violates an inmates **Eighth Amendment** right against cruel and unusual punishment based on a failure to prevent harm to the inmate under two circumstances: (a) the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm; and (b) the prison official(s) must have acted, or failed to act, with deliberate indifference to inmate health or safety." **Farmer v. Brennan, 511 U.S. 825, 833 (1994).** "The law,

29

That prison officials have a duty... to protect from violence at the hands of other prisoners, was clearly established..." **Farmer Supra**. Because the inquiry under the first prong was identical to the inquiry into whether the complaint had stated a claim under the **Eighth Amendment**, it was satisfied with respect to -Mitchell, Devine and Camelo-. Next the Court concluded that the pleadings were adequate to satisfy the second prong, finding that the right the Defendant's were alleged to have violated was clearly established and that if the alleged facts were proven, "a reasonable Defendant would have understood that his conduct violated the Plaintiff's **Constitutional** rights". (See Courts 2-16-18 **Memorandum and Order**) quoting **Maldonado v. Fontanes, 568 F. 3d 263, 269 (1st Cir. 2009)**. A Court must perform a two step analysis in determining qualified immunity. **Id. 268-9**. A Court must decide (1) whether the facts alleged or shown by the Plaintiff make out a violation of a **Constitutional** right (which the Plaintiff has shown); and, (2) if so, whether the right was "clearly established" at the time of the Defendant's alleged violation. "A right is 'clearly established if at the time of the alleged violation, the contours of the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right'." **Id at 269** (quoting **Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)**. Proof of Defendant's understanding that their actions were contrary to law, is in Defendant's moving Jones to sign a "waiver". Why, incorporate a "waiver" to be signed, disqualifying you from suit; unless you understand there is a possibility your actions can

result in legal consequences. "if, however, a determination of qualified immunity hinges on a disputed material fact, the factual dispute must be resolved by the jury and summary judgement is inappropriate." **Cordero v. Dickaut, 2011 U.S. Dist. Lexis 6022 (D. Mass. Jan 19, 2011).**

And while we are on the conversation regarding the "waiver". During Jones' deposition defense counsel introduced such "waiver" that Jones admitted signing on or about August 19, 2015 (See: Exhibit No 161 - Waiver). Although Jones verified his signature on said document. Jones, further, informed defense counsel of said document/"waiver" being null and void in this case for numerous reasons:

> 1. That August 19, 2015 waiver specifically state that it refuses to hold DOC officials responsible for any "prior" violations that occurred, prior, to August 19, 2015.
>
> 2. That, August 19, 2015, "waiver" specifically stated, declared, expressed, and specified "all prior conflicts" being resolved (See: Exhibit No 161).
>
> 3. As noted in Exhibit No 89 (Pg No 10) on or about August 26, 2015, Defendant's themselves recognized a new conflict that made Thompson a substantial risk to Jones, when they formally labeled Thompson an "Active Enemy" of Jones; this occurred "after" the signing of the August 19, 2015 "waiver".
>
> 4. On September 24, 2015, Jones filed a grievance informing Defendant's of a new conflict and requesting that Thompson be kept away from him; this occurred after the signing of that August 19, 2015 "waiver" (See: Exhibit No 4)

> 5. On September 25, 2015, Jones sent
> corresspondence to Mitchell informing her
> of his being sexually victimized, abused,
> traumatized and harassed by Thompson;
> this occurred, also, after the signing of
> that August 19, 2015 "waiver" (See; Exhibit
> No 11).

Furthermore, Jones signed the "waiver". Under the promise,
assumption, and belief that Defendant's would do what was reasonable;
and, that, was to keep Thompson away from him. Which, all knew, was
the only way the risk would be alleviated. Defendant's transferring
Thompson to Bridgewater State Hospital, on or about August 28, 2015;
but, than transferring Thompson back to OCCC on September 24 2015.
Shows a failure of Defendant's to take reasonable steps to
alleviate risks; and legally holds them accountable for their
actions.

The third inquiry, "whether a reasonable officer, similarly
situated, would understand that the challenged conduct violated
that established right"?:

Defendant's own answers to questions posed during depositions.
Present their understanding of the challenged conduct violating
established rights:

> —"As PREA Manager responsibilities include
> 'making sure that,... all time frame and
> whatsoever requirements of the policy were
> met'." (Pg No 7 — Devine Deposition;
> Exhibit No 149).

> —"In the event of a conflict both inmates
> would be separated." (See: Exhibit No 148;
> Pg.No 33 — Camelo Deposition)

–"Two inmates would be permanantly separated if an 'Active Conflict' exist." (See: Exhibit No 148; Pg No 25 – Camelo Deposition)

–"Again, if the 'Active Conflict' was on the computer on this time frame (See: Exhibit No 89), that would be an issue that both of these inmates would be in the same area, never mind the same dining hall." (See: Exhibit No 148; Pg No 35 – Camelo Deposition)

–"The 'Active Conflict' is specific to those two individuals to keep them separated by facilities." (See: Exhibit No 148; Pg No 35 – Camelo Deposition)

–"Inmates are separated if there is a significant security risk and safety risk'." (See: Exhibit No 141; Pg No 33 – Mitchell Deposition)

–"The consequences for anyone not following PREA guidelines or policy is subject to discipline" (See: Exhibit No 141; Pg No 10 – Mitchell Deposition)

–"Obligated to investigate **any** allegation of sexual harassment or sexual misconduct, 'under PREA', 'no matter how severe'." (See: Exhibit No 141; Pg No 17 – Mitchell Deposition)

–Disciplinary Action for Violation of Sexual Harassment And Abuse Policies:

1. "Staff **shall** be subject to disciplinary sanctions up to and including termination for violating agency sexual abuse or sexual harassment policies." (103 DOC 230.06) (See: Exhibit No 133)

Thereby, efficiently and sufficiently meeting the third inquiry. **"Section 1983** is a vehicle through which individuals may sue certain persons acting under color of state law for deprivation of federally assured rights." **Gagliardi v. Sullivan, 513 F. 3d 301, 306 (1st Cir. 2008).** Specifically **Section 1983** states:

> **Every person who, under color of any statue, ordinance, regulation, custom. or usage, of any State or Territory or the District of Columbia,**

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.... .

## DELIBERATE INDIFFERENCE:

It is well established that "prison officials have a duty under the 8th and 14th amandments to protact prisoners from violence at the hands of other prisoners." Cortez-Quinones v. Jiminez-Nettleship, 842 F. 2d 556, 558 (1st Cir. 1988) (quoting Leonardo v. Moran, 611 F. 2d 397, 398-99 (1st Cir. 1979) (internal quotation omitted).

It has also been well established, that, "not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an eighth amendment claim.' 'In order for a prison-condition complaint to state a violation of the Eighth Amendment, two requirements must be met'." Giroux v. Somerset County, 178 F. 3d 28, 32 (1st Cir. 1999).

First, "the alleged deprivation of adequate conditions must be objectively serious, i.e., 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Giroux, 178 F. 3d at 32 (quoting Farmer, 511 U.S. at 834). As already proven, given the nature of physical and psychological injuries sustained by Jones; again, the first requirement has been proven, and, met.

Second, "the official(s) involved must have had 'a sufficiently culpable state of mind', described as 'deliberate indifference' to inmate health or safety." Giroux, 178 F. 3d at 32 (quoting Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 115 L. Ed. 271 (1991). Thus, "a prison official cannot be found liable under the Eith Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." Farmer, 511 U.S. at 839.

