UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 16-CV-11666-LTS

EDWARD T. JONES,

    Plaintiff,

v.

COMMONWEALTH OF MASSACHUSETTS, ET AL.,

    Defendants.

## DEFENDANTS LISAMITCHELL'S, MICHAEL DEVINE'S AND JOHN CAMELO'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Lisa Mitchell ("Mitchell'), Michael Devine ("Devine") and John Camelo ("Camelo"), submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

## PARTIES

1. Plaintiff is an inmate lawfully in the custody of the Massachusetts Department of Correction ("DOC"). *First Amended Complaint ¶4*.

2. Plaintiff is currently incarcerated at Old Colony Correctional Center ("OCCC"). *First Amended Complaint ¶4*.

3. The defendants are Lisa Mitchell ("Mitchell"), the OCCC Superintendent for the relevant time period; Michael Devine ("Devine"), the OCCC Deputy Superintendent for the relevant time period; and, John Camelo ("Camelo"), a Captain at OCCC for the relevant time period. *First Amended Complaint ¶¶6,8,9*.

4. The only claims remaining after the Department of Correction Defendants'

Motion to Dismiss are claims under the Eighth Amendment and the Massachusetts Declaration of Rights, Article 26. *See Memorandum and Order (Document Number 73).*

5. Lisa Mitchell was the Superintendent of OCCC in 2015. *Deposition of Lisa Mitchell, attached as Exhibit A, p. 6.*

6. Michael Devine was the Deputy Superintendent of Programs, Treatment and Reentry at OCCC. In that position he oversaw things related to treatment, whether it be substance abuse or religious programs and also oversaw the whole reentry process. As the Deputy Superintendent of Programs, Treatment and Reentry he was also the Prison Rape Elimination Act ("PREA") Manager for OCCC. *Deposition of Michael Devine, attached as Exhibit B, pp. 5-6.*

7. Captain Camelo was the Captain of the Residential Treatment Unit ("RTU") at OCCC in 2015. His duties included conducting rounds of the unit and overseeing the staffing of that unit. *Deposition of John Camelo, attached as Exhibit C, p. 8.*

## THE RESIDENTIAL TREATMENT UNIT

8. OCCC is a medium security prison run by the DOC. The mission of OCCC Medium is to promote public safety through the management and treatment of the mentally ill offender in a safe, secure, and therapeutic environment. OCCC's diverse workforce provides meaningful programming opportunities designed to prepare mentally ill offender for successful reentry in the community. The majority of inmates incarcerated at OCCC have mental health issues. *Affidavit of Elena Clodius attached as Exhibit D,¶2.*

9. The purpose of the Residential Treatment Unit at OCCC is for inmates with

severe and persistent mental illness who have difficulty managing in general population, because they need frequent contact or they are on mental health watches, or if they need increased observations. Mental health staff is assigned to the RTU to help provide groups and support the inmates to function better. *Deposition of Vanessa Martino-Fleming, attached as Exhibit E, p. 15.*

10. According to the DOC's <u>Mental Health Services</u> Policy, 103 DOC 650, the Residential Treatment Unit ("RTU") is a "general population housing unit that provides an intermediate level of care for inmates whose mental illness, combined with significantly impaired social skills and limited ability to participate independently in activities of daily living, makes it difficult for them to function in the general population of a correctional facility, but who are not so impaired as to require psychiatric hospitalization". *Exhibit D, 103 DOC 650, <u>Mental Health Services</u> Policy attached as Exhibit 1 to Exhibit D, specifically 103 DOC 650.01Q.* The RTU provides "an intermediate level of care for general population inmates with a mental health classification of MH-4. These inmates do not require inpatient psychiatric hospitalization, but they present with a pervasive pattern of inability to function or manage appropriately within general population due to a mental disorder" *Exhibit D, ¶4, Exhibit 1, specifically 103 DOC.650.08A*.

