Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3
 4    * * * * * * * * * * * * * *
 5    EDWARD JONES,                  *
 6              Plaintiff            * Civil Action No.
 7    vs.                            * 1:16-CV-11666-LTS
 8    LISA MITCHELL, MICHAEL         *
 9    DEVINE AND JOHN J.             *
10    CAMELO,                        *
11              Defendants           *
12    * * * * * * * * * * * * * *
13
14            DEPOSITION OF LISA A. MITCHELL
15                 ROBINSON & COLE LLP
16                  One Boston Place
17                Boston, Massachusetts
18         November 14, 2018    10:24 a.m.
19
20
21
22         Maryellen Coughlin, RPR/CRR
23
24
```

EXHIBIT A

Page 6

1  Treatment Center in Bridgewater.
2      Q.   And can you please state for the
3  past five years every position you've held at the
4  department of corrections?
5      A.   In September of 2011 I was a
6  superintendent at Old Colony Correctional Center
7  in Bridgewater. I was the assistant deputy
8  commissioner of the southern sector for prisons
9  and then superintendent at the Massachusetts
10 Alcohol and Substance Abuse Center and currently
11 at the treatment center as a superintendent.
12     Q.   So in the fall of 2015, you were a
13 superintendent of the OCC; is that what you're
14 saying?
15     A.   At Old Colony Correctional Center.
16     Q.   So the entire prison?
17     A.   Correct.
18     Q.   And, Ms. Mitchell, do you know
19 Inmate Edward Jones?
20     A.   Yes.
21     Q.   Okay. Do you know Inmate Inmate A
22 Inmate A
23     A.   Yes.
24     Q.   How long have you known Inmate

Page 7

1  Inmate A
2      A.   Probably for about six or seven
3  years.
4      Q.   Okay. And, Ms. Mitchell, in your
5  position as superintendent of the OCC in 2015,
6  what responsibilities did you have?
7      A.   The administrator of the prison, so
8  everything dealing with security, safety, medical
9  services, mental health services, maintenance.
10 So everything that occurs within the prison falls
11 under me.
12     Q.   Did you make decisions about
13 whether to initiate a PREA investigation?
14     A.   Yes.
15     Q.   In all cases?
16     A.   Not always. We have a -- the
17 deputy superintendent of re-entry is the PREA
18 manager, so they would be involved in that
19 process also.
20     Q.   And was that individual Michael
21 Devine?
22     A.   Yes.
23     Q.   So could Michael Devine initiate a
24 PREA investigation without your authorization?

Page 8

1      A.   He could initiate it and inform me
2  of the investigation.
3      Q.   All right. Do you make the
4  decision about whether to place an inmate back
5  into general population?
6      A.   It's a multidisciplinary team.
7  When someone is placed in restrictive housing or
8  a special management unit, there's a meeting that
9  occurs three times a week to discuss each
10 individual that's in there, the circumstances in
11 which they were placed there. So there's a lot
12 of conversation. So there's medical, mental
13 health staff that are at the table, the inner
14 perimeter security team, the disciplinary
15 officer. So it's very -- it's very involved.
16     Q.   Okay. Are these the triage
17 meetings?
18     A.   This is the special management unit
19 meetings.
20     Q.   All right. And who usually attends
21 those special management meetings?
22     A.   So it would be the correctional
23 program officer that is responsible for the
24 special management unit, the director of

Page 9

1  classification, the disciplinary officer, the
2  deputy superintendent of re-entry, the IPS, inner
3  perimeter security, team, a member, the mental
4  health director, the hospital administrator.
5      Q.   Would Captain Camelo be an
6  attendant of these meetings?
7      A.   He was the IPS commander at the
8  time of the inner perimeter security team. So if
9  he was present at the facility, he would attend.
10 If not, someone from the team would participate.
11          MS. GLAZER: Can we go off the
12 record for a minute?
13          (Discussion off the record.)
14 BY MR. MONTHEY
15     Q.   Could you just clarify your
16 statement earlier, please?
