Page 1

1    UNITED STATES DISTRICT COURT
2       DISTRICT OF MASSACHUSETTS
3
4    - - - - - - - - - - - - - - - - - x
5    EDWARD T. JONES
6        Plaintiff
7    vs.            CA No. 18:16-CV-11666-LTS
8    COMMONWEALTH OF MASSACHUSETTS, et al.
9        Defendant
10   - - - - - - - - - - - - - - - - - x
11
12        DEPOSITION of MICHAEL J. DEVINE
13     Thursday, November 15, 2018 - 10:20 a.m.
14              Robinson+Cole LLP
15              One Boston Place
16            Boston, Massachusetts
17
18
19   Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR
20
21
22                                              EXHIBIT
23                                                 B
24

Page 2

1  APPEARANCES:
2
3  Robinson+Cole LLP
4     Andrew Monthey, Esq.
5     One Boston Place, 26th Floor
6     Boston, Massachusetts 02108
7     800.762.2678 | F: 617.557.5999
8     amonthey@rc.com
9     Counsel for plaintiff
10
11 Massachusetts Department of Corrections
12 Legal Division
13    Daryl F. Glazer, Esq.
14    70 Franklin Street, Suite 600
15    Boston, Massachusetts 02110
16    617.727.3300
17    daryl.glazer@massmail.state.ma.us
18    Counsel for defendant
19
20 Also present: Samuel Miller
21
22
23
24

Page 3

1              INDEX
2
3  WITNESS:
4
5  MICHAEL J. DEVINE
6     Examination by Mr. Monthey      4
7
8            EXHIBITS
9
10 Exhibit 1   Incident report                10
11 Exhibit 2   RTU Triage Minutes, 9/25/15    12
12 Exhibit 3   RTU Triage Minutes, 10/21/15   16
13 Exhibit 4   Incident report                19
14
15
16
17
18
19
20
21
22
23
24

Page 4

1            PROCEEDINGS
2
3          MICHAEL J. DEVINE, a witness
4  having been duly sworn, on oath deposes and
5  says as follows:
6
7            EXAMINATION
8  BY MR. MONTHEY:
9     Q   Good morning, Mr. Devine.
10    A   Good morning.
11    Q   Thanks for coming in this morning.
12 It's an especially cold day.
13    A   It is.
14    Q   I appreciate it.
15        First of all, could you just
16 state your full name for record.
17    A   Michael Joseph Devine.
18        MR. MONTHEY: And also, before
19 we proceed, I just mention real quick, the
20 same waivers as before?
21        MS. GLAZER: Yes.
22        MR. MONTHEY: Except for form
23 objections? Okay, perfect.
24 BY MR. MONTHEY:

Page 5

1     Q   And, Mr. Devine, you're not
2  currently employed with the Department of
3  Corrections?
4     A   No, no.
5     Q   Okay.
6         When did you leave employment
7  with the DOC?
8     A   It was effective May 1st of this
9  year, retirement.
10    Q   And could you just state every
11 position you held with the Department of
12 Corrections for the five years preceding
13 May 1, 2018?
14    A   Five years. 2013, at that point, I
15 was the deputy superintendent at Old Colony
16 Correctional Center.
17    Q   Okay.
18    A   And then about 2016, I then went to
19 the Boston Prerelease Center as the
20 superintendent, and then out from there.
21    Q   Okay.
22        And can you please just state
23 your responsibilities and duties as the
24 deputy superintendent?

2 (Pages 2 - 5)

Page 6

1  A  I was the deputy superintendent of
2  programs, treatment and reentry, so I oversaw
3  things related to treatment, whether it be
4  substance abuse or religious programs or, you
5  know, the whole reentry process, preparing
6  guys for, you know, eventual discharge,
7  education and things like that.
8  Q  Okay.
9     And did you oversee
10 allegations of sexual abuse and sexual
11 misconduct?
12 A  Yes.  The deputy of programs and
13 treatment was also the -- considered the PREA
14 manager at every institution.
15 Q  So you were the PREA manager?
16 A  Yes.
17 Q  And specifically, as the PREA
18 manager, was it your responsibility to
19 authorize investigations of sexual abuse?
20 A  No.  My understanding of the policy
21 was, the superintendent and the head of the
22 IPS department, the investigative office,
23 they kind of authorized it.  And as the PREA
24 manager, I was -- I would then track it from

