JOHN F. CAMELO

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3   EDWARD JONES,
4        Plaintiff,
5     vs.              Civil Action No. 1:16-cv-11666-LTS
6   LISA MITCHELL, MICHAEL DEVINE,
7   AND JOHN F. CAMELO,
8        Defendants.
9   -------------------------------x
10
11                DEPOSITION OF
12                JOHN F. CAMELO
13           Wednesday, November 7, 2018
14                  10:22 a.m.
15               Robinson & Cole
16               One Boston Place
17           Boston, Massachusetts 02108
18
19            Laurie K. Langer, RPR
20
21
22                                          EXHIBIT
23                                             C
24

Page 6

1  served a prior notice for a deposition, I believe, back
2  in July; do you remember that notice?
3      A. Yes, I received it from Miss Glazer.
4          MS. GLAZER: I would object, because you
5  sent me the notice, not to him.
6          MR. MONTHEY: So you received the notice and
7  everything.
8      Q. And your attorney has agreed to waive and read
9  notice.
10         MS. GLAZER: I'm happy to put that on the
11 record. I've agreed to -- you sent me the notice
12 because I represent the Defendants, so obviously you
13 couldn't contact him directly. And then I -- we
14 rescheduled actually at my request and I waived the
15 re-notice.
16         MR. MONTHEY: Perfect. Thank you.
17     Q. And, Captain Camelo, how long have you been
18 working for the Department of Correction?
19     A. 28 years.
20         MS. GLAZER: Can I just interject for a
21 second. I would like him to be able to read and sign.
22         MR. MONTHEY: Sure.
23         MS. GLAZER: I'm going to waive notary. And
24 I'll ask for 30 days.

Page 7

1          MR. MONTHEY: Yeah, that's fine. And
2  that's -- actually, I'll stipulate also to waive all
3  objections, except as objections to form, if that's
4  okay.
5          MS. GLAZER: Sure.
6      Q. And so you've been there for 20 years you said?
7      A. 28 years within the department.
8      Q. And how long have you been in the rank of
9  captain?
10     A. 10 years.
11     Q. 10 years. Okay. And have you ever been a
12 defendant to another lawsuit?
13         MS. GLAZER: Objection. I'm going to
14 instruct the witness only to answer for DOC related,
15 nothing personal.
16     Q. Have you ever been a defendant in a lawsuit
17 related to your duties at the DOC?
18     A. Not to my knowledge.
19     Q. Okay. And how long have you been the captain for
20 the residential treatment unit at Old Colony?
21         MS. GLAZER: Objection. Rephrase the
22 question. He's not currently there. The way your
23 question....
24         MR. MONTHEY: Okay.

Page 8

1      Q. How long -- okay. So how long have you been
2  working at the Residential Treatment Unit at Old Colony
3  Correctional Center?
4          MS. GLAZER: Objection. Off the record for
5  a second.
6          (Discussion off the record.)
7      Q. Okay. So where are you currently the captain?
8      A. The Minimum Unit, Old Colony Correctional Center.
9      Q. And were you previously the captain at the
10 Residential Treatment Unit?
11     A. Yes.
12     Q. Okay. Okay. And what years were you the captain
13 of the Residential Treatment Unit?
14     A. 2015 to the beginning of 2018.
15     Q. Do you roughly remember which month you began
16 there?
17     A. I do not.
18     Q. Okay. What duties did you have when you were a
19 captain at the RTU?
20     A. Conducted rounds of the unit daily and oversaw
21 the staffing of the unit. Just inquire of the staff
22 with any ongoing issues within the unit for that
23 specific day during the course of the week.
24     Q. And did you have any involvement with PREA

Page 9

1  investigations?
2      A. No.
3      Q. Did you ever review any reports from PREA
4  investigations?
5      A. I might have.
6      Q. You might have. And what sort of medium would
7  you have reviewed those reports?
8      A. Incident reports.
9      Q. Incident reports. Okay.
10        Generally speaking how does the Old Colony
11 Correctional Center differ from a traditional DOC
12 prison?
13         MS. GLAZER: Objection. He can answer. I'm
14 not sure he's qualified or, you know.
15        You can answer if you, you can.
16        I'm not sure what you consider a traditional
17 DOC prison. There are, like, 18 different prisons.
18         MR. MONTHEY: Okay. That's fine. We can
19 move on.
20     Q. Does the Old Colony Correctional Center generally
21 focus on mental health care for its inmates?
22     A. Yes.
23         MS. GLAZER: Objection.
24        You can answer.

