UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 16-CV-11666-LTS

EDWARD T. JONES,

Plaintiff,

v.

COMMONWEALTH OF MASSACHUSETTS, ET AL.,

Defendants.

### AFFIDAVIT OF ELENA CLODIUS

I, Elena Clodius, being duly sworn, do hereby depose and state as follows:

1. I am currently the Deputy Superintendent of Reentry at Old Colony Correctional Center ("OCCC"). I have held this position since approximately March 2018. I have been employed by the Department of Correction ("DOC") for thirty-seven years.

2. OCCC is a medium security prison run by the DOC. The mission of OCCC Medium is to promote public safety through the management and treatment of the mentally ill offender in a safe, secure, and therapeutic environment. OCCC's diverse workforce provides meaningful programming opportunities designed to prepare mentally ill offender for successful reentry in the community. The majority of inmates incarcerated at OCCC have mental health issues.

3. This Affidavit is based on my personal knowledge and review of the applicable records that are kept during the normal course of business at OCCC.

4. According to the DOC's Mental Health Services Policy, 103 DOC 650, the Residential Treatment Unit ("RTU") is a "general population housing unit that provides an intermediate level of care for inmates whose mental illness, combined with significantly impaired social skills and



EXHIBIT

D

limited ability to participate independently in activities of daily living, makes it difficult for them to function in the general population of a correctional facility, but who are not so impaired as to require psychiatric hospitalization". See 103 DOC 650, <u>Mental Health Services</u> Policy attached as Exhibit 1, specifically 103 DOC 650.01Q. The RTU provides "an intermediate level of care for general population inmates with a mental health classification of MH-4. These inmates do not require inpatient psychiatric hospitalization, but they present with a pervasive pattern of inability to function or manage appropriately within general population due to a mental disorder". 103 DOC.650.08A.

5. At OCCC the placement in the RTU is determined by mental health staff. Mental health staff first has to approve an inmate's placement in the RTU and then a Classification Board is held recommending the RTU based on the mental health approval. Central Classification gives the final approval for an inmate's placement in the RTU. See Exhibit 1, 103 DOC 650.08B.

6. According to the DOC's Inmate Management System ("IMS") Edward Jones and ▮▮▮▮ Inmate A ▮▮▮▮ were both housed in the RTU at OCCC on the following dates:

November 18, 2014-December 11, 2014

December 15, 2014-February 17, 2015

February 18, 2015-April 15, 2015

May 19, 2015-July 24, 2015

July 27, 2015-August 3, 2015

August 12, 2015-August 20, 2015

7. According to IMS, Edward Jones and ▮▮▮ Inmate A ▮▮▮ were never housed in the same cell at OCCC.

8. According to IMS, both Edward Jones and ▮▮▮ Inmate A ▮▮▮ were both housed in the

Health Services Unit ("HSU") at OCCC from October 24, 2015-October 29, 2015. They were housed in different cells in the HSU.

9. Attached to this Affidavit is a chart compiled from Edward Jones's and ▓Inmate A▓ ▓▓▓▓▓▓ Bed Management Histories from IMS that shows when both inmates were housed in the same unit. See Chart attached as Exhibit 2

10. According to IMS, Edward Jones filed Grievance Number 83803 about ▓Inmate A▓ ▓▓▓▓▓ on September 24, 2015. A review of Edward Jones's grievances shows that Grievance Number 83803 was the first time Jones filed a grievance about ▓Inmate A▓

11. In 2015, PREA investigations were conducted by the Inner Perimeter Security ("IPS") Team at the direction of either the Superintendent or the Deputy Superintendent of Reentry.

12. All investigations including PREA investigations are investigated by IPS. IPS has the responsibility to investigate all allegations. For PREA investigations specifically, allegations need to be investigated to ensure that an inmate is not being victimized.

13. Edward Jones was only involved in one PREA investigation in 2015.

14. There was a PREA investigation in 2015 in which inmate ▓▓▓ Inmate A ▓▓ reported that he had seen another inmate lick inmate Edward Jones's nipples. The PREA investigation was unfounded.


Signed under the pains and penalties of perjury this _9_ day of August 2019.

Elena Clodius

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: HEALTH SERVICES |
|---|---|
| TITLE: MENTAL HEALTH SERVICES | NUMBER: 103 DOC 650 |

**PURPOSE:** The purpose of this policy is to establish guidelines for the identification and treatment of inmates in need of mental health services.

**REFERENCES:** G.L. c. 124, §1(c), (q); G.L. c. 30, §36(a)
ACA Standards: 3-4336, 4337, 4342, 4349, 4362, 4367, 4368, 4369, Prison Rape Elimination Act of 2003, Public Law 108-79, 103 DOC 519, Sexually Abusive Behavior Prevention and Intervention Policy
NCCHC Standards:  P-08, P-10, P-27, P-31, P-37, P-51, P-53, P-66, P-67

**APPLICABILITY:** Public          **PUBLIC ACCESS:** Yes

**LOCATION:** DOC Central Policy File/Facility Policy File
Health Services Division Policy File
Inmate Library

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**

- Assistant Deputy Commissioner of Clinical Services;
- Director of Behavior Health;
- Superintendents;
- Program Directors of the contractual medical and mental health providers.

**EFFECTIVE DATE:** 01/30/2015

**CANCELLATION:** This policy cancels all previous Department policy statements, bulletins, directives, orders, notices, rules and regulations regarding mental health services for inmates.

**SEVERABILITY CLAUSE:**          If any part of this policy is, for any reason, in excess of the authority of the Commissioner, or otherwise inoperative, such decision shall not affect any other part of this policy.



**PRIVATE RIGHT OF ACTION EXCLUSION:** Nothing contained herein is intended to confer, or shall be interpreted as conferring, a private right of action for enforcement or damages.

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

103 DOC 650

MENTAL HEALTH SERVICES

TABLE OF CONTENTS

650.01  Definitions.............................................. 4
650.02  Admissions.............................................. 8
650.03  Non-Emergency Mental Health Assessments................. 11
650.04  Mental Health Classification............................ 18
650.05  Communications Regarding Mental Health Status
        and Needs of Inmates.................................... 19
650.06  Informed Consent........................................ 21
650.07  Psychotropic Medication................................. 22
650.08  Residential Treatment Units............................. 28
650.09  Mental Health Consultation in the Disciplinary Process.. 36
650.10  Segregation............................................. 37
650.11  Secure Treatment Units.................................. 46
650.12  Protective Custody Units................................ 55
650.13  Emergency Mental Health Procedures...................... 55
650.14  Management of Potentially Suicidal Inmates
        and Self-Injurious Behavior............................. 71
650.15  Communications on and Recommendations
        for Special Needs Inmates............................... 74
650.16  Mental Health Response to Reports of Sexually
        Abusive Behavior........................................ 76
650.17  Section 35 Services..................................... 78
650.18  Mental Health Reentry Planning and Procedures........... 80
650.19  Duty to Warn............................................ 85
650.20  On-Site Evaluations by Outside Mental Health
        Professional............................................ 86
650.21  Records and Continuous Quality Improvement.............. 88
650.22  Supplemental Mental Health Policies and
        Procedures.............................................. 89
650.23  Administrative Provisions............................... 90

Attachment 1    Mental Health Status Update Form
Attachment 2    Mental Health Appraisal
Attachment 3    Sick Call Request Form
Attachment 4    Mental Health Evaluation Form
Attachment 5    Initial Treatment Plan
Attachment 6    Case Closure Form
Attachment 7    Mental Health Classification Codes/Subcodes

Attachment 8    RTU Referral Form
Attachment 9    RTU Discharge Form
Attachment 10   Case Conference Summary Form
Attachment 11   Mental Health Consultation for Disciplinary
                Disposition Form
Attachment 12   Mental Health Clearance Form
Attachment 13   STU Referral Form
Attachment 14   Observation Check Sheet
Attachment 15   Crisis Treatment Plan
Attachment 16   Crisis Treatment Plan Discontinuation Form
Attachment 17   Four-Point Restraint Medical Examination
                Checklist
Attachment 18   Medical Restriction Form (IMS Generated)
Attachment 19   Problem List
Attachment 20   Discharge Plan
Attachment 21   Mental Health Parole Board Contact Sheet
Attachment 22   Request to Perform Outside Mental Health Services
                Form

650.01    Definitions

    A.    Assistant Deputy Commissioner, Clinical Services - The executive staff person who reports to the Deputy Commissioner of the Classification, Programs and Reentry Division. The duties of the Assistant Deputy Commissioner, Clinical Services, include, but are not limited to, the management of the Health Services Division and the oversight of the Department's health services contracts.

    B.    Central Office Segregation Oversight Committee – The committee charged with developing strategies to reduce the time spent in Segregation by inmates with Serious Mental Illness (SMI) and conducting monthly reviews of the circumstances of inmates with SMI who have been in Segregation in Special Management Units (SMU) or the Departmental Disciplinary Unit (DDU) for a period exceeding thirty (30) days.

    C.    Director of Behavioral Health – The Health Services Division clinician who reports to the Assistant Deputy Commissioner, Clinical Services, and is responsible for the management and oversight of the Department's mental health care services.

    D.    Exigent Circumstances – Circumstances, including institutional emergencies as set forth in the Department's regulations, or emergencies in Segregation or a Secure Treatment Unit (STU), under which the doing of an act otherwise required by a Settlement Agreement would create an unacceptable risk to the safety of any person. Exigent Circumstances shall not include the opinion of a clinician that notwithstanding an inmate's SMI, the inmate may remain in Segregation.

    E.    Inmate Management System (IMS): The Department of Correction's automated information system that provides processing, storage and retrieval of inmate related information needed by Department personnel and other authorized users within the criminal justice system.

    F.    Inter-System Transfer – The transfer of an inmate between a Department of Correction facility and a non-Department of Correction facility, including a facility of another state law enforcement or correctional agency, a county correctional facility,

or a facility of the Department of Mental Health, the Department of Children and Families or the Department of Developmental Services.

G.  Intra-System Transfer – The transfer of an inmate between facilities of the Department of Correction.

H.  Mental Health Classification – The system that identifies and codes the level of mental health services that an inmate requires based upon his or her mental health need.

I.  Medical Contractor – The Department's contract medical vendor.

J.  Mental Health Contractor – The Department's contract mental health vendor.

K.  Open Mental Health Case – An inmate who is diagnosed with a mental illness or determined to be in need of mental health intervention on an ongoing basis. At any time during his or her incarceration, an inmate may become an open mental health case (OMH) based on a mental health crisis, including suicidal threats or self-injurious behavior and/or the display of signs and/or symptoms of mental illness or emotional distress. Based upon clinical indications and within the discretion of the Primary Care Clinician (PCC), in consultation with the site Psychiatrist (if on medication) and/or Site Mental Health Director, an inmate may also be removed from the active mental health caseload. However, any inmate carrying the Gender Dysphoria (GD) diagnosis will remain an open mental health case.

L.  Primary Care Clinician (PCC) – Qualified Mental Health Professional, who is responsible for case management, direct treatment services and the overall mental health care of inmates assigned to his or her caseload while at a Department correctional facility.

M.  Program Mental Health Director – The contractual mental health provider who is responsible for the administration, management, supervision, and development of mental health programs and delivery of behavioral health services at all Department correctional facilities. The Program Mental Health Director provides and supervises mental health care services throughout the Department; evaluates patient care and assesses what is required by way of

treatment; determines the condition and adequacy of treatment facilities and programs; identifies the need for appropriate equipment; acts as a consultant for physicians and behavioral health care staff; delivers emergency and ongoing direct clinical service; develops and reviews Treatment Plans; and evaluates inmates when clinically indicated.

N.   Program Psychiatric Medical Director – The physician in charge of the statewide mental health services vendor, including Bridgewater State Hospital.   The Psychiatric Medical Director is Board Certified in Psychiatry.   The Program Psychiatric Medical Director provides and supervises psychiatric and mental health care services in the correctional setting throughout the Department; evaluates patient care and assesses what is required by way of treatment; determines the condition and adequacy of treatment facilities and programs; identifies the need for appropriate equipment; acts as a consultant for physicians and behavioral health care staff; delivers emergency and ongoing direct clinical service; reviews medical orders for mental health patients; evaluates pharmacy utilization, and develops and reviews Treatment Plans; and evaluates inmates when clinically indicated.

O.   Psychotropic Medication – Medication prescribed for the treatment of mental illness.

P.   Qualified Mental Health Professional - Treatment providers who are psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of patients.

Q.   Residential Treatment Unit (RTU) – A general population housing unit that provides an intermediate level of care for inmates whose mental illness, combined with significantly impaired social skills and limited ability to participate independently in activities of daily living, makes it difficult for them to function in the general population of a correctional facility, but who are not so impaired as to require psychiatric hospitalization.

R.   Secure Treatment Unit (STU) - A maximum security residential treatment program designed to provide an alternative to Segregation for inmates diagnosed with SMI who cannot be housed in general population due to

safety and/or security concerns. The Department currently operates two STUs: the Secure Treatment Program (STP) and the Behavioral Management Unit (BMU). The Department also operates RTUs which are not deemed STUs because the Department operates them as general population units.

S.    Secure Treatment Unit Review Committee – The committee convened to review STU referrals regarding inmates with SMI in Segregation, or to approve the termination of inmates with SMI from STU's. The Secure Treatment Unit Review Committee shall be chaired by the Director of Behavioral Health. Membership shall include the Program Mental Health Director, the Department of Correction administrator of the STP, the Department of Correction administrator of the BMU, and the Mental Health Vendor's clinical leaders of the STU's.

T.    Segregation – For the purpose of 103 DOC 650, the term Segregation refers to the confinement of an inmate in: (1) the Departmental Disciplinary Unit (DDU), (2) any Special Management Unit (SMU), or (3) any unit where the inmate is confined to his/her cell for approximately twenty-three (23) hours per day. For purposes of this definition, Segregation shall not include any placement ordered by a medical or mental health provider, including but not limited to, the placement of an inmate in clinical seclusion or restraint at Bridgewater State Hospital, the placement of a civilly committed Treatment Center inmate in the Minimum Privilege Unit, the placement of a civilly committed person at the Massachusetts Alcohol and Substance Abuse Center (MASAC) or a civilly committed person at MCI-Framingham in an observation cell, the placement of an inmate in a Health Services Unit, the placement of an inmate in a hospital or the placement of an inmate on a mental health watch.

U.    Serious Mental Illness (SMI) - For purposes of assessing whether Segregation may be clinically contraindicated, or whether an inmate in Segregation should be placed in a Specialized Treatment Unit, the term "Serious Mental Illness" shall be defined as the following:

1.    Inmates determined by the Department's mental health vendor to have a current diagnosis or a recent significant history of any of the following types of DSM-V diagnoses:

a. Schizophrenia
b. Delusional Disorder
c. Schizophreniform Disorder
d. Schizoaffective Disorder
e. Brief Psychotic Disorder
f. Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)
g. Psychotic Disorder Not Otherwise Specified
h. Major Depressive Disorder
i. Bipolar Disorder I and II

For purposes of this definition, "recent significant history" shall be defined as a diagnosis specified above in section (a)(1)-(9) upon discharge within the past year from an inpatient psychiatric hospital.

2. Inmates diagnosed with disorders that are commonly characterized by the mental health vendor with other DSM-V breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

3. Inmates diagnosed by the Department's medical or mental health vendor with a developmental disability, dementia or other cognitive disorders that result in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

4. Inmates diagnosed by the Department's mental health vendor with a severe personality disorder that is manifested by episodes of psychosis or depression, and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

Significant Functional Impairment

Factors for consideration when assessing significant functional impairment shall include the following:

a. The inmate has engaged in self harm which shall be defined as a deliberate act by the

inmate that inflicts damage to, or threatens the integrity of, one's own body. Such acts include but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, drug overdose, jumping and biting.

b.  The inmate has demonstrated difficulty in his or her ability to engage in activities of daily living, including eating, grooming and personal hygiene, maintenance of housing area, participation in recreation, and ambulation, as a consequence of any DSM V disorder.

c.  The inmate has demonstrated a pervasive pattern of dysfunctional or disruptive social interactions including withdrawal, bizarre or disruptive behavior, etc. as a consequence of any DSM V disorder.

V.  Site Mental Health Director - The Qualified Mental Health Professional appointed by the mental health vendor, with the approval of the Assistant Deputy Commissioner, Clinical Services, to oversee the contract mental health program at a facility or group of facilities.

650.02   Admissions

A.  Mental Health Screen

Each inmate admitted to a facility by a new commitment or by an Inter-System or an Intra-System Transfer shall receive a mental health screen (Attachment 1) by a qualified health care professional (e.g., a physician, physician assistant, nurse, or nurse practitioner) upon admission.

The qualified health care professional shall refer the inmate for further evaluation by a Qualified Mental Health Professional if:

1.  The mental health screen is positive for SMI, developmental disability or acute mental health symptomatology; or

2.    The inmate has a history of sexual abuse victimization or may be at risk for sexual abuse victimization while incarcerated; or

3.    Screening for risk of victimization and abusiveness:

   a.    All inmates shall be assessed during an intake screening and upon transfer to another facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates.

   b.    Intake screening shall ordinarily take place within 72 hours of arrival at the facility.

   c.    Such assessments shall be conducted using an objective screening instrument.

   d.    The intake screening shall consider, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

      i.     Whether the inmate has a mental, physical, or developmental disability;
      ii.    The age of the inmate;
      iii.   The physical build of the inmate;
      iv.    Whether the inmate has previously been incarcerated;
      v.     Whether the inmate's criminal history is exclusively nonviolent;
      vi.    Whether the inmate has prior convictions for sex offenses against an adult or child;
      vii.   Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;
      viii.  Whether the inmate has previously experienced sexual victimization;
      ix.    The inmate's own perception of vulnerability; and
      x.     Whether the inmate is detained solely for civil immigration purposes.

   e.    Within a set time period, not to exceed 30 days from the inmate's arrival at the facility, the facility will reassess the inmate's risk of victimization or abusiveness based upon any additional,

relevant information received by the facility since the intake screening.

f. An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness.

g. Inmates may not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to paragraphs (d)(1),(d)(7),(d)(8), or (d)(9) of this section.

h. The agency shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this standard in order to ensure that sensitive information is not exploited to the inmate's detriment by staff or other inmates.

4. Medical and mental health screenings; history of sexual abuse.

a. If the screening indicates that a prison inmate has experienced prior sexual victimization, whether it occurred in an institutional setting or in the community, staff shall ensure that the inmate is offered a follow-up meeting with a medical or mental health practitioner within 14 days of the intake screening.

b. If the screening indicates that a prison inmate has previously perpetrated sexual abuse, whether it occurred in an institutional setting or in the community, staff shall ensure that the inmate is offered a follow-up meeting with a mental health practitioner within 14 days of the intake screening.

c. Any information related to sexual victimization or abusiveness that occurred in an institutional setting shall be strictly limited to medical and mental health practitioners and other staff, as necessary, to inform treatment plans and security and management decisions, including

housing, bed, work, education, and program assignments, or as otherwise required by Federal, State, or local law.

d.   Medical and mental health practitioners shall obtain informed consent from inmates before reporting information about prior sexual victimization that did not occur in an institutional setting, unless the inmate is under the age of 18.

B.   Psychotropic Medication Prescription

Each inmate newly entering the Department of Correction with a prescription for psychotropic medication shall be referred to a psychiatrist. If the prescription is current and verified, the psychiatrist may continue the prescription and schedule an appointment for the inmate to be evaluated by a psychiatrist within fourteen (14) days. If the prescription is not verified, the psychiatrist shall schedule an appointment for the inmate to be evaluated by a psychiatrist within fourteen (14) days.

650.03   Non-Emergency Mental Health Assessments

A.   Mental Health Appraisal - New Commitment and Intra-System Transfer

1.   Each inmate admitted to a facility by a new commitment or by an Inter-System transfer shall receive a mental health appraisal (Attachment 2) by a Qualified Mental Health Professional within fourteen (14) days of admission. A mental health appraisal is not required if there is documentation that the inmate had received a mental health appraisal within the previous ninety (90) days. In such instances, a Qualified Mental Health Professional shall document any changes in a progress note and, as necessary, update the IMS Mental Health/Substance Abuse History, Medical Orders, and Restrictions/Special Needs screens.

2.   The Qualified Mental Health Professional shall refer the inmate for mental health treatment as indicated by the appraisal, including referral for the development and implementation of a mental health treatment plan.

3.  If the mental health appraisal indicates that the inmate has a developmental disability, the Qualified Mental Health Professional shall refer the inmate for evaluation by a licensed psychologist within fourteen (14) days. Such evaluation may include intelligence testing, if clinically indicated. If the evaluation indicates that the inmate has a developmental disability, the Site Mental Health Director shall develop an appropriate treatment plan and consult with the Superintendent as appropriate. The Primary Care Clinician shall notify the Department of Developmental Services for a determination of service eligibility at the time of such inmate's discharge from the Department.

4.  If the Qualified Mental Health Professional determines that the inmate has a history of sexual abuse victimization or may be at risk for sexual abuse victimization while incarcerated, the inmate shall be referred for monitoring and counseling as clinically indicated as provided by Section 650.16. The Qualified Mental Health Professional shall provide a confidential incident report to the Superintendent and update the IMS Housing Checklist Screen as indicated, upon becoming aware of any report of sexual abuse victimization not previously reported. If the inmate makes a disclosure that requires the issuance of a confidential incident report, the inmate shall be advised that such disclosure cannot be held in confidence.

5.  The Superintendent and the Director of Behavioral Health shall be notified if the mental health appraisal indicates that the inmate requires acute mental health care beyond that available at the facility (e.g., civil commitment pursuant to G.L. c. 123, § 18(a)).

6.  If the mental health appraisal indicates that the inmate has received prior inpatient or outpatient mental health treatment, reasonable efforts shall be made by the Qualified Mental Health Professional to secure written authorization or releases from the inmate to obtain such records. Information obtained from such records shall be entered in the inmate's medical record and in IMS, as appropriate.

B.   Mental Health Appraisal - Inter-System Transfer

Upon an Inter-System Transfer, a Qualified Mental Health Professional shall conduct a mental health appraisal in accordance with Section 650.03(1

C.   Mental Health Referral

Mental health referrals may occur by inmate self-referral (i.e., sick call request) or by staff referral. Each mental health referral shall be classified as (1) Emergent, (2) Urgent, or (3) Routine, and entered in the Sick Call Request/Mental Health Referral log. The mental health referral and the response shall also be documented in the inmate's medical record. The mental health response to each category of mental health referral shall be as follows:

1.   Emergent referrals require an immediate face-to-face response by a mental health clinician. All mental health referrals that indicate that an inmate is at acute risk for suicide or is experiencing acute symptoms shall be classified as Emergent.

2.   Urgent referrals require a face-to-face response by a mental health clinician on the same day. All mental health referrals that indicate an inmate is experiencing active symptoms shall be classified as Urgent.

3.   Routine referrals require a face-to-face or written response within five (5) business days. Mental health referral requests that do not indicate that an inmate is at acute risk for suicide, experiencing acute symptoms, or experiencing active symptoms, shall be classified as Routine.

4.   All mental health referrals that indicate that an inmate is experiencing some form of distress shall require a face-to-face interview.

5.   All mental health referrals that indicate an inquiry about mental health services (e.g., when a next appointment will be held or when a particular group is meeting) shall be responded to in writing.

D.    Inmate Self-Referral

Any inmate may request mental health services by completing a Sick Call Request Form (Attachment 3) or by making a verbal request to a correction officer. A Qualified Health Care Professional shall review Sick Call Request Forms daily. If the request appears to indicate an emergent mental health issue, the mental health clinician on-call shall be paged immediately. All non-emergent requests shall be referred to site mental health staff for review and triage in accordance with Section 650.03(F) and (G) within twenty-four (24) hours, or within seventy-two (72) hours on weekends. Mental health staff shall document the triage process in mental health staff meeting minutes.

E.    Staff Referral

1.    Staff may refer an inmate to mental health staff upon a belief that the inmate may be in need of mental health assistance or when an intake or segregation assessment indicates a need.

2.    In the event that an inmate is approved for an emergency escorted trip (EET) pursuant to 103 CMR 463, Furloughs, for the purpose of a hospital visit of a terminally-ill relative or viewing a deceased relative at a funeral home, staff shall refer an inmate to mental health staff to be offered a face-to-face evaluation upon the inmate's return from the EET.

3.    If any staff member believes that the inmate is at imminent risk for harm to self or others, the inmate shall be placed under constant watch in accordance with Section 650.13(B), and the inmate shall be evaluated by an on-site mental health clinician, or in the absence of an on-site mental health clinician, by an on-call mental health clinician. The mental health clinician shall inform the Shift Commander of the outcome of this evaluation. If the mental health clinician determines that the inmate is not at imminent risk of harm to self or others, the staff person shall refer to site mental health staff for review and triage in accordance with Section 650.03(F) and (G). Mental health staff shall document the triage process in mental health staff meeting minutes.

F.   Triage of Mental Health Referrals

Each working day a Qualified Mental Health Care
Professional shall triage mental health referrals to
determine the necessity and priority of follow-up
based upon the nature of the clinical situation. Based
upon this triage, each mental health referral shall be
classified as either (1) Emergent, (2) Urgent, or (3)
Routine, as set forth in Section 650.03(C), followed-
up accordingly, and entered in the Sick Call
Request/Mental Health Referral log.