**Undisputed Material Facts:** Defense could attempt to persuade the Court that not placing Thompson back in the RTU could be considered a "reasonable" action on their behalf. For numerous reasons, that, argument is an undisputed fact; that, can **not**, and, shall **not**, stand. It is an undisputed **FACT**, that, Mitchell, Devine and Camelo had knowledge that Thompson was labeled, on or about August 2015, as an "Active Enemy" of Jones (See: Exhibit No 89; Pg No 10 – classification Report of Jones). Another undisputed fact, is that, Mitchell's (as Superintendant) and Devine (as Deputy Superintendant of Classification) culpable state of mind is acknowledged in violating and disregarding DOC procedures when they allowed Thompson to be transferred back to OCCC. Information obtained from the Director of Security (at OCCC), clearly state, "the definition of a conflict is a relationship between inmates which may result

35

in placing them in danger.' 'For this reason no inmate is transferred to a facility where an active conflict exist'." (See: Exhibit No 121 - Response From Director of Security, Victor Correia, Re: "Active Enemy"). According to Director of Security, Correia, procedural policy **did not** even require Thompson to be housed at OCCC as long as he was labeled as an "active enemy" of Jones. It, is also, undisputed that psychiatrist Dr. Garvey and mental health clinician, Ms. Martino-Fleming informed both Mitchell and Devine of existing risks of serious harm; during an Inter-Facility Conference Call (IFCC) - where they pleaded with Mitchell and Devine, **NOT**, to house Thompson at OCCC as long as Jones was being housed there. (See: Exhibit No 145 - Deposition of Ms. Martino-Fleming, LMHC'S Response To Courts April 18, 2019 Order; Pg No 2 (Para No(s) 4, 5, 6 and 7). Mental health clinician Ms. Martino-Fleming, further, notified all three Defendant's of the serious risks of harm numerous times, as noted in response To Court's April 18, 2019 Order (See: Exhibit no 145). As pointed out above, it is well documented how mental health clinician, Ms. Martino-Fleming and other RTU treatment team made Camelo, Devine and Mitchell aware of serious risks of harm and safety concerns through RTU triage meetings; mental health progress notes; Incident Reports; emails; verbal communications, etc... As also pointed out above, it is well documented how Jones, himself informed Mitchell, Devine and Camelo of serious risks of harm and fears with being housed with Thompson by way of grievances; personal corresspondence; and, verbal communication. Based on

information obtained from classification reports of Thompson. It is an undisputed fact, that Mitchell, Devine and Camelo had a culpable state of mind to house Thompson at OCCC by any means necessary; because according to 2014 classification report of Thompson. There was at least three other DOC facilities Thompson did not have "active enemy" conflict situations at (MCI-Shirley, Souza Baranowski, and, The Massachusetts Sexual Offender Treatment Center): this is not a conclusionary statement, reflect to the evidence, you'll determine, also, it's a fact. **2014 Classification report of Thompson list Thompson as having an "active enemy" at only Bridgewater State Hospital, "OCCC", NCCI-Gardner, and MCI-Norfolk** (See: Exhibit No 155 - 2014 Classification Report of Thompson).[1] Mitchell (being Superintendant) and Devine (being Deputy Superintendant of Classification) culpable state of mind is noted in their failure to adhere to DOC classification, Code of Massachusetts Rules **(103 "CMR" 420)**, and issue Thompson a required, **annually,** classification hearing in 2015: this 2015 classification report of Thompson was requested in the April 12, 2019 Joint Status Report, and, ordered to be filed with the Court previously which has not occurred; Jones was informed (by stand-by counsel) that defense counsel has stated "no classification hearing of Thompson took place in 2015".

---

Footnote 1: Defendant's could have easily, also, re-classified Jones to MCI-Gardner's RTU. Where Jones had no "active enemys".

To not provide Thompson a re-classification hearing in 2015, would be a clear violation of Department of Corrections Classification regulations (**103 CMR 420**) and legislative enacted laws. Clear example why, in-camera hearing regarding discovery must take place, and, facts presented must be considered. "failure to classify inmates was one of several conditions that **exacerbated** violence at the City prison and constituted 'deliberate indifference'." **Fisher v. Koehler, 692 F. Supp. 1519 (S.D. N.Y 1988)**. "An inmate has the right to expect prison officials to follow policies and 'regulations'." **Payne v. Block, 714 F. 2d 1510 (11th Cir. 1984)**. Liberty interest may arise from Due Process Clause itself or from state law. **Hewit v. Helms 459 U.S. 460**. Among liberty interest arising from state law are liberty interest created by prison regulations as determined by Courts focusing on nature of alleged deprivations **Sandin v. Conner, 515 U.S. 472**. Furthermore, had a classification hearing took place, "annually", as required. Defendant's would have determined that Thompson was not even qualified to be housed at medium level security custody (according to Thompson's 2014 classification records). Thompson's point based score was a number fifteen (15) (See: Exhibit No 155 – Thompson's 2014 Classification Report). According to "Male Objective Point Based Classification Manual" (Pg No 13), **Thompson's custody level should have been maximum security custody – to be housed at no other place than Souza Baranowski Correctional Center** (See: Exhibit No 134 – Commonwealth of Massachusetts, Department of Corrections, Male Objective Point Based Classification Manual). "Correctional

facilities' knowledge that inmates were being housed without regard to custody and security needs, and that staff were not adequately supervising inmates was sufficient knowledge of an unreasonable and substantial danger to inmates. The correctional officials failed to end this practice, which constituted disregard of a substantial harm, and the facility could therefore be held liable under the Eighth Amendment." Calderon-Ortiz v. LaBoy-Alvarado, 300 F. 3d 60 (1st Cir. 2002). As Defendant's well acknowledge (5-30-17 Memorandum Of Law In Support Of Motion To Dismiss), in order to carry the full force of law and be binding on the DOC, "agency regulations must be promulgated in accordance with State Administrative Procedures Act, M.G.L.c. 30A sub. sec.(s) 2 and 6". Dougan, et al. v. Commissioner of Correction, et al., 34 Mass. App. Ct. 147 (1993). 103 CMR 420 – Classification (See: Exhibit No 140; Pg No 6 – 103 CMR 420 Classification Manual) is an "agency regulation... promulgated in accordance with State Administrative Procedures Act." It is further noted in Thompson's 11-16-2014 classification report, "do not transfer to OCCC until resolution of present conflicts at that institution" (See: Exhibit No 155 – 2014 Classification Report of Thompson). "Falure to follow prison policy does not, by itself, state a section 1983 claim"; Porro v. Barns, 642 F. 3d 1322, 1229 (10th Cir. 2010) "violation of a prison regulation does not give rise to an Eighth Amendment violation absent evidence the prison official's conduct failed to conform to the constitutional standard." (internal quotation omitted).

Mitchell claims (Deposition No 141; Pg No 43-44) "there was no where to house Thompson at where he could not have contact with Jones – other than PC (protective custody); where she housed him after he stabbed Jones: Separate chow, recreation, programs, movement, etc... A reasonable solution would have been there, or, at another DOC facility like MCI-Shirley, Souza Baranowski, or, where he is at now (the Massachusetts Treatment Center for The Sexually Dangerous) as was reccommended by the RTU mental health team on numerous occaisions. Whom exercised the only power and authority they had, and, medically had Thompson transferred to the Bridgewater State Hospital (under guise of psychiatric eveluation numerous times), in hopes of not having Thompson returned to OCCC. Which is why the Court's viewing in-camera, Confidential Health Protected Information – specifically "August and/or September 2015 Bridgewater State Hospital Evaluation Report; that, Court previously ordered to be filed with the Court (Para No 11 – April 12, 2019 Joint Status Report)", has to be examined and taken into consideration in deciding summary judgement issue.

Based on the facts presented, the decisions made by the Defendant's were, totally, unreasonable.

Jones submit that all three (3) knew or should have known that Thompson had a history of sexually harassing and assaulting staff and inmates. 2014 and 2016 classification records documents such behavior:

> -6-20-13 "Subject was involved in staff assault,
> assaulted two female officers and spit at a Lt.
> (lieutenant)": Incident Report No 112762.

–7–2–13 "Wrote inappropriate letter to female staff."

–"Since 2014, repeatedly made provocative statements to peers at OCCC."

–4–15–15 "Assaulting inmate."

–8–9–15 "Writing inappropriate note about female staff."

–8–25–15 "His behavior did not improve and he was 18A'd on 8–25–15; he presented as stable and returned to OCCC on 9–24–15."

–11–13–15 "Bridgewater State Hospital, gave inappropriate drawing to staff."

–2–19–16 "Displays violent behavior."

–2–20–16 "Subject in need of SO (Sex Offender) Treatment new D–Report Indecent Exposure."

–"Continued violent behavior towards inmates and staff."

–"Bridgewater State Hospital, claims Thompson harassing him incident report No."

–"Documented conflicts at both RTU facilities (OCCC and NCCI–Gardner) and expressed security concerns by institution."