11. At OCCC the placement in the RTU is determined by mental health staff. Mental health staff first has to approve an inmate's placement in the RTU and then a Classification Board is held recommending the RTU based on the mental health approval. Central Classification gives the final approval for an inmate's placement in the RTU. *Exhibit D, ¶5, and Exhibit 1, specifically 103 DOC 650.08B*.

12. The RTU was the unit that was designated to handle inmates who were seriously mentally ill. *Exhibit A, p. 43.*

13. All the inmates in the RTU had some degree of mental health issues. *Exhibit E, p. 55.*

## ALLEGATIONS OF SEXUAL HARASSMENT

14. All of the allegations in the Complaint occurred while plaintiff was incarcerated at OCCC. *First Amended Complaint.*

15. Plaintiff describes himself as being mentally ill. *First Amended Complaint p.1, ¶15.*

16. Plaintiff alleges that he was sexually harassed at OCCC by inmate Inmate A ( Inmate A for the time period from June to October, 2015. *First Amended Complaint ¶¶ 16, 20.*

17. Plaintiff first met inmate Inmate A about 2014 at OCCC. *Deposition of Edward Jones, attached as Exhibit F, pp. 32-33.*

18. According to the DOC's Inmate Management System ("IMS") Edward Jones and Inmate A were both housed in the RTU at OCCC on the following dates:

    November 18, 2014-December 11, 2014

    December 15, 2014-February 17, 2015

    February 18, 2015-April 15, 2015

    May 19, 2015-July 24, 2015

    July 27, 2015-August 3, 2015

    August 12, 2015-August 20, 2015

    *Exhibit D, ¶6 and chart attached as Exhibit 2 to Exhibit D.*

4

19. According to IMS, Edward Jones and [Inmate A] were never housed in the same cell at OCCC. *Exhibit D, ¶7*

20. Plaintiff alleges that [Inmate A] first sexually harassed him in May 2015. *Exhibit F, p. 36.*

21. Plaintiff alleges that the sexual harassment occurred when both he and [Inmate A] were housed in the Residential Treatment Unit ("RTU") at OCCC. *First Amended Complaint ¶¶ 16-21.*

22. Plaintiff testified that the first time [Inmate A] sexually harassed him was in May 2015; that [Inmate A] came up to plaintiff in plaintiff's cell when he was at the urinal and said "Wow. You got a big dick". *Exhibit F, p. 36.*

23. [Inmate A] did not touch plaintiff during this alleged incident. *Exhibit F, p. 37.*

24. Plaintiff testified that after this incident he "wanted to smash his face in"; meaning [Inmate A] face. *Exhibit F, p. 37.*

25. Plaintiff testified that [Inmate A] came into his cell in May 2015 and asked him if plaintiff likes men. Plaintiff said that [Inmate A] told him "I want to have sex with you" and plaintiff responded "I'm not going to have sex with you. Get the hell out of my cell". *Exhibit F, pp. 37-38.*

26. [Inmate A] did not touch plaintiff during this alleged incident. *Exhibit F, p. 38.*

27. Plaintiff testified that the next time [Inmate A] sexually harassed him was in about June, 2015. Plaintiff stated that [Inmate A] said "I want to have sex with you…I know you like men". *Exhibit F, p. 39.*

28. [Inmate A] did not touch plaintiff during this alleged incident. *Exhibit F, p. 40.*

29. Plaintiff testified that the next time [Inmate A] sexually harassed him was in June

5

2015. According to plaintiff, Inmate A approached plaintiff while he was at the urinal in his cell and Inmate A said "dudes act like they're funny just because they got a big dick. You know what I'm saying? It ain't my fault you got a big dick, you know". *Exhibit F, p. 40.*

30. Inmate A did not touch plaintiff during this alleged incident. *Exhibit F, p. 41.*

31. According to plaintiff in July 2015, Inmate A came to his cell and said "I want to have sex with you". Plaintiff said that Inmate A was also talking about another inmate and also about some brothers and uncles who raped family members; Inmate A was not talking about plaintiff. *Exhibit F, pp. 42-43.*