17     A.   Captain Camelo oversaw the
18 specialized units, so health services, the
19 residential treatment unit.
20     Q.   Who was the IPS officer/commander
21 then?
22     A.   I believe it was Dennis Butler.
23     Q.   Okay. Would IPS be the -- would
24 IPS be the agency within the DOC that would refer

3 (Pages 6 - 9)

Page 10

1  PREA allegations to your office?
2     A.   No.  Each facility is a separate
3  entity.  So, again, the deputy superintendent of
4  the respective facility would be involved, the
5  inner perimeter security members would be
6  involved.  Someone typically assigned to the
7  inner perimeter security team is also the PREA
8  investigator, if you will --
9     Q.   Mm-hmm.
10    A.   -- and they have to have
11 specialized training.
12    Q.   Is there a set of procedures or
13 standards or guidelines that you are required to
14 follow before initiating a PREA investigation?
15    A.   There's a policy for the Prison
16 Rape Elimination Act that we follow which is
17 adopted by the federal guidelines.
18    Q.   Do you know if there are any
19 consequences for you or anyone else within your
20 office if you do not follow the PREA guidelines
21 or policy?
22    A.   I would be subject to discipline.
23    Q.   Could you elaborate on what that
24 discipline would be?

Page 11

1     A.   It would vary based on the degree
2  of the violation of the policy.
3     Q.   Okay.  Ms. Mitchell, do you know a
4  Mr. Douglas Bower?
5     A.   Yes.
6     Q.   Do you supervise Mr. Douglas Bower?
7     A.   Bower, B-o-w-e-r.
8     Q.   Yes, Bower.  Excuse me.
9     A.   That's quite all right.  Yes, I
10 did.  He was a deputy superintendent.
11    Q.   Okay.  So I'm going to introduce
12 this quick exhibit.  This is an incident report.
13 It might be on the record already, but I will
14 share it.  So if you could just mark that.
15    (Whereupon, Deposition Exhibit 1,
16    Incident Report #1404619,
17    was marked for identification.)
18 BY MR. MONTHEY
19    Q.   Here you are.
20    A.   Thank you.
21    Q.   And, Ms. Mitchell, have you seen
22 this particular incident report before?
23    A.   Yes.
24    Q.   Okay.  And do you remember handling

Page 12

1  this incident?
2     A.   Yes.
3     Q.   Okay.  And did you initiate a PREA
4  investigation into Mr. Edward Jones as a result
5  of this incident?
6     A.   Yes.
7     Q.   Okay.  At this point, I'd like to
8  introduce this next exhibit.  It's a letter from
9  my client to Mr. Douglas Bower.
10    (Whereupon, Deposition Exhibit 2,
11    8/26/15 letter to Mr. Bower from Mr. Jones,
12    was marked for identification.)
13 BY MR. MONTHEY
14    Q.   Now, Ms. Mitchell, as you can see,
15 it's addressed to Mr. Douglas Bower, but if you
16 look on the last page, you are cc'd on this
17 letter.
18    A.   Yes.
19    Q.   Did you receive this letter?
20    A.   Yes.
21    Q.   Okay.  And if you'd like you could
22 take a minute, you could read the first
23 paragraph, the content of which suggests that
24 Mr. Jones is asking for certain PREA documents as

Page 13

1  a result of a PREA investigation into him.
2     A.   Yes.
3     Q.   Okay.  And as you stated you did
4  initiate a PREA investigation into him?
5     A.   Yes.
6     Q.   Okay, thank you.  I just have one
7  more exhibit on this topic.
8     (Whereupon, Deposition Exhibit 3,
9     9/1/15 letter to Mr. Jones from Mr. Bower,
10    was marked for identification.)
11 BY MR. MONTHEY
12    Q.   Here you are.  Ms. Mitchell, you
13 can take a minute, if you'd like, to read this.
14 No need to read it out loud.
15    A.   Okay.
16    Q.   Ms. Mitchell, is there any reason
17 why Mr. Bower underneath or under your
18 supervision would tell Mr. Jones that he's not
19 under a PREA investigation?