Page 7

1  that point, you know.
2  Q  What do you mean by "track" it?
3  A  Well, there was a database, and you
4  download whatever incident reports were
5  involved and making sure that, you know, all
6  the time frames and whatever requirements of
7  the policy were in the policy were met.
8  Q  Mr. Devine, do you personally know
9  a Vanessa Martino-Fleming?
10 A  Yes.
11 Q  And you regularly attended triage
12 meetings with Vanessa Martino-Fleming,
13 correct?
14 A  Yes, she was -- I don't know at the
15 time if she was the director, but she worked
16 in the residential treatment unit, and we
17 would have triage meetings Monday, Wednesday,
18 Friday, I believe.
19 Q  Okay.
20    And do you know Mr. Edward
21 Jones?
22 A  Yes.
23 Q  Okay.
24    How often did you meet with

Page 8

1  Mr. Jones?
2  A  Rarely.  There was no need for me
3  to meet with him.  We had this time -- a few
4  times that we called "access hour" that
5  inmates could come and speak to managers or
6  department heads, and occasionally he would
7  come and speak to me.
8  Q  Okay.
9     Did Mr. Jones ever come to
10 speak to you about threats of sexual violence
11 or sexual harassment from a [Inmate A]
12 A  I don't know if it was violence or
13 threats.  I remember him coming to me, saying
14 that Robert -- what was the first name again,
15 [Inmate A]
16 Q  [Inmate A]
17 A  [Inmate A] yes, you know, was saying
18 things that were out of school just as he was
19 walking around the block, and that was
20 annoying a lot of the people in the block.
21    And we became concerned that
22 [Inmate A], you know, mental illness, because
23 of his lack of a filter, was going to get
24 [Inmate A] in trouble.

Page 9

1  Q  Okay.
2     Now, in your experience
3  working with -- in prisons and with inmates,
4  did you ever have a situation where an inmate
5  faced sexual harassment and suffered mental
6  illness as a result?
7  A  No.
8  Q  Okay.
9     And at these triage meetings
10 that you attended, how often did you attend
11 those meetings?
12 A  They were held Monday, Wednesday,
13 Friday at around midday, and I would at least
14 get to a couple of them a week.
15 Q  Did you have the authority as PREA
16 manager to stop a pre-investigation?
17 A  No, no.
18 Q  Okay.
19    But you said you didn't have
20 authority to begin one either, correct?
21 A  Right.  Exactly.
22 Q  All right.
23    MR. MONTHEY:  So I'll
24 introduce this exhibit.  This is just an

Page 10

1  incident report prepared by
2  Ms. Martino-Fleming on August 6, 2015.
3         (Exhibit 1 marked for
4  identification.)
5  BY MR. MONTHEY:
6     Q   Mr. Devine, you can take a minute
7  if you'd like to review this incident report.
8         (Deponent read the document.)
9     A   Mm-hmm.
10    Q   Do you remember the facts contained
11 in this incident report?
12    A   Yes, in general, yes.
13    Q   Okay.
14        Now, when you advised
15 Ms. Martino-Fleming per the description in
16 this report to prepare this report, what
17 would be the purpose for her to prepare this
18 report?
19    A   Just to make notification of why
20 Edward Jones was under stress, so it would --
21 the IPS team could monitor it to make sure
22 there were no issues or problems.
23    Q   Did you -- well, let me rephrase.
24        Was a pre-investigation ever

Page 11

1  initiated against Mr. [Inmate A] in
2  response to these allegations?
3     A   I'm not sure, to be honest with
4  you.
5     Q   Okay.
6         And, to your knowledge, were
7  pre-investigations initiated in response to
8  sexual harassment allegations as opposed to
9  sexual assault?
10    A   It could be.
11    Q   Okay.
12        Mr. Devine, how long have you
13 known or -- let me rephrase.
14        Do you know inmate [Inmate A]
15 [Inmate A]
16    A   Yes.
17    Q   Okay.
18        And how long have you known
19 [Inmate A]
20    A   While I was at Old Colony, I knew
21 him for a few years while he was there.  Then
22 he left and came back, and I knew him that
23 way.
24    Q   In your opinion, did [Inmate A]

Page 12

1  [Inmate A] pose a physical danger to other
2  inmates at Old Colony?
3     A   No, no.
4     Q   Was he a climate issue?
5     A   He was at some point, because he --
6  because of his mental illness.  He would tend
7  to say inappropriate things.
8     Q   Okay.
9         So now if it's okay, I think
10 we can just talk through a bunch of triage
11 minutes meetings that we have here.  These
12 were produced in document requests.  They've
13 been substantially redacted.  But I think
14 what's clear is the content that we're going
15 to be discussing anyway.
16        MR. MONTHEY:  So if we could
17 just mark that, please.
18        (Exhibit 2 marked for
19 identification.)
20 BY MR. MONTHEY:
21    Q   You can take a minute to read it as
22 well.
23        (Deponent read the document.)
24    A   Okay.