3 (Pages 6 - 9)

Page 10

1  Q. Okay. And is that true for every inmate there?
2      MS. GLAZER: Objection.
3      You can answer.
4  A. Not necessarily. Some inmates are housed there,
5  and I'm not privy to their mental health status unless
6  it becomes an issue that staff will be concerned
7  regarding the security. So I can't say yes to that
8  question.
9  Q. Okay. And when conducting your duties that you
10 mentioned before as a captain at the RTU, are there any
11 specific guidelines or policies that you are required to
12 follow?
13 A. Post orders.
14 Q. Post orders?
15 A. Yes.
16 Q. And what are those?
17 A. Basically, a guideline of a job description.
18 Q. All right. Are you required to follow -- strike
19 that.
20     As captain of the RTU were you also required to
21 address conflicts between inmates?
22 A. If they arose to a conflict incident, yes.
23 Q. And by "incident" you mean one that resulted in
24 an incident report?

Page 11

1  A. Or verbally.
2  Q. Okay. So I would like to introduce this exhibit.
3  This is the Massachusetts Department of Correction
4  Conflicts policy.
5      (Deposition Exhibit No. 1 marked for
6  identification.)
7  Q. And just real quick, are you aware of this
8  policy?
9  A. Yes.
10 Q. Okay. And was this a policy that you were
11 required to adhere to when you were a captain at the
12 RTU?
13 A. Yes.
14 Q. And this policy on, if you look at page 2 of the
15 attached, I'll just quickly note, do you see at the
16 bottom that it says April of 2018?
17 A. Yes.
18 Q. Do you know if there were any changes made to
19 this policy between when you were a captain of the RTU
20 in 2015?
21 A. Not to my knowledge.
22 Q. Okay. So if you could please flip to page 4 of
23 the attached policy and do you see Section 426.03?
24 A. Yes.

Page 12

1  Q. And that says Inmate-to-Inmate Conflicts?
2  A. Uh-huh.
3  Q. Okay. And this is the policy rules that you
4  would be required to adhere to and follow were there to
5  be an inmate-to-inmate conflict?
6  A. Correct.
7  Q. Okay. Do you know what the penalties are for not
8  following these policies?
9  A. Penalties?
10 Q. Say, if you were to not follow one of these
11 required procedures, would there be any penalties to
12 you?
13 A. Yes.
14 Q. What kind of penalties would you be subject to?
15 A. It would be up to the superintendent, a decision
16 after the investigation was completed.
17 Q. So it's the superintendent's discretion about how
18 to handle?
19 A. Correct. Not discretion on the policy, the
20 policy is black and white. He has discretion on
21 discipline.
22 Q. Okay. Understood. We'll refer back to this.
23     Captain Camelo, did you ever meet Plaintiff
24 Edward Jones?

Page 13

1  A. Yes.
2  Q. Do you know how many occasions you met with him?
3  A. Within a course of a week once or twice.
4  Q. Once or twice. So do you generally meet him in
5  general population or in other?
6  A. In the unit specifically.
7  Q. Okay. That's fine. And how about Inmate Inmate A
8  Thompson, have you ever met him personally?
9  A. Yes.
10 Q. And the same frequency as Mr. Jones?
11 A. Correct.
12 Q. And at anytime when you were a captain at the RTU
13 were you ever made aware of any conflict between
14 Mr. Jones and Mr. Inmate A
15 A. I might have. Based on prior reports that were
16 submitted, Mr. Inmate A was a very, in my opinion,
17 mentally challenged, so he had a conflict probably with
18 everybody in the unit.
19     MS. GLAZER: Can we go off the record for
20 one second.
21     (Discussion off the record.)
22 Q. I'm going to introduce this other exhibit. This
23 is an incident report.
24     (Deposition Exhibit No. 2 marked for

Page 26

1 at RTU triage meetings?
2   A. I met with them on Wednesdays and some Fridays,
3 not all the time, based on scheduling.
4   Q. And what were the purpose of these meetings?
5   A. It was to review potential issues that would
6 arise from the various inmates and the various needs
7 regarding property, you know, canteen, stuff that they
8 would normally get dealing with a mental health
9 clientele. We try to forecast, for lack of a better
10 term, issues before they become problems, so that's,
11 that was the reason for the meetings with the mental
12 health clinicians.
13   Q. Did you attend -- let me back up for a second.
14     Were you ever made aware of the content of those
15 meetings that you did not attend?
16   A. No.
17   Q. So you never reviewed the minutes from those
18 meetings that you never attended?
19   A. No.
20   Q. So now I would like to introduce this quick
21 exhibit, this is an RTU Triage Meeting Minutes for
22 September 25, 2015.
23     (Deposition Exhibit No. 5 marked for
24 identification.)