G.   Triage of Mental Health Referrals When Mental Health
Staff Are Not On Site

Absent an emergency, upon the determination that an
inmate requires a mental health evaluation, the
Superintendent or designee shall call and notify the
on-call mental health clinician, who shall determine
whether an immediate mental health evaluation is
necessary. The on-call mental health clinician shall
follow-up with the referring staff person and arrange
for an evaluation by a Qualified Mental Health
Professional. The referral and evaluation shall be
documented in the medical record.

In an emergency, the inmate shall be transported to a
facility with on-site mental health staff.

H.   Non-Cooperation and Refusal of a Mental Health
Evaluation

1.   If an inmate refuses or does not cooperate with a
mental health evaluation, the medical or mental
health staff person seeking to perform the mental
health evaluation shall consult with the Site
Mental Health Director to determine what steps
should be followed. At a minimum, a mental health
clinician shall conduct a face-to-face interview
with the inmate to determine (1) whether the
inmate is continuing to refuse or not-cooperate,
(2) why the inmate is refusing or not
cooperating, and (3) whether immediate
intervention is required. The inmate's refusal or
non-cooperation, along with all subsequent steps
taken, shall be documented in the medical record.

2.   If an inmate undergoing detoxification refuses or
does not cooperate with a mental health

appraisal, the inmate shall be offered the mental health appraisal upon completion of the detoxification process so as to ensure that the non-cooperation or refusal did not relate to the detoxification process. If the inmate again refuses or does not cooperate, the mental health professional shall follow the procedures set forth in Section 650.03(H).

I.   Mental Health Evaluations

1.   If a mental health appraisal reveals that an inmate may require ongoing mental health treatment or services, a Qualified Mental Health Professional shall complete a mental health evaluation (Attachment 4) within fourteen (14) days of the completion of the mental health appraisal.

2.   Following the completion of the mental health evaluation, if the Qualified Mental Health Care Professional believes that further assessment is necessary, he or she may refer the case to the Site Mental Health Director, who shall determine whether further assessment is required. The Site Mental Health Director may refer the inmate for ongoing assessment for a period up to thirty (30) days from the completion of the mental health evaluation.

3.   An inmate may be referred for a mental health evaluation at any time during his or her incarceration on the basis of a mental health crisis, including suicidal threats, self-injurious behavior, or the display of signs and symptoms of mental illness. All referrals for a mental health evaluation shall be triaged within twenty-four (24) hours or on the next business day. The inmate shall be seen in a time frame commensurate with the nature of the referral, but not to exceed fourteen (14) days.

4.   If necessary to complete a mental health evaluation or to render a diagnosis, the mental health vendor shall timely obtain further psychological, neurological, medical and laboratory assessments.

5.   A mental health evaluation shall be completed prior to and in preparation of a mental health treatment plan.

J.   Open Mental Health Cases and Treatment Plans

1.   Following the completion of a mental health evaluation, or following the completion of the thirty (30) day assessment described in Section 650.03(I)(2), if it is determined that an inmate requires ongoing mental health treatment or services, the inmate shall be designated as an Open Mental Health Case and assigned a Primary Care Clinician (PCC).

2.   Within fourteen (14) days of a mental health appraisal conducted pursuant to Section 650.03(A) or (B), the PCC shall determine and document the inmate's mental health classification code and subcodes as provided by Section 650.04(B).

3.   Within thirty (30) days of the inmate's designation as an Open Mental Health Case, the PCC shall develop an Initial Treatment Plan. (Attachment 5).

4.   The treatment plan shall be reviewed and updated as follows:

For SMI inmates, review and update by the PCC every ninety (90) days for the first twelve (12) months, and every six (6) months thereafter, or more frequently if clinically indicated;

For non-SMI inmates, review and update by the PCC every six (6) months, or more frequently if clinically indicated;

For STU and RTU inmates, review and update by the treatment team every ninety (90) days or more frequently if clinically indicated.

5.   While the frequency and type of mental health services shall be dictated by the individual mental health classification (Section 650.04), each Open Mental Health Case shall be seen every thirty (30) days at a minimum. In addition, an inmate prescribed psychotropic medication shall be seen by a psychiatrist every ninety (90) days at a minimum.

K.   Procedures for Closing Mental Health Cases of SMI Inmates

1.   An SMI inmate with a current diagnosis of any of the following disorders shall remain on the Mental Health caseload (i.e., the mental health case cannot be closed):

- Schizophrenia
- Schizophreniform Disorder
- Schizoaffective Disorder
- Delusional Disorder
- Brief Psychotic Disorder
- Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)
- Psychotic Disorder Not Otherwise Specified

2.   If an SMI inmate is diagnosed with Major Depressive Disorder, Bipolar Disorder I, or Bipolar Disorder II in Full Remission (the DSM-V defines "Full Remission" "During the past two (2) months, no significant signs or symptoms of the disturbance were present") the case may be closed when the following criteria have been met:

The inmate has not been prescribed psychotropic medication for one (1) year; and

The inmate has consistently presented with no symptoms of depression, mania, or hypomania for one (1) year.

The procedure for closing such cases shall be as follows:

a.   When an SMI inmate is diagnosed with Major Depressive Disorder, Bipolar Disorder I, or Bipolar Disorder II in Full Remission has not exhibited symptoms for one (1) year, and has not been prescribed psychotropic medication for one (1) year, the treatment team may consider case closure. Prior to closing the case:

     i.   The Primary Care Clinician (PCC) shall present the rationale for case closure to the Site Mental Health Director.

     ii.   The Site Mental Health Director shall conduct a record review to ensure that the inmate's behavior and clinical presentation meets the criteria outlined above. This review shall be documented in an administrative progress note indicating the findings of the record review. The Site Mental Health Director may conduct a face-to-face evaluation when clinically indicated.

     iii. If the Site Mental Health Director determines that case closure is clinically appropriate, a staff psychiatrist shall conduct a face-to-face evaluation. This evaluation shall be documented in a progress note.

b.    If the PCC, Site Mental Health Director, and psychiatrist agree that case closure is clinically appropriate, the case shall be reviewed by case conference with the following participants: the PCC, psychiatrist, Site Mental Health Director, and the Program Mental Health Director (or designee). This review shall be documented in an administrative progress note indicating the findings of the clinical case conference.

c.    Upon approval by the Program Mental Health Director, the treatment team shall complete the case closure form (Attachment 6).

d.    Upon completion of the above steps, and upon the entry of all necessary documentation (i.e., case conference summaries) in the medical record, the Site Mental Health Director shall enter

the Mental Health Classification change in IMS to MH-0 with a subcode of "A".

650.04   Mental Health Classification

A.   Mental Health Classification System

The mental health classification system identifies the level of mental health services that an inmate requires due to his or her mental health needs and serves as a guide to mental health staff outlining recommended treatment interventions. The mental health codes and subcodes are set forth in Attachment 7.

B.   Assignment and Review of Mental Health Codes and Subcodes

1.   The inmate's PCC shall determine an inmate's initial mental health code and subcodes within fourteen (14) days of a mental health appraisal conducted pursuant to Section 650.03(A) or (B).

2.   As frequently as the inmate's mental health needs dictate, the PCC or a Qualified Mental Health Professional shall review and update the mental health classification codes and subcodes of each inmate with an Open Mental Health Case. At a minimum, the mental health codes and subcodes shall be reviewed at the time of the inmate's treatment plan update, as set forth in Section 650.03(J)(4).

3.   Upon discharge to a prison from Bridgewater State Hospital or from a Department of Mental Health facility, the PCC shall review the inmate's mental health codes and subcodes.

4.   The Program Mental Health Director shall review and approve (1) the decrease of a mental health classification from MH-4 to a lower classification, and (2) the increase of a mental health classification to MH-4 from a lower classification.

C.   Documentation of Mental Health Classification

Upon initial designation and upon each revision, the mental health classification codes and subcodes shall be entered into IMS and documented in the medical record by a member of the mental health team. All

changes to an inmate's mental health classification and/or subcode shall be entered immediately in the inmate's medical record and in IMS by the PCC or a member of the mental health team.

650.05    Communication Regarding Mental Health Status and Needs of Inmates

A.    Intra-Facility Communication

1.    Each Superintendent, in conjunction with the Site Mental Health Director, shall establish written site specific procedures to direct, guide and encourage correctional staff to seek and obtain consultation from mental health professionals when correctional staff have reason to believe that an inmate may be mentally ill or when mental health status is an issue in the consideration of classification, discipline, program participation, placement or release planning. Such procedures shall require communication to occur at least Monday through Friday between mental health professionals and the superintendent or designee in order to review all of the prior day's incident and disciplinary reports for any matter where it is believed that an inmate's mental status may be in question. Consideration of the inmate's mental health status as it pertains to the disciplinary process shall be governed by Section 650.09. Consideration of the inmate's mental health status as it pertains to housing, program assignments, work, transportation, special equipment and admission to and transfer from the facility shall be governed by Section 650.15.

2.    Facilities that do not have at least five (5) day per week mental health coverage shall be exempt from this required daily meeting, but site specific procedures shall be developed to ensure consultation from mental health professionals occurs at least weekly, and is sought on an as needed basis, when correctional staff have reason to believe that an inmate may be mentally ill or when mental health status is an issue in the consideration of classification, discipline, program participation, placement or release planning.

3. Site-specific procedures shall be submitted to the Director of Behavioral Health for approval.

4. The daily meeting shall provide the opportunity for mental health staff to raise specific inmate related mental health issues that may require some form of increased involvement or monitoring from correctional staff, but does not rise to the level of requiring an inmate to be placed on a mental health watch. This information shall also be documented in the meeting minutes and a site specific procedure shall be developed to ensure that relevant mental health information is communicated to the appropriate correctional or medical staff.

5. The daily meeting shall also provide a forum for senior Department site administration to inform mental health staff of any significant events expected to occur within the day that may impact upon an inmate's overall mental status (i.e. classification hearings, parole hearing, legal decisions, court trips, etc.). When it is suspected that an inmate will react negatively to such an event, mental health staff shall ensure that the inmate is to be evaluated by a Qualified Mental Health Professional upon completion of the event.

6. Mental health staff's input into any of these matters shall be documented within the official minutes of the daily meeting.

B. <u>Inter-Facility Communication</u>

Along with the medical record, a "Health Status Report" shall accompany each inmate who is transferred from one Department of Correction facility to another. This report shall contain information regarding the inmate's mental health history including psychiatric hospitalizations, psychotropic medications, any existing Probate Court order regarding medications, suicide attempts and sexual abuse victimization while incarcerated.

If the Site Mental Health Director at the sending facility believes that the inmate may suffer a psychiatric emergency or act out during transportation or upon arrival at the receiving facility, he or she shall communicate this belief to the Deputy

Superintendent of the sending facility and the Site Mental Health Director at the receiving facility. The Deputy Superintendent of the sending facility shall ensure that this information is communicated to the Central Transportation Unit as well as initiate contact with the Deputy Superintendent of the receiving facility.

C.   Inter-System Communication

A Health Status Report pursuant to 103 DOC 607.02(1) shall accompany each inmate who is released from the custody of the Department of Correction to another correctional or law enforcement agency or to the Department of Mental Health. Mental health participation in the reentry process shall be governed by Section 650.18.

650.06   Informed Consent

A.   In non-emergency situations, inmates shall be provided information necessary to give informed consent prior to the initiation of mental health treatment services, including treatment with psychotropic medication. The inmate shall be provided sufficient information upon which the inmate may make an informed decision as to the risks and benefits of the treatment offered. This information shall be provided in a language understood by the inmate.

B.   The inmate's written informed consent shall be obtained where required by a pre-printed informed consent or authorization form approved by the Director of Behavioral Health.

C.   Informed consent is not required in appropriate circumstances including:

1.   A mental health emergency requiring an intervention for the safety of the inmate, other inmates or staff;

2.   An intervention required to address a life-threatening situation;

3.   Emergency treatment, including treatment with antipsychotic medication, for an inmate who is not competent to make treatment decisions;

4.  Screening or treatment necessary to address a significant risk to the public health.

D.  If an inmate refuses an evaluation or treatment, the mental health clinician shall document the refusal in the medical record, including:

1.  A description of the service being refused;

2.  Evidence that the inmate has been made aware of any consequences to his/her mental health that may occur as a result of the refusal;

3.  The signature of the inmate and the date on any applicable form, along with the signature of any required witness.

650.07   Psychotropic Medication

A.  General

Psychotropic medications may be utilized as one facet of a multi-faceted treatment program. Each inmate who is prescribed psychotropic medications shall be considered an open mental health case and shall be followed by a Primary Care Clinician.

B.  Prescription and Discontinuation

1.  The following clinicians may prescribe psychotropic medication:

o  A Psychiatrist;

o  A mid-level clinician (i.e., a Clinical Nurse Specialist or Psychiatric Nurse Practitioner) with the authorization of the Program Psychiatric Director and under the supervision of the Site Medical Director or site Psychiatrist; and

o  In an emergency, a Physician who is trained or experienced in the use of psychotropic medication.

2.  Except in an emergency, psychotropic medication may be prescribed only following a physical examination consisting of the measurement of blood pressure, temperature and pulse readings, and a review of the admission examination and/or

most recent periodic health examination. In an emergency, the physical examination and review of the health examination shall be performed as soon as practical.

3.  The prescribing clinician shall inform the inmate (and document that he/she has done so) of the reasons for the prescribed medication(s), the anticipated benefits, probable consequences if medication is not accepted, and the possible major side effects of the medication(s). This information shall be reviewed with the inmate by face-to-face encounters every ninety (90) days or each time the medication regimen is changed. The prescribing clinician shall note, in the medical record, a statement of progress that reflects response to and changes in medications. [Cross-reference refusals, Rogers]

4.  A Psychiatrist or a mid-level clinician under the supervision of a Psychiatrist may discontinue the use of psychotropic medication.

5.  The decision to initiate or discontinue psychotropic medication and the rationale for such decisions shall be documented in the medical record. Documentation of psychiatric medication shall be entered on the IMS Medical Orders Screen and as a mental health classification sub-code on the IMS Mental Health and Substance abuse history screen.

C.  Dispensing

1.  Medications administered to inmates on mental health watch or in segregation shall be crushed whenever possible. In those instances where the prescribed medication cannot be crushed or it would be clinically contraindicated to do so, the use of liquid medication shall be considered.

2.  Inmates who are on mental health watch shall be removed from their cell prior to medication administration. A complete visual inspection of the inmate's mouth shall be made by correctional staff to insure that medications are swallowed and not hoarded.

D.  Monitoring and Compliance

The mental health contractor shall establish written policies and procedures for the purpose of monitoring inmates' degree of compliance with their medication orders, including written guidelines for the degree of compliance required for specific drugs and dosages. All procedures shall adhere to the following guidelines:

1.  The prescribing clinician shall complete a semi-annual AIMS scale or similar instrument on all inmates who are prescribed anti-psychotic medication.

2.  The inmate's compliance with prescribed psychotropic medication shall be documented in the medication administration record (MAR).

3.  For the purpose of determining an inmate's compliance with psychotropic medication, non-compliance shall constitute the following: Three (3) consecutive doses missed, or fifty percent (50%) of doses missed in one week, or a pattern of significant non-compliance.

4.  An inmate's failure to appear to receive prescribed medication shall be noted on the medication kardex or medication non-compliance log.

5.  An inmate's report or exhibition of medication side effects shall be documented and conveyed to the mental health team for a psychiatric referral.

6.  All medication kardex and medication non-compliance logs shall be reviewed on a daily basis to identify non-compliant inmates. The list of non-compliant inmates shall be provided to the attending physician and psychiatrist on a bi-weekly basis, unless the situation requires immediate attention.

E.  Treatment Non-Compliance and Refusal

1.  An inmate who repeatedly refuses his/her psychotropic medication, or has developed an intermittent pattern of non-compliance, shall be referred to the Site Mental Health Director for counseling, and to the Psychiatrist for follow up as needed. The inmate shall be counseled

regarding the possible consequences of medication refusal or non-compliance. This counseling shall be documented in the medical record.

2.  If the inmate continues to engage in non-compliance with the taking of the medication, the inmate shall be requested to sign a refusal of treatment form. If the inmate declines to sign the refusal of treatment form, a clinician, with another staff person as a witness, shall enter a notation on the form documenting the inmate's refusal to sign. Both staff members shall sign the refusal form as witnesses. Documentation of all such encounters shall be entered in the medical record. An inmate's symptoms or complaints of medication side effects shall be reported to the Psychiatrist.

3.  The Site Mental Health Director may request a clinical case conference to consider the inmate's competence to refuse treatment and the need for a court-authorized treatment plan.

F.  <u>Emergency Administration of Psychotropic Medication</u>

The emergency involuntary administration of psychotropic medication is governed by Section 650.13(D).

G.  <u>Non-Emergency Antipsychotic Medications for Incompetent Inmates</u>

1.  <u>General</u>

a.  Court authorization is required for the non-emergency provision of antipsychotic medications to an inmate who is not competent to provide informed consent. The non-emergency use of other psychotropic medications and non-psychotropic medications requires the approval of either the inmate's legal guardian or health care agent (see 103 DOC 620.12 (<u>Health Care Proxy Guidelines</u>).

b.  Court authorization for inmates at facilities other than Bridgewater State Hospital is sought from the Probate

Court. Court authorization for Bridgewater State Hospital patients may be sought from the Probate Court if an order is needed that will remain in effect beyond the period of the patient's civil commitment (e.g., for a patient who will be discharged to a prison). Such authorization requires a judicial determination of incompetence and a substituted judgment determination. The Probate Court will also appoint a medical guardian for the purpose of monitoring the court authorized treatment plan ("Rogers" treatment plan). An approved Rogers treatment plan shall be filed in the medical record and entered on the IMS Medical Orders Screen.

c. The Program Mental Health Director shall provide the Director of Behavioral Health with an updated list on a monthly basis of all Probate Court Rogers orders and proposed candidates for such orders. A member of the mental health team shall enter information regarding approved Rogers orders on the IMS Medical Issues Screen.

2. <u>Procedure to Obtain a Court-Authorized Treatment Plan</u>

a. All requests to seek a court authorized treatment plan for inmates shall be submitted to the Director of Behavioral Health for approval. The Director of Behavior Health will consult with the Department of Correction Legal Division. The Mental Health Contractor shall cooperate with the Department of Correction by providing court testimony, affidavits, treatment plans and records as may be required to secure court authorization.

b. All treatment plans submitted for court authorization should, when clinically appropriate, incorporate an intramuscular (IM) route of

administration order as an alternative to oral administration.

c.   If court authorization is sought for a Bridgewater State Hospital patient who will be discharged to a prison, the Bridgewater State Hospital Psychiatrist shall consult with a psychiatrist at the prison concerning the proposed treatment plan and medications that will be utilized at the prison. Notification shall be issued to the Superintendents of Bridgewater State Hospital and the receiving prison.

d.   A case conference between Bridgewater State Hospital and prison mental health clinicians may be scheduled prior to the discharge to the prison of a patient with a court authorized treatment plan.

3.   <u>Documentation</u>

a.   A court approved treatment plan shall be entered in the medical record and noted on the inmate's medication administration record (MAR).

b.   When an inmate is subject to a court approved treatment plan, the inmate's medication administration record will carry a notation on all pages that the psychotropic medications are ordered under the auspices of a Rogers order. A copy of the court approved treatment plan shall be filed in the medical record and referenced prior to any psychotropic medication changes to ensure that such changes are consistent with the treatment plan. Requests for court-approved changes shall be submitted to the Director of Behavioral Health for referral to the Legal Division.

c.   Medical and mental health staff shall cooperate with, and provide relevant information to, the guardian/treatment monitor designated by the Court to

monitor the treatment plan. The guardian/treatment monitor shall have access to the inmate's medical records. The treating Psychiatrist shall contact the guardian/treatment monitor, and, if necessary, the assigned Department of Correction counsel regarding all issues concerning the court authorized treatment plan, including the approval of non-antipsychotic medications.

4.   Involuntary Administration of Court-Authorized Treatment

a.   Inmates receiving antipsychotic medication pursuant to a court authorized treatment plan may not refuse to attend a medication line. Each Superintendent shall develop a written procedure, pursuant to 103 DOC 661, Pharmacy and Medications, to ensure that inmates attend the medication line and sign formal refusals when medication is not accepted.

b.   If an inmate with a court approved treatment plan refuses medication, a clinician shall inform the inmate that if he or she refuses to take the medication by mouth, he or she will be cuffed and escorted to the Health Services Unit (HSU) pending mental health consultation and counseling. The on-site or on-call Psychiatrist shall be contacted immediately for assessment and appropriate intervention.

c.   If the inmate continues to refuse the medication following counseling by mental health staff, the Psychiatrist may order that the inmate be placed in mental health restraints in the HSU for the administration of intramuscular (IM) medication, where IM medication is incorporated in the court authorized treatment plan. The Psychiatrist may also recommend alternatives to involuntary administration of IM medication.

      d.    Continuation of restraints beyond the period of time required for the administration of medication must be authorized by a Psychiatrist in accordance with Section 650.13(C)(2).

H. <u>Department of Mental Health Initiated Court Authorized Treatment Plans</u>.

1. Upon the civil commitment of an inmate from a prison to a facility of the Department of Mental Health pursuant to G.L. c. 123, § 18, the Psychiatrist assigned to the prison shall consult with Department of Mental Health staff concerning medication issues, including the need to obtain a court authorized treatment plan.

2. Upon the discharge of an inmate to a prison from a facility of the Department of Mental Health with a court authorized treatment plan obtained by the Department of Mental Health, the court authorized treatment plan shall be administered as provided herein.

650.08    <u>Residential Treatment Units</u>

A.    <u>Purpose</u>

Residential Treatment Units provide an intermediate level of care for general population inmates with a mental health classification of MH-4. These inmates do not require inpatient psychiatric hospitalization, but they present with a pervasive pattern of inability to function or manage appropriately within general population due to a mental disorder which may be evidenced by any of the following:

- Multiple transfers to an inpatient psychiatric setting;
- Frequent placement on mental health watch;
- Frequent reliance on crisis stabilization services/interventions;
- Frequent episodes of self-injurious behavior;
- Multiple disciplinary or rule infractions;
- Inability to follow routine/directions;
- Inability to participate independently in activities of daily living.

Inmates with acute medical needs requiring placement and treatment within an infirmary setting or an assistance with activities of daily living (ADL) unit are not appropriate for RTU placement.

The mission of the RTU's is to significantly reduce serious rule infractions, disciplinary issues, emergency crisis referrals, suicide attempts, self-injurious behaviors and psychiatric hospitalizations through the utilization of group and individual therapy within a residential, therapeutic treatment milieu.

B.   Residential Treatment Unit Referral and Placement

1.   A mental health clinician who believes that an inmate may benefit from RTU placement shall triage the case with the Site Mental Health Director. In the case that there is agreement that RTU placement is clinically indicated, the inmate's PCC shall complete an RTU referral form (Attachment 8) and submit the form to the Site Mental Health Director for review.

2.   If the Site Mental Health Director concurs that RTU referral is appropriate, he or she shall sign and approve the RTU referral. The referral shall then be submitted to the Program Mental Health Director for review and final determination. If the Program Mental Health Director determines that the RTU referral is clinically appropriate and does not require further evaluation to make a determination, he or she shall inform the following within five (5) business days: the Director of Behavioral Health; the Department's Central Classification Division; the RTU coordinators; and the PCC. If the Program Mental Health Director requires further evaluation in order to make a final determination, he or she shall conduct a medical record review and a face-to-face evaluation with the inmate. The Program Mental Health Director shall submit the final RTU placement determination to the Director of Behavioral Health within ten (10) business days.

3.   The mental health classification of an inmate who is determined to be clinically appropriate for RTU placement shall be designated as MH-4, subject to the review and approval of the Program

Mental Health Director pursuant to Section 650.04(B)(4).

4.    Upon notification by the Director of Behavioral Health and/or the Program Mental Health Director of clinical approval for RTU placement for a male inmate who is not already residing at the facility that houses the RTU, the Classification Division shall determine the appropriateness of the transfer under the point based classification system. Unless otherwise indicated, the inmate shall remain at the sending institution until bed space becomes available in the designated RTU. The RTU admission of an inmate who is already residing at the facility that houses the designated RTU constitutes an internal placement that does not require review by the Classification Division.

5.    Upon an inmate's transfer from an RTU to an inpatient psychiatric hospital (BSH for males, a DMH facility for females) the inmate's space in the RTU program shall be held for the entirety of the thirty (30) day evaluation period prescribed by G.L. c. 123, § 18(a). An RTU inmate who is subsequently civilly committed to an inpatient psychiatric hospital shall be afforded an RTU placement upon his or her discharge from the hospital if such placement remains clinically indicated.

C.    Residential Treatment Unit Programs and Operation

1.    Treatment Team

The RTU's utilize a multi-disciplinary treatment team. Treatment team membership may include the following: RTU Coordinator; assigned Captain; Unit Sergeant; assigned Correction Officers from all shifts; Correctional Program Officer; assigned mental health clinicians including the assigned Psychiatrist; and assigned nursing and program staff.

The treatment team shall conduct daily team triage meetings during normal business hours to review each inmate's status and discuss any identified issues or concerns. The daily team triage meetings shall be chaired by the RTU Coordinator.

The treatment team shall conduct multi-disciplinary treatment team meetings at least every ninety (90) days. Multi-disciplinary treatment team meetings shall include participation of a Psychiatrist, as well as the mental health and correctional staff who are directly involved in the inmate's care and treatment.