–"He instigated an argument with inmate Edward Jones in chow hall."

–"It should also be noted that subject has also displayed violent behavior during prior County commitments."

–2008 "Threaten to rape and kill female case–worker."

–See affidavit of Adam Parker (W–69942), signed under pains and penalties of perjury (See: Exhibit No 16).

–See affidavit of William Bower (W–10535), signed under pains and penalties of perjury (See: Exhibit No 17).

–See affidavit of Napoleon Sibley, signed under pains and penalties of perjury (See: Exhibit No 18).

–See affidavit of Gino Lister (W–101676), signed under pains and penalties of perjury (See: Exhibit No 19).

–See affidavit of Arthur H. Davis (W–42274) "... furthermore on several occasions I have heard Mr. Thompson make similar accusations about other inmates on the unit including inmate Edward Jones (See: Exhibit No 76 (Pg No(s) 1–2).

See: Exhibit No(s) 155 and 157 - 2014 and 2016 Classification Reports of thompson.

"The Court further found that the inmates had filed complaints and written letters to prison administrators to no avail, and that the harassment was obvious and widely known.' 'It concluded that the District of Columbia had acted with 'deliberate indifference' to the condition of 'sexual harassment' which... prisoners at the —District Facilities— must endure, and that the District was therefore liable under 42 U.S.C. 1983 for the violation of the inmates' **Constitutional** rights'." See **Woman Prisoners v. District of Columbia, 877 F. Supp. at 665-67 (D.D.C. 1994).**

Defense would argue, although Jones dispute this insinuation; that, Jones threw the first punch in the chow hall fight. Jones relies on the "incident Report" of Correctional Officer, 1st Lt. Robert V. Burgess, whose report clearly state, "As Thompson was leaving the area (towards the gate leaving the dining hall), He suddenly turned around, moved towards Jones and took a fighting stance initiating the altercation." (See: Exhibit No 139 , Incident Report of 1st Lt. Robert V. Burgess).

Who threw the first punch "is an argument without legal substance". Relying in the decision of **Santiago v. Walls, 599 F. 3d 749, *759; 2001 U.S. App. Lexis 6465, **22** "As the dissent suggests, it is possible for a litigant to induce his own defeat... Here however, **Mr. Santiago/Jones** did nothing of the sort. It is important to remember that his allegations in this case is an **Eighth Amendment** claim that the warden was deliberately indifferent..., and by

continuing by his own inaction, a situation that inevitably would lead to confrontation and violence... 'Identity of the 'first' to 'throw' a 'punch' certainly does not negate the grave-men of **Mr. Santiago's** complaint that the warden was deliberately indifferent.' 'It was the wardens job to insure that no fight ever took place'." Id. **Santiago** *759. According to the disciplinary report issued against Jones for the fight; Correctional Officer, McCarthy's report, list Thompson as instigating the incident (See: Exhibit No 35 (Pg. 1-2) – Disciplinary Report No 350398). The disciplinary report issued against Jones, was later "dismissed" (See: Exhibit No 35 (Pg. No 2)) after Jones received representation from a student attorney (Ms. Kathryn Yukevich); from the Harvard Prison Legal Assistance Project (See: Exhibit No 34 (Pg. No 1-3) – Yukevich's Motion For Dismissal).

As in **Santiago Supra**, Jones' allegation is an **Eighth Amendment** claim that Mitchell, Devine and Camelo was deliberately indifferent. And by their inactions to do what was reasonable. An inevitable situation of confrontation and violence occurred. Had they all took reasonable steps to alleviate the risks, like separating the inmates by institutions (as was constantly recommended, by RTU and mental health team), no fight would have taken place. And the physical and mental injuries sustained by Jones would not have occurred. "The Court found the Department of Corrections... could be found liable... 'if the inmate could prove that they were on notice he was a continuous target of sexual harassment and placing him near the assaulting inmate... was grossly negligent'." **Villante v. Department of Corrections of City of New York, 786 F.**

2d 516 (2d Cir. 1986).

"The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." **Beers-Capital v. Whetzer, 256 F. 3d 120, 133 (3rd Cir. 2001)**; See also **Barkes v. First Correctional Medical, Inc., 766 F. 3d 307, 323 (3rd Cir. 2014); Bistrian v. Levi, 696 F. 3d 352, 367 (3rd Cir. 2012)**. A 9-30-15 email to Mitchell states that:

> -"According to Ms. Smith this has been an ongoing issue with inmate Thompson.' 'Several reports have been written and the inmate has been placed on watches **due to it.**' 'On 8-28-15 inmate Thompson was transferred to BSH (Bridgewater State Hospital) and subsequently cleared to return to OCCC on 9-24-15'." (See: Exhibit No 143 - Email To Mitchell).

"Supreme Court says, that, prison officials will be liable for violating the **Eighth Amendment** when they are deliberately indifferent to substantial risks of serious harm to inmate. Put differently, officials, to be liable must be aware of a substantial risk of harm to the inmate and not take measures to alleviate the risk." **Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1982-83, 128 L. Ed. 2d 811 (1994)**. RTU and mental health team did what was reasonable, with the power and authority they had, to keep Thompson away from Jones. They wrote reports; they placed Thompson on watches; and, they went as far as transferring Thompson to BSH (Bridgewater State Hospital). Defendant's

Mitchell, Devine and Camelo' failure to classify and then bringing Thompson back to OCCC; and not taking RTU and mental health teams' reccommendations to keep separated (after BSH evaluation determined no psychological need for commitment of Thompson), is basically a failure to respond, or, take reasonable measures: Remember, it was not Defendant's who kept placing Thompson on mental health medical watches and transferring Thompson to BSH for evaluations; it was RTU staff and mental health team exercising the only (medical) authority they had, and, could use. This is not a conclusion. This is a fact, and is verified in a 9-30-15 email to Mitchell from Grievance Officer, Lavalley:

> -"Inmate Edward Jones, alleges that inmate
> Thompson is creating a climate issue...
> According to RTU staff, this is an ongoing
> issue with Thompson... RTU feels that this
> is more of a security concern because BSH
> cleared him to come back."

This is also another email that adds to the knowledge element of deliberate indifference. **Beers-Capital Supra.**

The **Eighth Amendment's** prohibition against cruel and unusual punishment requires that prison officials "take reasonable measures to guarantee the safety of inmates". **Farmer v. Brennan, 511 U.S. at 832 (citations and quotation marks omitted).** "Therefore those charged with the high responsibility of running prisons are required, as a matter of constitutionally imposed duty, to 'protect prisoners from violence at the hands of other prisoners'." **I'd at 833** (citation and quotation marks omitted).

Jones submit (and the record reflect above) that Defendant's were well aware of Thompson's history of sexually harassing and assaulting inmates and staff; this, inevitably caused Jones serious physical and psychological injury. See **Brown v. Buds, 398 F. 3d 904, 910 (7th Cir. 2005).** Jones has satisfied the objective prong of a failure to protect claim, "a Plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur".

Reflected above, there is an abundance of discoverable evidence (interrogatories, production of documents, depositions, video surveillance, etc...), accompanied with Jones' own exhibits and affidavits. Holding that Jones' allegations about what Defendant's knew about a dangerous prisoner is sufficient to rule summary judgement in favor of Jones. Defendant's Mitchell, Devine and Camelo disregarded an "active enemy" conflict; were well informed by RTU mental health clinicians; they sat in on numerous RTU triage meetings; they were a party to Inter Facility Conference Calls; they were informed by Co-Contracting psychiatrists; they were informed by other prisoners and staff; they received personal corresspondence from Jones; they received, and denied, grievances filed by Jones; Jones verbally communicated with them, and, they disregarded the risk that Thompson posed. An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety". **Jones v. Carroll, 628 F. Supp. 2d 551, 559 (D.**