32. Plaintiff stated he told Officer Mooreland about this incident in July, 2015 and Officer Mooreland notified Inner Perimeter Security ("IPS") officer O'Neil. *Exhibit F, pp. 43-44.*

33. Plaintiff testified that he spoke to Officer O'Neil about Inmate A *Exhibit F, p. 43.*

34. Plaintiff testified that after he spoke to Officer O'Neill, Inmate A was locked in his cell and plaintiff was released back to population. *Exhibit F, p. 44.*

35. According to plaintiff, the day after this alleged incident, Inmate A was moved out of the RTU and plaintiff did not see him again until October. *Exhibit F, p. 44.*

36. Plaintiff stated that from May to July 2015, Inmate A would come to his cell when he got out of the shower and "talk about how nice my body looked, … and he would always talk about how big my penis is". *Exhibit F, p. 49.*

37. Plaintiff testified that Inmate A did not touch him any of the times he claims that Inmate A sexually harassed him. *Exhibit F, p. 47.*

6

38. Plaintiff claims [Inmate A] sexually harassed/sexually targeted other inmates. *Exhibit F, pp. 47, 51.*

39. In plaintiff's opinion the terms sexual harassment and sexual targeting are the same things. *Exhibit F, pp. 48-49.*

40. Plaintiff claims [Inmate A] sexually targeted him by "specifically coming to my cell, by specifically pursuing me for sex, by specifically talking about my private parts, by specifically waiting until I got out of the shower to come and talk about how my body looked and stuff like that". *Exhibit F, p. 48.*

41. In August 2015, plaintiff said [Inmate A] "was causing confusion yelling out of his door about men having sex with little girls, fifteen thirteen, twelve year old girls and three brothers raping their little sister and stuff like that". [Inmate A] never mentioned plaintiff's name in any of the things he yelled out. *Exhibit F, p. 194.*

42. [Inmate A] never physically touched plaintiff. *Exhibit F, p. 119.*

43. Plaintiff did not specifically tell correctional staff what [Inmate A] said to him. He just told correctional staff that he was being harassed. *Exhibit F, p. 123.*

44. Plaintiff thinks that [Inmate A] is crazy and has severe mental health issues. *Exhibit F, p. 136.*

45. In August, 2015, plaintiff spoke to IPS about [Inmate A] According to plaintiff he spoke to IPS about how [Inmate A] was sexually harassing him and also about how [Inmate A] was creating a climate issue in the block. *Exhibit F, pp. 196-197.*

46. On August 19, 2015, plaintiff signed an Inmate Waiver Form which stated he had "no concerns about returning to general population". *Exhibit F, pp. 197-198,* and

*Inmate Waiver Form attached as Exhibit G.*

47. In September, 2015, plaintiff told staff that if ▮Inmate A▮ continued to make comments, plaintiff may smash him in the head. *Exhibit F, p. 191.*

48. On September 24, 2015, Vanessa Martino-Fleming wrote a confidential incident report which stated that she was approached in the RTU by plaintiff and four other inmates "regarding their concerns with ▮Inmate A▮ returning to the unit". The inmates reported that they were "'just trying to be proactive and do the right thing by coming forward because no one wanted to see Mr. ▮Inmate A▮ get hurt'". Plaintiff told her "'I don't want to but if he continues to make those comments I might smash him in the head'". *Exhibit E, pp. 29-30, 37-38, September 24, 2015 incident report attached as Exhibit H.*

49. According to Martino-Fleming, the inmates were fearful for ▮Inmate A▮ for him being hurt. *Exhibit E, p. 37.*

50. Captain Camelo and Deputy Devine advised Martino-Fleming to write the incident report after she reported to them what the inmates told her. *Exhibit E, pp. 48-50, 55.*

51. The incident report stated that inmates in the RTU, including plaintiff were fearful for ▮Inmate A▮ getting hurt. *Exhibit E, pp. 37-38, Exhibit H.*