20         MS. GLAZER:  Objection.  You can
21 answer.
22    A.   No.
23    Q.   So it's your position still that
24 you had initiated a PREA investigation?

4 (Pages 10 - 13)

Page 14

1  A. To the best of my recollection,
2  yes.
3  Q. I'd like to introduce this exhibit
4  as well. This, Ms. Mitchell, is a report that
5  was prepared for you by Sergeant Dennis Butler,
6  or at least it indicates on Page 1 that it's
7  front Sergeant Dennis Butler.
8      MS. GLAZER: Do you want it marked?
9      MR. MONTHEY: Yes.
10  (Whereupon, Deposition Exhibit 4,
11    PREA REPORT #988,
12    was marked for identification.)
13  BY MR. MONTHEY
14  Q. Ms. Mitchell, do you recognize this
15  document?
16  A. Yes.
17  Q. Okay. And if you look on Page 3,
18  the final page.
19  A. Yes.
20  Q. And the very first sentence of
21  Paragraph 1, if you could just read that.
22  A. "Inmate [Inmate A] allegation that
23  inmate's and Jones engaged in an inappropriate
24  act was unfounded. [Inmate A] could not provide a

Page 15

1  day, date, or time of the alleged incident. In
2  addition both and Jones denied being involved
3  with each other and stating the incident that was
4  reported of licking Jones nipple was untrue."
5  Q. And that's fine, that's fine. When
6  you receive an allegation of a PREA -- when you
7  receive an allegation of sexual misconduct, what
8  is the standard for you to begin an investigation
9  into that allegation under PREA?
10  A. We would conduct -- the inner
11  perimeter security team would conduct interviews.
12  They would potentially -- depending on the nature
13  of the sexual misconduct, the individuals would
14  be seen by mental health and by medical. If it
15  required them to go to Beth Israel to a SANE
16  nurse, sexual assault nurse, to discuss any kind
17  of sexual misconduct. If they didn't require,
18  and medical would make that determination when
19  they were evaluating them, if they did not
20  require that, then we would separate the two
21  until an investigation could be completed, and
22  that could be interviews, interviews with staff,
23  interviews with other individuals that were
24  residing in the unit. So it's pretty

Page 16

1  comprehensive based on the information that is
2  provided by the victim --
3  Q. Okay.
4  A. -- alleged victim.
5  Q. Has [Inmate A] ever in the
6  past made false allegations under PREA against
7  any other inmate?
8  A. I'm not sure.
9  Q. So you were never involved in any
10  previous false allegation by [Inmate A]
11      MS. GLAZER: Objection. You can
12  answer.
13      THE WITNESS: Oh.
14      I don't recall.
15  BY MR. MONTHEY
16  Q. Okay. So based off of this
17  document and the recommendation of Sergeant
18  Dennis Butler, you agreed that this was an
19  unfounded allegation?
20      MS. GLAZER: Objection.
21  Q. Do you agree that this is an
22  unfounded allegation?
23  A. Can I review this?
24  Q. Yes, please. Take your time.

Page 17

1  A. Yes, I would concur with the
2  finding.
3  Q. Okay. Ms. Mitchell, do you or any
4  of your officers who do investigate claims like
5  this investigate the credibility of those claims
6  prior to initiating a PREA investigation?
7  A. They're factfinders.
8  Q. So are they obligated to
9  investigate any allegation of sexual harassment
10  or sexual conduct?
11  A. Yes.
12  Q. No matter how severe?
13  A. No matter how severe.
14  Q. Okay. And just one last question
15  on this document, Ms. Mitchell. Is there a
16  reason this would have taken until January 12th
17  of 2016 for you to receive this?
18  A. Specifically, no, but it's not
19  their only function. Being a inner perimeter
20  security team they -- and it's indicated
21  here that -- no, I don't know. I just -- they do
22  a multitude of jobs.