Page 13

1     Q   Okay.
2         And do you remember this
3  particular meeting, by chance?
4     A   Not specifically.  I remember that
5  being discussed at a triage meeting.
6     Q   Okay.
7         So what was the purpose of
8  these triage meetings?
9     A   It was to kind of talk about the
10 high-profile inmates and what kind of issues
11 were going on and general questions, if they
12 needed materials, problems, program space.
13        It could be anything.
14 Anything to make the RTU run more smoothly.
15    Q   Okay.
16        And, Mr. Devine, were you
17 aware that Mr. Jones was seriously concerned
18 about returning [Inmate A] to the general
19 population around that date, September 25th?
20    A   Yes, I think there were several
21 inmates that were concerned.
22    Q   Okay.
23        And why were those other
24 several inmates concerned?

4 (Pages 10 - 13)

Page 14

1  A   Well, Inmate A wasn't well liked, I
2  don't think, in the RTU, because he was --
3  didn't have that filter and would always be
4  saying inappropriate things.
5  Q   So were they concerned because they
6  were worried about their own safety and the
7  harassment he would make toward them or --
8  A   No, I don't think they felt their
9  safety -- he annoyed people.  And some -- you
10 know, I was getting some people coming to me
11 saying they were worried about Inmate A that
12 he would say something inappropriate and
13 would end up maybe getting hurt or something.
14 Q   Okay.
15     So there was a general concern
16 that Inmate A anyone, could get hurt with the
17 situation at hand?
18 A   That anyone could get hurt?
19 Q   Let me rephrase.
20     There was a concern by other
21 inmates that someone could get hurt if Inmate A
22 was returned to the general population?
23 A   I don't know.  Well, I think they
24 were more concerned about Inmate A than anyone

Page 15

1  else, because Inmate A could be a problem --
2  you know, a threat to anybody physically.
3  Q   Okay.
4     Mr. Devine, are you at all in
5  charge of -- let me rephrase.
6     Mr. Devine, were you at all
7  involved with the placement of inmates in
8  general population?
9  A   Indirectly.  There was the
10 assignment officer that was.  For RTU
11 inmates, they had to be placed in there and
12 approved by a doctor, and a psychiatrist
13 signed off to go in there.
14     So if they were technically an
15 RTU inmate, then they would go into the RTU.
16 And really, I had no discretion at that
17 point.
18 Q   Okay.
19     And during your time as deputy
20 superintendent, did you ever initiate any
21 pre-investigation against Mr. Inmate A
22     Well, let me rephrase.  To
23 your knowledge, was a pre-investigation ever
24 initiate the against     Inmate A

Page 16

1  A   I'm not sure, to be honest with
2  you.
3  Q   Okay.
4     MR. MONTHEY:  Let's -- I'd
5  like to introduce this next triage minutes
6  from Wednesday, October 21, 2015.
7     (Exhibit 3 marked for
8  identification.)
9     (Deponent read the document.)
10 BY MR. MONTHEY:
11 Q   You can take a minute if you'd like
12 to review this.
13 A   Okay.
14 Q   Okay.
15     Mr. Devine, do you know what
16 is meant by Mr. Jones "decompensating"?
17 A   It's a mental health term, meaning
18 their mental health is -- you know, they're
19 starting to be very anxious and maybe their
20 mental health -- their symptoms are being
21 exacerbated.
22 Q   Okay.
23     So at these triage meetings,
24 was it -- it was expressed, then, that

Page 17

1  Mr. Jones was decompensating as a result of
2  this alleged PREA incident?
3  A   Yes.
4  Q   Okay.
5     Now, if you could just
6  clarify, if possible, when it says "alleged"
7  PREA incident, is that referring to the
8  investigation of Mr. Jones?
9     MS. GLAZER:  Objection.  You
10 can answer if you know.
11 A   I don't know, actually.  My --
12 well, I think this was written by someone
13 from the RTU, so --
14 Q   Okay.
15 A   -- they may have put it as a PREA
16 incident, but there was never anything formal
17 going on.
18 Q   And then at the last line, you'll
19 notice it says, "Deputy Devine to follow up
20 with Mr. Jones about the alleged PREA
21 incident," correct?
22 A   Mm-hmm.
23 Q   I assume -- well, excuse me.
24 Strike that.