Page 27

1   Q. And, Captain Camelo, do you see your name at the
2 top saying you were in attendance?
3   A. Yes.
4   Q. Do you remember being at this meeting?
5   A. I may have. I was there. If my name is on it, I
6 was there.
7   Q. Okay. Can you just tell me real quick what BSH
8 stands for in the description?
9   A. Where are you?
10   Q. It's just down next to "Edward Jones" to the
11 right under the Discussion/Conclusion.
12   A. Bridgewater State Hospital.
13   Q. Bridgewater State. Okay.
14     So at this meeting was this the first time that
15 you became aware that Mr. Jones was experiencing
16 increased irritability and flashbacks?
17   A. I don't recall if it was the first time, but I
18 know he had issues with [Inmate A]
19   Q. Okay. And did you -- in conversations that you
20 had with Miss Martino-Fleming, did she tell you about
21 the symptoms he was experiencing?
22   A. No. No. Other than he wasn't happy that [Inmate A]
23 [Inmate A] was in the same unit as him.
24   Q. Okay. And generally at these RTU -- well, strike

Page 28

1 that.
2     Did Mr. Jones ever discuss with you his concerns
3 about the way that Mr. [Inmate A] was treating him?
4   A. Mr. Jones would approach me when he needed
5 something. He wouldn't approach me if he had an issue
6 with another inmate, he would talk to other staff
7 regarding issues with inmates. A lot of inmates will
8 jockey for moving cells. Either to make their, you
9 know, their stay in the RTU more comfortable, and that's
10 a broad term, because they just want to do their time.
11     So it could have been that Mr. Jones was
12 irritated just by the fact that [Inmate A] was in
13 the unit during the time that he was there. He's one of
14 many that had issues with [Inmate A]
15   Q. Okay. Now, I'm going to introduce this other RTU
16 triage minutes for, this is for September 30, 2015.
17     (Deposition Exhibit No. 6 marked for
18 identification.)
19   Q. Have you -- do you see your name at the top next
20 to In Attendance?
21   A. Yes.
22   Q. Okay. And do you see the discussion or the
23 Discussion/Conclusion that was not redacted?
24   A. Yes.

Page 29

1   Q. Okay. Do you know what it means when it says he,
2 "signed a waiver about [Inmate A]
3   A. An inmate signs a waiver to confirm that he has
4 no issues with another inmate or being placed back into
5 population, whether it be in the same housing unit that
6 the inmate that he has an issue with currently lives.
7   Q. Okay. So you're saying that if he -- so you're
8 saying, first of all, Edward Jones is the one that
9 signed the waiver described here?
10   A. If that was noted on here. I wouldn't know that
11 unless I saw the waiver myself.
12   Q. Okay. And it notes here that he was made aware
13 that Mr. [Inmate A] has not returned to the A1 unit. Is
14 that where Mr. Jones was living at the time?
15   A. I would have to check the computer. I couldn't
16 confirm that.
17   Q. Okay. That's fine. Captain Camelo, were you
18 aware that Mr. Jones was suffering from PTSD?
19   A. No.
20   Q. At this time I would like to introduce this quick
21 incident report, this is dated September 24, 2015.
22     (Deposition Exhibit No. 7 marked for
23 identification.)
24   Q. Captain Camelo, do you see your name at the

Page 30

1  bottom here?
2      A. Yes.
3      Q. If you're listed there does that mean you would
4  have received this report?
5      A. No. I would have been noted on the, the dialogue
6  on the body of the report. I don't -- I don't get
7  confidential reports unless it was given to me by the
8  superintendent.
9      Q. Okay. And have you seen this particular report?
10     A. This is the first time I saw it.
11     Q. Okay. At the end of this particular description
12 it says -- if you could just read the last sentence of
13 the description.
14     A. "Shift Commander LaFlamme and Captain Camelo
15 notified."
16     Q. And then prior to that?
17     A. "The above inmates appeared visibly distressed
18 and the return of Mr. [Inmate A] appears to be creating a
19 major climate issue on the RTU."
20     Q. Okay. And it says four sentences from the
21 bottom, if you can read from "Inmate Jones," inmate
22 spelled incorrectly.
23     A. "Inmate Jones stated that the remarks
24 Mr. [Inmate A] makes 'triggers his PTSD symptoms.'"