2. Treatment Plans

Within thirty (30) business days of the inmate's placement in the RTU, the treatment team shall develop an Initial Treatment Plan, which shall be documented in the inmate's medical record. While individual members of the treatment team may complete specific items of the treatment plan, approval of the treatment plan shall occur during a multi-disciplinary team meeting.

RTU treatment plans may be reviewed at any time, but at minimum, every ninety (90) days during a multi-disciplinary treatment team review meeting. The inmate shall be requested to participate in the multi-disciplinary treatment team meeting and shall be afforded the opportunity to give input into his or her treatment goals and assigned treatment interventions. The inmate shall be requested to sign the treatment plan. The inmate's refusal to sign shall be documented in the treatment plan.

The treatment plan shall determine the inmate's level of clinical monitoring and frequency and modality of treatment interventions.

3. Programs

The RTU shall offer a variety of clinically-driven programs and activities. Although RTU inmates will not be forced to accept treatment, the inmate's PCC and the RTU treatment team shall monitor and encourage participation. When an inmate is reluctant to comply with treatment recommendations, staff efforts to engage the inmate will be documented.

The primary mode of mental health treatment in the RTU shall consist of group programming that

offers core treatment modules and elective groups. A portion of the group programming available will be maintained with rolling admission, allowing inmates to enter the group at varying stages of treatment and length of stay on the RTU. Assignment to core group treatment modules is at the sole discretion of the RTU treatment team and is based on the inmate's individualized treatment needs. Elective groups may be assigned based on the input and interest of the inmate. Attendance records shall be kept for each group conducted and each inmate's participation and attendance shall be documented in each inmate's medical record.

4.   Orientation Meetings

Upon admission to the RTU, each inmate shall participate in a formal RTU orientation meeting. The purpose of this meeting is to assist inmates in making a smooth transition to the RTU. The orientation meeting shall be facilitated by the RTU treatment team and provide inmates with an introduction to unit staff and an overview of the RTU rules and regulations, unit schedules and operations, program components, and program completion criteria. It is expected that most inmates will participate in this meeting within one (1) to two (2) days of admission to the RTU. All RTU orientation materials and unit program components shall be reviewed by the vendor's Director of Clinical Programs and are subject to approval by the Director of Behavioral Health.

5.   Earned Good Time

RTU inmates who participate in programming may earn five (5) days of earned good time each month based upon successful compliance with the elements of their Individualized Treatment Plans. Such elements shall include one or more of the following: attendance and participation in structured group or individual activities; absence of threatening or injurious behavior directed at self or others; quality of interactions with staff and peers; work assignments; educational programming.

There shall be no limit to the number of months that an inmate is eligible to receive earned good

time credits, as some inmates may require such programming and support in the RTU environment for an extended period of time. The maximum number of earned good time credits is established at five (5) days per month to provide an incentive for inmates to actively participate in this structured programming while at the same time offering a motivator for them to work toward integration into the general population housing where an additional two and one-half (2.5) days of good time may be earned. Inmates shall not be awarded increments of earned good time less than five (5) days (e.g., 2.5 days); they shall be credited either with five (5) days or with zero (0) days. All earned good time credits that are awarded shall be in the "program" category.

Each inmate's daily attendance shall be recorded in the IMS Program/Attendance screen for the purpose of tracking the inmate's program participation for the purpose of determining his or her performance rating and the award of earned good time credits.

At the end of each month, the RTU Coordinator shall convene a treatment team meeting with designated staff to assess each RTU inmate's compliance with his or her individualized treatment plan. RTU staff shall assess whether the inmate's degree of compliance was satisfactory, unsatisfactory, or incomplete. The RTU Coordinator shall enter each inmate's performance rating into the IMS Program/Attendance screen no later than the first business day of the following month. The final earned good time credit rating for each inmate who receives earned good time credits shall be determined by the facility Director of Treatment and shall be entered into IMS by the sixth day of the following month. The site Deputy Superintendent of Classification and Programs, in conjunction with the Department of Correction Unit Administrator, shall monitor the implementation of this process on a regular basis to ensure that the earned good time credits are entered in an accurate and timely manner in accordance with 103 CMR 410, Sentence Deductions.

D.   Residential Treatment Unit Discipline and Segregation

RTU inmates shall be subject to the disciplinary process. RTU inmates may be issued disciplinary reports and may be required to serve a disciplinary detention sanction in a segregation cell. RTU mental health staff shall provide consultation to the disciplinary hearing process pursuant to Section 650.09.

RTU inmates who are confined in a segregation cell shall be assessed at least two (2) times weekly by a Qualified Mental Health Professional during segregation rounds. Additionally, when an RTU inmate is placed in a segregation cell, a member of the RTU treatment team shall attempt to interview the inmate for an out of cell individual contact or shall have the opportunity to assess the inmate in an out of cell group contact at least twice per week. The out of cell contact or an inmate's refusal of out of cell contact shall be documented in the medical record.

E.   Residential Treatment Units Discharge

An inmate may be discharged from an RTU for the following reasons:

- The inmate no longer requires the level of service provided in an RTU or requires the level of services provided in a higher or lower security RTU; or

- The inmate is no longer clinically appropriate for RTU services; or

- The inmate may present security risks that cannot be safely managed in the RTU.

1.   RTU Discharge for Clinical Reasons

If the RTU coordinator believes that an inmate should be discharged, he or she shall triage the case with the Site Mental Health Director. The RTU Coordinator shall submit an RTU discharge form (Attachment 9) to the Site Mental Health Director.

If the Site Mental Health Director concurs that the RTU discharge is appropriate, the RTU discharge form shall be submitted to the Program Mental Health Director for review and final

determination. All RTU discharges require approval of the Program Mental Health Director. If the Program Mental Health Director determines that the RTU discharge is clinically appropriate and does not require further evaluation to make a determination, he or she shall convey the recommendation to the Director of Behavioral Health. If the Program Mental Health Director requires further evaluation in order to make a final determination, he or she may interview the offender and review pertinent records.

Once the RTU discharge is approved, the assigned RTU clinician shall document the reason for discharge and any treatment recommendations in a mental health progress note in the medical record and a reference in the treatment plan update. The Site Mental Health Director, and if appropriate, the Psychiatrist, shall review the treatment plan update.

As soon as possible, the Site Mental Health Director shall communicate the discharge determination to the facility Superintendent, who shall initiate the determination of an alternative housing assignment.

2.   RTU Discharge for Security Reasons

If an inmate continues to require RTU services, but the Superintendent determines that the inmate can no longer be safely housed within the facility RTU, the Superintendent shall request that the Director of Behavioral Health schedule a case conference to determine the manner in which the inmate's treatment and safety needs may best be managed.

A case conference shall include, at a minimum, the Superintendent; the Director of Behavioral Health, the Program Mental Health Director, the Site Mental Health Director and the PCC. Other staff may be requested to attend as appropriate.

The case conference shall make one of the following decisions:

- The inmate shall remain in the RTU at the current facility;

- The inmate shall be transferred to an RTU at another facility;
- The inmate shall be referred for placement in an STU;
- The inmate shall be placed in other housing/another facility with specific treatment plan modifications developed in concert with the receiving facility's mental health team.

The PCC shall complete a Case Conference Summary Form (Attachment 10), which shall be incorporated in the medical record. In addition, the PCC shall write a mental health progress note in the medical record documenting that the PCC discussed the decision regarding RTU retention or discharge with the inmate and with the receiving facility's Site Mental Health Director.

The Director of Behavioral Health shall communicate the disposition of the conference to the relevant divisions, facilities, and contract providers as appropriate.

650.09    Mental Health Consultation in the Disciplinary Process

A.    Notification to Mental Health – SMI Inmates

Site mental health staff shall be notified prior to service of a disciplinary report on any inmate with SMI who is charged with a Category 1 or Category 2 disciplinary offense, as defined by the Inmate Discipline regulation, 103 CMR 430.

B.    Superintendent's Review of Disciplinary Reports

During regularly scheduled reviews of recently issued disciplinary reports(Section 650.05(A)), the Superintendent or designee shall receive consultation from a site mental health staff member regarding mental health issues that may be implicated in the events described by the disciplinary report, and whether there are appropriate alternatives for addressing the matter by means other than the disciplinary process. Upon determination that the case should be managed by means other than the disciplinary process, the Superintendent may order that the disciplinary report be dismissed in whole or

in part. Such dispositions shall be documented in the meeting minutes.

a.   Inmates shall be subject to disciplinary sanctions pursuant to a formal disciplinary process following an administrative finding that the inmate engaged in inmate-on-inmate sexual abuse or following a criminal finding of guilt for inmate-on-inmate sexual abuse.

b.   Sanctions shall be commensurate with the nature and circumstances of the abuse committed, the inmate's disciplinary history, and the sanctions imposed for comparable offenses by other inmates with similar histories.

c.   The disciplinary process shall be considered whether an inmate's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

C.   <u>Consultation Regarding Disciplinary Disposition</u>

1.   Following the entry of a guilty finding on a Category 1 or Category 2 disciplinary offense for an inmate with a Mental Health Classification of MH-4, the hearing officer, if not recommending a DDU sanction, shall consult with mental health staff. Mental health staff shall render an oral opinion, if pertinent, as to whether there are mental health considerations that may bear on the issues of mitigation and determination of an appropriate sanction. This may include an opinion on the effect of particular sanctions or combination of sanctions on the inmate's mental health (e.g., loss of visits, canteen, television, etc.). The hearing officer shall indicate by "check off" on the disciplinary hearing form (Attachment 11) that he or she has received an opinion from mental health staff and document any change in the disposition of the case entered pursuant to that opinion.

2.   In the event that an inmate with a Mental Health Classification of MH-4 charged with a Category 1 or 2 disciplinary offense pleads guilty to disciplinary charges, prior to the imposition of disciplinary detention, other than a sanction of "time served," the hearing officer or

disciplinary officer shall consult with mental
health staff with respect to dispositional
recommendations and document any such change in
disposition as provided in Section 650.09(C)(1).

650.10    Segregation

Section 650.10(A) governs mental health procedures and
treatment attendant to the Segregation of an inmate in a
Special Management Unit (SMU). Section 650.10(B) governs
other twenty-three-hour per day cell Segregation. Section
650.10(C) governs mental health procedures and treatment
attendant to Segregation in the DDU. Section 650.10(D)
governs meetings attendant to Segregation and DDU.

A.    Special Management Units

    1.    Pre-Segregation Screen

        Each inmate being transferred to an SMU shall
        receive a mental health screen (Attachment 1) by
        a qualified health care professional (e.g., a
        Physician, Physician assistant, Nurse, or Nurse
        Practitioner) prior to such Segregation to
        determine (1) whether the inmate has an SMI,
        and/or (2) whether there are any acute medical or
        mental health contraindications to Segregation.
        Acute mental health contraindications to
        Segregation include that the inmate appears
        acutely psychotic, is actively suicidal or has
        made a recent serious suicide attempt, or is
        otherwise in need of immediate placement on
        mental health watch. The qualified health care
        professional shall document the screen and
        results in the medical record and in IMS. See 103
        DOC 630.17(1).

        If the screen is positive for an acute mental
        health contraindication to Segregation, the
        qualified health care professional shall contact
        an on-site or on-call mental health clinician,
        who shall evaluate the inmate for acute mental
        health contraindication to Segregation. The
        evaluation shall be documented in the medical
        record and communicated to the Superintendent, or
        during non-business hours, the Shift Commander,
        for immediate placement of the inmate in an
        alternative setting (e.g., mental health watch,
        inpatient hospitalization, or other appropriate
        healthcare setting). The disposition upon a

positive screen for an acute medical contraindication is governed by 103 DOC 630.17(6).

2.   <u>Initial Segregation Evaluations of Open Mental Health Cases</u>

Each inmate with an Open Mental Health Case who is placed in an SMU shall be evaluated by a Qualified Mental Health Professional within the next business day of such placement to determine (1) whether the inmate has an SMI, and/or (2) whether there are any acute medical or mental health contraindications to Segregation. For inmates placed in an SMU, the evaluation shall be conducted by the Qualified Mental Health Professional assigned to the SMU. If the inmate is currently designated as SMI, a clinical evaluation to determine SMI need not be performed. The Qualified Mental Health Professional shall document the evaluation in a Mental Health Clearance Form (Attachment 12) and in IMS.

3.   <u>Subsequent Segregation Evaluations of Open Mental Health Cases</u>

Each inmate with an Open Mental Health Case who is placed in an SMU shall be evaluated by a Qualified Mental Health Professional every thirty (30) days following such placement to determine (1) whether the inmate has an SMI, and/or (2) whether there are any acute medical or mental health contraindications to Segregation. For inmates placed in an SMU, the evaluation shall be conducted by the Qualified Mental Health Professional assigned to the SMU. If the inmate is currently designated as SMI, a clinical evaluation to determine SMI need not be performed. The Qualified Mental Health Professional shall document the evaluation in a Mental Health Clearance Form (Attachment 12) and in IMS.

4.   <u>Segregation Assessment of Non-Open Mental Health Cases</u>

Each inmate without an Open Mental Health Case who is placed in an SMU shall be assessed by the Qualified Mental Health Professional assigned to

the SMU within thirty (30) days of initial placement, and not less than once every ninety (90) days thereafter, to determine (1) whether the inmate has an SMI, and/or (2) whether there are any acute medical or mental health contraindications to Segregation. The Qualified Mental Health Professional shall document the evaluation in a Mental Health Clearance Form (Attachment 12) and in IMS.

5.   <u>Out-of-Cell Interviews</u>

The evaluations described in Sections 650.10(A)(2) and (3) and the assessment described in Section 650.10(A)(4) shall include, absent Exigent Circumstances, a face-to-face interview with the inmate conducted in a private confidential setting. If the inmate refuses the face-to-face interview, the clinician shall interview the inmate at the cell and document in the medical record the inmate's refusal, behavioral presentation and all attempts made to engage the inmate in a private interview. A Qualified Mental Health Professional may utilize a private interview for an evaluation described in Section 650.10(A)(2) and (3) and the assessment described in Section 650.10(A)(4) if a private interview is warranted in the clinician's professional judgment.

6.   <u>Special Management Unit Rounds and Referrals</u>

In each SMU, the Qualified Mental Health Professional assigned to the SMU shall make mental health rounds two (2) times a week. The Qualified Mental Health Professional shall arrange for an out-of-cell meeting with any inmate for whom a confidential meeting is warranted in the clinician's professional judgment. Custody staff shall provide escorts to facilitate out-of-cell meetings with clinicians, except in Exigent Circumstances and except where the inmate refuses. If the inmate is unavailable at the time of the round (e.g., recreation, shower, visit), the Qualified Mental Health Professional shall determine an appropriate follow-up based upon clinical judgment.

The Qualified Mental Health Professional shall document the completion of rounds in the SMU log,

document significant findings in the medical record and communicate any significant issues to the officer in charge of the SMU.

The Qualified Mental Health Professional, or in his or her absence, another mental health clinician shall review daily, or immediately if clinically indicated, referrals from custody staff and medical staff conducting rounds. The Qualified Mental Health Professional or mental health clinician shall determine the appropriate response based upon clinical judgment. Such referrals shall be reviewed by mental health staff in subsequent triage meetings.

7. <u>Removal of Inmates from Special Management Units</u>

Except in Exigent Circumstances, when any inmate in an SMU is determined to have an SMI, he or she shall be removed from the SMU, or referred to the STU Review Committee, or referred to an RTU, or if he or she remains in the SMU, provided with additional mental health services in accordance with Section 650.10(A)(8).

Except in Exigent Circumstances, if the Program Mental Health Director determines that continued placement in an SMU will pose an imminent risk of substantial deterioration to an inmate's mental health, the inmate shall be removed from the SMU, or referred to the STU Review Committee, or referred to an RTU, or if he or she remains in the SMU, provided with additional mental health services in accordance with Section 650.10(A)(8).

8. <u>Additional Mental Health and Out-of-Cell Services for SMI Inmates in Special Management Units</u>

Except in Exigent Circumstances, at a minimum, SMI inmates confined in an SMU shall be offered the following mental health and other services:

a. <u>Less than Thirty (30) Days</u>

If the SMI inmate has a Mental Health Classification of MH-1, MH-2 or MH-3, one (1) session of structured out-of-cell individual or group mental health per week, commencing in the first week of segregation, and which shall be part of a treatment plan;

the opportunity to speak to a mental health clinician at least five (5) days per week, and in-cell programming. A Qualified Mental Health Professional will review the mental health classification of each SMI inmate in Segregation every thirty (30) days, and more frequently if dictated by the inmate's mental health needs to ensure that the inmate is appropriately classified.

An SMI inmate with a Mental Health Classification of MH-4 shall be offered two (2) sessions of structured out-of-cell individual or group activity per week. These sessions shall be part of a treatment plan and shall include at least one session with a mental health clinician. The length of the out-of-cell clinical sessions shall be determined by the clinician on a case-by-case basis.

In addition to the five (5) hours of out-of-cell leisure activity already offered to inmates in segregation, an SMI inmate with a Mental Health Classification of MH-4 shall be offered two (2) additional hours of out-of-cell leisure activity per week. These extra hours may be provided either by offering additional out-of-cell sessions or by extending the period of existing out-of-cell sessions.

b.  <u>Over Thirty (30) Days</u>

After thirty (30) days in Segregation, the amount of weekly out-of-cell services offered to an MH-4 SMI inmate shall be increased to four (4) sessions of structured out-of-cell individual or group activity per week and, in addition to the five (5) hours out-of-cell leisure activity already offered to inmates in segregation, four (4) additional hours of out-of-cell leisure activity. For purposes of this section, placement of the inmate on mental health watch shall not be deemed to interrupt the duration of time in Segregation.

B.  <u>Other Twenty-Three Hour Cell Confinement</u>

Each inmate with an Open Mental Health Case who is placed in other twenty-three (23) hour cell confinement (i.e., cell confinement other than DDU or SMU confinement) shall be evaluated by a Qualified Mental Health Professional within twenty-four (24) hours to determine (1) whether the inmate has an SMI, and/or (2) whether there are any acute medical or mental health contraindications to Segregation. The evaluation shall be conducted by the inmate's PCC or other member of the mental health team. If the inmate has an SMI, such other twenty-three (23) hour cell confinement shall be subject to the provisions of Section 650.10(A)(7) and (A)(8).

The Deputy Superintendent for Classification and Programs shall be notified upon the placement of any inmate with an Open Mental Health Case in other twenty-three (23) hour cell confinement.

C.   Department Disciplinary Unit

1.   Pre-DDU Evaluations

Prior to placement in the DDU, an inmate shall be seen and evaluated by a Qualified Mental Health Professional to determine whether the inmate has an SMI and/or whether there are any acute medical or mental health contraindications to DDU placement. Acute mental health contraindications to DDU placement include that the inmate appears acutely psychotic, is actively suicidal or has made a recent serious suicide attempt, or is otherwise in need of immediate placement on mental health watch.

If the inmate is currently designated as having an SMI, or if the inmate is determined to have an SMI, the matter shall proceed in accordance with Section 650.10(A)(1).

If the inmate does not have an SMI, but the evaluation is positive for an acute mental health contraindication to DDU placement, the inmate shall be placed on a mental health watch in the DDU. The inmate shall be further evaluated to determine whether he meets the criteria for transfer to Bridgewater State Hospital and whether he has an SMI. If the inmate does not

meet the criteria for transfer to Bridgewater State Hospital and does not have an SMI, he may be placed in the DDU after the acute contradiction to DDU placement has passed and it is determined by the Site Mental Health Director that the inmate is discharged from mental health watch in accordance with Section 650.13(B)(8).

The Qualified Mental Health Professional shall document the pre-DDU evaluation and result in the medical record and communicate any significant issues to the Superintendent, or during non-business hours, to the Shift Commander.

2. <u>Subsequent DDU Evaluations</u>

Each inmate placed in the DDU shall be assessed by a Qualified Mental Health Professional after thirty (30) days of initial placement and not less than once every ninety (90) days thereafter. The evaluation shall be documented in the medical record and in the IMS Mental Health/Substance Abuse screen. This evaluation shall include, absent Exigent Circumstances, a face-to-face interview with the inmate conducted in a private confidential setting. If the inmate refuses the face-to-face interview, the Qualified Mental Health Professional shall interview the inmate at the cell and document in the medical record the inmate's refusal, behavioral presentation and all attempts made to engage the inmate in a private interview.

3. <u>DDU Rounds and Referrals</u>

The Qualified Mental Health Professional assigned to the DDU shall make mental health rounds two (2) times a week. The Qualified Mental Health Professional shall arrange for an out-of-cell meeting with any inmate for whom a confidential meeting is warranted in the clinician's professional judgment. Custody staff shall provide escorts to facilitate out-of-cell meetings with clinicians, except in Exigent Circumstances and except where the inmate refuses. If the inmate is unavailable at the time of the round (e.g., recreation, shower, visit), the Qualified Mental Health Professional shall determine an appropriate follow-up based upon clinical judgment.

The Qualified Mental Health Professional shall document the completion of rounds in the SMU log, document significant findings in the medical record and communicate any significant issues to the senior DDU officer.

The Qualified Mental Health Professional, or in his or her absence, another mental health clinician, shall address mental health referrals from custody staff and medical staff conducting rounds in accordance with Section 650.10(A)(5) and (6). The Qualified Mental Health Professional or mental health clinician shall determine the appropriate response based upon clinical judgment. Such referrals shall be reviewed by mental health staff in subsequent triage meetings.

4. **DDU Exclusion of SMI Inmates and Additional Services for Pre-Program SMI Inmates**

Inmates with SMI shall not be housed in the DDU except in Exigent Circumstances or as set forth below.

If the Department lacks an appropriate alternative placement for an SMI inmate with a DDU sanction, and the inmate has been approved for STU placement pursuant to Section 650.11(A), after approval by the Deputy Commissioner of Classification, Programs, and Reentry and the Assistant Deputy Commissioner, Clinical Services, the Department may confine an SMI inmate in the DDU pending the availability of an STU bed. Such inmates shall be considered to be "pre-program inmates." The Department shall address the placement of pre-program inmates on a case by case basis, taking into account the length of time that each pre-program inmate has been awaiting STU placement and his clinical needs.

At a minimum, pre-program inmates in the DDU shall be offered additional mental health and other services, consisting of the following:

a. **Less Than Thirty (30) Days**

- Two (2) out-of-cell sessions of structured individual or group activity per week

shall be offered. These sessions shall be part of a treatment plan and shall include at least one (1) session with a mental health clinician. The length of the out-of-cell clinical sessions shall be determined by the clinician on a case-by-case basis.

- In addition to the five (5) hours of out-of-cell leisure activity already offered to DDU inmates, two (2) additional hours of out-of-cell leisure activity per week shall be offered. These extra hours may be provided either by offering additional out-of-cell sessions or by extending the period of existing out-of-cell sessions.

- Upon entering the DDU from an SMU, pre-program inmates shall be offered the level of visitation, radio, and telephone privileges that had been provided in Segregation prior to DDU placement. Pre-Program inmates shall also be eligible to earn all privileges available to DDU inmates, contingent upon compliance with the Department's, institutional, and DDU rules.

b.   Over Thirty (30) Days

After thirty (30) days in the DDU, the amount of weekly out-of-cell services offered to a pre-program inmate with a mental health classification of MH-4 shall be increased to four (4) sessions of structured out-of-cell individual or group activity and, in addition to the five (5) hours of out-of-cell leisure activity already offered to DDU inmates, four (4) additional hours of out-of-cell leisure activity. A Qualified Mental Health Professional will review the mental health classification of each pre-program inmate in the DDU every thirty (30) days, and more frequently if dictated by the inmate's mental health needs to ensure that the inmate is appropriately classified. For purposes of this section, placement of the inmate on mental health watch shall not be

deemed to interrupt the duration of time in the DDU.

D.   Meetings

1.   Facility Segregation Committee

At each facility at which inmates with SMI are held in an SMU or other twenty-three (23) hour Segregation, the Site Mental Health Director shall participate in the facility SMU review meetings conducted in accordance with 103 CMR 423, Special Management, for the purpose of reviewing the status of such inmates to determine the reason(s) for Segregation and whether alternatives exist. Such review may include a review of pending investigation status, classification status, mental health developments, and disciplinary status. The Site Mental Health Director shall provide input regarding mental health issues and concerns of SMU inmates.

2.   Central Office Segregation Oversight Committee

Membership of the Central Office Segregation Oversight Committee shall include the Deputy Commissioner, Prison Division; the Deputy Commissioner, Classification, Program and Reentry Division; the Assistant Deputy Commissioners for the Northern and Southern Sectors, the Director of the Central Inmate Disciplinary Unit; the Director of Behavioral Health; and a mental health professional from the Mental Health Vendor.

The role of the Central Office Segregation Oversight Committee shall include:

- Developing strategies to reduce time spent in Segregation by inmates with SMI, including reducing time on awaiting action or identifying alternatives to Segregation for such inmates; and expansion of privileges for SMI inmates remaining in Segregation; and

- Conducting a monthly review of the circumstances of inmates with SMI, including pre-programs inmates, who have been in

Segregation for a period exceeding thirty (30) days as of the date of the monthly review. The review shall include consideration of facilitating the inmate's discharge from Segregation, assessment of the inmate's mental health classification level, and whether additional out-of-cell time is clinically indicated.   For purposes of this review, placement of the inmate on mental health watch or temporary placement in a health services unit shall not be deemed to interrupt the duration of time in Segregation.

The Central Office Segregation Oversight Committee shall maintain minutes that document reviews and actions taken, with the reasons for the Committee's decision and the potential alternatives for Segregation considered.