Del. 2009) quoting Pope v. Shafer, 86 F. 3d 90, 92 (7th Cir. 1996).
When they allowed Thompson back to OCCC knowing Jones and Thompson
was listed as "active enemies"; and, that, "active enemies" were
not to be housed at the same facilities that did not have
separate movements, chow, programs, yard, recreation, etc... They
disregarded the risk that Thompson posed. "To state a claim for
failure to protect, –Jones– need to allege that (1) he was
incarcerated under conditions posing a substantial risk of serious
harm and (2) that –Mitchell, Devine and Camelo– acted with
deliberate indifference to that risk." **Farmer, 511 U.S. at 834.**
Jones has met the first requirement, he was housed with an inmate
who was noted as an "active enemy" of his, and, because of his
behavior history, posed a significant risk of confrontation and
violence. With regard to the second requirement, Jones submitted
a grievance, asking that Thompson "be kept away from him". The
grievance officer "partially approved" the grievance; but, Mitchell
denied the grievance on appeal. Jones, further, alleged in
corresspondence to Mitchell that he was being "sexually victimized,
traumatized, harassed and abused" and asked that "Thompson be kept
away from me". RTU mental health staff and other Co–Contracting
psychiatrists (as noted in the record) informed Mitchell, Devine
and Camelo of fears "with not separating inmates by institutions".
These allegations is sufficient, at this pleading stage, to state
a claim that Mitchell, Devine and Camelo actually knew or
consciously turned a blind eye towards an obvious risk. **Farmer v.
Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994),**

Which held that **Eighth Amendment** liability requires actual awareness of risk. See **Serafin v. Johnstown, 53 Fed. Appx. 211, 213 (C.A.3 2002).** "Thus, in order to survive... summary judgement motion, Plaintiff must produce sufficient evidence supporting the inference that Defendant's 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.' 'Knowledge may be shown where the official has actual notice of the risk, **Nami v. Fauver, 82 F. 3d 63, 67-68 (3d Cir. 1996)** or where the risk was longstanding, pervasive, well-documented', or expressly noted by prison officials in the past, and the circumstances suggest that the Defendant-official's being sued had been exposed to information concerning the risk and thus must have known about it. **Farmer, 511 U.S. at 842.** An inmate 'normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." **Davis v. Muscarella, 615 F. Supp. 2d 296, 302 (D. Del.), Aff'd sub nom. Davis v. Williams, 354 F. App'x 603 (3d Cir. 2009) (citing Pope v. Shafer, 86 F. 3d 90 (7th Cir. 1996).**

As documented in corresspondence from Director of Security, Correia (See: Exhibit No 121 - Re: "Active Enemy"), throughout the state, it is procedural policy practice to keep "active enemies" apart. Unlike in **Santiago Supra**, Thompson had been listed as an "active enemy" of Jones by administrative Defendant's themselves (See: Exhibit No 89, Pg No 10 - "Active Enemy List"). This fact is noted in Jones and Thompson's classification reports; which lists both as "active enemys" of each other.

Defense downplay what happened to Jones, by stating that "Jones was, only, sexually harassed verbally"; as though that is not a violation or crime, or, even a reason to pursue **Eighth Amendment** deliberate indifference claim. Defense may be right, had Jones been a regular individual; and not, a person in treatment for PTSD suffering from major depression, suicide ideation, anti-social behavior, stress as a result of a documented history of sexual abuse. "Correctional officers placed a homosexual inmate suffering from PTSD (as a result of past sexual abuse) 'in a cell with a known sexual predator, dispite their awareness of the inmates particular vulnerabilities.' 'The inmate was subsequently raped by his cellmate. The Court denied the officers motion to dismiss, finding the officers had sufficient knowledge of a substantial risk of serious harm'." **Fox v. Superintendent, Stafford County Dept. of Correction, 2012 WL 2277928 (D.N.H. Junee 18, 2012).** Instead of being raped, Jones was stabbed by this known violent inmate and sexual predator, and, seriously injured. As in <u>Fox Supra</u>. Defendant's were aware of Jones' particular vulnerabilities (RTU triage meeting, RTU mental health team, Co-Contracting psychiatrists, Jones' decompensating state). Proving sufficient knowledge of the risks in this case as well. The **Prison Rape Elimination Act, Prison and Jails Standards,** defines "sexual harassment" as repeated and unwelcome sexual advances, requests for sexual favors, **"or verbal comments, gestures"**, or actoins of a derogatory or offensive nature by one inmate, detainee, or resident directed towards another. (See: Exhibit No 133, Pg No 9 – Department of Justice

Prison Rape Elimination Act Prison And Jails Standards).

Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of laws will bring cruel and unusual punishment into consideration. "Recognising that prisoner could bring Section 1983 action for physical and psychological harm resulting from 'sexual harassment'." **Freitas v. Ault**, 109 F. 3d 1335, 1338 (8th Cir. 1997). **Doe v. Welborn**, 110 F 3d 520, 524 (7th Cir. 1997) (stating that prisoner did not show the kind of extreme and officially sanctioned psychological harm that might support a claim for damages under the **Eighth Amendment**). Unlike in **Doe Supra**, the Jones case have shown "the kind of extreme and officially sanctioned psychological harm that... support a claim for damages under the **Eighth Amendment**." **Id. 524**. RTU mental health team, Jones' own exhibits, Inter Facility Conference Call "IFCC" , mental health clinicians, and, Co-Contracting psychiatrists; all, support this "extreme and officially sanctioned psychological harm". **Doe Supra**. **benefield v. McDowall**, 241 F. 3d 1267 (10th Cir. 2001), "Plaintiff-inmates claim for damages under **8th amendment** that he suffered psychological injury... **survived** Defendant guards' motion to dismiss for qualified immunity even though inmate was not in fact assaulted." In this case, Jones was also assaulted; in sum, Jones has filed a complaint that rises to the level of objective cruelty sufficient to violate the **Eighth Amendment**.

According to the Equal Employment Opportunity Commission ("EEOC")

(See: Exhibit No 116 and 138 - What Is Sexual Harassment), the
National Sexual Assault Hotline (See: Exhibit No 137). A convicted
level 3 Sex Offender peeping at, making unwanted sexual statements
and advances; and, invading the privacy of a victim (with a long
history) of sexual abuse while they are in the process of utilizing
the bathroom is a lot more than just verbal harassment. According
to "RAINN", the same mental health effects of sexual harassment
psychiatrists and mental health clinicians document Jones
experiencing; Anxiety, Depression, PTSD, Suicide Ideation. Are the
same emotional, physical, and, mental effects professionals state
a person being sexually harassed will experience,(See: Exhibit No
116, Pg No 2 - Sexual Harassment/"RAINN"). Invading another's
privacy by looking at and complementing their private parts while
they are in the process of utilizing the bathroom/urinating is
defined under "Lewd Acts" as "Peeping" (See: Exhibit No 117, Pg No
3 - Lewd Acts). For legal purposes, a public place is defined as
any place accessible to or, readily viewable by, the general
public,...,... Places not necessarily open to the public that are
considered "public places" for the purpose of charging an individual
with lewd acts may include hospitals, **jails**, and **prisons**. (See:
Exhibit No 117, Pg No 2 - Lewd Acts). "The law prohibits unwelcome
"sexual conduct and words" or "actions" of a sexual nature... "it
may be oral or written and could include requests" (See: Exhibit
No 158 - Jones Deposition). The Supreme Court of Massachusetts, in
**Melnychenko v. 84 Lumber Company, 424 Mass. 285, 676 N.E. 2d 45
(1997)**, "concluded that... sexual harassment is prohibited under

51

state law... The trial judge concluded that....'The unwelcome sexual advances and requests for sexual favors were more than lewd horseplay and raunchy talk'.'They constituted sexual harassment'." (See: Exhibit No135, Pg No 2 - Sexual Harassment-Legal Definition of Sexual Harassment). Compare **Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 633 (1988)** to the Department of Correction. Both agencies have "a complaint procedure typically part of the policy". DOC's is **Sexually Abusive Behavior Prevention And Intervention Policy (103 DOC 519)**. That, is suppose to "recognise that a prompt and thorough investigation of a complaint, followed by appropriate disciplinary action, can minimize liability". (See: Exhibit No 135, Pg No 7 - Legal Definition Of Sexual Harassment). When an agency fails to follow policy procedures, it fails to minimize their legal liability; thereby, holding them liable. The fact, that, Jones is an inmate/ prisoner and not an emplyee does not disqualify his **Eighth Amendment** rights to be free from cruel and unusual punishment through sexual harassment. In **Harris v. Forklift System, 510 U.S. 17, 114 U.S. S. Ct. 367, 126 L. Ed. 295 (1993),**"The Supreme Court overruled the lower court, holding that courts must not focus their inquiry on concrete psychological harm,... So long as the workplace environment would reasonably be perceived as hostile or abusive..."; in light of the physical and psychological injuries sustained by Jones, there is no question of Jones existing in a physical and psychological hostile and abusive environment (See: Exhibit No 135 - Legal Defeinition Of Sexual Harassment). Who is