52. Vanessa Martino-Fleming thought ▮Inmate A▮ safety was at risk. *Exhibit E, p. 21.*

53. Mental health staff thought that some inmates in the RU may assault ▮Inmate A▮ *Exhibit E, pp. 21-22.*

54. In Deputy Devine's opinion ▮Inmate A▮ did not pose a physical danger to other

8

inmates at OCCC. *Exhibit B, pp. 11-12.*

55. In Deputy Devine's opinion [Inmate A] was a climate issue because of his mental illness; "he would tend to say inappropriate things". *Exhibit B, p. 12.*

56. According to Superintendent Mitchell, [Inmate A] was seriously mentally ill. *Exhibit A, pp. 42-43.*

57. In Captain Camelo's opinion, [Inmate A] was very mentally challenged "so he had a conflict probably with everybody in the unit". *Exhibit C, p. 13.*

58. According to Captain Camelo, plaintiff was 'one of many that had issues with [Inmate A] *Exhibit C, p. 28.*

59. According to Deputy Devine, [Inmate A] was not well liked because he would say inappropriate things. Other inmates were worried about [Inmate A] because they were concerned "he would say something inappropriate and would end up maybe getting hurt or something". *Exhibit B, p. 14.*

60. Plaintiff never told Deputy Devine that he was decompensating as a result of his interactions with [Inmate A] *Exhibit B, p. 18.*

61. In 2015, it was the responsibility of the IPS team to determine whether a conflict existed between inmates. IPS would conduct an investigation, enter information into IMS and Supt. Mitchell would be one to review it. *Exhibit A, p. 31-32.*

62. Inmates were not always separated when a conflict was entered between them. If a conflict was approved they could have been separated by housing, could have been separated by institution. An approved conflict means that there was a valid conflict between two individuals. The conflict "has to be a very significant security risk and safety risk". *Exhibit A, pp. 32-33.*

9

63. The purpose of the Inmate Waiver Form is to determine whether or not an inmate needs to be separated from another inmate; if the inmate can be returned to population. *Exhibit A, pp. 34-35.*

64. If an inmate did not sign the Inmate Waiver Form, he may have been placed in restrictive housing or a special management unit if he had protective custody issues. Said inmate may have been separated from his conflict by housing unit. OCCC would have continued to monitor the process and look into any allegations further. *Exhibit A, p. 35.*

65. An inmate would not sign an Inmate Waiver Form if an inmate had a valid enemy issue or conflict. *Exhibit A, p. 35.*

66. Lisa Mitchell did not make the final decision about whether to return an inmate to general population. *Exhibit A, p. 38.*

67. An inmate signs an Inmate Waiver Form "to confirm that he has no issues with another inmate or being placed back into population, whether it be in the same housing unit that the inmate that he has an issue with currently lives". *Exhibit C, p. 29.*

68. ▇Inmate A▇ was a climate issue the first day he arrived in the RTU. *Exhibit C, pp. 31-32.*

69. "A climate issue is an inmate who is verbally abusive to other inmates. More than one. That poses a climate issue within the unit. So specifically, again, ▇Inmate A▇ ▇▇▇▇ again was a highly, you know, ill mental health inmate and very problematic within his confinement in the Department of Correction". *Exhibit C, p. 31.*

70. Ms. Martino-Fleming did not tell Captain Camelo about any symptoms plaintiff was experiencing. She just told Captain Camelo that plaintiff "wasn't happy that [Inmate A] was in the same unit as him". *Exhibit C, p. 27*.

71. If an inmate "was causing a climate issue to a degree where it could cause potential harm to another inmate, the staff, he would be removed from the unit and the incident would be investigated". *Exhibit C, p. 32*.

72. According to Captain Camelo "[t]he potential was there for any inmate to pose danger to another inmate at any given time… Not just [Inmate A] not just Jones, it could be any inmate in the unit". *Exhibit C, p. 32*.