23  Q. Okay. Thank you. So moving along
24  chronologically, after this first investigation

Page 30

1  December of 2015 as a result of this incident?
2  A.  This incident report?
3  Q.  Yeah.
4  A.  I don't recall.
5  Q.  Do you know if any other individual
6  had initiated a PREA investigation of Mr. Jones
7  in December of 2015?
8  A.  I don't recall.
9  Q.  Okay. And would the only other
10 individual who would make that decision be
11 Mr. Michael Devine?
12 A.  He would be consulted, but the
13 content of this report doesn't reflect anything
14 PREA related.
15 Q.  Okay. And do IPS officers conduct
16 investigations that are not exclusively
17 PREA-related investigations?
18 A.  Yes.
19 Q.  Okay. And, Ms. Mitchell, I'm just
20 going to jump back, if it's okay.
21 A.  Mm-hmm.
22 Q.  I would just like to introduce this
23 exhibit. This is the Massachusetts Department of
24 Correction Conflicts Policy?

Page 31

1  (Whereupon, Deposition Exhibit 13,
2  Massachusetts Department of Correction
3  Conflicts Policy, was marked
4  for identification.)
5  BY MR. MONTHEY
6  Q.  Now, Ms. Mitchell, if you look on
7  just the second page of the document I gave you,
8  you'll note on the bottom left this is dated from
9  April 2018.
10    Have there been any changes since
11 2015 of the DOC conflicts policy that I should be
12 aware of?
13 A.  I am not sure. The policy gets
14 reviewed annually.
15 Q.  Okay.
16 A.  And it goes through our policy
17 process.
18 Q.  All right.
19 A.  And the reviewing authority is the
20 ultimate person to sign-off on the policy and
21 then it gets distributed to the institutions. So
22 it may undergo changes, and it may not, but I
23 don't know.
24 Q.  Okay. So as of 2015 when you were

Page 32

1  a superintendent of OCCC, were you responsible
2  for determining whether a conflict existed
3  between inmates?
4  A.  No.
5  Q.  Who was?
6  A.  The inner perimeter security team
7  would conduct an investigation.
8  Q.  Okay.
9  A.  They would review, again,
10 factfinding information. They would enter it
11 into our inmate management system, which is a
12 database, and they would enter the information
13 into the computer, and I would be the one to
14 review it. After the inner perimeter security
15 team entered that information, then I would be
16 the reviewing authority on that.
17 Q.  Okay. And are inmates separated
18 when a conflict is entered between them?
19 A.  Not always. If it's approved, they
20 may be separated by housing; they may be
21 separated by institutions.
22 Q.  And what do you mean by if it's
23 approved?
24 A.  If we believe that there's a valid

Page 33

1  conflict between two individuals, we may separate
2  by housing.
3  Q.  Okay.
4  A.  If there's something significant.
5  It has to be a very significant security risk and
6  safety risk.
7  Q.  Does sexual harassment or abuse
8  constitute a significant risk?
9  A.  We would look into the allegations,
10 and if a determination was made that they weren't
11 substantiated, they were unfounded, then we would
12 not -- that would not constitute a conflict.
13 Q.  Okay. So if a conflict were to
14 exist and two inmates would be separated, would
15 that conflict need to be resolved before those
16 two inmates are put back in the general
17 population together?
18 A.  Conflicts are reviewed in
19 conjunction with classification reviews, and that
20 information is updated so that we can review any
21 conflict that does exist. So if during that
22 process the classification review or annual
23 review would review that, we would consult with
24 the individuals involved. If they were separated

```
                                                    Page 34
 1   by facility, that facility that housed the other
 2   individual would be contacted to be interviewed
 3   potentially to make that determination so we
 4   could terminate the conflict or continue it if it
 5   was that significant.
 6      Q.   I would like to introduce this one,
 7   too?
 8           (Whereupon, Deposition Exhibit 14,
 9           Inmate waiver form,
10           was marked for identification.)
11   BY MR. MONTHEY
12      Q.   This is an inmate waiver form that
13   was signed by Mr. [Inmate A]
14           Now, Ms. Mitchell, you've seen
15   these inmate waiver forms before?