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400

Page 18

```
 1          Did you follow up with
 2  Mr. Jones about the alleged PREA incident?
 3      A    I don't know in this instance.  I
 4  don't remember ever being directed or
 5  suggested to follow up with Mr. Jones about
 6  any PREA incident.
 7      Q    Okay.
 8           And you've spoken -- you spoke
 9  to Mr. Jones about [Inmate A] at least
10  once, correct?
11      A    Yes.
12      Q    Okay.
13           And did he ever express to you
14  that he was suffering certain mental -- or
15  that he was decompensating as a result?
16      A    No.  There was no talk about him
17  decompensating at all.
18      Q    Okay.
19           Did he ever say he was
20  suffering from PTSD or any other mental
21  illnesses as a result?
22      A    No, I don't recall that.
23      Q    All right.
24           MR. MONTHEY:  Jump ahead.  I'd
```

Page 19

```
 1  like to introduce another exhibit.
 2           (Exhibit 4 marked for
 3  identification.)
 4           (Deponent read the document.)
 5  BY MR. MONTHEY:
 6      Q    Mr. Devine, do you remember the
 7  facts of this particular description?
 8      A    I don't specifically, no.
 9      Q    Okay.
10           Do you know if there was ever
11  a second PREA investigation initiated against
12  Mr. Jones?
13      A    No.
14      Q    You mean you do not know if one was
15  done or there was not one that was done?
16      A    Oh, I don't know if one was done,
17  actually.
18      Q    Okay.
19           Mr. Devine, did you -- as
20  deputy superintendent, did you ever discuss
21  with Captain John Carmelo sexual abuse or
22  harassment allegations made by Mr. Jones
23  against Mr. [Inmate A]
24      A    I don't remember directly.  I think
```

Page 20

```
 1  that Captain Carmelo was probably in the room
 2  during a triage meeting where it was
 3  discussed.
 4      Q    Okay.
 5           And, Mr. Devine, what steps
 6  would be taken if an investigation were done
 7  of [Inmate A] and found that he had
 8  sexually harassed Mr. Jones?
 9      A    It would be referred to the IPS
10  office and perimeter security, and they would
11  interview all the parties involved to make an
12  assessment whether or not there was a valid
13  issues.
14      Q    Okay.
15           Mr. Devine, do you remember if
16  [Inmate A] was placed in protective
17  custody in 2015?
18      A    I do remember he was in the
19  protective custody unit for a while, but I
20  don't know the year or time.
21      Q    Is there a reason why -- sorry.  Go
22  ahead.
23      A    No, I don't remember the exact time
24  or year.
```

Page 21

```
 1      Q    What is the purpose of placing an
 2  inmate in protective custody?
 3      A    Because there may be other inmates
 4  that could, you know, want to get at him for
 5  whatever reason.
 6      Q    So the purpose of placing an inmate
 7  in protective custody is not to stop that
 8  inmate from harming others?  It's to protect
 9  the inmate being put in protective custody?
10      A    Yes.
11      Q    Okay.
12           Now, were you aware that there
13  was a fight between Mr. Jones and
14  Mr. [Inmate A] on October 24th?
15      A    Yes.
16      Q    Okay.
17           And following that fight, did
18  you ever have a discussion with Mr. Jones
19  about the fight?
20      A    I don't remember specifically
21  having a discussion about that.
22      Q    And did you ever have a discussion
23  with [Inmate A] about the fight?
24      A    I don't remember specifically, no.
```

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 26

1 WITNESS: MICHAEL J. DEVINE
2
3   SIGNATURE PAGE/ERRATA SHEET
4
5 PAGE  LINE  CHANGE OR CORRECTION AND REASON
6 ___   ___   _____
7 ___   ___   _____
8 ___   ___   _____
9 ___   ___   _____
10 ___  ___   _____
11 ___  ___   _____
12 ___  ___   _____
13 ___  ___   _____
14 ___  ___   _____
15 ___  ___   _____
16 ___  ___   _____
17 ___  ___   _____
18 ___  ___   _____
19 ___  ___   _____
20 ___  ___   _____
21 ___  ___   _____
22 ___  ___   _____
23 ___  ___   _____
24 ___  ___   _____

Page 27

1 ___  ___   _____
2 ___  ___   _____
3 ___  ___   _____
4 ___  ___   _____
5 ___  ___   _____
6 ___  ___   _____
7 ___  ___   _____
8 ___  ___   _____
9 ___  ___   _____
10 ___  ___  _____
11 ___  ___  _____
12 ___  ___  _____
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20 ___  ___  _____
21 ___  ___  _____
22 ___  ___  _____
23 ___  ___  _____
24 ___  ___  _____

Page 28

1 I have read the transcript of my deposition taken
  on November 15, 2018. Except for any
2 corrections or changes noted above, I hereby
  subscribe's to the transcript as an accurate record
3 of the statements made by me.
4 Signed under the pains and penalties of perjury
  Deponent: _____ 12/19/2018
5       MICHAEL J. DEVINE
  On this ___ day of _____, 201__, before me,
6 the undersigned notary public, personally appeared
  MICHAEL J. DEVINE, who presented satisfactory
7 evidence of identification, to wit,
  _____, and signed this document in my
8 presence.
9 _____
  Notary Public in and for _____
10 My commission expires _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24

8 (Pages 26 - 28)