Page 31

1      Q. So when you were notified by Miss Martino-Fleming
2  who prepared this report, she did not tell you that he
3  suffered from PTSD symptoms?
4      A. She may have. I don't recall the dialogue, if
5  any, other than what's written on this report.
6      Q. Okay. Were you ever made aware that [Inmate A]
7  comments to Mr. Jones were exacerbating some of his
8  mental health, his mental health -- let me rephrase.
9          Were you ever made aware by Miss Martino-Fleming
10 that the, that [Inmate A] comments to Mr. Jones were
11 exacerbating his symptoms from his mental illnesses?
12     A. Not specifically to Jones. Just that he was
13 becoming a climate issue within the unit while he was
14 housed in the same unit as Jones.
15     Q. What do you mean by a "climate issue"?
16     A. A climate issue is an inmate who is verbally
17 abusive to other inmates. More than one. That poses a
18 climate issue within the unit. So specifically, again,
19 [Inmate A] again was a highly, you know, ill mental
20 health inmate and very problematic within his
21 confinement in the Department of Corrections.
22     Q. So were you ever -- strike that, actually.
23         When were you made aware that Mr. [Inmate A] was a
24 climate issue at this particular moment in 2015?

Page 32

1      A. The first day he arrived he was a climate issue.
2      Q. Got it. And if someone were a climate issue they
3  would, would a guard or someone who's present, staff
4  member, report to you about that?
5      A. Yes.
6      Q. Okay. And then what would be your first
7  response?
8      A. If it warranted that he was causing a climate
9  issue to a degree where it could cause potential harm to
10 another inmate, the staff, he would be removed from the
11 unit and the incident would be investigated.
12     Q. Was it your opinion that Mr. [Inmate A] posed a
13 physical danger to other inmates in 2015?
14     A. The potential was there for any inmate to pose
15 danger to another inmate at any given time. I -- it's
16 kind of hard to answer that question. It can go up at
17 any moment. Not just [Inmate A] not just Jones, it could
18 be any inmate within the unit. Again, RTU was a
19 Residential Treatment Unit, but more mentally ill
20 inmates than general population. That's the reason for
21 the RTU unit.
22     Q. And since you were a captain at the Residential
23 Treatment Unit, did you ever receive any special
24 training to work with mentally ill inmates?

Page 33

1      A. I went to a course at the academy for two days
2  and there was, put on by the DOC through their mental
3  health agency. Mitzi Peterson and Jerry Riley were the
4  instructors. At that time it was mandated that staff
5  working the unit received that type of training.
6      Q. Okay. And just referring back, was there ever,
7  were you ever warned that Mr. [Inmate A] posed a physical
8  danger to Mr. Jones?
9      A. No.
10     Q. And, Captain Camelo, was [Inmate A] ever moved as a
11 result of conflict, a conflict with Mr. Jones?
12     A. If there was a conflict with both of them they
13 would be separated, yes.
14     Q. And did you ever make a decision to separate?
15     A. I would make the decision initially, but as far
16 as the active conflict that would come up from the
17 superintendant.
18     Q. When two inmates are separated, are there any
19 circumstances where those two could still interact?
20     A. If I separated two inmates based on information
21 given to me as the shift commander with the RTU director
22 or supervisor, I would separate those inmates until any
23 potential issues or climate issues were addressed and
24 there was no potential issue if they were to be released

9 (Pages 30 - 33)

JOHN F. C

Page 40

room 9

r.

where

more

at

Page 42

1      DEPOSITION ERRATA SHEET
2
3  Our Assignment No: NY 3066423
4  Case Caption:   Jones vs. Mitchell, et al
5
6      DECLARATION UNDER PENALTY OF PERJURY
7  I declare under penalty of perjury that I have
8  read the entire transcript of my Deposition taken in the
9  captioned matter or the same has been read to me, and
10 the same is true and accurate, save and except for
11 changes and/or corrections, if any, as indicated by me
12 on the DEPOSITION ERRATA SHEET hereof, with the
13 understanding that I offer these changes as if still
14 under oath.
15      Signed on the __31__ day of __December__ 2018
16
17 _____
18      JOHN F. CAMELO
19
20
21
22
23

1      DEPOSITION ERRATA SHEET
2  Page No. _17_ Line No. _4_ Change to: _Mental_
3  _Health_
4  Reason for change: _"Environmental" is wrong._
5  Page No. _20_ Line No. _4_ Change to: _Captain_
6  _____
7  Reason for change: _"Detective" is not my title._
8  Page No. _23_ Line No. _21_ Change to: _R.T.U. Captain_
9  _____
10 Reason for change: _"yard chief captain" is not correct._
11 Page No. ____ Line No. ____ Change to: _____
12 _____
13 Reason for change: _____
14 Page No. ____ Line No. ____ Change to: _____
15 _____
16 Reason for change: _____
17 Page No. ____ Line No. ____ Change to: _____
18 _____
19 Reason for change: _____
20 Page No. ____ Line No. ____ Change to: _____
21 _____
22 Reason for change: _____
23 SIGNATURE: _____ DATE: _____
24       JOHN F. CAMELO