650.11    Secure Treatment Units

A.    Secure Treatment Unit Referral and Placement

1.    The Director of Behavioral Health shall be notified:  (1) By the Director of Inmate Discipline upon a determination pursuant to 103 CMR 430.08 that a DDU hearing shall be held for an inmate with SMI, or upon the imposition of a DDU sentence for an inmate with SMI; and (2) By the Program Mental Health Director that an inmate housed in the DDU has been diagnosed with an SMI, or that an inmate with SMI without a DDU sentence may require placement in an STU.

2.    Upon any such notification, the Director of Behavioral Health shall contact the Program Mental Health Director who shall ensure that an STU Referral Form (Attachment 13) is initiated and completed at the site where the inmate is currently housed.  The STU Referral Form shall be completed by the inmate's Primary Care Clinician (PCC) and reviewed by the Site Mental Health Director to ensure that the STU Referral Form incorporates all of the pertinent clinical information The STU Referral Form shall be completed within five (5) days.   In instances where an inmate is not awaiting a DDU hearing is referred for placement in an STU, such referral shall be generated by the inmate's PCC, reviewed by the Site Mental Health Director and then

reviewed by the Program Mental Health Director to ensure the appropriateness of the referral.

3. The Program Mental Health Director shall immediately notify the Director of Behavioral Health after having ensured that the STU Referral Form has been completed correctly and that the referral is clinically appropriate.

4. Upon receipt of the STU Referral Form, the Director of Behavioral Health shall convene a meeting of the STU Review Committee, either in person or by a conference call, within five (5) days. The STU Review Committee shall be chaired by the Director of Behavioral Health. Membership shall include the Program Mental Health Director, the Department of Correction administrator of the STP, the Department of Correction position assigned to oversee the operation of the BMU, and the Mental Health Vendor's clinical leaders of the STP and the BMU. The STU Review Committee shall determine which STU is the more appropriate placement. In instances in which an inmate has been referred for STU placement without a pending DDU hearing, the STU Review Committee shall determine whether STU placement is warranted, whether the inmate would be more appropriately admitted to an RTU, or whether the inmate could be appropriately managed by enhanced outpatient treatment, which may include an individualized incentive plan. The STU Review Committee may call upon the Site Mental Health Director or the inmate's PCC to present the case and provide additional information, upon a determination that such presentation or additional information is necessary.

5. In instances in which the STU Review Committee has determined that an inmate pending placement pursuant to a DDU hearing is appropriate for placement in an STU but is unable to reach consensus regarding whether the BMU or STP is more appropriate, the case shall be referred to the Program Mental Health Director for a final recommendation regarding the placement of the inmate. This must occur within five (5) days. In instances where there is a lack of consensus regarding the placement of an inmate who was not referred pursuant to a pending DDU hearing, the case shall be referred to the Program Mental

Health Director and the Assistant Deputy
Commissioner, Clinical Services who shall come to
consensus within five (5) days regarding the
appropriate placement.

6. Upon a clinical recommendation to place the
inmate in an STU, the Director of Behavioral
Health shall forward the determination to the
Assistant Deputy Commissioner, Clinical Services
and the Assistant Deputy Commissioners for the
Northern and the Southern Sectors, who shall
review the referral information to determine
whether there are any security concerns raised by
the STU placement recommendation and if so,
whether Exigent Circumstances may require the
rejection of the STU placement recommendation.
This review shall occur within five (5) days. If
the Assistant Deputy Commissioners for the
Northern and Southern Sectors disagree whether
Exigent Circumstances exist, the matter shall be
referred to the Deputy Commissioner, Prison
Division, for a determination whether Exigent
Circumstances exist. If the STU placement
recommendation is affirmed, the Director of
Behavioral Health shall effect the final
disposition. If the STU placement recommendation
is rejected, the determination shall be
communicated by the Assistant Deputy Commissioner
of Clinical Services to the Director of
Behavioral Health, who shall reconvene the STU
Review Committee within five (5) days to consider
possible alternative placements (e.g., placement
of the inmate in the STP instead of the BMU or
vice versa, RTU placement). If an alternative
placement is recommended, the Director of
Behavioral Health shall convey such
recommendation to the Assistant Deputy
Commissioner of Clinical Services and the
Assistant Deputy Commissioners for the Northern
and the Southern Sectors, who shall again review
the referral information to re-determine whether
Exigent Circumstances warrant the denial of the
alternative placement recommendation. In the
event that no alternative placement is
recommended or that the alternative placement
recommendation is rejected, the case shall be
referred to the Deputy Commissioner, Prison
Division, who shall make the final placement
determination.

7.   Upon the final decision to place an inmate in an STU or an RTU, the Director of Behavioral Health shall notify the Department's Central Classification Division transfer coordinator, who shall effect the prompt classification and transfer of the inmate to the selected unit.

8.   All final decisions pursuant to an STU referral shall be made within thirty (30) calendar days of the receipt of the referral by the Director of Behavioral Health.

B.   <u>Secure Treatment Unit Programs and Operation</u>

1.   Each STU shall provide a variety of treatment programs and modalities to optimize the overall level of functioning of inmates with SMI within the correctional environment, and to prepare them for successful reentry into general population or the community.

2.   Each STU shall utilize a phase system designed to provide inmates with the opportunity to earn incentives and privileges contingent upon behavioral stability and program participation. Each STU shall utilize time frame guidelines for phase progression, but all decisions to move an inmate between phases shall be made by the STU treatment team.

3.   Behavioral programming in each STU shall include incentives to encourage positive behavior. These incentives may include, where appropriate, the opportunity to earn additional privileges and reduce disciplinary sanctions. Substantial rule infractions may result in an immediate reduction of incentives, phase regression, or in extreme cases, program termination. Each STU treatment team shall review incidents of rule infractions and determine an individualized treatment response, which shall be documented in the inmate's treatment plan.

4.   STU inmates shall be subject to the disciplinary process as follows. Category 3 and 4 disciplinary offenses, as set forth in 103 CMR 430.24, may be reduced to an informal report and referred to the STU treatment team for addressing through program incentives and the phase system. Category 1 and 2

disciplinary offenses shall be addressed through the disciplinary system.

5. DDU time for STU inmates serving DDU sentences shall continue to run. STU treatment teams may recommend up to a thirty (30) day DDU time cut as an individual incentive for every ninety (90) days of successful participation. Criteria for successful participation shall include, at a minimum, the absence of behavior resulting in disciplinary reports, treatment compliance and active program participation for the designated time period. Time cut recommendations shall be submitted to the Deputy Commissioner, Prison Division, for determination.

6. Nothing contained herein shall restrict the authority of the Superintendent to address matters of safety and security in the STU.

C. <u>Secure Treatment Unit Out-of-Cell Time</u>

1. Inmates in an STU shall be scheduled for fifteen (15) hours of structured out-of-cell activity per week, with no fewer than ten (10) hours to be offered, and ten (10) hours per week of unstructured out-of-cell activity to be offered, including exercise but excluding showers, absent Exigent Circumstances.

2. For STU inmates assigned to a program phase that allows contact with other inmates, out-of-cell activities shall include opportunities for socialization including congregate exercise and dining, as determined by the treatment team.

D. <u>Secure Treatment Unit Discharge</u>

1. <u>STU Discharge Upon the Completion of a DDU Sentence</u>

a. The minimum length of time that an inmate who is admitted with a DDU sentences resides in an STU shall be defined by the inmate's DDU sentence. Upon the expiration of an inmate's DDU sentence prior to his successful progression through all phases of the STU program, the inmate shall be referred for another placement commensurate

with his mental health treatment needs and his behavioral and security needs.

b.   The STU treatment team shall request a case conference to be held, within ninety (90) days prior to the inmate's anticipated completion of his DDU sentence in order to determine the most appropriate aftercare placement. The STU treatment team shall determine whether an RTU level of care is clinically indicated, and if so, the inmate shall be referred for RTU placement. If an RTU level of care is not clinically indicated, the inmate's placement upon his discharge from the STU shall be effected by the classification process.

c.   Upon an inmate's request to remain in an STU after the completion of his DDU sentence, the STU treatment team shall recommend whether continued STU placement is clinically appropriate. The recommendation shall be conveyed to the Director of Behavioral Health and a case conference convened to determine the appropriate disposition. A determination that voluntary continued STU placement is clinically indicated shall be conveyed to the Central Classification Division for scheduling a classification board.

d.   Notwithstanding an inmate's expressed desire to be discharged from the STU upon the completion of his DDU sentence, the STU treatment team may recommend that the inmate remain in the STU based upon the extent to which the inmate's SMI contributes to his potential threat to staff and/or other inmates. The treatment team shall consider the inmate's history of predatory or assaultive behavior, the inmate's use of weapons, and the extent of any serious injury that the inmate has caused or is likely to cause in the future. The treatment team shall recommend specific security or classification criteria, setting conditions that would warrant consideration of the inmate's discharge from the STU. Such conditions shall include, but not be limited to, consistent psychiatric and behavioral

stability as indicated by remaining free from Category 1 and 2 disciplinary offenses; significant and consistent reduction in the incidence of self-injury and/or threats of self-injury; and engagement in programming and compliance with mental health treatment. The treatment team shall review and monitor the inmate's compliance with such treatment and behavioral criteria on a quarterly basis.

2. <u>STU Discharge Prior to Completion of a DDU Sentence</u>

   a. If an STU inmate's successful completion of all phases and requirements of the STU program prior to the completion of his governing DDU sentence, if the STU treatment team determines that the inmate is appropriate for discharge from the STU, the treatment team shall submit a request to the Director of Behavioral Health for a case conference to review the inmate's progress and appropriateness for discharge.

   b. The requirements for STU discharge consideration prior to completion of a DDU sentence shall include, but not be limited, to the following:

   - Successful completion of all program phases;
   - Achievement of 90% participation in group programming during the previous twelve (12) months;
   - Achievement of 90% participation in individual programming during the previous twelve (12) months;
   - No Category 1 and Category 2 disciplinary offenses for the previous twelve (12) months;
   - No negative incidents reports for the previous nine (9) months;
   - No instances of self-injury for the previous twelve (12) months; and
   - No placement on accountability status for the previous twelve (12) months.

c.    If the case conference produces a recommendation that the STU inmate be discharged prior to completion of his DDU sentence, the Director of Behavioral Health shall submit such recommendation to the Deputy Commissioner, Prison Division, for a determination whether the remaining DDU sentence should be suspended and the inmate transitioned from the STU to another placement.

d.    If the Deputy Commissioner, Prison Division determines that the remaining DDU sentence should be suspended and the inmate transitioned from the STU to another placement, the Director of Behavioral Health shall convene a case conference to determine an appropriate placement and formulate a transition plan. If the prior case conference had determined that an RTU level of care is clinically indicated, the inmate shall be referred for RTU placement. If the prior case conference had determined that an RTU level of care is not clinically indicated, the inmate's placement upon his transition and discharge from the STU shall be effected by the classification process.

e.    The DDU sentence of an inmate who is discharged from an STU prior to completing the DDU sentence shall be suspended for the remaining period of such DDU sentence. During period of suspension, if such inmate commits another disciplinary offense that is subject to a DDU referral, the inmate shall be returned to an STU for the period remaining on the suspended sentence, plus the period of any new DDU sentence that may be imposed for the new offense. However, if such inmate is no longer determined to have an SMI, or if the Deputy Commissioner, Prisons Division determines that Exigent Circumstances warrant DDU placement, the inmate shall be placed in the DDU to serve his DDU sentence(s).

3.    <u>Secure Treatment Unit Discharge for Inmates Admitted Without DDU Sentences</u>

a.  Upon the successful completion of all phases and requirements of the STU program by an inmate who was admitted to the STU without a governing DDU sentence, or at any time prior to the successful completion of the STU program by such inmate, if the STU treatment team determines that the inmate is appropriate for discharge from the STU, the treatment team shall submit a request to the Director of Behavioral Health for a case conference to review the inmate's progress and appropriateness for discharge.

b.  In assessing the inmate's appropriateness for STU discharge, the case conference participants shall consider the requirements set forth in Section 650.11(E)(2). If the case conference determines that an RTU level of care is clinically indicated, the inmate shall be referred for RTU placement. If the case conference determines that an RTU level of care is not clinically indicated, the inmate's placement upon his transition and discharge from the STU shall be effected by the classification process.

E.  <u>Secure Treatment Unit Termination</u>

Inmates with SMI shall not be returned to Segregation from an STU prior to completing the STU program, except in Exigent Circumstances or for program termination as follows:

1.  Inmates may be considered for termination from an STU prior to completing the program if the inmate engages in assaultive behavior or presents severe behavioral problems without demonstration of any effort to change and it is the consensus of the STU treatment team that the behavior has not improved and shows no indication of future change. Termination shall not be considered without evidence and documentation of consistent refusal to engage in programs or chronic disruptive behavior that compromises the integrity of the program. The STU treatment team shall meet to determine if further treatment interventions can be expected to produce no or minimal behavior changes. The STU treatment team shall also consider whether transfer to a different STU would be appropriate. If the STU

treatment team concludes that termination is warranted, the STU treatment team shall submit a request to the Director of Behavioral Health for a case conference to review the inmate's status and appropriateness for termination. In conjunction with this case conference, the treatment team shall recommend a discharge plan consistent with the inmate's needs. Final approval of STU termination shall be made by the STU Review Committee.

2.    Pursuant to the procedures established for review of Exigent Circumstances in Section 650.23(C), the Department shall periodically reassess inmates who have been terminated from an STU and returned to Segregation. The inmate shall be referred to the same or a different STU if the inmate's behavior and motivation demonstrably improve. The inmate shall have a treatment plan designed to motivate him or her to participate in clinically-indicated therapeutic programming in an appropriate setting.

F.    Secure Treatment Unit Staff Training

Subject to collective bargaining agreements and bidding process, there shall be initial pre-service and annual in-service training of all staff in the STUs regarding mental health and mental illness, medications, co-existing disorders, and programming needs. Training shall be as follows:

1.    Upon the opening of any new STU, all security and treatment staff regularly assigned to the unit will receive forty (40) hours of specialized training.

2.    New security and treatment staff assigned to a STU after it is open and operational will receive eight (8) hours of specialized orientation training at the time of assignment. The Department will endeavor to provide each new staff member with an additional thirty-two (32) hours of structured on-the-job training during the first seventy-five (75) days of assignment.

G.    Secure Treatment Unit Documentation

Each STU shall utilize a program manual approved by the Director of Behavioral Health. Program manual

changes shall be submitted to the Director of Behavioral Health for review and approval prior to implementation.

Each STU shall also utilize standard instruments approved by the Director of Behavioral Health to document the following:

- Program schedules;
- Program participation by unit and by inmate;
- Phase and incentives, by unit and by inmate;
- Structured out-of-cell programming offered and provided, by unit and by inmate, including documentation of any instances in which such programming was not provided in accordance with Section 650.11(C) (Exigent Circumstances);
- Non-structured out-of-cell programming offered and provided, by unit and by inmate including documentation of any incidents in which such programming was not provided in accordance with Section 650.11(C) (Exigent Circumstances);
- Outcome measures by unit and by inmate, as determined by the Director of Behavioral Health.

650.12     <u>Protective Custody Units</u>

Each inmate in a protective custody unit shall be screened weekly by a mental health clinician during rounds. Rounds shall include a face-to-face encounter. If the inmate is unavailable (e.g., on recreation status, shower, etc.), an appropriate follow-up shall be determined on the basis of clinical judgment.

Any significant findings shall be documented in the medical record. The mental health clinician shall communicate significant issues to the officer in charge of the unit. Staff and inmate referrals shall be addressed in accordance with Section 650.03(C).

650.13     <u>Emergency Mental Health Services</u>

A.    <u>Referral for Emergency Mental Health Services</u>

Referral procedures for emergency mental health services are set forth in Sections 650.03(C) through (G).

Any staff member may place an inmate "at risk" to ensure constant supervision, pending evaluation by mental health staff.

B.    <u>Mental Health Watch in the Prisons</u>

This section governs mental health watches in the prisons.

The admission of an inmate to the Intensive Treatment Unit (ITU) at Bridgewater State Hospital is governed by 103 BSH 651, <u>Use of Seclusion and Restraints for Bridgewater State Hospital</u>.

1.    <u>Mental Health Watch Cells</u>

Each Superintendent shall designate specific mental health watch cells in the Health Services Units(HSU) that have been designated as suicide resistant. The Superintendent, in conjunction with the Site Mental Health Director, may request that the Director of Behavioral Health approve the utilization of mental health watch in cell locations other than in the Health Services Units. The utilization of mental health watch in a cell outside of the HSU shall require constant

observation if the cell has not been designated as suicide resistant. A current listing of the facility's designated mental health watch cells shall be provided to the Director of Behavioral Health on an annual basis, or more frequently should the location or suicide resistant designation of those cells be changed. A site specific procedure shall also be forwarded to the Director of Behavioral Health which outlines which cells will be used as overflow mental health watch cells in the event that all other cells are occupied.

2.    Placement on Mental Health Watch

Any inmate whose behavior is deemed concerning enough to warrant some level of increased observation regardless of the inmate's mental health diagnosis shall be placed on a mental health watch.

3.    Level of Supervision

A Qualified Mental Health Professional shall determine the level of supervision indicated for a mental health watch. The determination of the level of supervision shall not be dictated by the availability of bed space or staff; rather it shall be based upon the specific needs of the inmate requiring a mental health watch.

There are two levels of mental health watch:

a.    Constant Observation utilizes one-to-one supervision;
b.    Close observation utilizes checks within fifteen (15) minute intervals.

Constant Observation is indicated for an inmate who is actively suicidal, by threatening or engaging in self-injury and whom mental health staff consider to be at high risk for suicide. An inmate on constant observation shall be observed by a staff member on a continuous, uninterrupted basis. Although the observation itself is constant, the documentation shall occur at fifteen (15) minute intervals or more frequently when and as notable behaviors or events occur.

Close Observation is indicated for the inmate who is not actively or acutely suicidal, but who is expressing suicidal ideation and/or who has a recent prior history of self-destructive behavior and whom mental health staff considers to be at low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. An inmate on close observation shall be observed by staff at staggered intervals not to exceed every fifteen (15) minutes. Documentation shall occur at fifteen (15) minute intervals as such observation occurs.

Close Circuit Television may be utilized as a supplement, but not as a substitute, for monitoring by staff observation.

4.  Out-of-Cell Assessments

As a matter of routine, inmates on a mental health watch shall be escorted from their watch cell to a private setting to receive their required mental health assessment. All efforts shall be made to ensure that this out-of-cell assessment occurs. A cell front assessment shall be performed if the inmate refuses an out-of-cell assessment. A Qualified Mental Health Professional shall enter a progress note documenting an inmate's refusal of an out-of-cell assessment and noting the completion of a cell front assessment. To the extent possible, an inmate should be seen for an out-of-cell assessment prior to discharge from mental health watch.

5.  Documentation

a.  Observation Check Sheet – The staff person conducting constant or close observation shall utilize the Observation Check Sheet (Attachment 14). The Observation Check Sheet shall be provided to mental health staff upon their request for review and in aid of assessing the inmate. A copy of the completed Observation Check Sheet shall be

reviewed by the Deputy Superintendent and kept filed in the Deputy's Office.

b. <u>Inmate Management System</u> – A Qualified Mental Health Professional shall enter the requisite mental health watch information in IMS. After the conditions of the mental health watch are entered, including level of monitoring, clothing allowances and other routine activities, the mental health watch form shall be printed from IMS, and affixed to the cell door where the mental health watch is being conducted. A copy of the completed IMS form shall be filed in the inmate's medical record.

c. <u>Medical Record</u> – A Qualified Mental Health Professional shall enter a completed crisis treatment plan (Attachment 15) in the inmate's medical record documenting a suicide risk assessment and the justification for the level of observation or change in the level of observation.

6. <u>Conditions</u>

a. <u>Clothing</u> – A Qualified Mental Health Professional shall determine clothing restrictions and the issuance of a safety garment commensurate with the level of the inmate's risk for suicidal or self-injurious behavior.

b. <u>Activities</u> – Inmates on mental health watch shall be allowed all routine activities (e.g., family visits, telephone calls, recreation, etc.) unless there are security reasons precluding those activities, or if a Qualified Mental Health Professional conducting the mental health watch evaluation determines that any such activity is clinically contraindicated.

c. <u>Shower</u> – Inmates on mental health watch shall have shower access commensurate with their security levels.

7. <u>Attorney Visits</u>

a. Inmates on mental health watch shall have unimpeded access to their attorneys at any time.

b. Prior to any attorney or other legal visit with an inmate on mental health watch, a Qualified Mental Health Professional shall conduct a clinical evaluation and identify the appropriate conditions of the visit, consistent with the inmate's mental health status, including but not limited to whether the visit should be a contact or non-contact visit; the appropriate clothing; and the appropriate permissible property, if any (e.g. pen/pencil). These conditions shall be entered on the IMS Mental Health Watch screen.

c. The Superintendent shall determine the location and conditions of any legal visit for an inmate on mental health watch based upon the recommendations of the Site Mental Health Director and also upon the facility's ability to meet the restrictions imposed on the visit by the Site Mental Health Director, taking into account the physical plant and the safety and security concerns that exist within the facility. The Superintendent, or designee shall be responsible for notifying the attorney of the conditions and restrictions of any such visit.

d. All visits shall be entered on the IMS Inmate Schedule screen. All visits shall be supervised by a DOC employee for safety/security purposes. At the conclusion of all such visits, a clinician shall follow-up with the inmate to ensure that his/her mental status has not changed, and note the inmate's mental status in the inmate's medical record and on the IMS Mental Health Watch screen.

8. <u>Duration and Discharge</u>

a. A mental health watch shall be no longer in duration than necessary to deal with the mental health crisis that caused the inmate to be placed under observation. The goal is

to safely discharge the inmate from mental health watch to the inmate's housing unit within ninety-six (96) hours; however, any decision to discharge the inmate from mental health watch shall be determined solely on the clinical judgment of mental health staff.

b.   In the event that an inmate is maintained on mental health watch for more than seventy-two (72) hours, the Director of Behavioral Health and Mental Health Program Director shall be notified and consulted until the inmate is discharged from mental health watch.

c.   An inmate shall not be discharged from a mental health watch without a treatment team discussion of his/her case during mental health staff's daily team meeting, unless it is clinically contraindicated (for example if a delay might appear punitive or exacerbate the inmate's level of impulsiveness). In such cases, a Qualified Mental Health Professional may, with the approval of the Site Mental Health Director, discharge an inmate from a mental health watch.

d.   An inmate placed on constant observation shall be downgraded to close observation for a reasonable period of time prior to being discharged from a mental health watch, unless the inmate has been placed on constant observation solely for the reason that the watch cell was not deemed to be suicide resistant. In such cases, the mental health clinician shall document the reason for the constant observation status and note that inmate's clinically assessed risk level indicates only a close observation.

e.   A Qualified Mental Health Professional shall complete a Crisis Treatment Plan Discontinuation Form (Attachment 16) prior to discharging an inmate from mental health watch. The form shall be filed in the medical record. The termination of the mental health watch shall be entered on the IMS Mental Health Watch screen.

f.    After being discharged from a mental health watch, an inmate shall be assessed by a Qualified Mental Health Professional within seventy-two (72) hours and then again within seven (7) days.  If an inmate who has been discharged from a mental health watch is not on the active open mental health caseload, s/he should be assessed to determine the appropriate level of clinical follow-up required.

g.    In the event that the inmate is discharged from a mental health watch to Segregation, the inmate shall be assessed by a Qualified Mental Health Professional upon the third and seventh day following discharge, or more frequently as clinically indicated.

C.    Therapeutic Restraints

This section governs the use of therapeutic restraints in prisons. The use of therapeutic restraints at Bridgewater State Hospital is governed by G.L. c. 123, § 21 and 103 BSH 651, Seclusion and Restraint. Refer to 103 CMR 505, Use of Force

1.    Purpose of Therapeutic Restraints

a.    Imminent Danger to Self or Others - When an inmate presents an imminent danger to self or others by reason of mental illness, the use of therapeutic restraints shall be considered. In this situation, therapeutic restraints constitute the treatment modality. However, therapeutic restraints may be ordered as a treatment modality only after determining that other available interventions are ineffective or inappropriate or have failed previously (e.g., mental health contact, mental health watch, medication).

b.    Involuntary Treatment - Therapeutic restraints may be utilized where necessary to facilitate the administration of involuntary medical or mental health treatment in an emergency or pursuant to a court order.

2.   Authorization for Therapeutic Restraints

    a.   Therapeutic restraints may be ordered only by a psychiatrist or approved by the on-call psychiatrist as a temporary measure for the control of behavior. Under no circumstances shall therapeutic restraints be used as a disciplinary measure. Therapeutic restraints shall not be used as a convenience for facility medical staff, except as authorized by a court order.

    b.   Therapeutic restraints may be ordered by a psychiatrist or approved by the on-call psychiatrist to restrict the movement of an inmate to allow for the safe involuntary administration of psychiatric medication. Such restraints should be utilized only if other less restrictive measures are deemed ineffective or inappropriate or have failed previously.

    c.   Pro re nata (PRN) orders for therapeutic restraints are not permitted.

3.   Forms of Therapeutic Restraints

    a.   Padded leather restraints may be used to secure an inmate in a supine or face up position to a secure bed for the purpose of restricting movement or behavior which may be harmful to self or others. Metal restraints may be used only if the inmate has a documented history of escape from soft restraints or ability to be uncontrolled in soft restraints.

    b.   Padded wedges utilized to facilitate the involuntary injection of medication are not deemed therapeutic restraints.