52

a victim? sexual misconduct, sexual harassment, stalking, threat
of harm (See: Exhibit No 136 - Types of Victimization; and,
Exhibit No 118 - Sexual Misconduct). "We have held that failure
to provide protection constitute an **Eighth Amendment** violation
only if deliberate indifference by prison officials to a prisoner's
welfare 'effectively condones the attack by allowing it to happen'."
**Lewis v. Richards, 107 F. 3d 549, 533 (7th Cir. 1997). (Quoting
Santiago, 559 F. 3d 749, *756; 2010 U.S. App. Lexis 6465, **14)**
"While an inmate does not have a federal constitutional right to
rehabilitation, he is entitled to be confined in an environment
which does not result in his degeneration or which threatens his
mental and physical well being." **Battle v. Anderson, 564 F. 2d at
401, 403 (10th Cir.).** The definition of "Degeneration": Fallen or
deteriorated from a former, higher, or normal condition. In the
words of RTU mental health clinician, Ms. Martino-Fleming, "Mr.
Jones had already been triggered by Mr. Thompson's prior sexualized
comments, and had experienced decompensation". (See: Exhibit No 145,
Pg No 2 (Para No 5) - vanessa Martino-Fleming's Response To Courts
April 18, 2019 Order).


**UNNECESSARY PREA INVESTIGATIONS:**

(1) It is Jones' position that Defendant's subjected him to
unnecessary, and, undocumented PREA investigations that exacerbated
his PTSD, anxiety, depression and stress. these allegations are
legally sufficient for pleading purposes (as stipulated in 2-16-18
Memorandum And Order (Page No 10)). (2) And, their failure to

conduct necessary, and, documented PREA investigations makes them complicit to exacerbated PTSD, anxiety, depression, stress; that, inevitably resulted in sustained physical and psychological injuries. Furthermore, pursuant to **F.R.Civ.P. 57**, Jones is legally entitled to seek "declaratory relief" under 28 U.S.C. 2201. "A declaratory judgement is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding...' 'The controversy' must necessarily be of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts'." **Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S. Ct. 466, 80 L. Ed. 688 (1936).** "The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status, may be declared."

Although declaratory judgement may be sought in order for the Court to interpret a written contract. Courts will not grant a declaratory judgement unless the parties have an ongoing "contractual relationship in which declaratory relief could affect the then-present behavior of the contracting parties". **globe Fresh Produce, Inc. v. Epicure Trading, Inc. No. 11-01270; Dist. Lexis 36699.** Jones states herein, that, his "contractual" relationship with the Defendant's is represented through The Prison Rape Elimination Act and Defendant's implementing and following their own "103 DOC 519" policy regarding Jones.

Wherefore, Jones want to make it clear, that, this is not a

pleading, claim, or, argument regarding Defendant's violating The Prison Rape Elimination Act. This pleading, regards Defendant's not following their own "written policy mandating zero tolerance towards all forms of sexual abuse and sexual harassment that outlines the agencys approach to preventing and responding to such conduct". (See: Exhibit No 132 (Page No 10, Sub. Sec. 115.11)).

With regard to the PREA investigations. Defendant's are damn if they did; and, damn if they did'nt:

(1) If they did conduct PREA investigations, they were not done in accordance to Department of Corrections, Sexually Abusive Behavior Prevention And Intervention Policy (103 DOC 519) (See: Exhibit No 96 - 103 DOC 519-Sexually Abusive Behavior Prevention And Intervention Policy); A policy implemented, under the Department of Justice's, National Standards to Prevent, Detect, and respond to Prison Rape Under The Prison Rape Elimination Act **"28 C.F.R. Part 115-Docket No. OAG-131 RIN1105-AB34 May 17, 2012"** (See: Exhibit No 132 - Department of Justice, Prison Rape Elimination Act, Prison And Jail Standards (Page No 1-37)). Now, if agency Defendant's failure to follow and adhere to their own written policy regulations, causes or results in sustained psychological injuries to another. Than, those agency Defendant's are legally liable for injuries sustained. "A company's policy against sexual harassment would be relevant to demonstrate reasonable care." **Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).**
A complaint procedure is typically a part of a policy, and a prompt

and thorough investigation of a complaint, can minimize legal liability. When agency officials steps outside policy, individually and purposely disregards such policy requirements. Than, they are subjectable to whatever mishap befalls. The bottom line is that they did not follow policy requirement procedures of 103 DOC 519 (Sexually Behavior Prevention And Intervention Policy (Exhibit No 96); and, as a result automatically labels any PREA investigations committed against Jones unnecessary. The Court has ordered "subjecting Jones to unnecessary PREA investigations that exacerbated his PTSD are sufficient for pleading purposes".

**Undisputed Facts:**

During deposition Devine stated he was PREA Manager (See: Exhibit No 149, Pg No 6 - Devine Deposition). Devine further stated, as PREA Manager responsibilities include, "making sure that,..., all time frames and whatever requirements of the policy were in the policy were met". (See: Exhibit No 149, Pg No 7 - Devine Deposition).

During deposition Mitchell admitted she was the administrator dealing with security, safety, maintnance, "everything that occurs within the prison falls under me..."(See: Exhibit No 141, Pg No 7 - Mitchell Deposition). Mitchell further admitted she (as Superintendent) and Devine (as Deputy Superintendent and PREA Manager) "made decisions about whether to initiate PREA investigations" (See: Exhibit No 141, Pg No 7 thru 8 - Mitchell Deposition). Mitchell also, "don't recall" if she ordered a PREA investigation on December 3, 2015. (See: Exhibit No 141, Pg No

29 thru 30 - Mitchell Deposition).

During deposition Camelo stated the "Superintendent (meaning Mitchell) authorizes or direct investigations unit to initiate PREA investigations". (See: Exhibit No 148, Pg No 21 - Camelo Deposition).

Deputy Superintendent of Operations, Douglas L. Bower states "Your recent corresspondence to Superintendent Mitchell has been referred to my office for response.' 'In your letter dated August 26, 2015, you request all information pertaining to a PREA investigation that began against you on the same date.''Please be informed you have not been named in any PREA investigation initiated on or about that date." (See: Exhibit No 1, Pg No 1 - august 26, 2015 PREA Investigation Reply).

(a) what the record does reflect is that on August 26, 2015, inmates Jones and Cruz was sent to new-man lock-up area. Where they were detained, questioned by PREA investigator (Institutional Perimiter Security) "IPS" officer, Silva; regarding inmate Alex Cruz, sucking on Jones' nipples. both inmates were told that they would not be released back to population until they agreed to be examined by medical and mental health (told that their refusal to be examined by medical and mental health, would result in being placed in solitary confinement). After submitting to medical and mental health examinations, they were released. On the same date Jones wrote a letter to Mitchell, requesting all information relating and pertaining to such PREA investigation (See: Exhibit No 1, Pg No 2-4 - Corresspondence To Mitchell). Deputy

57

Superintendent, Bower, issued a response informing Jones that he had "not been named in any PREA investigation initiated on or about that date". (See: Exhibit No 1 - Corresspondence Denying PREA Investigation). As a result of Defendant's failure to admit conducting a PREA investigation against Jones. Jones requested a copy of the mental health screening examination report (that he was forced to comply with). Upon receipt of the report. Jones acknowledged that the psychiatrist whom performed the screening examination, noted in the report that such examination was, conducted by way of a "DOC crisis referral, 'related to a PREA report'". (See: Exhibit No 3, Pg No 2 - Mental Health-Progress Note of Daniel P. Bradley, MSW, LICSW): Had it not been for this document, Jones would have never been able to prove he had been in a PREA investigation. As a result of Defendant's continued failure to admit conducting a PREA investigation. Jones asked inmate Alex Cruz, to also, request from medical a copy of the mental health examination report (that he was also forced to comply with) from that date in Cruz' case. Mr. Cruz' report also noted the psychiatrist, whom performed the screening examination, stating in the report that the screening examination was performed as a result of a "DOC referral, 'related to a PREA report'". (See: Exhibit No 22, Pg No 2 - Mental Health-Progress Note of Daniel P. Bradley, MSW, LICSW). Jones approached Camelo about the situation, and was told by Camelo "to not lose any sleep over the PREA investigation', 'it occured as a result of fabricated information provided by Vernon Thompson'". Camelo further promised