73. Captain Camelo was never warned that [Inmate A] poses a physical danger to plaintiff. *Exhibit C, p. 33*.

**INCIDENT IN CHOW HALL ON OCTOBER 24, 2015**

74. Plaintiff alleges that on October 24, 2015, [Inmate A] came and sat behind him in the chow hall while plaintiff was eating. Plaintiff alleges that [Inmate A] said "how he still wants to have sex with me, how I have a big dick and how he hasn't forgotten about me". *Exhibit F, pp. 59-60, 130*.

75. According to plaintiff he told Officer Mooreland about [Inmate A] comments and Officer Mooreland told [Inmate A] to leave plaintiff alone. *Exhibit F, pp. 60-61*.

76. According to plaintiff, Officer Mooreland told [Inmate A] to leave the chow hall. *Exhibit F, pp. 61, 134-135*.

77. According to plaintiff, after Officer Mooreland ordered [Inmate A] to leave the chow hall, [Inmate A] came over to plaintiff and said "some other crazy stuff".

11

*Exhibit F, pp. 134-135*. According to plaintiff, [Inmate A] "was leaving the chow hall and he came over to my table and says, I want to kiss you". *Exhibit F, p. 61*.

78. According to plaintiff, [Inmate A] said "I'm going to stab you with my fork. As soon as I drop off my tray, I'm going to stab you with my fork". *Exhibit F, p. 61*. Plaintiff testified that [Inmate A] said "as soon as I put my tray away, I'm going to stab you anyway, you know". *Exhibit F, p. 135*.

79. Plaintiff told [Inmate A] "if you don't get away from me, I'm going to smash your face in". *Exhibit F, p. 61*.

80. Plaintiff got up and followed [Inmate A] *Exhibit F, p. 61*. Plaintiff testified that that he was "not going to wait for him to put his tray up". Plaintiff testified that he followed [Inmate A] to put his tray away. *Exhibit F, p. 135*. Plaintiff testified that [Inmate A] told him he was going to stab him with his fork and plaintiff followed him. *Exhibit F, p. 138-139*.

81. Plaintiff alleges that [Inmate A] broke his fork and stabbed plaintiff with it. *Exhibit F, p. 61*.

82. According to plaintiff, he got up. [Inmate A] put his hands up as though he was going to stab plaintiff. Plaintiff put his hand out to block it and [Inmate A] stabbed him in the hand. Plaintiff and [Inmate A] got into a fight and according to plaintiff "I got the better of him". *Exhibit F, p. 62-63*.

83. Plaintiff testified that he was behind [Inmate A] when [Inmate A] broke the fork and swung. *Exhibit F, p. 135*.

84. According to plaintiff, [Inmate A] knew plaintiff was following him to the tray disposal area. *Exhibit F, pp. 139-140*.

12

85. According to plaintiff, the fight was a mutual thing; nobody hit first. *Exhibit F, p. 140.*

86. Plaintiff testified that he told IPS Officer Adorno that plaintiff "beat his ass"; meaning Inmate A *Exhibit F, p. 141.*

87. According to plaintiff, Inmate A stabbed him first with the fork, but then plaintiff hit Inmate A *Exhibit F, p. 141.*

88. According to plaintiff, he won the fight. *Exhibit F, pp. 141-142.*

89. According to plaintiff, he received three stitches in his hand; the stitches were done at OCCC. *Exhibit F, p. 142.*

90. Plaintiff testified that he punched Inmate A who then fell. When Inmate A was on the ground, plaintiff stomped on his stomach with his right foot probably three times. *Exhibit F, pp. 145-146.* According to plaintiff he "was trying to stomp him in his penis". *Exhibit F, p. 146.*

91. Plaintiff testified "I should have" in response to a question asking if he jumped on Inmate A *Exhibit F, p. 145.*

92. After he knocked Inmate A to the floor, plaintiff pulled him away from correctional staff and then stomped on him. Plaintiff pulled Inmate A by his feet about two feet. *Exhibit F, p. 150.*

93. Correctional staff told plaintiff to stop stomping on Inmate A They had to tell him to stop 2-3 times before plaintiff stopped. *Exhibit F, pp. 147-148.*