16      A.   Yes.
17      Q.   Can you just describe for the
18   record what the purpose of these forms are?
19      A.   To determine whether or not if
20   there is a separation if they can return to
21   population, or if they haven't been removed from
22   population but they're -- it's at the onset of an
23   allegation, they will be interviewed. If they
24   claim there's no issues, then that's what will be
```

```
                                                    Page 35
 1   documented.
 2      Q.   So what are the consequences if an
 3   inmate does not sign the waiver form.
 4      A.   We may put them in restrictive
 5   housing or a special management unit if they have
 6   protective custody issues. We may separate by
 7   housing units. And we would continue to monitor
 8   the process and look into the allegations
 9   further.
10      Q.   So in your opinion, would any
11   inmate not sign these forms?
12           Is there a reason -- excuse me,
13   strike that. I'll rephrase.
14           Is there a reason an inmate would
15   not sign one of these forms?
16      A.   If they had a valid enemy issue or
17   conflict.
18      Q.   Okay. So when Mr. [Inmate A]
19   signed this on September 24th, 2015, as you see
20   there on the day --
21      A.   Yes.
22      Q.   -- this was around the same time as
23   you had received correspondence from Mr. Jones
24   indicating that he feared Mr. [Inmate A] correct?
```

```
                                                    Page 36
 1      A.   Yes.
 2      Q.   Okay. And is this waiver the only
 3   way? Let me rephrase that.
 4           When the decision was made to put
 5   Mr. [Inmate A] back in general population, your
 6   office only relied on this waiver?
 7      A.   Not necessarily. It would be one
 8   factor to consider.
 9      Q.   So to what extent did you put
10   weight on Mr. Jones' letter allegations?
11      A.   Which letter are you referring to?
12      Q.   I refer back to -- let's pull that
13   one out.
14           This is the September 24th letter
15   that he addressed to you. Excuse me, September
16   25th.
17      A.   Okay, this document, the waiver
18   form, was signed on the 24th. I received the
19   letter on the 25th or it was dated on the 25th.
20      Q.   Right.
21      A.   So it was received in my office on
22   the 28th.
23      Q.   And per the chart that we discussed
24   earlier for [Inmate A] placement, he was
```

```
                                                    Page 37
 1   returned to general population, Attucks II,
 2   September 30th, correct?
 3           MS. GLAZER: Can you refer the
 4   exhibit number to the witness?
 5           MR. MONTHEY: Sure. I believe it
 6   was Exhibit 6.
 7      A.   So say those dates again, please.
 8      Q.   So per that chart, it's also true
 9   that Mr. [Inmate A] was returned to general
10   population on September 30th, 2015, correct?
11      A.   He was in the health services unit
12   from the 24th of September 'til the 30th.
13      Q.   'Til the 30th, okay.
14      A.   Yes.
15      Q.   And as you stated before, the fact
16   that Mr. Jones and Mr. [Inmate A] may have been in
17   separate housing units would not preclude them
18   from being able to interact in any way in the
19   chow hall?
20      A.   Right, yes.
21      Q.   Okay. So once this waiver form
22   was -- once you received this waiver form, was
23   this immediately before you made the decision to
24   return Mr. [Inmate A] back to general population?
```

10 (Pages 34 - 37)

Page 38

1   A.   I may not have ever seen this form.
2   It's not something that is submitted to my
3   office.
4   Q.   Okay.  But you do make the
5   decision, final decision, about whether to return
6   an inmate to general population, correct?
7   A.   No.
8   Q.   Okay.
9         MS. GLAZER:  Can we take a little
10  break?
11        MR. MONTHEY:  Yes, please.
12        (A break was taken.)
13        MS. GLAZER:  I'm going to ask the
14  witness just to clarify the response to one of
15  your questions.  I think the response may be a
16  little misleading.
17        In response -- I'm just trying to
18  remember correctly.  Your response to
19  interactions between units.