4.   Location

Therapeutic restraints shall be used only in specifically designated cells within HSU's+ or other units and those cells shall be designated in the facility's site specific procedures. Alternative location plans, including the circumstances for such utilization, shall be submitted to the Director of Behavioral Health on

an annual basis, or more frequently should the location plan or circumstances for utilization be revised.

5. <u>Procedure for Using Therapeutic Restraints</u>

   a. Whenever possible, prior to obtaining an order for therapeutic restraints, the Site Mental Health Director, or designee, shall be contacted. The Site Mental Health Director or designee shall consult with the on-site or on-call psychiatrist. The psychiatrist shall make a decision regarding the use of therapeutic restraints. The psychiatrist shall convey the restraint order to the appropriate on-site mental health or medical professional and appropriate medical staff.

   b. The shift commander shall be notified if the decision is made to place an inmate in mental health restraints. The shift commander shall direct the correctional staff in placing the inmate in restraints.

   c. Notwithstanding the psychiatric decision regarding the use of mental health restraints, the Superintendent may take any additional steps that the Superintendent deems necessary to ensure the safety and security of staff, the inmate and other inmates.

   d. To prevent the potential for positional asphyxiation, the following guidelines have been established to reduce the risk of in-custody deaths due to restraining an inmate:

      i. Staff shall always maintain observation of a restrained inmate to recognize breathing difficulties or loss of consciousness. Staff shall be alert to issues such as obesity, alcohol and drug use, or psychotic behavior.

      ii. Staff members shall never sit or put their weight on an inmate/patient's back, chest or abdomen while the inmate/patient is in restraints.

iii. In situations involving an unrestrained inmate/patient who is resisting efforts of staff to regain control of him/her, staff may use their weight for only such period of time as is necessary to gain control of and/or restrain the inmate/patient.

iv. If as a result of a use of force, it becomes necessary to restrain an inmate/patient to the ground, bed, floor, etc., the inmate/patient, once handcuffed, shall, as soon as possible, be placed on his/her side. The inmate/patient shall never be kept face down on his/her stomach. Staff shall take all possible efforts to avoid prolonged compression of an inmate/patient's abdomen.

v. Staff at no time shall connect handcuffs to leg restraints.

vi. Inmates/Patients shall never be transported face down on their stomach (i.e., while using a stretcher, gurney, backboard or vehicle).

6. <u>Medical Review of Inmates in Therapeutic Restraints</u>

a. Immediately following the placement of an inmate in therapeutic restraints, medical staff shall conduct an examination of the inmate to ensure that no injuries exist, that restraint equipment is not applied in a manner likely to result in an injury, and that there is no medical contraindication to maintaining the inmate in therapeutic restraints.

b. Inmates in therapeutic restraints shall be examined by medical staff immediately following placement in therapeutic restraints and every fifteen (15) minutes subsequent to the initial examination. The purpose of such examinations is to check for injuries and respiration and circulation.

    c.    Medical staff shall check the inmate's vital signs at a minimum of every thirty (30) minutes while the inmate is awake or at least once per shift while the inmate is asleep. Medical staff shall perform vital sign monitoring more frequently as clinically indicated.

7.    <u>Documentation and Review</u>

    a.    The use of therapeutic restraints shall be documented in the medical record, on the Physician Order Sheet, in the Progress Notes, and on the IMS Mental Health Watch Screen. The content of this documentation shall include specific reasons for the use of these restraints.

    b.    All medical examinations conducted shall be documented in the inmate's medical record and on the Four-Point Restraint Medical Examination Checklist (Attachment 17).

    c.    The Medical Examination Checklist shall be submitted to the shift commander for incorporation in the Use of Force Report governed as required by 103 CMR 505, <u>Use of Force</u> policy.

8.    <u>Duration of Therapeutic Restraints</u>

    a.    Therapeutic restraints may be prescribed for a period not to exceed two (2) hours. Renewal orders may be prescribed for periods not to exceed two (2) hours. Renewal orders shall be documented. The inmate shall be evaluated prior to renewal.

    b.    During regular business hours, the psychiatrist shall prescribe renewal orders. During non-business hours, the on-call mental health clinician shall be contacted, who shall contact the on-call psychiatrist for such renewal orders.

    c.    After two (2) hours and every two (2) hours thereafter, an inmate may be allowed to exercise her/his limbs. Exercise shall be accomplished by freeing one limb at a time from restraints and for a period of

approximately two (2) minutes. Exercise shall only be granted if the freeing of the limb will not pose a threat of harm to the inmate being restrained or to others. Denial of exercise shall be reported to the Superintendent and mental health staff who shall notify the psychiatrist. The reporting officer shall document the reasons for the denial. Exercise shall be documented in the comment section of the Correction Officer Observation Sheet (Attachment 14).

d.  PRN orders for therapeutic restraints shall not be written. Within forty-eight (48) hours of the initial use of therapeutic restraints, the psychiatrist must document the clinical rationale for not pursuing psychiatric hospitalization.

e.  If an inmate is restrained beyond eight (8) hours, the Director of Behavioral Health shall be notified, who in turn shall notify the Deputy Commissioner for Programs, Classification and Reentry.

f.  No inmate may be kept in therapeutic restraints for longer than seventy-two (72) consecutive hours. If continued use of restraints is indicated after seventy-two (72) consecutive hours in which restraints have been continuously ordered, the inmate shall be transferred to the appropriate psychiatric facility at the earliest possible time.

g.  In all cases, therapeutic restraints shall be discontinued at the earliest possible time, based upon observation of the inmate's behavior and clinical condition.

h.  All inmates in therapeutic restraints must be under constant observation with notations of condition made at a minimum of every fifteen (15) minutes on the Correction Officer Observation Sheet (Attachment 14). Notations shall include inmate behavior during the designated time period.

9.  <u>Feeding</u>

a.   Meals shall not be withheld from inmates in therapeutic restraints. The on-site/on-call medical director or Site Mental Health Director shall determine whether the inmate will receive the same meals as those served to the general population or an alternative meal that meets nutritional guidelines, as set forth in Attachment 18.

b.   If an inmate in therapeutic restraints becomes disruptive during feeding, the inmate's actions shall be interpreted as a refusal to eat. All feeding and refusals shall be documented on the Correction Officer Observation Sheet (Attachment 14). Medical staff shall document nutritional intake on the Intake and Output Chart in the inmate's medical record.

10.   <u>Use of Toilet Facilities</u>

Access to a toilet shall be made available upon request or at reasonable intervals. Use of restraint equipment to ensure the safety of the inmate and staff shall be reviewed and approved by the shift commander.

11.   <u>Programs</u>

Inmates in therapeutic restraints shall not be allowed participation in any programs, including visitation. The inmate shall be provided appropriate psychiatric, psychological or medical examinations and interventions. The shift commander shall assure that proper security is maintained during examinations and interventions.

12.   <u>Use of Audio/Visual Equipment</u>

Whenever possible, audio/video equipment shall be used to assist in documentation of placement in therapeutic restraints, including initial and subsequent medical and psychiatric examinations, feeding, breaks, removal of restraints, and any other significant incident.

13.   <u>Use of Therapeutic Restraints at Outside Hospitals</u>

The use of therapeutic restraints in outside hospitals, including the Lemuel Shattuck Hospital, shall follow the protocol of the hospital.

D.   **Emergency Involuntary Administration of Psychotropic Medication in the Prisons**

The involuntary administration of antipsychotic medication may be used only on an emergency basis and only as set forth herein.

1.   **Criteria for Involuntary Administration of Psychotropic Medication**

The involuntary administration of psychotropic medication may be used if:

a.   An inmate poses a clear and immediate threat to harm him/herself or others; or to prevent the immediate, substantial and irreversible deterioration of a serious mental illness of an inmate who is currently incapable of making informed medical decisions on their own behalf; and

b.   All less restrictive or intrusive measures have been employed or have been judged by the treating psychiatrist, on-call psychiatrist, or physician to be inadequate.

2.   **Medical Authorization**

Once involuntary administration of psychotropic medication is deemed appropriate by the psychiatrist or an on-call psychiatrist, the following should be documented in the inmate's medical record:

a.   The inmate's condition, threat posed, and reason for the involuntary administration of psychotropic medication, including other treatments attempted within the immediately preceding twenty-four (24) hours; and

b.   Authorization for involuntary administration of psychotropic medication that is specifically limited to a single dose of such medication; and

      c.    A description of how the medication is to be administered (e.g. intramuscularly, orally).

      d.    This can be documented as a written order by the on-site psychiatrist, or communicated via verbal order by an on-call psychiatrist outside of business hours; and

      e.    When indicated and available, consultation with another psychiatrist or Site Medical Director prior to the involuntary administration of psychotropic medication is encouraged.

3.    <u>Monitoring</u>

Following the emergency administration of psychotropic medication, the inmate shall be monitored for any adverse reactions or side effects, and any such side effects shall be documented in the medical record.

4.    <u>Treatment Plan</u>

As soon as possible following the emergency administration of psychotropic medication, the inmate's treatment plan shall be reviewed to incorporate goals to identify less restrictive treatment alternatives.

E.    <u>Psychiatric Hospitalization</u>

1.    <u>Bridgewater State Hospital</u>

a.    <u>Civil Commitment</u>

G.L. c. 123, §18(a) provides that a court may order the admission of male inmates to Bridgewater State Hospital (BSH) for inpatient evaluation and, if necessary, civil commitment and court authorization for treatment with antipsychotic medication. The recommendation for civil commitment to BSH shall be made by a licensed and qualified psychiatrist or psychologist. To facilitate continuity of care, the Site Mental Health Director at the sending prison shall provide the BSH Intensive Treatment Unit Director with a verbal report regarding all pertinent clinical issues. In addition, the Deputy

Superintendent of Classification and Programs at the sending prison shall provide the BSH Deputy Superintendent of Patient Services with a verbal report of information that is pertinent for the patient's management, safety and treatment.

b. <u>Discharges</u>

At least forty-eight (48) hours prior to an inmate's discharge from BSH to a prison, the Medical Director of Bridgewater State Hospital shall provide the Site Mental Health Director at the receiving prison (or in the event of a discharge to a county facility, the person designated by the Sheriff) with a verbal report of any information that has implications for the inmate's management, safety, and treatment at the receiving prison. In addition, the BSH Deputy Superintendent of Patient Services shall provide the Deputy Superintendent (or in the event of a discharge to a county facility, the person designated by the Sheriff) with a verbal report of any information that has implications for the inmate's management, safety, and treatment at the receiving prison.

Inmates discharged from BSH shall be accompanied by at least two (2) copies of the most recent Section 18(a) evaluation or discharge note and a Discharge Summary Form. These documents shall be transported with the inmate and delivered to the Superintendent and Health Services staff.

The Section 18(a) evaluation or discharge note and Discharge Summary shall include but not be limited to:

- Identifying Information;
- Referral Information;
- Relevant History;
- Course of Hospitalization;
- Current Medications;
- Patient's Understanding of Reason for Admission;

- Mental Status;
- Clinical Impressions Regarding Need for Care and Treatment.

Prior to the discharge of a civilly committed BSH inmate to a prison, an inter-facility case conference shall be requested by the BSH treatment team and scheduled by the Health Services Division in order to directly discuss clinical recommendations for treatment and to ensure uninterrupted care.

2. Department of Mental Health

   a. Civil Commitment

   G.L. c. 123, §18(a) provides that a court may order the admission of female inmates to a facility of the Department of Mental Health (DMH) for inpatient evaluation and, if necessary, civil commitment and court authorization for treatment with antipsychotic medication. The recommendation for civil commitment to a DMH facility shall be made by a licensed and qualified psychiatrist or psychologist. MCI-Framingham mental health clinicians shall communicate with the designated Department of Mental Health clinician to convey pertinent information.

   b. Discharges

   Upon the discharge of an inmate from a facility of the Department of Mental Health to MCI-Framingham, the MCI-Framingham Site Mental Health Director shall request from DMH all information which is necessary to ensure continuity of care, including the information set forth in Section 650.05(B).

3. Male Inmates

Although G.L. c. 123, §18(a) also provides for the civil commitment of a male inmate to a DMH facility, it is rare. The Director of Behavioral Health shall be contacted immediately upon knowledge of a civil commitment of a male inmate

to a DMH facility or the discharge of a male
inmate from a DHM facility to a prison.

4.   Other Forensic Evaluations

The Superintendent of BSH, in conjunction with
the Medical Director of BSH, shall establish
written procedures that detail the
confidentiality parameters of all other types of
forensic evaluations. The procedures shall
include safeguards against the unauthorized
release of information to third parties.

5.   Hunger Strikes or Cessation of Nutritional Intake

a.   For the purpose of this Section, a "hunger
strike" shall mean when an inmate declares a
hunger strike and refuses nourishment (food
or supplement) for more than twenty-four
(24) hours (four consecutive meals) for
reasons other than physical or mental
illness.

b.   The Mental Health Contractor, in conjunction
with the Medical Contractor, shall maintain
written procedures governing the management
of hunger strikes or cessation of
nutritional intake.

c.   An inmate who has declared a hunger strike
or who has refused to take food or
supplements for twenty-four (24) hours shall
be referred for a mental health evaluation
pursuant to Section 650.03(I). Subsequent
mental health evaluations shall continue
during regular business hours for the
duration of the failure to eat behavior.
Psychiatric hospitalization shall be
considered if the inmate meets the civil
commitment criteria.

d.   Mental health clinicians shall cooperate
with Department staff and medical staff in
the management of the event, including the
provision of counseling to the inmate to
resolve the problem.

6.   Access to Emergency Medical and Mental Health
Services

a.   Inmate victims of sexual abuse shall receive timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment.

b.   If no qualified medical or mental heath practitioners are on duty at the time a report of recent abuse is made, security staff first responders shall take preliminary steps to protect the victim pursuant to § 115.62 and shall immediately notify the appropriate medical and mental health practitioners.

c.   Treatment services shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with an investigation arising out of the incident.

650.14   Management of Potentially Suicidal Inmates and Self-Injurious Behavior

A.   General Policy

Whenever an inmate is identified as "at risk" for self-destructive behavior, mental health staff shall conduct an immediate evaluation. Correctional staff shall implement precautionary procedures, including continuous monitoring and/or observation, until the evaluation occurs. The mental health evaluation shall determine the course of action required to provide the inmate with support and monitoring during the critical period. If the inmate has attempted suicide or otherwise engaged in self-injurious behavior, the inmate shall receive immediate medical attention. Correctional staff shall be trained in the identification and custodial care of inmates with mental illness.

B.   Referral

The referral process for the potentially suicidal inmate shall be governed by Sections 650.03(C) (Mental Health Referral). 650.03(E) (Staff Referral) and 650.13(A) (Referral for Emergency Mental Health Services).

C.   Monitoring

The monitoring process for the potentially suicidal inmate shall be governed by Section 650.13(B) (Mental Health Watch in the Prisons).

D.   Evaluation

The evaluation of the potentially suicidal inmate shall be governed by Section 650.03(I) (Mental Health Evaluation). The evaluation of a potentially suicidal inmate shall include an assessment of the following:

- Inmate's mental status;
- Inmate's self-report and reports of others regarding the behavior resulting in the referral;
- Current suicide risk, ideation, plans, lethality of plan, recent stressors, family history, factors that contributed to any recent suicidal behavior and mitigating changes, if any, in those factors and goals of behavior;
- History of suicidal behavior/ideation, including frequency, methods used or contemplated, reasons why, consequences of prior attempts and gestures;
- Inmate's report of his or her potential for suicidal behavior;
- Inmate's capacity to seek mental health help if needed and expressed intent to do so.

Mental health staff shall consult with a psychiatrist if necessary for the evaluation.

E.   Treatment

If it is determined that an inmate is in danger of immediate self-harm, the inmate shall be placed on a clinically appropriate level of Mental Health Watch as provided by Section 650.13(B) (Mental Health Watch in the Prisons). Emergency mental health treatment may be provided as clinically indicated as provided by Section 650.13 (Emergency Mental Health Services). The inmate's mental health team shall develop and implement a treatment plan to address the inmate's short term and long term needs.

F.   Discharge from Mental Health Watch

If it is determined that an inmate is not currently at risk of suicide or self-injurious behavior, the inmate may be restored to his or her housing unit with follow-up by mental health staff as clinically indicated.

The discharge from Mental Health Watch of the potentially suicidal inmate shall be governed by Section 650.13(B)(8) (Duration and Discharge).

G.   Suicide Prevention Plan

The Program Mental Health Director shall collaborate with the Director of Behavioral Health in establishing a site-specific suicide prevention plan. The suicide prevention plan shall:

- Identify the warning signs and symptoms of impending suicidal behavior;
- Provide an understanding of the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors;
- Review how to respond to suicidal and depressed offenders;
- Highlight communication between correctional and health care personnel;
- Outline referral procedures;
- Review housing observation and suicide watch level procedures;
- Outline follow-up monitoring protocols for offenders who make a suicide attempt;
- Identify inmates who require evaluation for potential suicide risk;
- Provide for referral, assessment, monitoring, and placement of inmates who are at risk for potential suicide;
- Ensure that communication occurs among mental health, medical and correctional staff regarding the status of inmates identified as "at risk" for potential suicide;
- Establish a protocol for the intervention of a suicide in progress;
- Establish a protocol for notification of completed and attempted suicides;
- Provide for the review of completed and attempted suicides; and
- Establish data collection for completed and attempted suicides and for self-injurious behavior.

H.   **Training for Correctional Personnel**

1.   Subject to collective bargaining agreements and bidding process, correction officers and correctional program officers shall receive annual in-service training of at least two (2) hours per year on mental health issues and suicide prevention.

2.   Such annual training for correction officers and correctional program officers shall include the identification and custodial care of inmates with mental illness and may include:

   a.   Interpreting and responding to symptomatic behaviors, and communication skills for interacting with inmates with mental illness with emphasis on SMI;

   b.   Recognizing and responding to indications of suicidal thoughts;

   c.   Conducting a proper suicide prevention observation;

   d.   Responding to mental health crises, including suicide intervention and cell extractions;

   e.   Recognizing common side-effects of psychotropic medications;

   f.   Professional and humane treatment of inmates with mental illness;

   g.   Trauma informed care;

   h.   De-escalation techniques; and (ix) alternatives to discipline and use of force when working with inmates with mental illness.

I.   **Training for Mental Health Personnel**

The Mental Health Contractor shall train contract mental health clinicians on the prevention and management of self-injurious behavior. Training shall include a yearly in-house seminar on suicide prevention strategies.

650.15    Communications on and Recommendations for Special Needs Inmates

A.    General Policy

Inmates shall be identified who, due to mental illness or developmental disabilities, have special needs regarding housing, program assignments, work, transportation, special equipment and admission to and transfer from the facility. Special needs and any recommendations regarding such special needs shall be documented in the medical record and in the appropriate IMS screens, and shall be communicated as necessary and appropriate to medical and mental health clinicians, Department staff and outside hospital staff.

B.    Procedure

1.    Mental health clinicians shall assess inmates for special needs and review the medical record for documentation of special needs upon intake, upon transfer and on an ongoing basis. Thereafter, any special needs shall be reviewed and renewed or discontinued at least annually.

2.    Mental health clinical recommendations for housing, program and work assignments, transportation and special equipment shall be documented on the Medical Restrictions Form in IMS (Attachment 18) by a member of the mental health team and forwarded to the site Mental Health Director for review. Special needs shall also be documented in the Problem List (Attachment 19).

3.    If the recommendation concerns housing, program and work assignments and transportation, the Site Mental Health Director shall notify and provide the Superintendent with the Medical Restrictions Form. The Superintendent shall initiate appropriate communication and measures. Recommendations concerning transportation shall be conveyed to the Records Department.

4.    If the recommendation requires the provision of special equipment, the site Mental Health Director shall forward the completed Medical Restrictions Form to the Site Medical Director

for review and approval and to the Superintendent
or other Department designee for security review
within seven (7) days of completion of the form.
If the order is not denied by the Site Medical
Director or by the Superintendent or designee and
further evaluation or testing is not required,
the Medical Contractor shall order any equipment
within seven (7) days of the Site Medical
Director's approval. The equipment shall be
provided to or made available for the inmate
within a reasonable time.

5.   Mental health staff shall participate as invited
or included in Department of Correction meetings
in order to alert Department staff as to the
special needs of inmates and to recommend
strategies to address these needs.

6.   Completed Medical Restrictions Forms and Problem
Lists shall be filed in the "Miscellaneous
Section" of the medical record and the
information entered into the IMS Medical/Mental
Health Restrictions screen.

C.   Inmates with Disabilities and Inmates With Language
Barriers

The agency shall take appropriate steps to ensure that
inmates with disabilities (including, for example,
inmates who are deaf or hard of hearing, those who are
blind or have low vision, or those who have
intellectual, psychiatric, or speech disabilities),
have an equal opportunity to participate in or benefit
from all aspects of the agency's efforts to prevent,
detect, and respond to sexual abuse and sexual
harassment. Such steps shall include, when necessary
to ensure effective communication with inmates who are
deaf or hard of hearing, providing access to
interpreters who can interpret effectively,
accurately, and impartially, both receptively and
expressively, using any necessary specialized
vocabulary. In addition, the agency shall ensure that
written materials are provided in formats or through
methods that ensure effective communication with
inmates with disabilities, including inmates who have
intellectual disabilities, limited reading skills, or
who are blind or have low vision. An agency is not
required to take actions that it can demonstrate would
result in a fundamental alteration in the nature of a
service, program, or activity, or in undue financial

and administrative burdens, as those terms are used in regulations promulgated under title II of the Americans With Disabilities Act, 28 CFR 35.164.

650.16   <u>Mental Health Response to Reports of Sexually Abusive Behavior</u>

A.   The mental health response to reports of sexually abusive behavior shall be governed by 103 DOC 519, <u>Sexually Abusive Behavior Prevention and Intervention</u>. The Mental Health Contractor shall establish procedures consistent therewith.

B.   The mental health response shall include the following:

1.   Any inmate who reports being physically victimized by sexually abusive behavior shall be brought to the Health Services Unit for emergency medical and mental health treatment as needed.

a.   Unless otherwise precluded by Federal, State, or local law, medical and mental health practitioners shall be required to report sexual abuse pursuant to paragraph (A) of this section and to inform inmates of the practitioner's duty to report, and the limitations of confidentiality, at the initiation of services.

b.   If the alleged victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the agency shall report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

2.   The inmate shall be evaluated by a qualified health care professional for physical injuries and emergency medical treatment.

3.   An emergency mental health referral to the on-site mental health clinician shall be made following the completion of the medical examination. Any reports of physical or verbal abuse of a sexual nature shall be referred to the mental health crisis clinician.

4.   The on-site mental health clinician shall conduct an initial assessment to identify any symptoms which may preclude the inmate's transport to an outside hospital (i.e. gross psychotic symptoms, risk of self harm) and offer supportive services as needed.   If the report of sexually abusive behavior occurs when there are no on-site mental health clinicians, a qualified medical provider shall screen the inmate and immediately notify the on-call mental health clinician if the inmate victim is deemed at risk of harm to self or others.

5.   Following the completion of the medical and mental health assessments, the Superintendent, in consultation with medical and mental health clinicians, shall determine whether there is sufficient physical evidence to justify a referral to an outside hospital with a SANE program in accordance with 103 DOC 630.16.

6.   Upon the inmate's return from the outside hospital, the inmate shall be brought to the HSU for appropriate follow-up care to include a mental health screen by a Qualified Health Professional.   If the screen indicates that the inmate is at risk to harm self or others, a mental health clinician shall be immediately notified.   Otherwise, the inmate shall be seen by a Qualified Mental Health Professional within twenty-four (24) hours or no later than the next business day to assess the need for ongoing monitoring and counseling.

7.   The facility shall conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, including where the allegation has not been substantiated, unless the allegation has been determined to be unfounded.

Such review shall ordinarily occur within 30 days of the conclusion of the investigation.

The review team shall include upper-level management officials, with input from line supervisors, investigators, and medical or mental health practitioners.

C.   <u>Specialized PREA Training: Mental Health Care</u>

1.   The agency shall ensure that all full- and part-time mental health care practitioners who work regularly in its facilities have been trained in:

   a.   How to detect and assess signs of sexual abuse and sexual harassment;

   b.   How to preserve physical evidence of sexual abuse;

   c.   How to respond effectively and professionally to victims of sexual abuse and sexual harassment; and

   d.   How and to whom to report allegations or suspicions of sexual abuse and sexual harassment.

2.   The mental health vendor shall maintain documentation that mental health practitioners have received the training and forward a list of trained staff to the DOC on a quarterly basis.


D.   Access to Emergency Medical and Mental Health Services

1.   Inmate victims of sexual abuse shall receive timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment.

2.   If no qualified medical or mental heath practitioners are on duty at the time a report of recent abuse is made, security staff first responders shall take preliminary steps to protect the victim and shall immediately notify the appropriate medical and mental health practitioners.

E.   Ongoing Medical and Mental Health Care for Sexual Abuse Victims and Abusers.

1.   Mental health staff shall offer a mental health evaluation and, as appropriate, treatment to all inmates who have been victimized by sexual abuse in any prison.

2.   The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from DOC custody.

3.   A mental health evaluation of all known inmate-on-inmate abusers shall be conducted within 60 days of learning of such abuse history and mental health staff shall offer treatment when deemed clinically appropriate.