Jones that "none of the information regarding the PREA investigation would be placed in Jones' institutional records". upon speaking with Devine (PREA Manager) personally, regarding the August 26, 2015 PREA investigation. Devine responded by telling Jones, "no PREA investigation took place" and "that there was no paper-work surrounding that". (See: Exhibit No 158 - Jones Deposition). As a result of the information received from the mental health evaluation report; the information received from Devine; the information received from Camelo; the exacerbation of PTSD and other trauma arising from the experience; as well as, Defendant's failure to conduct PREA investigations in accordance with Policy (103 DOC 519) procedures. Jones filed civil complaint. Although Institutional Perimiter Security ("IPS") PREA investigation officer, Silva, conducted the investigation in August of 2015. A document turned over by way of discovery, is an investigation report (not submitted by PREA investigation officer, Silva); but, submitted by a Sgt. Cotton dated January 12, "2016" (dated five (5) months later), now exist.[2] (See: Exhibit No 159 - August 2015 PREA Investigation Report). According to **Sexually Abusive Behavior Prevention And Intervention Policy ("103 DOC 519")**. Required, general Procedures ("103 DOC 519") and other applications in the policy; were not followed or adhered to, in PREA investigations conducted against Jones.

Footnote No 2: During discovery Jones requested Pro-Bono counsel to depose PREA investigation ("IPS") officer, Silva, to no avail. After the Court allowed Pro-Bono counsel permission to withdraw and appointed him as stand-by counsel. The Court provided Jones an opportunity to file a "Joint Status Report" (Dk No 107) to "request for further documents and re-open depositions"; Motion(s) to Depose/PREA investigation officer, Silva, was denied by the Court and, so was Motion For Reconsideration (Dk No(s) 120, 121, 125, 126).

(b) On or about November 27, 2015, 1:15 A.M Jones informed
correctional staff that he was in a mental health crisis and
needed to be escorted from his cell due to a personal emergency.
Upon arrival to the Hospital Security Unit ("HSU"). Jones informed
the nurse that he had a nightmare consisting of a nocturnal
emission (of semen); and upon waking up, his cell-mate was awake.
And as result of his cell-mate being awake, he felt uncomfortable
and ashamed to wash himself and change his bedding and clothing in
front of his cell-mate. Jones explained to the nurse that his RTU
mental health clinician was aware of the situation (that was
triggered by the August 2015 PREA investigation), and was in the
process of elaborating for single cell placement as a result of
the problem. As documented in incident report No 1435811. Mental
health RTU director, Erin Stewart (was called at home) and
instructed nurse Rodrigue to hold Jones in HSU on fifteen (15)
minute mental health crisis watch, in a secured mental health cell;
until mental health could eveluate Jones the following morning
(See: Exhibit No 162 - Incident Report of Nurse Practioner,
Darlene Rodrigue). From November 27, 2015 thru December 3, 2015,
Jones stayed housed in the HSU in a mental health crisis cell (on
fifteen (15) minute watch); due to DOC officials telling mental
health, that, there were no empty cells in the unit to house Jones
in by himself. As a result of a promise from mental health that
"as soon as a single cell was available, Jones would be housed in
it"; Jones agreed to be released back to the cell that he was

originally housed in with inmate Anthony Fowler. upon arrival back
to the unit, Jones acknowledged that there were three (3) empty
cells in the unit. At which time Jones approached unit officer,
Olivera, telling the officer how he had been housed in the HSU
under the assumption that there was no empty cells
in the unit to house him in by himself; and, as a result of the
trauma suffering from the August PREA investigation, he had been
having wet dreams involving nocturnal emissions and felt
uncomfortable and ashamed with being housed with a cell-mate at
that time. And Jones requested that he be immediately assigned to
one of the three (3) empty cells. Officer, Olivera, told Jones
that Special Housing Assignment Officer Captain, Camelo, would
be contacted and a cell would be assigned by the time Jones
arrived back to the unit from work. After Officer, Olivera, spoke
to Camelo; Jones was escorted from work and taken to new-man
lock-up area and locked in a cell. Moments later, Jones' cell-mate,
Anthony Fowler was escorted to new-man lock-up area and locked in
a cell. PREA investigation (IPS) officer, Silva, arrived and
questioned Jones and Fowler regarding sexual activities between
them; which they both denied. Jones and Fowler were than told that
they could not be released back to population until they were
screened and examined by mental health and medical. Fowler agreed
to be screened and examined; but, Jones refused. After an hour of
being detained, Jones was finally forced to be screened by mental
health clinician, Tod Derbyshire. And as a result of the trauma,
depression and stress Jones was displaying. Derbyshire ordered

Jones placed on fifteen minute crisis watch in an HSU mental
health cell (See: Exhibit No 127 (Pg. 1-2) - Mental health-
Mental Status Update of Tod Derbyshire). Again, although Jones
and Fowler was put through the process's one goes through in a
PREA investigation. Both Jones and Fowler were told there was no
record or paper-work to substantiate a PREA investigation was
conducted involving Jones and Fowler. Upon request, turned over by
way of discovery, was an incident report written by officer,
Olivera; falsely claiming that on December 3, 2015 Jones stated
that "he couldn't be trusted around his cell-mate" (See: Exhibit
No 164 - Incident Report of Correctional Officier, Olivera). This
incident report is what is alleged to have initiated the PREA
investigation against Jones and Fowler. According to Sexually
Abusive Behavior Prevention And Intervention Policy ("103 DOC 519").
Required General Procedures ("103 DOC 519.03") and other
applications in the policy; were not followed or adhered to, in
PREA investigations conducted against Jones.

(c) On or about January 4, "2019". Jones wrote an email to a
family friend (Lenita Richardson). Although the email was addressed
and sent to Ms. Richardson personally, the salutation greeted a
Boston Globe reporter (Milton J. Valencia); whom, Jones requested
Ms. Richardson forward the email to. The contents of the email
reminded Ms. Valencia of publishing a story (in the Globe) about
Vernon Thompson raping a fifteen year old girl in 2010. Jones was
informing Ms. Valencia of himself, staff and other inmates being
sexually harassed by Thompson also. And he further informed Ms.

Valencia of certain DOC staff's failure to stop it. To
substantiate his claims, Jones specifically noted as witnesses
his mental health clinician, Ms. Martino-Fleming, and, his Pro-
Bono attorney. Jones, further, referred Ms. valencia to the above
docketed case at the U.S. District Courthouse. On or about
January 6, 2019, Jones was notified to report to the Institutional
Perimiter Security ("IPS") office. Upon arrival, Jones was met by
IPS officer, Adorno; whom had intercepted the above email (and
was refusing to forward it to its intended recipient). And, was
demanding that Jones explain the reasons for forwarding Ms.
Richardson the email. At which time Jones explained to IPS officer,
Adorno, how upper echelon officials at OCCC ignored Jones' reports
of being sexually harassed by Vernon Thompson "in 2015". Jones
went on to explain how there was a case pending in the U.S.
District Court; and, Jones' intention was to bring media attention
to his issue, along with all other issues being reported in the
media surrounding sexual abuse and harassment at that time. Jones
was than immediately escorted to new-man lock-up area and locked
in a cell; was told, he would not be released back in to general
population until he agreed to be examined by medical and mental
health relating to a PREA investigation. On approximately February
22, 2019, Jones received corresspondence from Pro-Bono counsel
(Andrew W. Monthey). Such corresspondence informed Jones, that,
as a result of defense counsel forwarding Pro-Bono counsel Jones'
email (Jones intended be sent to Ms. Richardson, in an attempt
for her to notify the media of this case); Pro-Bono counsel would

be seeking withdrawal from the case (See: Exhibit No 108 - Notice
Of Intent To Withdraw). On approximately March 5, 2019, Jones
received an "Inmate Notification-Allegation of Sexual Abuse/
Harassment" form (regarding PREA Case No 1692). Such form notified
Jones, that, "an investigation was conducted ("in 2019") into your
allegations that you suffered sexual abuse and/or sexual harassment
("in 2015"), and the result is unfounded" (See: Exhibit No 131 -
Inmate Notification-Allegation of Sexual Abuse Harassment). A PREA
investigation report turned over by way of discovery, noted that
PREA investigation IPS officer, adorno, failed to speak with Ms.
Martino-Fleming in conducting his investigation (although she was
mentioned in the email as a witness to the harassment) (See: Exhibit
No 160 - Adorno's PREA Investigation Report No 1692). According to
policy 103 DOC 519.07 D(2): "Any potential witnesses 'shall' be
interviewed in an attempt to corroborate the victim's statements..."[3]
Adorno's PREA investigation report, also noted, that, instead of
Adorno speaking personally with Vernon Thompson. Adorno phoned IPS
at the Sexual Offender Treatment Center (where Thompson is now
housed), and requested Thompson be questioned by IPS there ("in