94. Inmate A only stabbed plaintiff with the fork; he did not hit him. The only physical contact by Inmate A was with the fork. *Exhibit F, p. 148.*

95. Inmate A stabbed plaintiff in the right hand and plaintiff punched Inmate A

13

with his right hand. *Exhibit F, p. 149.*

96. Correctional staff took both plaintiff and [Inmate A] to the Health Service Unit after the fight. *Exhibit F, p. 151.*

97. Plaintiff testified that he "was ready to beat the hell out of [Inmate A] *Exhibit F, p. 104.*

98. Prior to the fight in the chow hall, [Inmate A] had never touched plaintiff. *Exhibit F, p. 63.*

99. Plaintiff alleges that he was sexually harassed/targeted by [Inmate A] from May until October "until I stopped him". *Exhibit F, p. 70.*

100. Plaintiff said he did not report every incident involving [Inmate A] to Lisa Mitchell or to Capt. Camelo. *Exhibit F, p. 67.*

101. After [Inmate A] was moved out of the RTU, other than being in the chow hall, he did not sexually harass and/or sexually target plaintiff. *Exhibit F, p. 74.*

102. After the fight in the chow hall, plaintiff did not see [Inmate A] again; he has not seen [Inmate A] since October 2015. *Exhibit F, p. 91.*

103. Plaintiff testified that he spoke to Deputy Devine about [Inmate A] only twice before the October fight in the chow hall; once in July 2015 and once in August 2015. *Exhibit F, p. 101.*

104. Plaintiff testified that he spoke to Supt. Mitchell about two times about [Inmate A] The first time was probably in August 2015 and within a few days of speaking with her [Inmate A] was moved out of the RTU. *Exhibit F, pp. 102-104.*

105. Plaintiff testified that after speaking with Supt. Mitchell at Access Hour in August, 2015 about [Inmate A] he never spoke to her again about [Inmate A]

14

*Exhibit F, p. 111.*

106. According to Superintendent Mitchell, "[e]very inmate that we have in our custody poses a threat". "[A]t any given time an inmate can be assaulted. This is a medium security facility. The mission is to deal with mentally ill individuals. Some are seriously mentally ill and others may just have a diagnosis of a mental disorder. So at any given time, they can be self-injurious, they can be assaultive. They carry all the DSM-IV diagnoses. Plus we have individuals that are just antisocial, and they're high risk of assaultive behavior". *Exhibit A, p. 40.*

107. There is no such thing as a keep-away order. *Exhibit A, pp. 40-41.*

## PREA INVESTIGATIONS

108. In 2015, PREA investigations were conducted by the Inner Perimeter Security ("IPS") Team at the direction of either the Superintendent or the Deputy Superintendent of Reentry. *Exhibit D, ¶11.*

109. All investigations including PREA investigations are investigated by IPS. IPS has the responsibility to investigate all allegations. For PREA investigations specifically, allegations need to be investigated to ensure that an inmate is not being victimized. *Exhibit D, ¶12.*

110. Staff is obligated to investigate any allegation of sexual harassment or sexual conduct. *Exhibit A, p. 17.*

111. Plaintiff thinks Captain Camelo subjected him to two unnecessary PREA investigations. According to plaintiff, one was when Captain Camelo took information from Officer Oliveira and forwarded it to IPS who did a PREA investigation. And the second was when plaintiff was subjected to a PREA

investigation based on information from :Inmate A: *Exhibit F, pp. 165-166.*

112. Edward Jones was only involved in one PREA investigation in 2015. *Exhibit D, ¶13.*

113. Plaintiff testified that he told Officer Oliveira that he was having "wet dreams and that I wasn't going to live in a cell with anyone any longer." Officer Oliveira contacted Captain Camelo and informed him what plaintiff had said. Plaintiff claims this led to a PREA investigation. *Exhibit F, pp. 166-167.* This alleged investigation did not involve :Inmate A: *Exhibit F, p. 170.*