20        MR. MONTHEY:  Mm-hmm.
21        MS. GLAZER:  I'm just going to ask
22  Ms. Mitchell to clarify about that.
23  A.   So when [Inmate A] was in the health
24  services unit on the 24th through the 30th --

Page 39

1   when they're in the health services unit, they're
2   either there for medical reasons or for mental
3   health reasons.  So at that point, he is
4   restricted to that cell.
5   Q.   Okay.
6   A.   He cannot go to the chow hall.
7   He's fed at his cell, in his cell.  He's not
8   going to any programming at that point 'cause he
9   needs increased monitoring --
10  Q.   Okay.
11  A.   -- either by medical or mental
12  health.
13  Q.   But when [Inmate A] was placed in
14  Attucks II between September 30th and October
15  24th, that's general population, he would have
16  been able to interact with Mr. Jones in some
17  ways?
18  A.   Yes.
19  Q.   And you said including the chow
20  hall?
21  A.   Yes.
22  Q.   All right.  And there's only one
23  chow hall where they all go to?
24  A.   Yes.

Page 40

1   Q.   And by "they all," I mean all the
2   inmates from Attucks I and Attucks II.  All of
3   them go to the same chow hall?
4   A.   Every housing unit with the
5   exception of segregation and health services.
6   Q.   Okay.  Ms. Mitchell, was it ever
7   indicated to you that Mr. [Inmate A] posed a
8   physical threat to any inmate while in general
9   population?
10  A.   Every inmate that we have in our
11  custody poses a threat.
12  Q.   Okay.
13  A.   It's universal precautions.  So at
14  any given time an inmate can be assaulted.  This
15  is a medium secure facility.  The mission is to
16  deal with mentally ill individuals.  Some are
17  seriously mentally ill and others may just have a
18  diagnosis of a mental disorder.  So at any given
19  time, they can be self-injurious, they can be
20  assaultive.  They carry all the DSM-IV diagnoses.
21  Plus we have individuals that are just
22  antisocial, and they're high risk of assaultive
23  behavior.
24  Q.   Ms. Mitchell, is there such a thing

Page 41

1   as a keep-away order?
2   A.   No.
3   Q.   Is there any sort of order that can
4   be issued that keeps two inmates completely
5   separate?
6   A.   We can develop plans.  Did one
7   exist at Old Colony, none that I'm aware of.  At
8   my current facility, you know, we operate with
9   some plans for individuals based on their level
10  of dangerousness but that's very infrequent.
11  Q.   So there was no plan at Old Colony
12  to address keeping two inmates apart from each
13  other?
14  A.   We would look at the conflict
15  policy.
16  Q.   Okay.
17  A.   And if there was a conflict, then
18  that would be what would dictate to us as to
19  whether or not to separate by housing or
20  facility.
21  Q.   Okay.  And have other inmates
22  written to your office or you personally stating
23  their concern with the sexual harassment of
24  Mr. [Inmate A]

11 (Pages 38 - 41)

Page 42

1  A.  I don't recall. I receive hundreds
2  of letters.
3  Q.  Mm-hmm.
4  A.  I review incident reports. And we
5  investigate all allegations of any kind of sexual
6  misconduct or harassment.
7  Q.  Okay. When you receive notice of a
8  conflict, of a potential conflict, are those
9  conflicts characterized?
10  A.  Inmate on inmate or inmate on
11  staff?
12  Q.  Right. Well, let me clarify. If
13  you have an inmate-on-inmate conflict is the
14  severity categorized?
15  A.  It's based on the facts. And if
16  they have threatened to kill someone, another
17  inmate, that obviously rises to the level of very
18  significant, as opposed to someone that might
19  make an allegation against someone else as a room
20  thief. So there's varying degrees of allegations
21  that we have to investigate.
22  Q.  Okay. And when you moved
23  Mr. [Inmate A] or when -- let me rephrase that.
24       When Mr. [Inmate A] was moved into

Page 43

1  Attucks II on September 30th, was Attucks II the
2  only separate housing that Mr. [Inmate A] could be
3  moved to within general population?