650.17   Section 35 Services

A.   General Provisions

Under G.L. c. 123, § 35, a Massachusetts District Court may order a civil commitment for a period of up to ninety (90) days to MASAC (males) or to MCI-Framingham (females), who is an "alcoholic" or "substance abuser." Section 35 defines "alcoholic" as a person who chronically or habitually consumes alcoholic beverages to the extent that (1) such use substantially injures his health or substantially interferes with his social or economic functioning, or (2) he has lost the power of self-control over the use of such beverages." Section 35 defines "substance abuser" as "a person who chronically or habitually consumes or ingests controlled substances or who intentionally inhales toxic vapors to the extent that: (i) such use substantially injures his health or substantially interferes with his social or economic functioning; or (ii) he has lost the power of self-control over the use of such controlled substances or toxic vapors." Such civil commitments are admitted to MASAC or to MCI-Framingham and provided infirmary-level detoxification services. Section 35 requires a review of the necessity of the commitment on days thirty (30), forty-five (45), sixty (60) and seventy-five (75) as long as the commitment continues.

The Healthcare Contractor shall provide all Section 35 services set forth herein. The Department may also utilize Section 35 services provided by other Commonwealth agencies.

B.   The Massachusetts Substance Abuse and Addiction Center

1.  The Massachusetts Addiction and Substance Abuse Center (MASAC) is designated as a minimum security prison with two distinct populations that are physically separate; Section 35 civil commitments and minimum security Department sentenced inmates.

2.  The Healthcare Contractor shall provide medical detoxification and related medical services to the civil population and other required medical services to both populations.

3.  The Mental Health Contractor shall provide alcohol and substance abuse treatment, necessary mental health services, and discharge planning for up to ninety (90) days to the civil population and required mental health services to the minimum security inmates.

    The Mental Health Contractor shall provide ongoing assessments required by G.L. c. 123, § 35 for the civil commitments to assist the Superintendent in conducting reviews to determine the appropriateness for discharge.

4.  Substance abuse treatment shall be organized according to empirically supported approaches (i.e., based on social learning, cognitive behavioral models, etc.). The Mental Health Contractor shall employ methodologies that have been proven effective on the basis of random controlled trials and/or meta-analysis, which should be referenced and documented.

5.  After the inmate is cleared by the Medical Contractor from the detoxification process to participate in substance abuse treatment, the Mental Health Contractor shall provide each participant with a minimum of twenty (20) hours of substance-abuse specific programming each week. At minimum, such programming should focus on:

    - Relapse prevention;
    - Substance abuse education;
    - Aftercare and discharge planning;
    - Family reunification;
    - Interpersonal skills training;
    - Health and wellness;

- Creating recovery plans; and
- 12-step programming.

6.    Substance abuse treatment shall employ a case management model. Case managers shall initiate an Individual Treatment Plan for all program participants. The Treatment Plan shall include a schedule of classes and activities. The Treatment Plans shall be reviewed and updated weekly.

C    MCI-Framingham

1.    In compliance with the Settlement Agreement in Hinckley v. Fair (Hampshire No. 88-064), women who are civilly committed to MCI-Framingham under G.L. c. 123, § 35 are held only long enough to secure a treatment bed in the community.

2.    The Healthcare Contractor shall provide medical detoxification and other necessary medical treatment to all inmates and civil commitments at MCI-Framingham.

3.    The Mental Health Contractor shall provide necessary Mental Health Services and discharge planning, as well as ongoing assessments required by G.L. c. 123, § 35, to assist the Superintendent in determining the appropriateness for discharge of civil commitments who are also not being held pursuant to the criminal process.

650.18    Mental Health Reentry Planning and Procedures

A.    General Policy

The ongoing needs of inmates with open mental health cases shall be addressed in anticipation of the inmate's discharge from the Department of Correction. All inmates with open mental health cases who require ongoing services after release shall have a discharge plan, which may include referral for services in the community. Mental health clinicians shall collaborate with Department of Correction staff in the reentry process to ensure the continuity of mental health care.

B.    Case Identification and Initiation

Utilizing the institutional release lists, mental health clinicians shall identify inmates with open mental health cases who are within one (1) year of discharge or parole and in need aftercare planning.

At least six (6) months prior to any anticipated discharge, a mental health clinician shall initiate plans to address the inmate's need for continuing mental health care upon discharge. This shall include the identification of appropriate providers for the continuation and maintenance of medication and therapy as indicated. Documentation of all discharge planning shall be recorded in the medical record and entered in the Release/Aftercare Plan Screen in IMS. Additionally, for any actual placements, information shall be entered in the Release Address screen.

C.   Discharge Plan

1.   At least forty-five (45) days prior to the anticipated discharge of an inmate with an open mental health case, or sooner if required by a short sentence structure, a mental health clinician shall work with the inmate to complete a Discharge Plan (Attachment 20). The Discharge Plan shall identify services available in the community and reflect sufficient details of the inmate's clinical diagnoses, medications and future needs. Contacts and telephone numbers shall be provided for the inmate's reference following discharge.

2.   All discharge plans shall be updated if the mental health services and/or services for reentry change. Any changes to the discharge plan shall be dated.

3.   If the inmate has been identified as the victim of sexually abusive behavior while incarcerated, a referral for sexual abuse counseling shall be included in the discharge plan where clinically warranted.

4.   The discharge plan shall be signed by the mental health clinician, the inmate and the Site Mental Health Director or designee. The inmate's refusal to sign shall be noted in the discharge plan.

5.   The discharge plan shall be completed fourteen (14) days prior to the anticipated discharge. The

inmate shall be provided with a copy. A receipt of the mental health record form shall be completed.

6. A copy of the discharge plan shall be placed in the mental health section of the inmate's medical record.

D. **Mental Health Parole Board Contact Sheet**

The Site Mental Health Director shall obtain a list of inmates scheduled for parole hearings on a monthly basis from the Institutional Parole Officer (IPO). Parole hearing information is maintained on the IMS Institution Schedule Query Screen.

When a parole hearing is scheduled for an inmate with an open mental health case who may have mental health aftercare needs, a mental health clinician shall complete the Mental Health Parole Contact Sheet (21) in advance of the hearing and provide it to the inmate for signature. The signed Mental Health Parole Board Contact Sheet shall be submitted to the Institutional Parole Officer (IPO). An inmate's refusal to complete and sign the Mental Health Parole Board Contact Sheet shall be noted in the medical record. The Institutional Parole Officer or other Parole Board representative shall be notified by the reentry Correctional Program Officer of the inmate's refusal.

E. **Department of Mental Health Referral**

If an inmate with an open mental health case has been assessed as meeting the clinical criteria for ongoing Department of Mental Health (DMH) services (as described in 104 CMR 29.04 (2)(a) or (2)(b)) and may be in need of DMH services upon discharge from the Department of Correction, a mental health clinician shall initiate a DMH referral as follows:

1. A mental health clinician shall secure the inmate's signature on the DMH release form included in the DMH application. The mental health clinician shall then complete the DMH application for Adult Continuing Care and the DMH Adult Clinical Summary Sheet, providing relevant clinical documentation and other information for review by DMH Eligibility Determination Specialists.

2.   With the appropriate executed DMH release, the mental health clinician shall share information from the inmate's mental health record with the DMH representatives to determine the inmate's eligibility for continuing care services and/or to initiate a community based service plan.

3.   A mental health clinician shall facilitate the entry of DMH representatives to conduct inmate and staff interviews and review records related to release planning. A mental health clinician shall meet with the DMH Forensic Transition Team Coordinator and/or DMH Case Manager at the inmate's facility and collaborate with the development of a service plan.

4.   A mental health clinician shall note the inmate's eligibility for DMH services in the inmate's treatment plan.

5.   A mental health clinician, in conjunction with other staff participating in transition planning, shall communicate any problems or concerns related to the service plan to the Forensic Transition Team Coordinator. The mental health clinician shall notify the DMH liaison of any change in the discharge date at least one month prior to the anticipated discharge date.

F.   <u>Civil Commitment upon Discharge</u>

If an inmate with an open mental health case is assessed as requiring involuntary civil commitment to Bridgewater State Hospital upon the expiration of his sentence, the mental health clinician shall proceed as follows:

1.   A mental health clinician shall commence the discharge process at least sixty (60) days prior to the inmate's discharge date, ensuring that he or she receives timely updates as to actual discharge date.

2.   In conjunction with the Site Mental Health Director, the mental health clinician shall consult with the Director of Behavioral Health and the Medical Director of Bridgewater State Hospital.

3.  A case conference may be scheduled as needed. The case conference may include participation by the inmate's Primary Care Clinician, the Site Mental Health Director, the Site Psychiatrist, the Program Mental Health Director, the Director of Behavioral Health, the Department of Correction Mental Health Regional Administrator, the Correctional Program Officer, and other staff as warranted.

4.  If at any time during the discharge planning process, the inmate is deemed in need of immediate civil commitment, the civil commitment process shall proceed in accordance with Section 650.13(E)(1).

5.  The Medical Director of Bridgewater State Hospital must file a petition pursuant to sections 7 and 8 of G.L. c. 123 with the district court prior to the expiration of the commitment under section 18(a).

6.  In the event that a transfer to Bridgewater State Hospital occurs on the day of the inmate's discharge from the Department of Correction, the section 18(a) transfer must occur immediately, as a petition under sections 7 and 8 and must be filed prior to 4:00 p.m. on the day of such discharge.

7.  If an inmate requires commitment to a facility of the Department of Mental Health on the day of his or her discharge from the Department of Correction, a psychiatrist shall file a petition under G.L. c. 123, § 12.

G.  Department of Developmental Services Referral

If an inmate with an open mental health case has been assessed to have a developmental disability that may render the inmate eligible for services from the Department of Developmental Services (DDS), a mental health clinician shall initiate an application for continuing care services and act as liaison with DDS to facilitate the inmate's transition to the community.

At least six (6) months prior to anticipated discharge, the assigned mental health professional will complete a DDS application. This eligibility

determination packet will be forwarded to the designated DDS liaison with all required releases and clinical documentation.

H.   <u>MassHealth Adult Disability Supplement</u>

Three (3) months prior to the anticipated discharge of an inmate with an open mental health case, a mental health clinician shall initiate the MassHealth Adult Disability Supplement application (long form). The following documentation is required:

- Twelve (12) months of mental health progress notes, including the inmate's mental health treatment plan;
- Twelve (12) months of psychiatric progress notes, including medication updates;
- The Medication Administration Record (MAR);
- Discharge summaries from Bridgewater State Hospital if the inmate has been hospitalized within the past twelve (12) months;
- Any neuropsychological testing completed within the past twelve (12) months; and
- Any pertinent medical documentation.

I.   <u>Reentry Clinical Case Conference</u>

No later than ninety (90) days prior to the anticipated discharge of an inmate with an open mental health case, a reentry clinical case conference should be considered if the inmate is considered at risk for homelessness and has one of the following:

- A significant medical diagnosis that involves an infectious disease, a chronic care issue or a terminal illness and/or a newly diagnosed problem;
- Serious cognitive deficits and/or a serious mental health diagnosis (a current DSM-V) which is characterized by the impairment of the individual's normal cognitive, emotional or behavioral functioning in such manner that he or she may have difficulty functioning and/or planning appropriate discharge and follow-up care;
- A substance abuse or alcohol addiction that has a long-term history and has not had recent

treatment, but which requires out-patient follow-up care.

J.    Discharge Medication

An inmate receiving psychotropic medication may be provided with a prescription and/or the remainder of his or her patient-specific blister pack at the time of discharge, in accordance with the inmate's needs and follow-up care. The psychiatrist shall determine whether an inmate should be discharged with a supply of medication or with a written prescription.

650.19   Duty to Warn

A mental health clinician who, in the course of diagnosing or treating an inmate, has reason to conclude that the inmate poses a threat to a third person, and that said clinician is obliged by a statute (including G.L. c. 112, § 129A (licensed psychologist), G.L. c. 112, § 135A (licensed social worker), G.L. c. 112, § 172A (mental health counselor) or otherwise obliged to warn a third person or take action to prevent the occurrence of harm, said shall notify the Program Mental Health Director, who shall notify and consult with the Director of Behavioral Health. The Director of Behavioral Health may consult with security staff, convene a case conference or take any other appropriate action to address the situation.

650.20   On-Site Evaluations by Outside Mental Health Professionals

The following procedure shall be followed by all facilities whenever a request is received for an inmate examination or evaluation by an outside mental health professional (i.e., any mental health professional who is not currently employed by the Department of Correction or the Department of Correction Mental Health Contractor).

A.    Prior to admittance, the outside mental health professional performing the evaluation or examination shall complete the Request to Perform Outside Mental Health Services Form (Attachment 23), copies of which shall be available in the outer control area.

B.    In all cases, the inmate shall sign an authorization to release medical/mental health information in order for the outside mental health professional to examine

the inmate's medical and/or mental health record (see
103 DOC 607, Attachment B).

C.   The outside mental health professional may enter the
facility through the normal facility visiting
procedure, with any documents related to the
evaluation, if he or she indicates on Attachment 23
the nature of the services as one or more of the
following:

1.   Court-Ordered Evaluation
2.   Criminal Responsibility Evaluation (G.L. c. 123,
§15(b))
3.   Competency Evaluation (G. L. c. 123, § 15(b))
4.   Commitment to BSH (G.L. c. 123)
5.   Sexual Dangerousness (G.L. c. 123A)
6.   Transfer Hearing (G.L. c. 123A)
7.   Competency of Witness to Testify (G.L. c. 123,
§19)
8.   Guardianship/Probate Issues
9.   Criminal Defense
10.  Bail Hearing (issues of dangerousness) (G.L.
c.276, §58A)
11.  Commutation of Sentence (120 CMR 901 et seq.)
12.  Parole
13.  Department of Children and Families or Department
of Youth Services
14.  Social Security Disability
15.  Non-court ordered examination in conjunction with
civil claim.

D.   Advance notification and approval in the above cases
are not required. However, the outside mental health
professional must have a valid license to provide
services consistent with the discipline in which the
professional is trained to practice. The license,
along with the required visiting identification, shall
be submitted with the visiting slip.

E.   Special accommodations (e.g. attorney room, non-
visiting hours, recording equipment, projector) may be
requested and may be approved by the Superintendent or
designee, in advance of the visit.

F.   If the outside mental health professional indicates,
on Attachment 23, that the nature of the service is
for any other reason than those cited in Section
650.20(C), the following procedure shall be followed:

1.   A request must be made in writing to the
     Superintendent.   The request must include
     on Attachment 23, the specific reason for and nature
     of the examination, any special accommodations,
     and a copy of the valid license to provide
     services.

2.   Upon the approval of the Superintendent, the
     evaluator may enter the facility through the
     normal facility visiting procedure or via any
     special accommodations approved by the
     Superintendent.

G.   All outside mental health professionals shall be
     subject to the following additional requirements:

1.   The outside mental health professional shall be
     informed that he or she may not perform an
     intrusive examination, nor may he or she write
     any orders or notes in any part of the medical or
     mental health record.

2.   The outside mental health professional shall be
     informed that neither the Department of
     Correction nor the Mental Health Contractor is
     obligated to comply with any consultation
     recommendations that he or she makes.   The
     outside mental health professional may offer a
     consultation report.   The consultation report
     shall be reviewed by the Site Mental Health
     Director or the Medical Director at Bridgewater
     State Hospital and may be included in the
     inmate's medical health record.

H.   The Director of Behavioral Health shall be notified of
     any request for an outside mental health consultation
     where the reason for such consultation concerns an
     allegation of lack of services within a facility,
     inappropriate treatment within a facility,
     inappropriate segregation or inappropriate DDU
     placement so that the Director may consider proper
     review, comment or initiate a peer review.


650.21   Records and Continuous Quality Improvement

A.   Mental Health Records

     Mental health records shall be governed by 103 DOC
     607, Inmate Medical Records Policy.

B.   Peer and Mortality Reviews

Mortality reviews shall be governed by 103 DOC 622, Death Procedures.

The Health Contractor and their respective personnel shall participate in peer review, mortality review, case review and other such functions, and shall cooperate with such additional clinicians in achieving the common goal of providing quality health services to inmates. Such participation shall include full cooperation in any investigation, mortality review, peer review and case review performed by the Department, the Medical Contractor, the Mental Health Contractor or by any consultant retained by the Department. Full cooperation shall include the provision of any requested information and reports within the time period required by the Director of Behavioral Health. Any findings pertinent to DOC policy of the vendor's internal review shall be shared with the Director of Behavioral Health.

The Director of Behavioral Health shall have timely access to Department of Correction incident and investigation reports necessary to perform a mortality review.

C.   Continuous Quality Improvement

1.   The Mental Health Contractor shall fully participate in Continuous Quality Improvement (CQI) initiatives that are defined and required by the Health Services Division, from planning through study completion, reporting, monitoring and follow-up.

2.   The Mental Health Contractor shall develop and provide planned, systematic and ongoing comprehensive quality improvement processes for monitoring, evaluating and improving the quality and appropriateness of mental health care provided to Inmates. The Mental Health Contractor shall identify indicators to monitor the quality and appropriateness of the important aspects of care, and organize the data collected for each such indicator in a manner to facilitate the identification of situations in need of more detailed evaluations of the quality or appropriateness of care. Upon identification of

such problems, the respective Mental Health Contractor shall take actions to correct problems or improve the quality of care.

3. The Mental Health Contractor shall provide the Director of Behavioral Health with documentation of an appropriate Continuous Quality Improvement program for its subcontractors.

4. The Mental Health Contractor shall include in its Continuous Quality Improvement indicators the examination of high risk/high volume activities, self-injurious behavior and other sentinel events, and special treatment procedures including but not limited to the utilization of mental health watches, chemical restraints, therapeutic restraints and court approved treatment.

650.22    Supplemental Mental Health Policies and Procedures

A.    Department Policies

103 DOC 519, Sexually Abusive Behavior and Intervention Policy, governs the mental health response to sexually abusive behavior.

103 DOC 652, Identification, Treatment and Correctional Management of Inmates Diagnosed with Gender Dysphoria, governs the treatment of Gender Dysphoria.

B.    Facility Mental Health Policies

Except as set forth herein, the provisions of 103 DOC 650 shall apply to all facilities.

Bridgewater State Hospital, as an accredited psychiatric hospital, promulgates hospital-specific policies and procedures. Other facilities shall not adopt site-specific mental health policies except upon the prior approval of, and subject to the review of the Director of Behavioral Health. All site-specific mental health policies shall be consistent with the provisions of 103 DOC 650.

C.    Mental Health Treatment Unit Policies

The Director of Behavioral Health, in conjunction with the facility superintendents, shall promulgate and

update operational procedures and inmate handbooks for mental health treatment units, including:

- The Secure Treatment Program (STP)
- The Behavioral Management Unit (BMU)
- The MCI-Framingham Intensive Treatment Unit (ITU)
- The Residential Treatment Units (RTUs)

D.   **Contractor Policies**

The Mental Health Contractor and the Medical Contractor shall promulgate, update and submit policies and procedures consistent with 103 DOC 650 for review, approval and co-signature by the Assistant Deputy Commissioner of Clinical Services.

The Mental Health Contractor shall promulgate, update and submit policies for Bridgewater State Hospital, for review, approval and co-signature by the Superintendent of Bridgewater State Hospital.

## 650.23   Administrative Provisions

A.   **Designees**

An action that this policy requires to be taken by an identified official may be taken by that official's designee as circumstances dictate.

B.   **Temporal References**

Unless otherwise provided by this policy, all temporal references to "days" within this policy shall mean calendar days.

C.   **Exigent Circumstances**

1.   If a provision of this policy specifically requires a prior determination whether Exigent Circumstances may preclude the occurrence of an act or action, the determination shall be made by the Assistant Deputy Commissioners for the Northern and Southern Sectors. If the Assistant Deputy Commissioners for the Northern and Southern Sectors do not agree whether Exigent Circumstances exist, the matter shall be referred to the Deputy Commissioner, Prison Division for final determination.

2. In all other instances in which an act or action required by this policy does not occur for reason of Exigent Circumstances, notification shall be made to the Assistant Deputy Commissioner for the appropriate sector. In such instance, responsible staff shall attempt to resolve the Exigent Circumstances as soon as possible, and the act or action shall be performed as soon as possible after the Exigent Circumstances cease to exist.

Attachment 1

## Mental Status Update Form
### (Generated by IMS)

To access this form:

1.    Log onto IMS.

2.    Select the "Medical" tab located at the top of the page.

3.    Select "Mental Health/Substance Abuse History" from the drop down box.

Attachment 2

# Mental Health Initial Appraisal

| Inmate Name | # | DOB | Facility: |
|---|---|---|---|

Date of Admission: _____   Today's Date:_____   Awaiting Trial:_____

Charge:_____   Sentence Structure/Violation:_____   Current time served:_____

Print Name/Title:_____

Signature of Screener:_____   ☐ Available records reviewed prior to interview
☐ Copy of Orientation To MH Services given to inmate

|  | YES | NO |
|---|---|---|
| 1.  Is this the individual's first incarceration? |  |  |
| 2.  Is the individual less than 18 years old? |  |  |
| 3.  What is the individual's highest grade level completed? _____     Special Education _____ |  |  |
| 4.  Does the individual report ever being hospitalized for mental health problems? ☐ If yes, signed ROI |  |  |
| 5.  Does the individual report ever report experiencing symptoms of mood, anxiety, or psychosis? |  |  |
| 6.  Were outpatient services received for this issue? ☐ If yes, signed ROI |  |  |
| 7.  Does the individual report currently prescribed psychotropic medications?<br>If YES, what medications? _____<br>Have these medications been verified? ☐ Yes ☐ No ☐ Record Unavailable |  |  |
| 8.  Does the individual report history of substance abuse? ☐ Drugs     ☐ Alcohol     ☐ Both |  |  |
| 9.  Does the individual appear to be under the influence of a substance currently? |  |  |
| 10. Does the individual report a history of substance abuse treatment?  If YES, dates _____ |  |  |
| 11. Does the individual report a history of head trauma or seizures? |  |  |
| 12. Does the individual report a history of hurting others out of anger? |  |  |
| 13. Does the individual report a history of committing sex offenses? |  |  |
| 14. Does individual report a history of being abused or victimized by others?<br>☐ Sexual          ☐ Physical          ☐ Both          ☐ Neglect<br>☐ Adulthood     ☐ Childhood/Adolescence     ☐ Both     ☐ Unwilling to discuss |  |  |
| 15. Does the individual report being sexually abused or victimized while incarcerated (include current or previous incarceration)? **If yes, notify the shift commander immediately (PREA)** |  |  |
| 16. Does the individual require further counseling related to prior sexual abuse or victimization? |  |  |
| 17. Does the individual report thinking about hurting himself/herself? |  |  |
| 18. Does the individual report ever attempting suicide? |  |  |
| 19. Does the individual report or does physical appearance suggest a history of self-mutilation? |  |  |
| 20. Does receiving staff report verbalization or other indications of suicide risk? |  |  |
| 21. Does the individual have a +Q5? |  |  |
| 22. Does the individual exhibit signs of abnormal behavior?          If YES, please indicate below:<br>☐ Poor eye contact     ☐ Poor hygiene     ☐ Unresponsive     ☐ Disoriented<br>☐ Memory deficits     ☐ Paranoid     ☐ Illogical speech content     ☐ Pressured Speech<br>☐ Appears to be hearing voices or seeing things     ☐ Other unusual behavior (specify):_____ |  |  |
| 23. Does the individual's behavior suggest risk of assault on others? |  |  |
| 24. Does the individual's behavior suggest risk of suicidal behavior? |  |  |
| 25. Does individual show signs of extreme emotional response to incarceration?<br>If YES:  ☐ Signs of depression such as crying, downcast face or emotional flatness<br>☐ Signs of being overly anxious, afraid or angry<br>☐ Signs of feeling unusually embarrassed or ashamed<br>☐ Other (specify): |  |  |
| 26. Does the individual have difficulty responding to questions?  If YES:<br>☐ Unable to stay alert  ☐ Unable to pay attention  ☐ Unable to follow directions  ☐ Unresponsive          ☐<br>Hostile     ☐ Disorganized/Illogical speech  ☐ Unable to read  ☐ Cognitive functioning appears limited |  |  |
| 27. Does the individual appear to have limited cognitive functioning?<br>Estimate level: ☐ Mildly impaired  ☐ Moderately Impaired  ☐ Significantly impaired (refer to psychologist) |  |  |
| 28. Based on this clinical assessment, do you have any concerns regarding the inmate being sexually victimized or sexually aggressive towards others?  **If yes, notify the shift commander immediately (PREA)**. |  |  |

**INITIAL PLAN:** ☐  Immediate intervention required based on risk assessment          * Any yes requires a comment
☐  Psychiatric Follow-up (Medications verified and/or psychiatrist assessment needed)
☐  Refer for Mental Health Evaluation
☐  No Mental Health Follow-up (No need for assistance identified)

Housing, job assignment, and program participation ☐ Routine ☐ Special recommendations made to classification

| nmate Name | # | DOB | Facility: |
|---|---|---|---|
| | | | |

COMMENTS_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature: _____

Print Name: _____

Date: _____

Time: _____

**Attachment 3**

SICK CALL REQUEST FORM

Name: _____   ID#: _____   Unit #: _____

Date of Birth: _____   Date: _____   Check ONLY One Box: ☐ Medical ☐ Dental

Nature of problem or request: _____   ☐ Mental  Health

_____

_____

**I consent to be treated by the healthcare staff for the condition described above.**

**Inmate Signature:** _____   **Date:** _____

\*\*\*\*\*\*DO NOT WRITE BELOW THIS AREA - PLACE THIS SLIP IN MEDICAL BOX OR DESIGNATED AREA \*\*\*\*\*\*

| Date/Time Received | Referred to:           ☐ Nurse           ☐ Provider<br>☐ Mental Health ☐ Dental     ☐ Other<br>**Institution:** _____   **Slip Sorted By:** _____<br>☐ **Emergency**   ☐ **Urgent**   ☐ **Routine**   ☐ **Administrative** |
|---|---|

Subjective:


Objective:   **T** _____ **P** _____ **R** _____ **B/P** _____ **W/T** _____




Assessment:


Plan:




**Signature & Title** _____   **Date:** _____   **Time:** _____



**Attachment 4**

Massachusetts Department of Correction Health Services

| Inmate Name | # | DOB | Facility: |
|---|---|---|---|

### Mental Health Evaluation

Evaluator/Title (print): _____

Mental Health Initial Appraisal has been reviewed ☐ _____

Date of Evaluation: _____

Initial Treatment Plan Due by: _____

| Age: | Race: | Sex: |
|---|---|---|

| Charge(s)/Offense(s): | Sentence: |
|---|---|

| PERSONAL HISTORY | | |
|---|---|---|
| Place of Birth: | Marital Status: | # of Children: |
| Education/DMR Services: | Previous Employment: | |
| Living Situation Prior to Incarceration: | | |

| CRIMINAL HISTORY | |
|---|---|
| # Major Adult Incarcerations: | Prior Adult Offenses/Juvenile Offenses: |

| MEDICAL HISTORY | Head Trauma? ☐ Y ☐ N | Seizures? ☐ Y ☐ N | Chronic Illness? ☐ Y ☐ N |
|---|---|---|---|
| Medical conditions reported: | | | |

| MENTAL HEALTH HISTORY | |
|---|---|
| | |
| Psychiatric Hospitalizations/Dates (Include reason for hospitalization): | |

| Prior Outpatient Treatment ☐ Y ☐ N | ☐ Psychiatrist | ☐ Psychologist | ☐ Mental Health Clinician | Recent: ☐ Y ☐ N |
|---|---|---|---|---|

Reason for Treatment:

Recent Provider of Outpatient Services:

Recent Psychotropic Medications:

Past Psychotropic Medications:

Family Psychiatric History:

**SUBSTANCE ABUSE HISTORY**

☐ Yes ☐ No   Substance abuse.  If YES, substances abused:

☐ Yes ☐ No   Substance abuse while incarcerated:

☐ Yes ☐ No   Substance abuse treatment.  If YES, dates and agencies providing treatment:

☐ Yes ☐ No   History of Overdose

**Mental Health Evaluation (page 2 of 3)**

**TRAUMA/ABUSE HISTORY**

☐ Sexual abuse reported.   ☐ Physical abuse reported.   ☐ Traumatic experience reported.   ☐ Other abuse/trauma.