---

Footnote No 3: Although the entire email/Adorno PREA
investigation incident occured after discovery closing.
the Court allowed defense to arbitrarily label Lenita
Richardson's email "Supplemental Discovery", and,
incorporate it into this case; along with Adorno's
"2019" PREA Investigation Report No 1692. After the
Court allowed Pro-Bono counsel permission to withdraw
and appointed him as stand-by counsel. The Court
provided Jones an opportunity to "request for further
documents and re-open depositions"; Motions To Depose/
Adorno was denied by the Court, and, so was Motion For
reconsideration (See: Dk No(s) 120, 121, 125 and 126).

2019") regarding Jones' 2015 allegations; which Thompson claimed to not remember such events (See: Exhibit No 160 - Adorno's PREA investigation report No 1692). According to Sexually Abusive Behavior Prevention And Intervention Policy ("103 DOC 519"). Required, General Procedures ("103 DOC 519.03") and other applications in the policy; were not followed or adhered to, in PREA investigations conducted against Jones.

General Procedures 103 DOC 519.03 clearly state:
"All allegations and incidents of inmate on inmate... sexually abusive behavior 'shall' immediately be reported by Department employees, contractors and volunteers to the shift commander verbally and followed up with a confidential incident report to the superintendent before the end of his/her shift.'
'During non-business hours, these allegations 'shall' be reported to the shift commander who 'shall' ensure that the superintendent is immediately notified. Failure of any Department employee, contractor or volunteer to report these allegations may result in disciplinary action, up to and including termination.'
'As defined in "103 DOC 519.02"; Sexually Abusive Behavior: 'The term used in this policy to describe' 'all prohibited sexual behavior.' sexually abusive behavior includes acts of intimacy, sexual contact, 'sexual abuse'..." Webster's definition of "Sexual Abuse": "Coarse and insulting speech (verbal), to attack in words".
See: **Prison Rape Elimination Act, Prison And Jail Standards** (Exhibit No 132, Pg. No 29); **Sub. Sec. 115.73(e)** - "All such 'notifications'

or attempted 'notifications' 'shall' be documented."

The Court has challenged Jones to show that the PREA investigations were unnecessary. First and foremost, if an investigation is not conducted in accordance with what its agency policy dictate. It is not only considered unnecessary; but, also, inappropriate. furthermore, the circumstances Jones was put through regarding the made up/created PREA incidents caused psychological harm. Had the PREA investigations actually been necessary; than they would have been conducted in accordance with what its agency policy dictated. Any PREA actions/investigations for, or, against Jones, outside of what agency policy dictated; are considered unnecessary. As stated prior, Defendant's are damd if they did, and damd if they did'nt; regarding any PREA investigations committed against, or, in behalf of Jones.

Lets begin with paragraph (c):

The plain and simple fact, that, a PREA investigation was conducted in "2019". Into allegations that was reported by Jones (as proven above: by letters, grievances and verbally), and, numerous other staff (RTU mental health clinicians, treating psychiatrists, and, other inmates) in "2015"; is proof that Defendant's (at the least Mitchell and Devine) disregarded policy requirements as set forth in "103 DOC 519" (See: Exhibit No 96 – Sexually Abusive Behavior Prevention And Intervention Policy). Mitchell affirms in her deposition (Pg No 17) "that they are 'obligated' to investigate 'any' allegation of 'sexual harassment'

or sexual misconduct, under PREA, 'no matter how severe'." Devine
affirms in his deposition (Pg no 7) that "as PREA manager
responsibilities include 'making sure that,..., all time frames
and whatever requirements of the policy, were in the policy, were
met'." Than, why was'nt a PREA investigation conducted in "2015"
upon receipt of the sexual harassment allegations made by Jones,
RTU mental health staff, Co-Contracting psychiatrists, and, other
inmates? The allegations reported by Jones (grievances and
corresspondence) and mental health clinicians and psychiatrists
(to Mitchell, Devine and Camelo) in "2015"; were more extreme than
those mentioned in the "2019" email (See: Exhibit No 99 – email To
Lenita Richardson). Conducting a PREA investigation in "2019", into
"2015" allegations; is an acknowledgement on Defendant's behalf,
that, they dropped the ball into "2015" allegations. It has well
been established, that, conducting a PREA investigation in "2015";
would have led to a sufficient remedy to eleviate the risk of
harm. "Prison officials have a duty to protect thier inmates by...,
creating and sustaining a safe prison environment, 'and
investigating allegations of sexual misconduct or abuse when they
arise'." **Chao v. Ballista, 806 F. Supp. 2d 358 (July 28, 2011).**
conducting an investigation into allegations "four years after
they arise" (allowing physical and psychological harm to occur
first) is not living up to a duty to protect; or, considered
creating and sustaining a safe environment.

Paragraph (b):

Again, Defendant's are damd if they did, and, damd if they did'nt.

Either way, had this PREA investigation actually been necessary; than it would have been conducted in accordance to what policy requirements dictated. What we do know is that officier, Olivera, wrote an incident report indicating a PREA allegation; Jones and Fowler were detained and questioned by the PREA investigator; Jones and Fowler, were than, required to be examined by medical and mental health; but, there is no required records documenting a PREA investigation being initiated. There is no record of Jones being questioned; there is no record of Fowler being questioned; there is no record of Jones being examined by medical and mental health; nor is there a record of Fowler being examined by medical and mental health. The only documentation that exist to substantiate a PREA investigation being initiated. Is the incident report documenting Jones being placed on fifteen (15) minute watch; as a result of the trauma, depression and stress, Jones was experiencing as a result being put through the fraudulent PREA investigation process (See: Exhibit No 127 (Pg No 1-2) - Mental Health-Mental Status Update). Lets just say we give Defendant's the benefit of a doubt, and say that officer, Olivera made an honest mistake, comprehending Jones' point of view. That, still, does not explain why policy requirements (in 103 DOC 519) were not followed or adhered to. And why this PREA investigation was not documented and reported in accordance to what 103 DOC 519.03 (See: Exhibit No 96 - Sexually Abusive Behavior Prevention And Intervention Policy) or **Prison Rape Elimination Act, Prison And Jail Standards** require.

Paragraph (a):

Proof of Defendant's acknowledging this PREA investigation being unnecessary is noted in defense counsel's deposition questions of Jones; see exhibit No 158 - Pages 182 (para 17)-183:

Q. "Im going to call your attention to the bottom page 1, please, second paragraph, I think the sentence. I'm going to read it... The first grievance I allowed to be withdrawn, and not formally filed as a result of a promise to me from Captain Camelo, insuring no PREA allegation documents or reports would be placed in my six (6) part folder as a result of false information submitted by inmate Vernon Thompson, and that, 'Vernon Thompson would not be housed near or around me'."

A. "Yes".

Q. "Okay. What was the promise from Captain Camelo?"

A. "Captain Camelo told me that no information regarding those PREA incidents would be -- would follow me and that Vernon Thompson would not be housed near or around me. He would not be arriving back at OCCC after this incident."