114. Plaintiff testified that he was psychologically traumatized by this PREA investigation. He claims the PREA investigation exacerbated his PTSD and caused him major depression, stress and fear. *Exhibit F, p. 169-170*

115. The second PREA issue involved :Inmate A: According to plaintiff, :Inmate A: had allegedly told staff that he had seen another inmate licking plaintiff's nipples. *Exhibit F, p. 170.*

116. Superintendent Mitchell initiated a PREA investigation as a result of an allegation by :Inmate A: that he saw another inmate lick plaintiff's nipples. *Exhibit A, pp.11-12, Exhibit D, ¶14.*

117. The finding on that PREA investigation was unfounded. *Exhibit F, pp. 83, 170, Exhibit D, ¶14.*

118. Superintendent Mitchell concurred with IPS's finding that it was an unfounded allegation. *Exhibit A, pp. 16-17.*

119. Captain Camelo had no involvement with PREA investigations. *Exhibit C, pp. 8-9.*

120. In Vanessa Martino-Fleming's role as a clinician she would not recommend that PREA allegations not be investigated. *Exhibit E, pp. 53-54.*

121. Deputy Devine was not responsible for authorizing investigations of sexual abuse. *Exhibit B, pp. 6-7.* He also did not have the authority to stop a PREA investigation. *Exhibit B, p. 9.*

122. Plaintiff thinks the PREA investigation was unnecessary because staff should have known that [Inmate A] "lies about stuff like that". *Exhibit F, 171-172, 180.*

## PLAINTIFF'S CORRESPONDENCE/GRIEVANCES

123. On September 25, 2015, plaintiff wrote a letter to Superintendent Mitchell. In the letter he says that [Inmate A] "victimize, traumatize, harass and abuse me verbally". Nowhere in the letter does it say that plaintiff is in fear of a physical assault by [Inmate A] or that [Inmate A] even physically touched him. *Exhibit 11 to First Amended Complaint, attached here as Exhibit I.*

124. On August 19, 2015, plaintiff signed an Inmate Waiver From that states he had '[n]o concerns about returning to general population". *Exhibit G.*

125. On September 24, 2015 plaintiff filed Grievance Number 83803 about inmate [Inmate A] This grievance was received by the Institutional Grievance Coordinator on September 28, 2015. A review of Edward Jones's grievances shows that Grievance Number 83803 was the first time Jones filed a grievance about inmate [Inmate A] *Affidavit of Gregory Saucier ¶4, attached as Exhibit J.*

126. Plaintiff does not make any allegations in his grievance about being afraid

17

for his safety. *Grievance Number 83803(including appeal) attached as Exhibit K*.

127. The Institutional Grievance Officer ("IGC") partially approved plaintiff's grievance. The Institutional Grievance Officer wrote "[y]our grievance is partially approved; this issue with inmate [Inmate A] is being handled administratively". *Exhibit K*.

128. Plaintiff appealed the IGC's findings to Superintendent Mitchell. *Exhibit K*.

129. In his grievance appeal, plaintiff does not make any allegations about being afraid for his safety. *Exhibit K*.

130. Superintendent Mitchell denied plaintiff's appeal stating "[n]ot entitled to information requested". *Exhibit K*.

                DEFENDANTS LISA MITCHELL, MICHAEL DEVINE, AND JOHN CAMELO,
By their attorney,

NANCY ANKERS WHITE
Special Assistant Attorney General

Dated: September 13, 2019    /s/ Daryl F. Glazer_____
Daryl F. Glazer
BBO #567138
Dfglazer@doc.state.ma.us
Legal Division
.     Department of Correction
70 Franklin Street, Suite 600
Boston, MA 02110-1300
(617) 727-3300, Ext. 1102

**CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing

and that on this date a copy of this document was mailed, first class postage, to the plaintiff at his address, OCCC, 1 Administration Road, Bridgewater, MA 02324.

September 13, 2019 /s/ Daryl F. Glazer
Daryl F. Glazer