4  A.  [Inmate A] is seriously
5  mentally ill. The Attucks I unit, the
6  residential treatment unit, is the unit that was
7  designated to handle individuals that met that
8  mental health classification.
9  Q.  Mm-hmm.
10  A.  So when we put him in Attucks II or
11  when we would move someone to Attucks II, it was
12  kind of a unit close enough to the clinical
13  staff. As you moved in the facility, the units
14  became more aggressive and maybe to a lesser
15  degree of their mental illness as far as actively
16  mentally ill or exhibiting symptoms of mental
17  illness. So we monitor where we put all inmates,
18  and we have to consider whether they're a
19  predator, whether they're someone who's been
20  victimized, who we house people together with.
21  So there's a lot that goes into housing an
22  individual within the facility.
23  Q.  Okay. But when he was placed back
24  in September 30th, were there other housing where

Page 44

1  there was not access to the same chow hall that
2  Mr. Jones used that you could have placed him in?
3  A.  No, other than we have a protective
4  custody unit or special housing unit in which we
5  had protective custody inmates, and they would
6  eat separately, go to health services separately,
7  go to programs separately. They had their own
8  recreation times 'cause they were at high risk to
9  be potentially assaulted.
10  Q.  Okay. Those are all of my
11  questions for now.
12       MS. GLAZER: Okay. I don't have
13  anything.
14       (Deposition concluded at 11:26 a.m.)

Page 45

1       CERTIFICATE
2       I, Maryellen Coughlin, RPR/CRR and
3  notary public in the Commonwealth of
4  Massachusetts, do hereby certify that the
5  foregoing is a true and accurate transcript of
6  my stenographic notes of the deposition of
7  LISA A. MITCHELL, who appeared before me,
8  satisfactorily identified himself, and was by me
9  duly sworn, taken at the place and on the date
10  hereinbefore set forth.
11       I further certify that I am neither
12  attorney nor counsel for, nor related to or
13  employed by any of the parties to the action in
14  which this deposition was taken, and further
15  that I am not a relative or employee of any
16  attorney or counsel employed in this case, nor
17  am I financially interested in this action.
18       THE FOREGOING CERTIFICATION OF THIS
19  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20  THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21  CONTROL AND/OR DIRECTION OF THE CERTIFYING
22  REPORTER.
23
24  _____
    MARYELLEN COUGHLIN, RPR/CRR

12 (Pages 42 - 45)

Page 46

```
 1      UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   * * * * * * * * * * * * * * *
 5   EDWARD JONES,            *
 6        Plaintiff           * Civil Action No.
 7   vs.                      * 1:16-CV-11666-LTS
 8   LISA MITCHELL, MICHAEL   *
 9   DEVINE AND JOHN J.       *
10   CAMELO,                  *
11        Defendants          *
12   * * * * * * * * * * * * * * *
13
14        I, LISA A. MITCHELL, do hereby
15   certify, under the pains and penalties of
16   perjury, that the foregoing testimony is true
17   and accurate, to the best of my knowledge and
18   belief.
19        WITNESS MY HAND THIS 7 day of
20   December, 2018.
21                  [signature]
22                  LISA A. MITCHELL
23
24
```

Page 47

```
 1           CORRECTION SHEET
 2   DEPONENT: LISA A. MITCHELL
 3   CASE: EDWARD JONES VS. LISA MITCHELL,
 4         MICHAEL DEVINE AND JOHN J. CAMELO
 5   DATE TAKEN: 11/14/18
 6   ******************************************
 7   PAGE / LINE / CHANGE OR CORRECTION AND REASON
 8     /    /
 9     /    /
10     /    /
11     /    /
12     /    /
13     /    /
14     /    /
15     /    /
16     /    /
17     /    /
18     /    /
19     /    /
20     /    /
21    /19/  haul to hall - sp.
22     /    /
23     /    /
24     /    /
```

13 (Pages 46 - 47)