Describe.  Include past or current symptoms resulting (e.g., flashbacks, nightmares, numbing):

**SUICIDE RISK ASSESSMENT** Rating:   ☐ Low ☐ Moderate ☐ High (intervention required)

☐ Yes ☐ No   Has current thoughts of suicide?

☐ Yes ☐ No   Has current plan for suicide?  If YES, describe:

☐ Yes ☐ No   Is it possible for inmate to implement plan?

☐ Yes ☐ No   Suicide/self-harm attempt(s) in last 90 days.  If yes, when, where and method:

☐ Yes ☐ No   Suicide attempts in the past. If yes, when, where and method:

☐ Yes ☐ No   Suicidal ideation in the past. If yes, when, where and type:

☐ Yes ☐ No   Suicidal attempts/ideation when previously incarcerated. If yes, when, where and method:

☐ Yes      ☐ No      Ever placed on suicide watch during previous incarcerations? If yes, provide details:

---

**VIOLENCE RISK ASSESSMENT Rating:**   ☐ Low  ☐ Moderate  ☐ High (intervention required)

☐ Yes   ☐ No   Has current thoughts of violence?
☐ Yes   ☐ No   Has current homicidal ideation?
☐ Yes   ☐ No   Violent behavior in last 90 days? If yes, when, where and type:

☐ Yes   ☐ No   History of any violent behavior? If yes, when, where and type:

☐ Yes   ☐ No   Segregation time in prior incarcerations related to violence? If yes, when and why:

☐ Yes   ☐ No   Current charge or prior sentences related to violent behavior? If yes, when and type:

---

**MENTAL STATUS EXAMINATION**

ORIENTATION:   ☐ Normal   ☐ Disoriented to Time   ☐ Disoriented to

APPEARANCE:   ☐ Neat   ☐ Disheveled   ☐ Poor Hygiene

ATTITUDE:   ☐ Cooperative   ☐ Minimally Cooperative   ☐

INTERVIEW BEHAVIOR:   ☐ Appropriate   ☐ Hyperactive   ☐ Agitated   ☐ Hostile   ☐ Threats   ☐ Verbally Abusive   ☐ Attention Seeking   ☐ Manipulative   ☐ Seductive   ☐ Crying   ☐ Tearful   ☐ Unresponsive   ☐ Withdrawn   ☐ Slow   ☐ Evasive   ☐ Poor Eye Contact   ☐ Bizarre Behavior:

AFFECT AND MOOD:   ☐ Appropriate   ☐ Depressed   ☐ Anxious   ☐ Angry   ☐ Suspicious   ☐ Labile   ☐ Flat Affect   ☐ Euphoric   ☐ Inappropriate   Other:

SPEECH:   ☐ Natural   ☐ Slow   ☐ Rapid   ☐ Pressured   ☐ Soft   ☐ Loud   ☐ Slurred   ☐ Impediment

THOUGHT PROCESSES:   ☐ Logical   ☐ Disorganized   ☐ Delusional   ☐

MEMORY:   ☐ No deficit   ☐ Impairment in Recent Memory   ☐

HALLUCINATIONS:   ☐ None   ☐ Visual   ☐ Auditory   ☐ Olfactory

DELUSIONS:   ☐ Delusions Not Present   ☐ Delusions Present   ☐

| JUDGMENT: | ☐ Good | ☐ Fair | INSIGHT: | ☐ Good | ☐ Fair |
|---|---|---|---|---|---|

| INTELLECTUAL ABILITIES: | ☐ Average or above | ☐ Marginal | ☐ |
|---|---|---|---|

Significantly Compromised (refer to psychologist)

## DIAGNOSTIC IMPRESSIONS WITH RATIONALE, ISSUES OF RISK (Be sure to include on Inmate's problem list)

Axis I:

Axis II:

Axis III:

Axis IV:

Axis V:

DAP:

## GLOBAL RATING OF DISTRESS (please check one):

☐ No Distress  ☐ Mild  ☐ Moderate  ☐

Severe  ☐ Extreme

## TREATMENT/MANAGEMENT PLAN:

☐ ☐No mental health follow-up required

☐ ☐Further evaluation needed. Mental Health follow-up to be scheduled.

☐ ☐Mental health follow-up necessary.  Inmate placed on caseload and Treatment Plan to be completed

☐ ☐Immediate intervention required based on risk assessment

☐ ☐Referrals needed, specify:

| Mental Health Classification Level (with sub-code): |
| --- |
| |

| Evaluating Clinician/Title: | Date |
| --- | --- |
| Mental Health Director: | Date |
| Other (Title) | Date |

**Attachment 5**

## INITIAL MENTAL HEALTH TREATMENT PLAN

| Inmate Name | # | DOB | Facility: MCI-CONCORD |
|---|---|---|---|

Primary Care Clinician (print):_____                Treating
    Psychiatrist (print):_____
Date of Treatment Plan:_____                Treatment Plan must be
reviewed by:___
Mental Health Classification Level (with sub-code):_____

| DSM-IV-TR DIAGNOSES and DSM CODES   (write out both) |
|---|
| Axis   I: |
| Axis  II: |
| Axis III: |
| Axis  IV: |
| Axis   V: |

| Inmate Strengths: |
|---|
| Inmate Challenges/Needs: |

| LONG TERM GOAL(S): (Target of overall treatment; indication of overall treatment success) |
|---|
|  |

| SHORT TERM GOALS (Steps needed to move toward Long Term Goals) |
|---|
| #1 - Target Symptom(s)/Obstacle to Long Term goal: |
| Short Term Goal (measurable, objective, achievable prior to next treatment plan review): |
| Target Date for Resolution: |
| Intervention & Modality (what MH staff are doing, how and how often): |
| Staff Members Responsible      ☐ MD/NP      ☐ PCC      ☐ Other MH Staff   ☐   OTHER: |
| #2 - Target Symptom(s)/Obstacle to Long Term goal: |

| | |
|---|---|
| Short Term Goal (measurable, objective, achievable prior to next treatment plan review): | |
| Target Date for Resolution: | |
| Intervention & Modality (what MH staff are doing, how and how often): | |
| Staff Members Responsible ☐ MD/NP ☐ PCC ☐ Other<br>MH Staff ☐ OTHER: | |

| | |
|---|---|
| Inmate Signature: | Date |
| Reason no inmate signature: | |
| Primary Care Clinician: | Date |
| Psychiatrist/Nurse Practitioner: | Date |
| Mental Health Director: | Date |
| Other (Title) | Date |

Attachment 6

## Request for Case Closure

Inmate Name: _____ DOB:

_____

Commitment #: _____

Date Triaged: _____

Date Closed: _____

How the inmate began psychiatric treatment (reason for original referral):

_____

_____

_____

_____

_____

_____

Course of Treatment:

_____

_____

_____

_____

_____

_____

Reason to Close Case:

_____

_____

_____

_____

_____

_____

Primary Clinician: _____ Date: _____

Director of Mental Health: _____ Date: _____

Psychiatrist: _____ Date: _____

Attachment 7

## Mental Health Classification Form

☐ Initial Classification     ☐ Classification Change Institution:

_____

☐ **MH-5 Severe functional impairment due to a mental disorder (Hospitalization)**

Sub Code(s)     A ☐     B ☐     C ☐     D ☐

❖ Severe debilitating symptoms, such as persistent danger of hurting self or others, recurrent violence, inability to maintain minimal personal hygiene, or gross impairment in communication; severely disorganized thinking and behavior
❖ Cannot safely and/or adequately be treated in a prison environment
❖ This code is effective once an inmate is referred to the 18A commitment process.

☐ **MH-4 Serious functional impairment due to a mental disorder (RTU, BMU, STP)**

Sub Code(s)     A ☐     B ☐     C ☐     D ☐

The inmate may experience severe impairment in mental health functioning and/or behavioral control that significantly impacts ability to function in a general population setting. (May include recurrent episodes of psychiatric decompensation, frequent reliance on crisis stabilization services, pervasive pattern of self-injury and/or multiple disciplinary infractions, etc.)
❖ Psychiatric intervention and/or evaluation required
❖ Psychotropic medications may be indicated (regardless of whether inmate is noncompliant)
❖ Inmate requires structured daily activities and comprehensive mental health programming to maintain stability
❖ A multidisciplinary treatment plan review is needed more frequently than every 6 months

☐ **MH-3 Moderate level of mental health treatment needs (General Population)**

Sub Code(s)     A ☐     B ☐     C ☐     D ☐

❖ The inmate experiences moderate impairment in mental health functioning and/or behavioral control
❖ Psychiatric intervention and/or evaluation required
❖ Psychotropic medications may be indicated (regardless of whether inmate is noncompliant)
❖ Inmate must be seen at least monthly by their assigned primary care clinician, but may require more frequent monitoring due to concerns related to self-injury and/or psychiatric decompensation
❖ The inmate is prioritized for group treatment when available and clinically indicated
❖ Inmate is able to function in general population with structured support from mental health staff
❖ The inmate requires a multidisciplinary treatment plan

❖ The inmate may participate in DOC programs as available; there may be program restrictions based on  mental health symptoms

☐ **MH-2 Mild level of mental health treatment needs (General Population)**

Sub Code(s)        A ☐     B ☐     C ☐     D ☐

❖ The inmate experiences mild impairment in mental health functioning and/or behavioral control
❖ Psychiatric intervention and/or evaluation may be necessary
❖ Psychotropic medications may be indicated (regardless of whether inmate is noncompliant)
❖ The inmate requires assignment of a primary care clinician and must be seen at least monthly for outpatient mental health treatment
❖ Group treatment may be provided when available and clinically indicated
❖ The inmate requires a multidisciplinary treatment plan
❖ The inmate can participate in DOC programs as available

☐ **MH-1 Case management needs          Sub Code          D ☐ (General Population)**

❖ The inmate experiences mild or minor impairment in mental health functioning
❖ The inmate is stable with treatment provided on an outpatient basis which may include case management and group treatment
❖ Psychotropic medications are not indicated
❖ The inmate may require monitoring due to discontinuation of psychotropic medications within the past 6 months
❖ The inmate's history contains evidence of a suicide attempt or psychiatric hospitalization within the past year
❖ The inmate requires a multidisciplinary treatment plan
❖ The inmate can participate in DOC programs as available

☐ **MH-0  No current mental health treatment needs      Sub Code D ☐ (General Population)**

❖ The inmate does not demonstrate any identified need for mental health assistance
❖ The inmate may receive crisis intervention services when indicated
❖ The inmate can participate in DOC programs as available

☐ **MH-9 Awaiting evaluation – no classification code**
❖ Pending disposition upon completion of mental health evaluation

**Glossary of Mental Health Classification Sub Codes**

A:   Inmate is designated as SMI (seriously mentally ill) based upon definition
B:   Inmate is currently prescribed psychotropic medication by a psychiatrist
C:   Inmate is currently prescribed medication by a psychiatrist that must

be administered by  nursing staff, requiring  a facility with 7 day nursing coverage

D:    Inmate has a history of self-injurious behavior

**ANY INMATE MEETING THE CRITERIA FOR SMI MUST BE CLASSIFIED WITH A DESIGNATION OF AT LEAST A MH-2**

linician Printed Name: _____

ignature: _____

ate: _____

Attachment 8

## DEPARTMENT OF CORRECTION
## RTU REFERRAL FORM

NAME:                              ID:                    DOB:

DATE OF REFERRAL:

REFERRING FACILITY:

HOUSING UNIT:

CURRENTLY IN SEGREGATION (yes/no):

If currently in segregation please report the following:
          o  Date placed in SMU:
          o  Offense leading to SMU placement:

REFERRING CLINICIAN AND CONTACT INFORMATION:


CURRENT DIAGNOSIS:
AXIS I:
AXIS II:
AXIS III:
AXIS IV:
AXIS V: (CURRENT):       GAF (HIGHEST PRIOR YEAR):
SMI (yes/no):
Current MH Classification and Subcode:

CRIMINAL OFFENSE:

GCD/PE (include both dates):

COMMITMENT EXPIRES (BSH ONLY):

PRIOR INCARCERATIONS:

DISCIPLINARY/INSTITUTION ADJUSTMENT:

CURRENT MEDICATIONS AND DOSAGE:

MENTAL HEALTH HISTORY:

PSYCHIATRIC HOSPITALIZATIONS (include dates and reasons):

OUTPATIENT MENTAL HEALTH TREATMENT:

SUBSTANCE ABUSE HISTORY:

MENTAL HEALTH WATCHES (include dates and reasons):

FREQUENCY OF CRISIS CONTACTS:

HISTORY OF SUICIDE/SELF-INJURIOUS BEHAVIOR (include dates):

PRIOR RTU TREATMENT:

CURRENT MENTAL STATUS:

CURRENT FUNCTIONAL STATUS:

CURRENT PSYCHIATRIC SYMPTOMS THAT IMPAIR INDEPENDENT FUNCTIONING IN GENERAL POPULATION:

INMATE'S PERCEPTION AND UNDERSTANDING OF RTU PLACEMENT:


RTU TREATMENT GOALS:       1.
                           2.
                           3.
                           4.
                           5.


POTENTIAL BARRIERS FOR RTU TREATMENT:


_____

INMATE SIGNATURE/DATE


_____

CLINCIAN SIGNATURE/DATE


_____

MENTAL HEALTH DIRECTOR/DATE (FROM REFERRING SITE)

Please fax to MHM Regional Office at (508) 285-7616

---

**(PLEASE DO NOT WRITE BELOW THIS LINE)**

Date Referral Received:

Contacts Regarding this Referral:

RESULT:    ☐    INMATE MEETS CRITERIA         ☐       INMATE DOES NOT MEET CRITERIA

```
Director of Clinical Programs (or designee)        Date
```

**RECOMMENDED RTU SITE:** (TO BE ISSUED BY DOC CLASSIFICATION)

☐ **Old Colony (Maximum)** ☐ **Old Colony (Medium)** ☐ **NCCI Gardner** ☐ **MCI-FRAMINGHAM**

Attachment 9

# RESIDENTIAL TREATMENT UNIT DISCHARGE SUMMARY

| Inmate Name | # | DOB: | Facility: |
|---|---|---|---|

| Admitted on:<br>Length of Stay in the RTU: | Date of Discharge:<br>Multiple RTU Admissions: Yes   No |
|---|---|

**Reason for RTU Placement:**

**Admitting Diagnosis:**
Axis I:
Axis II:
Axis III:
Axis IV:
Axis V:

**Reason for RTU Discharge:**
 Clinically and behaviorally stable.  No longer in need of RTU placement (attach any case conference documentation)
 After assessment in the RTU the inmate is deemed not to require RTU level of care (Case conference required.  Attach case conference summary).

**Treatment Progress on RTU:**

**Current Mental Status:**

Inmate compliant with medication?     Yes        No

Inmate placed on mental health watch during the last 30 days?     Yes        No

Relevant Medical Information:

**Discharge Diagnosis:**
Axis I:
Axis II:
Axis III:
Axis IV:
Axis V:

Current Medications:

Follow-up Treatment Recommendations:

| Inmate Signature: | Date |
|---|---|
| Reason no inmate signature: | |
| Primary Care Clinician: | Date |
| Psychiatrist/Nurse Practitioner: | Date |
| Mental Health Director: | Date |
| Other (Title) | Date |

*Complete and submit this form to DOC Health Services Division and MHM Regional Office at least 48 hours prior to the case conference*

| Inmate Name: | Inmate ID#: |
|---|---|
| Date of Case Conference: | Inmate DOB: |
| Facilities Involved: | This form was completed by: |

**Attendees (list all individuals on the conference call and in attendance):**

**Past History (brief overview of the inmate's psychiatric, legal, and DOC history):**

**Recent History (current behavioral and clinical issues/concerns for discussion):**

**Multiaxial Diagnoses:**
Axis I:
Axis II:
Axis III:
Axis IV:
Axis V:

**Medication Regimen (list all medications and dosages):**

**Probate or District Rogers (include history of Probate and/or District Rogers and dates):**

**Reason(s) for the Inter-Facility Case Conference:**

**Plan (To be completed and submitted within 24 hours of the case conference. Identify all responsible parties and dates for completion of identified tasks. Include all clinical, housing, and classification issues):**

| PLAN: | Responsible Party: |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |

| Signature: |
|---|
| Printed Name: |
| Date: |

Attachment 11

## Mental Health Consultation for Disciplinary Disposition

This form is to be completed for all inmates designated MH-4 who have been found guilty or who have plead guilty to a Category 1 or Category 2 Disciplinary Offense who are not sanctioned with a Department Disciplinary Unit (DDU) sanction.

_____          _____
Inmate Name                              Commitment Number


_____
Disciplinary Report Number

Check One Result
☐    Guilty Plea
☐    Guilty Finding


_____          _____
Printed Name of Officer                  Date of Finding


_____  _____
Printed Name of Mental Health Staff Person   Date of
                                             Disposition Consult
Consulted

As a result of consulting with mental health staff regarding the above-referenced disciplinary matter and inmate, the sanction(s) I have imposed has been impacted as indicated:

Part 1
☐ Mental health staff did not recommend a sanction modification.
☐ Mental health staff recommended a sanction modification.

Part 2 (Complete only if mental health staff recommended modification.)
☐  Sanction was not modified.
☐  Sanction modified in whole or in part pursuant to the recommendation.


_____             _____
Date Completed                      Signature of Disciplinary Officer
                                    or Hearing Officer

```
                                                    Attachment 12
                                                  (MH Clearance Form)
```

| CRISIS TREATMENT PLAN DISCONTINUATION FORM | Inmate Name: <br> ID #: <br> Institution:          Location: <br> Date: |
|---|---|

| CURRENT DIAGNOSES | *(Identify current diagnosis and conditions that require treatment during watch.)* |
|---|---|

**Axis I:**

**Axis II:**

**Axis III:**

**Axis IV:**

**Axis V:**

**MH Classification:**          **Subcode(s):**

| CURRENT REVIEW OF PRECIPITATING EVENT(S) | *(Describe behaviors and events that led to inmate being placed on mental health watch. Include statements made by the inmate regarding current risk and safety)* |
|---|---|



| Historical (Static) Risk Factors | | | | *Review each item.* | | | |
|---|---|---|---|---|---|---|---|
| Prior suicidal/self-injurious behavior | Y | N | ? | History of physical or sexual abuse | Y | N | ? |
| Prior suicidal/self-injurious ideation | Y | N | ? | History of severe impulsivity | Y | N | ? |
| Family/close friend history of suicide | Y | N | ? | History of mental illness/psychiatric tx | Y | N | ? |
| History of substance abuse | Y | N | ? | Cluster B Personality Traits | Y | N | ? |

*Describe above/Additional Narrative:*

| Clinical (Current, Dynamic) Risk Factors | | | | *Review each item.* | | | |
|---|---|---|---|---|---|---|---|
| Recent suicidal/self-injurious behavior | Y | N | ? | Auditory command hallucinations | Y | N | ? |
| Recent/current impulsivity | Y | N | ? | Hopelessness and/or helplessness | Y | N | ? |
| Recent assaultive/violent behavior | Y | N | ? | Feelings of worthlessness | Y | N | ? |
| Recent suicidal/self-injurious ideation | Y | N | ? | Current insomnia with poor appetite | Y | N | ? |
| Premeditated, lethal plan/behavior | Y | N | ? | Social withdrawal atypical for inmate | Y | N | ? |
| Lack of future orientation or plans | Y | N | ? | Shame, threat to self-esteem, or guilt | Y | N | ? |
| Rigid, all-or-nothing thinking | Y | N | ? | Intense turmoil, agitation, anxiety, anguish or despair | Y | N | ? |
| Fatalistic delusions or fantasies | Y | N | ? | | | | |

| Belief that death will bring relief | Y | N | ? | Elevated anger, hostility or alienation | Y | N | ? |
|---|---|---|---|---|---|---|---|
| Fixed determination to harm/kill self | Y | N | ? | Sudden calm following suicide attempt | Y | N | ? |
| Treatment noncompliance | Y | N | ? | Affective instability or lability | Y | N | ? |
| Suicide notes/giving belongings away | Y | N | ? | Fearfulness regarding safety | Y | N | ? |

*Describe above/Additional Narrative:*

| Situational (Current, Dynamic) Risk Factors | | | *Review each item.* | | |
|---|---|---|---|---|---|
| Signs of withdrawal/detoxification | Yes | No | Recent parole violation/new charge | Yes | No |
| Chronic, serious or terminal illness | Yes | No | First jail/prison sentence | Yes | No |
| New disciplinary charge or sanctions | Yes | No | Recent loss, rejection or separation | Yes | No |
| Single cell placement | Yes | No | Other recent bad news | Yes | No |
| Administrative/disciplinary segregation | Yes | No | Trauma or sexual/physical abuse in facility | Yes | No |
| High profile crime | Yes | No | Conflicts with peers/officers | Yes | No |
| Potential for long/life sentence | Yes | No | Chronic physical pain | Yes | No |

*Describe above/Additional Narrative:*

| Protective Factors | | | *Review each item.* | | |
|---|---|---|---|---|---|
| Family support | Yes | No | Realistic future orientation and plans | Yes | No |
| Support from spouse/significant other | Yes | No | Positive goal orientation | Yes | No |
| Role in caring for children or dependents | Yes | No | High school or greater level of education | Yes | No |
| Positive, supportive peer relations | Yes | No | Treatment compliance | Yes | No |
| Strong protective spiritual/religious beliefs | Yes | No | Positive coping skills *(describe below)* | Yes | No |

*Describe above/Additional Narrative:*

| Current Mental Status | | | | |
|---|---|---|---|---|
| Orientation | Normal | Disoriented to Time | Disoriented to Place | Disoriented to Person |
| Appearance | Neat | Disheveled | Unkempt/Malodorous | Bizarre |
| Attitude | Cooperative | Dismissive | Guarded/Suspicious | Hostile/Negative |
| Interview Behavior | Appropriate | Hyperactive | Agitated/Restless | Threatening |
| | Violent | Slow   Withdrawn | Tearful | Disorganized/Ritualized |
| Mood | Euthymic | Elated/Expansive | Depressed | Other: |
| Affect | Appropriate | Labile | Flat/Blunt | Inappropriate/Disorganized |
| Perception | No Hallucinations | Hallucinations  (describe): | | |
| Cognition | No Delusions | Delusions  (describe): | | |
| Suicidal/Self-Injurious Ideation | No | Yes (describe): | | |
| Homicidal/Assaultive Ideation | No | Yes (describe): | | |

| Insight | Good | Impaired | **Judgment** | Good | Impaired |
|---|---|---|---|---|---|

**Current Stressors:**

| **Collateral Information** | *Describe any additional data regarding inmate behavior as reported by Nursing, Custody or Other staff.* |
|---|---|
| | |

| **Assessment of Current Risk:** | Low | Moderate | High |
|---|---|---|---|

*Comments/Discussion of Rationale:*

| **Summary of Treatment While on Mental Health Watch:** |
|---|
| |

| **Outcome of Treatment on Mental Health Watch:** |
|---|
| *Describe specific behavioral changes achieved as a result of crisis treatment interventions:* |

| Overall progress in treatment during Mental Health Watch: | None | Minimal | Moderate | Good |
|---|---|---|---|---|

| **Plan and Recommendations For Continued Care** | |
|---|---|
| Return to assigned housing unit<br><br>(circle housing type): general population   RTU   STU   medical   SHU   segregation | Inmate instructed on Mental Health access |

| Placement on the MH caseload with individual treatment plan | Referral to Medical for (specify): |
|---|---|
| Refer for inpatient psychiatric hospitalization | Other (specify): |

Additional planned interventions/follow-up and recommendations:


*(Psychiatric Staff Only)* Medications and Labs Ordered:


| Observation status and behavioral crisis has been added to Master Problem List in medical record |
|---|
| Inmate's Individualized Treatment Plan has been reviewed in light of Crisis Treatment Plan and revised as necessary |

|  |  |  |
|---|---|---|
| Staff Name (printed) with Credentials | Staff Signature | Date and Time |

Attachment 13

## STU REFERRAL FORM

NAME:                              ID:                      DOB:

DATE REFERRAL COMPLETED:

REFERRING FACILITY:                    CURRENT HOUSING UNIT:

REFERRING   CLINICIAN   AND   CONTACT   INFORMATION   (email,   phone number):

LENGTH OF DDU SENTENCE:

DISCIPLINARY INFRACTION THAT RESULTED IN DDU PLACEMENT:

CURRENT DIAGNOSIS:
AXIS I:
AXIS II:
AXIS III:
AXIS IV:
GAF (within past year): Lowest ___ Current ___ Highest ___
SMI (yes/no):
Current MH Classification and Subcode:

CURRENT MEDICATIONS AND DOSAGE:

RECENT MEDICATION CHANGES (INCLUDE DATE OF CHANGES AND DOSAGES):

MEDICATION COMPLIANCE:

PROBATE ROGERS HISTORY (INCLUDE DATES AND SPECIFICS REGARDING ADMINISTRATION OF MEDICATIONS):

ALLERGIES AND KNOWN/REPORTED SIDE EFFECTS:

SIGNIFICANT MEDICAL HISTORY (e.g., TRAUMATIC BRAIN INJURY, INSULIN DEPENDENT, REQUIRES INHALER, etc.)