Q. "Okay. Did any of these PREA allegations end up in your six (6) part?"

A. "They was removed."

Q. "Did they end up in your six (6) part?"

A. "They was removed."

Q. "When were they removed?"

A. "Prior to my viewing my 6 part folder."

Q. "How do you know that?"

A. "Because why they exist now? They exist -- the point is they exist now. So, if they exist now,

where was they being held at? In a special
folder that says, dont put in inmate Jones'
6 part folder? Well, we're going to hold
this in a special place?"

Q. "So you're making an assumption?"

A. "I'm making a clear observation. I have
documents now that -- where would they be
held at if not in my 6 part folder that
revolves around me and this PREA incident.
They're in my medical folder."

Q. "you have no personal knowledge that these
documents were held in your 6 part folder?"

A. "no."

Why would any of the Defendant's agree to not file PREA

information, as policy require, except they acknowledge such

investigation being unnecessary?

Defense counsel would have the Court believe that Defendant

Camelo had no involvement in the PREA incidents. Above they

contradict themselves. The line of questioning above; defense

counsel is trying to lead one to believe, that, Camelo stuck to

a promise of not filing anything connected to the PREA

investigation in Jones' six (6) part folder.

Second of all, according to "General Procedures (103 DOC 519.

03), the only ones to be involved (once an allegation is reported);

is, the superintendent, the PREA manager, investigative services,

the Assistant Deputy Commissioner, and, the Deputy Commissioner.

And, last but not least, if, it is defense' position that

Camelo had no involvement in any PREA incidents. Than how is it

possible, for Camelo, to arrange for information that is required

to be filed; not to be filed, stored, documented, or, reported?
A prime example of a failure to adhere to, and, follow the same
policy; that, Jones is alleging Defendant's disregarded. More
disregard of this policy is in defenses failure to turn over
discovery; that, substantiate them adhering to, and, following
requirements as set forth in 103 DOC 519 policy. The same
requirements, Devine stated in deposition (Pg No 7), his
responsibility were insure be met.

As required, in all three PREA investigations (in Para no(s)
(a) (b) and (c). Defendant's are unable to provide documentation
that they followed PREA policies. A question posed to Mitchell
during deposition was Q. "Is there a set of procedures or standards
that you are required to follow before initiating a PREA
investigation?" A.(Answer). "Theres a policy for the **Prison Rape
Elimination Act** that we follow which is adopted by the federal
guidelines."
Defendant's are unable to present notifications substantiating that
the Assistant Deputy Commissioner, the Office of Investigative
Services, the PREA Manager, and, the Deputy Commissioner of the
Prison Division; were notified of the alleged sexually abusive
behavior, set forth in para no(s) (a) (b) and (c). Nor are they
able to present any referrals, or other required documentation;
that, they followed the PREA policy in conducting, or, failing
to conduct, PREA investigations set forth above in paragraphs (a)
(b) or (c). "An inmate has the right to expect prison officials
to follow policies..." **Payne v. Block, 714 F. 2d 1510 (11th Cir.**

1984). "The prisoner's interest has real substance and is
sufficiently embraced within **Fourteenth Amendment** 'liberty' to
entitled him to those minimum procedures appropriate under the
circumstances and required by the **Due Process Clause** to insure
that the state-created right is not arbitrarily abrogated." **Wolf
v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).**
Jones had a "liberty interest" NOT to be traumatized; or, to have
his PTSD exacerbated, as a result of unnecessary PREA investigations
that was not conducted in accordance with policy. "A state may vest
prisoners with protected liberty or property interest under the
**Due Process Clause** through its statutes or regulations." **Wolf Supra**.

Rule 57 provides that the existence of another adequate remedy
does not preclude a declaratory judgement that is otherwise
appropriate. "The states immunity is not shared by state officers
in the extent that the suit seeks prospective injuctive or
declaratory relief or seeks damages from officers in thier
individual capacities." **Ex Parte Young 209 U.S. 123.**


**RECKLESS DISREGARD:**

Throughout this entire case. One cannot help but to acknowledge
the "reckless disregard" on behalf of Defendant's. Defendant's
"recklessly disregarded" policies (103 DOC 519: Sexually Abusive
Behavior Prevention And Intervention Policy); (103 DOC 426:
Inmate Conflict Policy); (103 CMR 420: Classification); guidelines
and procedures involving "Active Enemy".

1). "Reckless Disregard" is noted in Defendant's failure to

issue Thompson a required, "annually", classification hearing in 2015 as the regulation dictated. 2). "Reckless Disregard" is noted in Defendant's failure to place Thompson at a security level his point based score required he be housed at. 3). "Reckless Disregard" is noted in Defendant's failure to house Thompson at a facility where he had no "Active Enemys" at. 4). "Reckless Disregard" is noted in Defendant's failure to "separate inmates by institutions" as was reccommended by RTU mental health staff. "To act in 'reckless disregard' of a person's rights means the voluntary doing or failure to do of something that you're requested to do.' 'It means such disinterest in the thing you are supposed to do, that your conduct may be classified as wanton, 'reckless.''Conduct is wanton if it is done in disregard of the rights of others'." **Frett v. Goverment of Virgin Islands, 838 F. 2d 968; 1988 U.S. App. Lexis 1856.** "The Court concluded that a jury could find that the remaining Defendant's had acted with 'reckless disregard' of... safety, and had thereby contributed to his injuries" physically and psychologically. <u>**Frett Supra**</u>. "The court, referring to **Davidson v. Cannon, 474 U.S. 344, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1986)**, corrected counsel, pointing out that in **section 1983** cases the applicable standard of care was not negligence -- reasonable care -- 'but recklessness'." "The 'reckless indifference' of all the above named Defendant's is the proximate cause of Plaintiff's injuries." <u>**Frett Supra**</u>.


**FORSEEABILITY:**

According to past conduct of Thompson; as noted in 2014 and 2016

classification reports of Thompson (See: Exhibit No 155 and 157 – Classification Reports of Thompson), and, will also be noted substantially in 2015 Bridgewater State Hospital Evaluation Report (which is why "court required in-camera review of documents" is necessary, required, and, requested); harm was forseeable.[4] As documented above, RTU mental health team; Co-Contracting psychiatrists; other inmates; and, Plaintiff, warned Defendant's. "That –Thompson– posed a serious danger to... inmates –specifically Jones– ; but, they nevertheless returned him to the general prison population, where perfectly foreseeable harm occurred." Frett v. government of Virgin Islands, 839 F. 2d 968; 1988 U.S. App. Lexis 1856. Santiago v. Walls, 2001 U.S. App. Lexis 6465.

## LEGAL STANDING:

Summary Judgement is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); Celotex, Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.

---

Footnote No 4: Upon order of the Court to file a "Joint Status Report" (Dk No 107); the Court provided Jones an opportunity to "request further documents" (numbered 1 thru 11). A request for "Confidential Health Protected Information" of Vernon Thompson, including Vernon Thompson's August and/or September 2015 Bridgewater State Hospital Evaluation Report (numbered 11, of "Joint Status Report") was requested, and, ordered by the Court to be filed with the Court by 4-25-19 (Dk No 120), to which Defendant's have failed to file as ordered by the Court.

Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. **Id.**

The case before the Court. The moving party/Jones, have established an absence of a genuine issue of material fact by (1) presenting evidence that will negate all elements of the non-moving party's case; and (2) demonstrating that the non-moving party failed to establish an essential element of that party's case. **Celotex, 477 U.S. at 322-323, 106 S.Ct. 2548.** Through the pleadings, depositions, affidavits, exhibits, production of documents Jones "believes that he has demonstrated the absence of a genuine issue of material fact". **Id. at 323, 106 S.Ct. 2548.** "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party's, there is no 'genuine issue for trial.'" **Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 SW.Ct. 1575, 20 L.Ed.2d 538 (1986)** (quoting **First Nat'l Bank of Ariz. v. Cities serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L.Ed.2d 569 (1968).**

For the reasons stated above, and, throughout; Summary Judgement shall be granted in favor of Jones. As law requires...

Dated: 9-6-19

Respectfully Submitted,

Mr. Edward Jones (W-102323) Pro-Se
OCCC
1 Administration Road
Bridgewater, Mass 02323