MENTAL HEALTH HISTORY SINCE INCARCERATED (INCLUDE DATES AND INTERVENTIONS):

SPECIALIZED TREATMENT INTERVENTIONS (e.g., 18A's, RTU'S, ETC., (INCLUDE DATES AND RESPONSE TO TREATMENT INTERVENTIONS)):

PRIOR PSYCH TESTING (INCLUDE COPY OF TESTING RESULTS):

PSYCHIATRIC HOSPITALIZATIONS (INCLUDE BSH EVALUATION):

OUTPATIENT MENTAL HEALTH TREATMENT PRIOR TO INCARCERATION:

SUBSTANCE ABUSE HISTORY:

MENTAL HEALTH WATCHES (PAST 12 MONTHS):

FREQUENCY OF CRISIS CONTACTS (SPECIFY DATE, REASON, AND OUTCOME OVER THE PAST 12 MONTHS):

HISTORY OF SUICIDE/SELF-INJURIOUS BEHAVIOR (INCLUDE DATES AND BRIEF DESCRIPTIONS OF BEHAVIORS FOR PAST 12 MONTHS):

SELF-INJURIOUS BEHAVIOR REQUIRING OUTSIDE MEDICAL ATTENTION IN THE PAST 12 MONTHS (INCLUDE DATES AND DESCRIPTIONS OF IDENTIFIED TRIGGERS, BEHAVIORS AND INTERVENTIONS):

LOCATION WHERE SELF-INJURIOUS BEHAVIOR OCCURRED (e.g., IN SEGREGATION, GENERAL POPULATION, ETC.):

CURRENT FUNCTIONAL STATUS (PLEASE INCLUDE MENTAL STATUS EXAM):

CURRENT PSYCHIATRIC SYMPTOMS AND/OR BEHAVIORAL PROBLEMS THAT IMPAIR INDEPENDENT FUNCTIONING IN SEGREGATION:

CHRONIC PSYCHIATRIC SYMPTOMS AND/OR BEHAVIORAL PROBLEMS THAT IMPAIR INDEPENDENT FUNCTIONING IN GENERAL POPULATION:

TREATMENT GOALS:
1.
2.
3.
4.
5.

INMATE'S PERCEPTION AND UNDERSTANDING OF STU PLACEMENT:

IDENTIFIED STRENGTHS:

IDENTIFIED POSITIVE COPING STRATEGIES:

_____

CLINICIAN SIGNATURE/DATE

_____

MENTAL HEALTH DIRECTOR/DATE (FROM REFERRING SITE)


TEAM RECOMMENDATION FOR STU PLACEMENT:

☐ BEHAVIOR MANAGEMENT UNIT

☐ SECURE TREATMENT PROGRAM



Please email to

_____

**(PLEASE DO NOT WRITE BELOW THIS LINE)**

**DATE REFERRAL RECEIVED:**

**DATE OF STU REVIEW COMMITTEE REVIEW:**

☐   INMATE MEETS CRITERIA FOR PLACEMENT IN THE BEHAVIOR MANAGEMENT UNIT

☐   INMATE MEETS CRITERIA FOR PLACEMENT IN THE SECURE TREATMENT PROGRAM

☐   INMATE DOES NOT MEET CRITERIA FOR PLACEMENT IN A SECURE TREATMENT UNIT (RATIONALE FOR DECISION PROVIDED IN A SEPARATE DOCUMENT):


_____   _____

**DIRECTOR OF BEHAVIORAL HEALTH (DOC)/DATE:**

_____

**DIRECTOR OF CLINICAL PROGRAMS (MHM)/DATE:**

Attachment 14

## OBSERVATION CHECK SHEET

NAME: _____ CELL_____

DATE_____ COMMITMENT # _____

| T I M E | AWAKE | ASLEEP | COHERENT | DISPOSITION | COMMENTS | PRINT NAME | OFFICER'S SIGNATURE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**ALL NOTATIONS SHALL BE MADE AT 15 MIN INTERVALS, EACH ENTRY SHALL BE IN INK**

Attachment 15

| CRISIS TREATMENT PLAN FOR MENTAL HEALTH WATCH | Inmate Name:<br>ID #:<br>Institution:          Location:<br>Date: |
|---|---|

**CURRENT DIAGNOSES** *(Identify current diagnosis and conditions that require treatment during watch.)*

Axis I:

Axis II:

Axis III:

Axis IV:

Axis V:

MH Classification:          Subcode(s):

**PRECIPITATING EVENT(S)** *(Describe behaviors and events that led to inmate being placed on mental health watch. Include statements made by the inmate)*

| Historical (Static) Risk Factors | | | | Review each item. | | | |
|---|---|---|---|---|---|---|---|
| Prior suicidal/self-injurious behavior | Y | N | ? | History of physical or sexual abuse | Y | N | ? |
| Prior suicidal/self-injurious ideation | Y | N | ? | History of severe impulsivity | Y | N | ? |
| Family/close friend history of suicide | Y | N | ? | History of mental illness/psychiatric tx | Y | N | ? |
| History of substance abuse | Y | N | ? | Cluster B Personality Traits | Y | N | ? |

*Describe above/Additional Narrative:*

| Clinical (Current, Dynamic) Risk Factors | | | | Review each item. | | | |
|---|---|---|---|---|---|---|---|
| Recent suicidal/self-injurious behavior | Y | N | ? | Auditory command hallucinations | Y | N | ? |
| Recent/current impulsivity | Y | N | ? | Hopelessness and/or helplessness | Y | N | ? |
| Recent assaultive/violent behavior | Y | N | ? | Feelings of worthlessness | Y | N | ? |
| Recent suicidal/self-injurious ideation | Y | N | ? | Current insomnia with poor appetite | Y | N | ? |
| Premeditated, lethal plan/behavior | Y | N | ? | Social withdrawal atypical for inmate | Y | N | ? |
| Lack of future orientation or plans | Y | N | ? | Shame, threat to self-esteem, or guilt | Y | N | ? |
| Rigid, all-or-nothing thinking | Y | N | ? | Intense turmoil, agitation, anxiety, anguish or despair | Y | N | ? |
| Fatalistic delusions or fantasies | Y | N | ? | | | | |
| Belief that death will bring relief | Y | N | ? | Elevated anger, hostility or alienation | Y | N | ? |
| Fixed determination to harm/kill self | Y | N | ? | Sudden calm following suicide attempt | Y | N | ? |
| Treatment noncompliance | Y | N | ? | Affective instability or lability | Y | N | ? |
| Suicide notes/giving belongings away | Y | N | ? | Fearfulness regarding safety | Y | N | ? |

*Describe above/Additional Narrative:*

| Situational (Current, Dynamic) Risk Factors | | | Review each item. | | |
|---|---|---|---|---|---|
| Signs of withdrawal/detoxification | Yes | No | Recent parole violation/new charge | Yes | No |
| Chronic, serious or terminal illness | Yes | No | First jail/prison sentence | Yes | No |
| New disciplinary charge or sanctions | Yes | No | Recent loss, rejection or separation | Yes | No |
| Single cell placement | Yes | No | Other recent bad news | Yes | No |
| Administrative/disciplinary segregation | Yes | No | Trauma or sexual/physical abuse in facility | Yes | No |
| High profile crime | Yes | No | Conflicts with peers/officers | Yes | No |
| Potential for long/life sentence | Yes | No | Chronic physical pain | Yes | No |

*Describe above/Additional Narrative:*

| Protective Factors | | | Review each item. | | |
|---|---|---|---|---|---|
| Family support | Yes | No | Realistic future orientation and plans | Yes | No |
| Support from spouse/significant other | Yes | No | Positive goal orientation | Yes | No |
| Role in caring for children or dependents | Yes | No | High school or greater level of education | Yes | No |
| Positive, supportive peer relations | Yes | No | Treatment compliance | Yes | No |
| Strong protective spiritual/religious beliefs | Yes | No | Positive coping skills *(describe below)* | Yes | No |

*Describe above/Additional Narrative:*

### Current Mental Status

| | | | | |
|---|---|---|---|---|
| **Orientation** | Normal | Disoriented to Time | Disoriented to Place | Disoriented to Person |
| **Appearance** | Neat | Disheveled | Unkempt/Malodorous | Bizarre |
| **Attitude** | Cooperative | Dismissive | Guarded/Suspicious | Hostile/Negative |
| **Interview Behavior** | Appropriate | Hyperactive | Agitated/Restless | Threatening |
| | Violent | Slow      Withdrawn | Tearful | Disorganized/Ritualized |
| **Mood** | Euthymic | Elated/Expansive | Depressed | Other: |
| **Affect** | Appropriate | Labile      Flat/Blunt | Inappropriate/Disorganized | |
| **Perception** | No Hallucinations | Hallucinations  (describe): | | |
| **Cognition** | No Delusions | Delusions  (describe): | | |
| **Suicidal/Self-Injurious Ideation** | No      Yes (describe): | | | |
| **Homicidal/Assaultive Ideation** | No      Yes (describe): | | | |
| **Insight** | Good | Impaired | **Judgment**      Good      Impaired | |

**Current Stressors:**

| Collateral Information | *Describe any additional data regarding inmate behavior as reported by Nursing, Custody or Other staff.* |
|---|---|
| | |

| Assessment of Current Risk: | Low | Moderate | High |
|---|---|---|---|
| *Comments/Discussion of Rationale:* | | | |

---

**Goal of Crisis Treatment Plan:**

Behavioral safety and stability will be restored, such that the inmate remains free from suicidal, self-injurious, homicidal and/or assaultive ideation, plan or intent.

**Measurable Objectives of Crisis Treatment Plan:**



**Strategies to Manage Risk:**

Placement on close observation (15") mental health watch

Placement on constant (1:1) mental health watch:

Refer to medical for the following issue or concern:

Refer to psychiatrist for evaluation or review of medication

Request information/records from:

Other:

**Strategies to Reduce Risk:**

*(Identify how suicidal/self-harm ideation can be avoided, and specific actions staff and inmate can take to reduce risk and establish safety. Indicate specific interventions for providing interventions, and any communication strategies likely to promote safety.)*

**Inmate Strategies:**



**Staff Interventions:**



Observation status and behavioral crisis added to Master Problem List in medical record

Inmate's Individualized Treatment Plan has been reviewed in light of Crisis Treatment Plan

| Staff Name (printed) with Credentials | Staff Signature | Date and Time |
|---|---|---|

Attachment 16

| CRISIS INTERVENTION TREATMENT PLAN DISCONTINUATION FORM | Inmate Name: |
| | ID #: |
| | Institution:          Location: |
| | Date: |

| CURRENT DIAGNOSES | *(Identify current diagnosis and conditions that require treatment during watch.)* |
|---|---|
| Axis I: | |
| Axis II: | |
| Axis III: | |
| Axis IV: | |
| Axis V: | |
| MH Classification:          Subcode(s): | |

**CURRENT REVIEW OF PRECIPITATING EVENT(S)** *(Describe behaviors and events that led to inmate being placed on mental health watch. Include statements made by the inmate regarding current risk and safety)*

| Historical (Static) Risk Factors | | | | *Review each item.* | | | |
|---|---|---|---|---|---|---|---|
| Prior suicidal/self-injurious behavior | Y | N | ? | History of physical or sexual abuse | Y | N | ? |
| Prior suicidal/self-injurious ideation | Y | N | ? | History of severe impulsivity | Y | N | ? |
| Family/close friend history of suicide | Y | N | ? | History of mental illness/psychiatric tx | Y | N | ? |
| History of substance abuse | Y | N | ? | Cluster B Personality Traits | Y | N | ? |

*Describe above/Additional Narrative:*

| Clinical (Current, Dynamic) Risk Factors | | | | *Review each item.* | | | |
|---|---|---|---|---|---|---|---|
| Recent suicidal/self-injurious behavior | Y | N | ? | Auditory command hallucinations | Y | N | ? |
| Recent/current impulsivity | Y | N | ? | Hopelessness and/or helplessness | Y | N | ? |
| Recent assaultive/violent behavior | Y | N | ? | Feelings of worthlessness | Y | N | ? |
| Recent suicidal/self-injurious ideation | Y | N | ? | Current insomnia with poor appetite | Y | N | ? |
| Premeditated, lethal plan/behavior | Y | N | ? | Social withdrawal atypical for inmate | Y | N | ? |
| Lack of future orientation or plans | Y | N | ? | Shame, threat to self-esteem, or guilt | Y | N | ? |
| Rigid, all-or-nothing thinking | Y | N | ? | Intense turmoil, agitation, anxiety, anguish or despair | Y | N | ? |
| Fatalistic delusions or fantasies | Y | N | ? | | | | |
| Belief that death will bring relief | Y | N | ? | Elevated anger, hostility or alienation | Y | N | ? |
| Fixed determination to harm/kill self | Y | N | ? | Sudden calm following suicide attempt | Y | N | ? |
| Treatment noncompliance | Y | N | ? | Affective instability or lability | Y | N | ? |
| Suicide notes/giving belongings away | Y | N | ? | Fearfulness regarding safety | Y | N | ? |

*Describe above/Additional Narrative:*

| Situational (Current, Dynamic) Risk Factors | *Review each item.* |
|---|---|

| Signs of withdrawal/detoxification | Yes | No | Recent parole violation/new charge | Yes | No |
|---|---|---|---|---|---|
| Chronic, serious or terminal illness | Yes | No | First jail/prison sentence | Yes | No |
| New disciplinary charge or sanctions | Yes | No | Recent loss, rejection or separation | Yes | No |
| Single cell placement | Yes | No | Other recent bad news | Yes | No |
| Administrative/disciplinary segregation | Yes | No | Trauma or sexual/physical abuse in facility | Yes | No |
| High profile crime | Yes | No | Conflicts with peers/officers | Yes | No |
| Potential for long/life sentence | Yes | No | Chronic physical pain | Yes | No |

*Describe above/Additional Narrative:*

| Protective Factors | | | *Review each item.* | | |
|---|---|---|---|---|---|
| Family support | Yes | No | Realistic future orientation and plans | Yes | No |
| Support from spouse/significant other | Yes | No | Positive goal orientation | Yes | No |
| Role in caring for children or dependents | Yes | No | High school or greater level of education | Yes | No |
| Positive, supportive peer relations | Yes | No | Treatment compliance | Yes | No |
| Strong protective spiritual/religious beliefs | Yes | No | Positive coping skills *(describe below)* | Yes | No |

*Describe above/Additional Narrative:*

| Current Mental Status | | | | |
|---|---|---|---|---|
| **Orientation** | Normal | Disoriented to Time | Disoriented to Place | Disoriented to Person |
| **Appearance** | Neat | Disheveled | Unkempt/Malodorous | Bizarre |
| **Attitude** | Cooperative | Dismissive | Guarded/Suspicious | Hostile/Negative |
| **Interview Behavior** | Appropriate | Hyperactive | Agitated/Restless | Threatening |
| | Violent | Slow | Withdrawn | Tearful | Disorganized/Ritualized |
| **Mood** | Euthymic | Elated/Expansive | Depressed | Other: |
| **Affect** | Appropriate | Labile | Flat/Blunt | Inappropriate/Disorganized |
| **Perception** | No Hallucinations | Hallucinations  (describe): | | |
| **Cognition** | No Delusions | Delusions  (describe): | | |
| **Suicidal/Self-Injurious Ideation** | No | Yes (describe): | | |
| **Homicidal/Assaultive Ideation** | No | Yes (describe): | | |
| **Insight** | Good | Impaired | **Judgment**   Good     Impaired | |
| **Current Stressors:** | | | | |

| Collateral Information | *Describe any additional data regarding inmate behavior as reported by Nursing, Custody or Other staff.* |
|---|---|
| | |

| Assessment of Current Risk: | Low | Moderate | High |
|---|---|---|---|
| *Comments/Discussion of Rationale:* | | | |

## Summary of Treatment While on Mental Health Watch:

## Outcome of Treatment on Mental Health Watch:

*Describe specific behavioral changes achieved as a result of crisis treatment interventions:*

Overall progress in treatment during Mental Health Watch:       None         Minimal         Moderate         Good

## Plan and Recommendations For Continued Care

| Return to assigned housing unit<br><br>(circle housing type): general population  RTU  STU  medical  SHU  segregation | Inmate instructed on Mental Health access |
|---|---|
| Placement on the MH caseload with individual treatment plan | Referral to Medical for (specify): |
| Refer for inpatient psychiatric hospitalization | Other (specify): |

Additional planned interventions/follow-up and recommendations:

*(Psychiatric Staff Only)* Medications and Labs Ordered:

| Observation status and behavioral crisis has been added to Master Problem List in medical record |
|---|
| Inmate's Individualized Treatment Plan has been reviewed in light of Crisis Treatment Plan and revised as necessary |

| Staff Name (printed) with Credentials | Staff Signature | Date and Time |
|---|---|---|
| | | |

ATTACHMENT 17

**FOUR POINT RESTRAINT MEDICAL EXAMINATION CHECKLIST**

TYPE RESTRAINTS UTILIZED

4 Point Soft Posey Restraints _____
4 Point metal Restraints_____
Security Restraint Chair _____

Inmate Name:_____     Commitment
     #:_____

ORDERED
     BY_____
     __
                              ( PRINT )

DATE STARTED _____     TIME
     STARTED_____

DATE ENDED     _____     TIME ENDED
     _____

| TIME | CHECKED BY HSU STAFF NAME | REMITY CIRCULATION CHECKED, PULSE PRESENT MOVEMENT ADEQUATE |
|------|---------------------------|-----------------------------------------------------------|
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |
|      |                           |                                                           |

ATTACHMENT 18

MEDICATION RESTRICTION FORM
(GENERATED BY IMS)

To access the form:

1.      Log onto IMS

2.      Select the "Medical" tab located at the top of the page.

3.      Selected the "Medical Restriction/Special Needs" option from the drop
                                                                  down box.

# PROBLEM LIST

_____
**Institution**

**NAME:** _____  **ID#** _____  **DOB** _____

**MEDICATION ALLERGIES:** _____

| Date Identified | Significant Health Problems | Healthcare Practitioner Signature | Date Resolved | Healthcare Practitioner Signature |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ATTACHMENT 20

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES
DISCHARGE PLAN
Mental Health


NAME/#: _____ Date   MH   Case   Opened:
_____

Today's Date: _____ Date   of   Release:
_____

(expected)


Diagnosis:   Axis _____ I

Axis _____ II

Axis _____ III

Current Medications: (at discharge, Mental Health only)

_____

_____

_____


Identify Mental Health Needs and Services for reentry to
community:
(Include: contacts, phone number, addresses, etc.)

1. _____

_____

2. _____

_____

3. _____

_____

4. _____

Comments:

_____

_____

_____

_____

Check here if plan changes  _____  (Identify Change Below and Date)

_____

_____

_____

_____

Did inmate participate in planning?    Yes: _____ No: _____

If No, why:

_____

_____

_____

Clinician          Signature          and          Date:
        _____

Clinician              Printed              Name:
        _____

Inmate          Signature          and          Date:
        _____

Inmate              Printed              Name:
        _____

☐ MH              Director              reviewed:
        _____
                        (Dates)

Attachment 21

## Mental Health (MH) / Parole Contact Sheet

Inmate Name:_____   Date of Birth:_____

DOC#:_____

Date MH services initiated:_____   Axis I diagnosis:_____

Date MH services terminated:_____   Axis II diagnosis:_____

Axis III diagnosis:_____

MH services inmate currently receives:
_____
_____

Predominated symptoms / reason for service:
_____
_____
_____

Current medications:
_____
_____

# of 18 (a)'s:_____

Is inmate seen as a potential DMH client?:_____
Is inmate seen as a potential DMR client?:_____

Services to be addressed upon release (circle all that apply):
1.   DMH application for continuing care: filed / not filed / not applicable
2.   Outpatient referral for meds / counseling
3.   Substance abuse treatment
4.   Housing / employment
5.   Case management
6.   Other:_____

### Acknowledgement and Release

I have read the information contained in this form, or have had it read to me, and I hereby give my permission to MHM Services, Inc. and its agents or assigns to release any and / or all of the information contained in this form to the Parole Board, it's members and staff.

In signing this Acknowledgement and Release, I agree that information from this form may be used to coordinate my aftercare treatment.

Inmate signature:_____   Date:_____

Clinician signature:_____   Date:_____

Attachment 22

## MASSACHUSETTS DEPARTMENT OF CORRECTION
### Health Services Division
### REQUEST TO PERFORM OUTSIDE MENTAL HEALTH SERVICES
### (PSYCHIATRIST, PSYCHOLOGIST, LICENSED SOCIAL WORKER)

I_____, agree to perform or cause to perform a mental health evaluation on _____, # _____, an inmate in the custody of the Department of Correction.  In so doing, I understand that neither the Department of Correction, nor any of its agents, officials, or employees, nor the medical provider for the Department of Correction, will incur any financial obligation for said services.

Name and Address of Provider: _____

(Please print clearly)

_____

_____

_____

NATURE OF SERVICES:                    CHECK ANY THAT APPLY

Court-ordered
Criminal Responsibility (G.L. c. 123, §15(b))_____
Competency Evaluation (G. L.c. 123, § 15(b))_____
Commitment to BSH (G.L. c. 123)
Sexual Dangerousness (G.L. c. 123A)          _____
Transfer Hearing (G.L. c. 123A)              _____
Criminal Defense
Bail Hearing(G.L. c. 276, §58A)              _____
   (issues of dangerousness)
Commutation of Sentence (120 CMR 901 *et seq.*)_____
Parole
DSS or DYS                                   _____
Social Security Disability                   _____
Non-court ordered examination in conjunction _____
   with civil claim

OTHER: (Please Specify)
1._____
2._____
3._____

Signed: _____    Witness: _____

Title: _____     Date: _____

MA Lic. # _____
Date: _____

List of time periods when Edward Jones and ███ Inmate A ███ were housed in the same housing unit:

| Start Date | End Date | Facility | Housing unit/cell of Jones | Housing unit/cell of ██Inmate A██ |
|------------|----------|----------|----------------------------|-----------------------------------|
| 10/24/2015 | 10/29/2015 | OCCC | HSU/G02 | HSU/G05 |
| 08/12/2015 | 08/20/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G27 |
| 08/12/2015 | 08/12/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G25 |
| 07/29/2015 | 08/03/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G25 |
| 07/27/2015 | 07/29/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G21 |
| 06/03/2015 | 07/24/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G21 |
| 05/19/2015 | 06/03/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G25 |
| 02/26/2015 | 04/15/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G22 |
| 02/18/2015 | 02/26/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G17 |
| 02/06/2015 | 02/17/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G17 |
| 01/20/2015 | 02/06/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G14 |
| 01/15/2015 | 01/20/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G16 |
| 12/15/2014 | 01/15/2015 | OCCC | *Attucks I/*G20 | *Attucks I/*G22 |
| 12/11/2014 | 12/11/2014 | OCCC | *Attucks I/*G20 | *Attucks I/*G22 |
| 11/18/2014 | 12/11/2014 | OCCC | *Attucks I/*G20 | *Attucks I/*G05 |

**EXHIBIT**

Ex. 2 to Ex. D