Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3
 4   EDWARD JONES
 5              Plaintiff
 6   v.                          CIVIL ACTION
 7   LISA MITCHELL, et al.       NO. 16-11666-LTS
 8
 9              Defendants
10   _____/
11
12        DEPOSITION OF VANESSA MARTINO-FLEMING
13                 Boston, Massachusetts
14             Monday, September 17, 2018
15
16
17
18   Reported by:
19   Deborah Roth, RPR-CSR
20   Job No. NY 3005705
21
22
23
24
25
```

EXHIBIT E

Page 14

1 symptoms, the acuity. So if they are more
2 symptomatic and they're having difficulty
3 managing them, I increase their contact.
4 You know, if they are doing rather well,
5 somebody like that I would meet every other
6 week when he is doing well.
7    Q. Are you qualified at all to make an
8 official mental health diagnosis?
9    A. Yes.
10    Q. And what diagnoses have you -- or for
11 what mental illnesses have you diagnosed
12 Mr. Jones?
13    A. I haven't myself diagnosed him.
14 Usually the psychiatrist diagnoses them. I
15 defer to the psychiatrist in the setting.
16 So me, per se, I haven't given one, but I
17 know he has PTSD as a diagnosis. I agree
18 with that.
19    Q. And do you have -- have you stated a
20 cause for his PTSD at all?
21    A. I'm sorry?
22    Q. Have you come up with a cause for it
23 at all?
24    A. There's contributing factors, for
25 sure.

Page 15

1    Q. Do you know what those contributing
2 factors are?
3    A. A significant sexual abuse history.
4    Q. Do you know when he was abused
5 sexually?
6    A. I know as a young child, even through
7 adolescence, and on more than one occasion,
8 multiple times by multiple people.
9    Q. So he demonstrates symptoms of PTSD
10 as a result of sexual abuse as a child?
11    A. Yes.
12    Q. Can you describe the purposes of the
13 residential treatment unit?
14    A. Sure. So the residential treatment
15 unit is people with severe and persistent
16 mental illness that have difficulty
17 managing in general population, because
18 they need frequent contact or they are on
19 mental health watches, if they need
20 increased observations, sometimes their
21 safety might be at risk, or, you know, they
22 decompensate and you increase contact.
23       You know, we are there to help
24 provide groups and kind of support them to
25 help them function better.

Page 16

1    Q. Do you refer inmates to the RTU?
2    A. Not typically. I'm in the RTU. Most
3 of my clients are in the RTU. I get the
4 people who are referred.
5    Q. So how does someone end up in the
6 RTU?
7    A. If there is someone who's in general
8 population is having difficulty
9 functioning, maybe self-injury, maybe
10 there's someone who's psychotic, they don't
11 take their medications, you know, they're
12 on frequent watches.
13       So they come up as requiring
14 increased service. Their clinician would
15 talk about a referral for more support.
16    Q. Was Mr. [Inmate A] another
17 inmate in the RTU?
18    A. Yes.
19    Q. And did Mr. Jones ever communicate to
20 you about his complaint about Mr. [Inmate A]
21    A. Yes.
22    Q. Was it your opinion that [Inmate A]
23 [Inmate A] actions incited his PTSD more?
24       MS. GLAZER: Objection.
25       MR. MONTHEY: Would you say your

Page 17

1 basis for the objection, please.
2       MS. GLAZER: Well, as to the form
3 of the question and whether or not the
4 witness is qualified to make that
5 determination.
6       MR. MONTHEY: Okay, I will proceed
7 to the next one.
8       At this point I would like to
9 introduce the mental health progress notes
10 you prepared.
11       (Exhibit 3 was marked for
12        identification.)
13       MR. MONTHEY: Counsel, we have
14 agreed to ensure the confidentiality of all
15 these documents through a stipulated
16 protected order.
17    Q. Ms. Martino-Fleming?
18    A. Yes.
19    Q. Take a minute to verify these are, in
20 fact, your signatures?
21    A. Yes.
22    Q. If you can authenticate them.
23    A. Yes.
24    Q. I know there are a lot of these.
25       Do you regularly prepare mental

5 (Pages 14 - 17)

Page 18

1  health progress notes for every meeting with
2  Mr. Jones?
3     A. Yes.
4     Q. Do you prepare them for any
5  interaction or only formal appointments?
6     A. I do for the other interactions, as
7  well. You know, if someone comes to me and
8  there is an issue, I will, if it is
9  something worth documenting.
10    Q. We have arranged these in
11  chronological order.
12       There is an incident report I will
13  refer you to. It is one you prepared on
14  September 25, 2015.
15    A. Okay.
16    Q. It's about in the middle of the page.
17       First of all, did you enter all
18  these descriptions on each of these mental
19  progress notes? Did you type all of these
20  words in?
21    A. Yes.
22    Q. And do you have a formal sort of
23  computer system that you submit these or is
24  it just a form?
25    A. This is the form that we used at the

Page 19

1  time.
2     Q. Okay. So if you notice here, in the
3  middle, if you could just read the entire
4  first paragraph marked D.
5     A. I apologize for typos. We couldn't
6  do Spellcheck with whatever the system was.
7        "Writer and inmate met in the RTU
8  treatment room for one-and-one session.
9  Inmate" -- if it's incorrect grammar, can
10 we assume or should I read it word for
11 word? "Stated," the word "stated" should
12 be in there.
13    Q. That's fine.
14    A. "Stated he was extremely frustrated
15 with the events that occurred yesterday
16 with mental health and the DOC. Writer
17 acknowledged that the DOC's decision to
18 place the other RTU inmate that he had a
19 previous issue with back on the unit was a
20 stressful situation for him. Writer
21 reiterated that writer and all other RTU
22 staff had made it abundantly clear to the
23 DOC that there were numerous concerns with
24 placing this other inmate back on the unit.
25 Writer recognizes that inmate had

Page 20

1  experienced some increased symptoms related
2  to previous incidents as well as with
3  current DOC decision. Inmate and writer
4  process his frustrations with the system
5  and that he submitted a grievance regarding
6  this. Writer reiterated that mental health
7  had made their clinical opinion clear to
8  the DOC that this other RTU inmate's safety
9  was at risk. Writer praised inmate for
10 coming over to the RTU yesterday instead of
11 acting on his angry feelings. Writer
12 reiterated this was a prosocial way to
13 manage his emotions. Inmate reported that
14 'maybe it was a good idea to go back on his
15 medications to help him through this time.'
16 Writer acknowledged that it may be helpful
17 for him, and she would inform psychiatry.
18 Reviewed positive coping skills."
19    Q. Okay. Do you remember what your
20 reference was in the beginning of "the
21 events that occurred yesterday"?
22    A. I would have to just -- I'm not sure.
23 There were a few things that happened
24 around that time, if it was in relation to
25 a particular incident report. There are a

Page 21

1  few incidents I could have been referring
2  to.
3     Q. Okay. And in your opinion, or to
4  your memory, you mentioned here that you
5  reiterated that mental health had made their
6  clinical opinion clear to the DOC that this
7  other RTU inmate's safety was at risk.
8  Which RTU inmate were you referring to
9  there?
10    A. [Inmate A]
11    Q. So you were saying that [Inmate A]
12 [Inmate A] safety was at risk?
13    A. Yes.
14    Q. Why did you think that his safety was
15 at risk?
16    A. Because over time, you know, Ed had
17 -- [Inmate A] kept making statements to Ed,
18 calling him kind of sort of obscene names.
19 He was accusing him of things, but [Inmate A]
20 was also doing that to other people on the
21 unit, as well.
22       So it wasn't just Ed, there were
23 some other people than Ed that he was kind
24 of accusing of being like, he'd say, a baby
25 raper. So we were worried that other

Page 22

1  inmates may also wind up assaulting Inmate A
2  Inmate A because they were frustrated with
3  his kind of outbursts, as well.
4     Q. Did you feel that Mr. Jones was
5  equally at risk?
6     A. I think I would say more
7  psychologically. Physically it's possible
8  but more what I saw was a psychological
9  decompensation.
10    Q. If we could move to the next progress
11 note, which is dated October 8, 2015.
12       Do you remember preparing this
13 one?
14    A. Yes.
15    Q. Okay. Was it your opinion that the
16 PREA allegations against Mr. Jones, the
17 first one as referenced here, prior to
18 October 8th, was it your opinion that that
19 PREA investigation had exacerbated
20 Mr. Jones's illnesses or mental health?
21    A. Yes. I think it contributed to it.
22    Q. In what way do you think it
23 contributed?
24    A. I think with PREA allegations, number
25 one, it is an allegation of some sexual

Page 23

1  nature or something that may have been
2  triggering, but also with PREA there is
3  people, where you have to talk to a lot of
4  people. You have to follow up with medical
5  sometimes. So that can be triggering for
6  people with PTSD.
7     Q. Okay. So if you could just read in
8  Paragraph D, the third from the top, where
9  it starts with "writer reiterated." Would
10 you read that sentence?
11    A. Let's see. "Writer reiterated that
12 she had already and continues to express
13 concerns regarding this to the DOC."
14    Q. Now, based off of this report, what
15 were you referring to when you said "this"?
16    A. Let's see. I'm going to read the
17 first half.
18    Q. Take your time.
19    A. (Witness reviews document.)
20       This is referring to, we had
21 reported to the DOC that we were concerned
22 about having Inmate A come back to
23 the unit, or them both being on the unit
24 together, and that it wasn't a good -- it
25 wouldn't be, you know, clinical, but also

Page 24

1  like safety-wise we were worried for
2  people's safety.
3     Q. Okay.
4     A. So I think I'm referring to that I
5  have already discussed our concerns and
6  made them aware of this.
7     Q. "Them" being the Department of
8  Correction?
9     A. Yes.
10    Q. We can move on now to, I would like
11 to refer to a progress note you prepared on
12 November 10, 2015.
13    A. Okay.
14    Q. Do you remember preparing this
15 progress note?
16    A. Yes.
17    Q. So in Paragraph A, if you could just
18 read from second line where it starts with
19 "inmate does appear."
20    A. "Inmate does appear to be
21 experiencing increased symptoms since
22 recent PREA allegation. Inmate appears to
23 be utilizing positive coping skills in
24 order to manage symptoms. No symptoms of
25 psychosis observed, reported at this time.

Page 25

1  Inmate denied homicidal/suicidal ideation
2  and is future oriented."
3     Q. What increased symptoms did you
4  observe?
5     A. Well, it was flashbacks, a
6  significant amount of flashbacks,
7  nightmares, anxiety, depression.
8        Also there was a period of time
9  where he was having nocturnal emissions at
10 night that were very disturbing to him. So
11 he really had a lot of anxiety around that.
12    Q. I will refer you to the next one
13 dated November 17, Paragraph B. Again you
14 referred to the increased symptoms.
15    A. Uh-huh.
16    Q. Was it your opinion around this time
17 that the PREA allegation was having a
18 substantial effect on his mental health?
19    A. Yes.
20    Q. I would like to move on to the
21 progress note prepared on December 1st,
22 2015. It's dated at the top under "Session
23 Date."
24       The first question I have here is
25 it says that the entering clinician was a

7 (Pages 22 - 25)

Page 26

1 different person, but is that your signature
2 below that person?
3   A. Yeah.
4   Q. So this person prepared this report?
5   A. Correct.
6   Q. And you reviewed it?
7   A. Yes.
8   Q. Okay. I want to refer in the center
9 of Paragraph D. You say "this writer
10 explained." Do you see that part?
11   A. Uh-huh.
12   Q. Can you read that sentence?
13   A. "This writer explained mental
14 protocol and informed inmate that this
15 would be discussed during triage but no
16 decision could be made."
17   Q. What do you mean by "triage"?
18        MR. PUDDISTER: Objection. She
19 didn't write this document.
20        MR. MONTHEY: I will rephrase.
21   Q. Do you know what the author meant by
22 "triage"?
23   A. Daily we have a meeting where the
24 providers, the other clinicians, the
25 psychiatrist, mental health director, we

Page 27

1 meet and discuss our mental health watches,
2 which he was on at this time. So he would
3 have been brought up, and, you know, for a
4 disposition of what we were going to do
5 with him, and what his concerns were, we
6 would have discussed all this and the
7 single cell request.
8   Q. Okay. In your opinion was the single
9 cell request an important way to separate
10 Mr. Jones from another inmate as a result of
11 his -- of any sort of safety issues?
12   A. Well, as far as -- we assess if it's
13 a mental health single cell request. They
14 separate mental health and then security.
15        As far as we go, we would say if
16 this person is experiencing symptoms where
17 we think they would need to be housed
18 independently for a while, we would do it
19 just based on the mental health symptoms
20 that are occurring at the time.
21        MR. MONTHEY: Okay. At this point
22 I would like to refer to the incident
23 reports.
24        First I would like to introduce an
25 incident report dated August 5, 2015.

Page 28

1        (Exhibit 4 was marked for
2         identification.)
3   Q. Ms. Martino-Fleming, do you remember
4 preparing this incident report?
5   A. Yes.
6   Q. Could you please read the description
7 out loud?
8   A. "On 8/3/2015, I, Vanessa
9 Martino-Fleming, LMHC, met briefly with
10 inmate Edward Jones who reported that
11 inmate [Inmate A] is yelling obscene
12 things at people. Inmate [Inmate A] was
13 talking about a 52-year-old man having oral
14 sex with a two-month-old baby. Writer
15 called crisis and had the inmate placed on
16 a 15-minute mental health watch. Writer
17 spoke with Captain Camelo and Deputy Devine
18 regarding inmate [Inmate A] being a climate
19 issue on A-1." Deputy Devine and Captain
20 Camelo advised me to write an incident
21 report. End of the report."
22   Q. Okay. Thank you so much.
23   A. Uh-huh.
24        MR. MONTHEY: Also I would like to
25 mark this next incident report dated

Page 29

1 September 24, 2015.
2        (Exhibit 5 was marked for
3         identification.)
4   Q. Do you remember preparing this
5 incident report?
6   A. Yes.
7   Q. Could you please read the description
8 out loud?
9   A. Yes. "On September 24, 2015, I,
10 Vanessa Martino-Fleming, LMHC, was
11 approached in the RTU by inmate Edward
12 Jones. Inmate" redacted "inmate" redacted
13 "and inmate" redacted "regarding their
14 concerns about inmate [Inmate A]
15 returning to the RTU. All of the above
16 inmates reported that they were just trying
17 to be proactive and do the right thing by
18 coming forward because no one wanted to see
19 Mr. [Inmate A] get hurt. The above inmates
20 reported that they were, as well as
21 numerous others on the unit, agitated about
22 him returning to the unit after all of the
23 provocative sexual remarks he has made in
24 the past. Inmate Jones stated that 'I
25 don't want to, but if he continues to make

| Page 30 | Page 32 |
|---|---|
| 1  those comments I might smash him in the<br>2  head.' Inmate Jones stated that the<br>3  remarks Mr. [Inmate A] makes triggers his<br>4  PTSD symptoms. Mr. Jones also discussed<br>5  his frustrations with the false PREA<br>6  allegation Mr. [Inmate A] made against him.<br>7  The above inmates appeared visibly<br>8  distressed and the return of Mr. [Inmate A]<br>9  appears to be creating a major climate<br>10 issues on the RTU. Shift Commander<br>11 LaFlamme and Captain Camelo notified."<br>12         MR. MONTHEY: And I would like to<br>13 introduce this third incident report dated<br>14 December 11, 2015.<br>15         (Exhibit 6 was marked for<br>16         identification.)<br>17   Q.  Ms. Martino-Fleming, did you prepare<br>18 this report?<br>19   A.  Yes.<br>20   Q.  Could you read the description?<br>21   A.  "On December 11, 2015, I, Vanessa<br>22 Martino-Fleming, LMHC, met with inmate<br>23 Edward Jones in the A-1 treatment room per<br>24 security request. Mental Health Director<br>25 Neal Norcliff informed writer that the | 1  Martino-Fleming, LMHC, met with inmate<br>2  Edward Jones for a one-on-one session.<br>3  Inmate reported he found out today that<br>4  inmate [Inmate A] was coming back to<br>5  A-1. Inmate Jones reported that 'if I see<br>6  him and he talks to me, I'm going to knock<br>7  his teeth out. The DOC knows that he<br>8  shouldn't be around me. This is a serious<br>9  issue. We are enemies. I'm all right now.<br>10 As long as I don't hear from him or see him<br>11 I will be okay.' Inmate reported that he<br>12 was planning on requesting an emergency<br>13 class-board to leave OCCC. IPS Sergeant<br>14 Carton and Shift Commander LaFlamme<br>15 notified."<br>16   Q.  Thank you. I have a couple of<br>17 questions about incident reports.<br>18         When you prepare them, when you<br>19 prepare an incident report, what is the<br>20 purpose generally behind preparing an<br>21 incident report?<br>22   A.  To document any possible, you know,<br>23 issues that could, you know, affect the<br>24 safety, you know, of individuals in the<br>25 institution. |

| Page 31 | Page 33 |
|---|---|
| 1  superintendent's office received a letter<br>2  where inmate was expressing suicidal<br>3  ideation. Writer met with inmates Jones<br>4  and discussed the comments in the letter.<br>5  Inmate denied thoughts to harm himself or<br>6  anyone else at the time. Inmate stated<br>7  that he wrote the letter a while ago.<br>8  Inmate did discuss his frustrations<br>9  regarding the incidents that have taken<br>10 place over the past few months. Inmate is<br>11 future oriented to speaking with family and<br>12 meeting with mental health next week. MHW<br>13 not clinically indicated at this time.<br>14 Shift Commander Prarlo notified."<br>15   Q.  Thank you.<br>16         MR. MONTHEY: This is the final<br>17 incident report. This is dated August 16,<br>18 2016.<br>19         (Exhibit 7 was marked for<br>20         identification.)<br>21   Q.  Did you prepare this incident report?<br>22   A.  Yes.<br>23   Q.  Could you read the final one out<br>24 loud.<br>25   A.  "On August 16, 2016, I, Vanessa | 1   Q.  Okay. And is there a standard that<br>2  you have when you prepare an incident report<br>3  of seriousness of the incident?<br>4   A.  We consult usually, you know, if it's<br>5  questionable, we can consult with IPS, but<br>6  these to me were pretty apparent that I<br>7  needed to report them.<br>8   Q.  Is this a last resort when you're<br>9  concerned?<br>10   A.  I'm not sure. Can you re...<br>11   Q.  Would you intervene before filing one<br>12 of these, or do you file one of these after<br>13 asking questions?<br>14   A.  Well, basically when people tell us,<br>15 we report it, and then IPS can do a further<br>16 investigation piece.<br>17         If it is concerning enough, we<br>18 report it so the DOC knows what's going on,<br>19 that's why I report to the shift commander<br>20 and the unit captain, unit team captain.<br>21   Q.  By "IPS" what do you mean?<br>22   A.  Inner Perimeter Security.<br>23   Q.  When you prepare these incident<br>24 reports, is there an online system that you<br>25 enter them into? |

9 (Pages 30 - 33)

Page 34

1  A. Yes.
2  Q. It's within the DOC network that you
3  enter these reports?
4  A. Yes.
5  Q. To your knowledge, who receives the
6  reports?
7  A. To my knowledge, it would be the
8  shift commander. It would be IPS. The
9  superintendent. If it's confidential, then
10 no one else can read it. So it would be
11 the superintendent and the shift commander,
12 but it's not confidential, it can be seen
13 by anyone who has access.
14  Q. Okay. Once you have submitted an
15 incident report, are you able to view it
16 after?
17  A. If it's not confidential.
18  Q. Who marks it confidential? Do you
19 mark it confidential?
20  A. I typically would, yes.
21  Q. Why would you mark an incident report
22 confidential?
23  A. I mean sometimes it may not be
24 appropriate for other people to be viewing
25 the content of what we're writing about.

Page 35

1  So to minimize that we can make it
2  confidential.
3  Q. Are these the only four incident
4  reports you prepared with regard to Mr.
5  Jones?
6  A. That I recall, yes.
7  Q. Okay. Did any other individuals help
8  you prepare --
9  A. No.
10  Q. -- either one of these?
11  A. Uhn-uhn.
12  Q. So you entered all four of them by
13 yourself?
14  A. Yes.
15  Q. I will ask you a couple questions
16 specifically about each. So I will refer
17 back to the first one from August 6th, 2015.
18  A. Okay. All right.
19  Q. Was Mr. Jones the only source of your
20 information for this incident report?
21  A. For this incident, yes. There have
22 been other people that reported the same
23 thing. It's possible other clinicians
24 could have written an incident report based
25 on that.

Page 36

1  Q. It states that you spoke with
2  Defendant Camelo and Defendant Devine?
3  A. Yes.
4  Q. Do you normally speak with them when
5  you have a concern?
6  A. Captain Camelo is the unit team
7  captain. He was in charge of the unit. He
8  would be somebody we would let know.
9     I don't know if he was the shift
10 commander that day or not, but the shift
11 commander and Deputy Devine would sit in.
12 So we wanted to inform him of our concerns
13 of what was going on.
14  Q. Do you receive responses when you
15 submit incident reports, generally speaking?
16  A. Not typically.
17  Q. On the bottom where it says "Shift
18 Commander" and "Comments," that's not
19 something that you can view? There are
20 normally no comments?
21  A. I don't think so. Yeah. Yeah.
22  Q. We will move on to the one dated
23 September 24th.
24     So when you say in here that the
25 above -- center of the paragraph -- "the

Page 37

1  above inmates reported that they were, as
2  well as other, agitated about him returning
3  to the unit after all the provocative sexual
4  remarks he had made in the past"?
5  A. Uh-huh.
6  Q. How agitated would you describe the
7  inmates?
8  A. They were very agitated and
9  concerned. I remember specifically the
10 group of them came over that day, and, you
11 know, were standing there expressing their
12 concerns. So, yeah, I remember they were
13 really agitated.
14  Q. Were they afraid?
15  A. I would say -- I mean they were
16 fearful for Inmate A about getting hurt.
17 There were some other men there he was also
18 yelling some things out to. They were
19 fearful of him getting hurt, but also
20 knowing the climate on the unit was being
21 disturbed by him. He was keeping people
22 up. He was yelling and screaming in the
23 middle of the night.
24     I think I remember them saying
25 they waited, that they didn't want to come

10 (Pages 34 - 37)

Page 38

1 together at once, but they felt like they
2 needed to at this time.
3    Q. Toward the bottom you say that "he
4 appears to be creating a major climate
5 issue."
6    A. Yes.
7    Q. Can you describe what you mean by
8 that?
9    A. "Climate issue" meaning he would be
10 yelling all kinds of things at all hours of
11 the night and people would say we can't
12 sleep. He's kind of yelling out these
13 obscenities. He was triggering other
14 people who had trauma, too, not only Ed
15 Jones, but other people who were kind of --
16 this guy is bringing me to a place that is
17 not very healthy for me.
18    Q. Let's move on to the next one dated
19 December 11, 2015.
20    A. Uh-huh.
21    Q. Has Mr. Jones expressed suicidal
22 ideation?
23    A. Yes.
24    Q. Has he ever committed or attempted
25 suicide, to your knowledge?

Page 39

1    A. To my knowledge, he has had attempts
2 in the past.
3    Q. Okay. Were any of those attempts
4 during this period when Inmate A was --
5       Were any of these attempts during
6 the periods when you were filing these
7 incidents reports with regard to Inmate A
8 Inmate A and Mr. Jones.
9    A. I was aware that he went on watch and
10 that he did have some hunger strikes and
11 things like that.
12    Q. When you say "went on watch," what
13 does that entail?
14    A. We increased the observation of the
15 inmate because we are concerned for their
16 safety, or they're presenting increased
17 symptoms, and they are not doing well, so
18 we are concerned for their safety, or if
19 they are going to hurt themselves or
20 someone else. They are not stable, and
21 they need increased observation.
22    Q. This was in the RTU?
23    A. The mental health watches occur in
24 the HSU, but this occurred in the RTU.
25    Q. What is the process for increased

Page 40

1 monitoring when one is on watch?
2    A. How does somebody get put on watch.
3    Q. What does the RTU staff do when they
4 put someone on watch?
5    A. I recall one of the other ones.
6       I can call the crisis clinician
7 who then can put them on watch or I can put
8 them on a watch myself and increase the
9 observation, and then, you know, determine
10 whether or not they should receive, what
11 kind of property, a smock or scrubs, based
12 on their acuity.
13    Q. When you have a patient that has
14 suicidal ideation, do you always prepare an
15 incident report?
16    A. No.
17    Q. Okay. Besides a progress report and
18 incident report, do you prepare any other
19 type of formal report?
20    A. If somebody has suicidal ideation?
21    Q. Yes.
22    A. Just a progress note.
23    Q. How does the RTU staff make the
24 decision to put someone on watch?
25    A. In this instance, I was already aware

Page 41

1 of the letter and the comments in it
2 because I had already discussed it with
3 him. So he was, you know -- he kind of
4 informed me in one of the sessions: I
5 wrote this letter just so you know.
6       When it came back, that's when the
7 DOC had requested that we see him, that he
8 wasn't an imminent threat.
9       We determine if somebody is an
10 imminent threat to themselves, a risk to
11 themselves or someone else, or do we feel
12 like they need increased monitoring.
13       At this point in time it didn't
14 appear clinically indicated.
15    Q. Do you have a copy of that letter?
16    A. No.
17    Q. Did you give it to a DOC staff?
18    A. I didn't have it myself. I didn't
19 have it. It was the DOC that had it. They
20 showed it to me and said he wrote this
21 letter.
22       And we might want have read it and
23 said, Oh, okay. We will address it with him
24 because we were requested to go see him and
25 talk about it with him.

11 (Pages 38 - 41)

Page 46

1  people we had concerns about. We were
2  trying to be on the same page, you know,
3  talk about any climate issues.
4      If somebody is decompensating, so
5  that way they are aware of it, you know,
6  kind of look out for them a little bit. If
7  we had any security concerns or questions.
8      So we kind of talk about all that
9  stuff. You know, people were leaving,
10 parole, all these other things.
11     Q. Did you ever express to Defendant
12 Camelo that [Inmate A] posed a danger
13 to Edward Jones?
14     A. I definitely said, you know, this is
15 an issue that -- right. He is on the unit.
16 I don't know if I specifically said like a
17 physical concern, but for sure it was a
18 mental health concern. So I would say that
19 he is -- Ed Jones is decompensating because
20 of what's going on the unit.
21     Q. Define "decompensating"?
22     A. Ed Jones was becoming increasingly
23 anxious and irritable, agitated,
24 nightmares, all that kind of stuff.
25     Q. Did you ever speak with Defendant

Page 47

1  Camelo about Edward Jones' decompensation?
2      A. Yes.
3      Q. Did you express that you believed the
4  cause to be Mr. [Inmate A]
5      A. Yes.
6      Q. Do you know approximately how many
7  times you spoke with Defendant Camelo about
8  this?
9      A. Multiple.
10     Q. You don't remember the exact number?
11     A. I don't know. It was multiple
12 occasions.
13     Q. Does the same apply to Defendant
14 Devine.
15     A. Yes. Maybe not as individual, but
16 part of the triage meeting, for sure, he
17 was aware.
18     Q. How about Defendant Mitchell, did you
19 speak with her at all?
20     A. Not specifically, because I didn't
21 really have access to her, because I wasn't
22 in the morning meeting, and she didn't come
23 to our triage meeting.
24     Q. I'm going to jump back to an incident
25 report.

Page 48

1      A. Sure.
2      Q. Let's jump to the September 24th one
3  for now.
4      A. Uh-huh.
5      Q. Okay. Did you have a conversation
6  with Defendant Camelo about the facts of
7  this incident report?
8      A. Yes.
9      Q. Do you remember the conversation?
10     A. I went to him, and I told him that,
11 you know, all these people just came to me,
12 and they're concerned, and it was one of
13 those things where it's hard, because when
14 you have multiple inmates come to you, they
15 don't want to also be seen as having a
16 group conflict type of thing or like an
17 uprising, but they came together to show
18 unity, and that they were really concerned.
19     I did have -- I did, you know,
20 inform him. I know, too, we also had a
21 case conference in the past that we had
22 expressed this to him before [Inmate A]
23 [Inmate A] came back from Bridgewater and we
24 expressed our concerns.
25     Q. Okay. What did Defendant Camelo --

Page 49

1  did he recommend you take any action?
2      A. Writing the incident report, and I
3  think that was basically it after that.
4      I was trying to explain to him he
5  wasn't going to hurt him at this point in
6  time, but if inmate [Inmate A] kept
7  antagonizing him, something might happen.
8      But after that, after this, I
9  don't recall any other followup that I did.
10     Q. Do you know what Defendant Camelo
11 said to you?
12     A. I remember him saying write an
13 incident report, and we will take a look
14 into it. I went my way, and he went his.
15     Q. You don't know what happened as a
16 result of filing this incident report
17 ultimately?
18     A. I don't recall, yeah.
19     Q. I will jump over to the -- jump back
20 to the August 6th one --
21     A. Uh-huh.
22     Q. -- if you don't mind.
23     A. Okay.
24     Q. Do you remember having a conversation
25 with Deputy Devine and Captain Camelo about

13 (Pages 46 - 49)

Page 50

1  this incident?
2  A. Yes. Yep.
3  Q. Okay. And they advised you to write
4  an incident report?
5  A. Uh-huh.
6  Q. Was that all they had advised you to
7  do?
8  A. Write an incident report, just, you
9  know, keep an eye on it, let us know, you
10 know, if anything else comes up.
11 Q. To your knowledge, they didn't --
12 they took no action in response --
13 A. To my knowledge, after this incident
14 report, that's all, yeah. I don't know
15 what happened.
16 Q. Let me rephrase it real quick.
17    So do you know if they took any
18 action in response to this incident report
19 directly after this?
20 A. I don't believe so.
21 Q. Putting these away for now, do you
22 know of any action the Department of
23 Correction took in response to any of the
24 warnings you made about [Inmate A]
25    MS. GLAZER: Objection.

Page 51

1  Q. I will rephrase.
2     Do you --
3     MR. MONTHEY: Can we go off the
4  record for a couple minutes.
5     (A recess was taken from
6     11:02 to 11:08 a.m.)
7  BY MR. MONTHEY:
8  Q. I will jump back in.
9  A. Uh-huh.
10 Q. Did you ever express to either
11 Defendant Devine, Defendant Mitchell or to
12 Defendant Camelo the opinion that
13 Mr. [Inmate A] posed a threat to Mr. Jones'
14 life?
15 A. I did report -- it would not have
16 been to Superintendent Mitchell -- that
17 [Inmate A] can be impulsive, and he
18 can get agitated, and, for sure, when he is
19 not doing well, he could be a risk to other
20 people.
21 Q. Was [Inmate A] a patient of
22 yours?
23 A. Not my client, no.
24 Q. Okay. So you had repeatedly told
25 them about the incidents between [Inmate A]

Page 52

1  [Inmate A] and Edward Jones?
2  A. Multiple times.
3     MS. GLAZER: Objection.
4  Q. You had repeatedly told -- about how
5  many occasions do you think you spoke with
6  Defendant Devine about the interactions
7  between [Inmate A] and Edward Jones?
8  A. I mean multiple, two, three.
9  Q. Okay. The same for Defendant Camelo?
10 A. Yes.
11    MR. MONTHEY: Okay. Well, as of
12 now, I do not have any more questions.
13    MS. GLAZER: I have a few. I will
14 keep my voice up.
15    EXAMINATION
16 BY MS. GLAZER:
17 Q. I would like to just go back to
18 Exhibit 3. The September 25, 2015 --
19 A. Which one?
20 Q. September 25, 2015. The first
21 section, maybe the third sentence here.
22    "Writer reiterated that writer and
23 all other RTU staff had made it abundantly
24 clear to the DOC that there were numerous
25 concerns with placing this other inmate back

Page 53

1  on the unit." Can I ask who you reiterated
2  this to?
3  A. Sure. I reiterated it to Ed, you
4  know.
5  Q. Mr. Jones?
6  A. Yes. Mr. Jones, that we had
7  discussed this with DOC staff, and we also
8  had a case conference and made it clear we
9  were concerned about having him back on the
10 unit.
11 Q. I want to clarify. So you told
12 Mr. Jones that you had informed DOC there
13 were concerns with placing [Inmate A]
14 back on the unit?
15 A. Correct.
16 Q. Now, there was, I believe Mr. Monthey
17 asked you questions about PREA allegations
18 about Mr. Jones.
19    Is it your understanding that any
20 and all PREA allegations need to be
21 investigated?
22 A. Correct.
23 Q. In your role as a clinician would you
24 ever recommend that PREA allegations should
25 not have been investigated?

14 (Pages 50 - 53)

Page 54

1  A. No.
2  Q. And it's not your role as a clinician
3  to investigate the PREA allegations?
4  A. Correct.
5  Q. In your role as a clinician, would
6  you ever recommend that any allegations,
7  whether they be PREA allegations, or staff
8  misconduct or other inmate misconduct not be
9  investigated?
10  A. No. No.
11  Q. Even if any investigation would lead
12  to exacerbating a patient's symptoms, would
13  it still need to be investigated?
14  A. Yes, to my knowledge.
15  Q. And other inmates besides Mr. Jones
16  complained about [Inmate A]
17  A. Yes.
18  Q. By the nature of Mr. [Inmate A] being
19  classified -- let me strike that.
20     Were you the one who made the
21  decision for Mr. [Inmate A] to be placed in
22  the RTU at Old Colony?
23  A. No.
24  Q. By the virtue of Mr. [Inmate A] being
25  placed in the RTU at Old Colony, is it safe

Page 55

1  to assume he had mental health issues?
2  A. Yes.
3  Q. Did all of the inmates in the RTU at
4  Old Colony have mental health issues?
5  A. To some degree, yes.
6  Q. I want to turn to Exhibit 4, please,
7  the incident report from August 6, 2015.
8     In your last sentence you state
9  "Deputy Devine and Captain Camelo advised me
10  to write an incident report."
11  A. Uh-huh.
12  Q. Was this the incident report they
13  advised you to write?
14  A. Yes.
15  Q. So both Deputy Devine and Captain
16  Camelo, after you reported it to them, they
17  told you to document what you had reported
18  to them?
19  A. Yes.
20     MS. GLAZER: That's all I have at
21  this time.
22     REEXAMINATION
23  BY MR. MONTHEY:
24  Q. Just a couple followup questions.
25     Referring to the PREA,

Page 56

1  investigation when you met with Mr. Jones,
2  were you aware that he was going through
3  PREA investigation?
4  A. Yes. He had one, and then he had
5  another one.
6  Q. You were aware of both --
7  A. Yes.
8  Q. -- during the time?
9     Did you have any knowledge of the
10  PREA investigation beginning before they
11  began?
12  A. No.
13  Q. Okay. So you had no involvement in
14  whether there was going to be a PREA
15  investigation?
16  A. Correct.
17  Q. Okay. Had you known that there would
18  have been a PREA investigation, given
19  Mr. Jones' mental state, would you have
20  advised against one?
21  A. That's really kind out of my scope.
22  I can't advise one way or other. I can
23  report my concerns to the DOC, like, Hey,
24  this is a PREA issue, this may, you know,
25  exacerbate this person's symptoms or

Page 57

1  something like that, just so you know, kind
2  of an awareness, but it's not for me to
3  recommend it or not recommend it. I just
4  report it.
5  Q. Do you say that because of your
6  position in the DOC or because of your
7  credentials as a counselor?
8  A. I mean just that's -- I would say I
9  mean it's not my area of expertise to say
10  whether or not an incident happened or
11  didn't happen. So I mean that's not so
12  much for me to say.
13  Q. Have you ever been involved in
14  advising on whether there should be a PREA
15  investigation of any inmate?
16  A. No.
17  Q. That's completely outside of your --
18  A. Correct. Even if some of these
19  claims that were made were even more absurd
20  or maybe a small likelihood, about whatever
21  it is, it still wouldn't be my position one
22  way or the other to have to say whether
23  there should be a PREA investigation.
24  Q. Okay. And when Mr. Jones is going
25  through the first PREA investigation -- to

15 (Pages 54 - 57)

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: JONES v. MITCHELL
Dep. Date: 9/17/2018
Deponent: VANESSA MARTINO-FLEMING

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| 28 | 10-14 | that 'Inmate Inmate A is yelling obscene things at people.' 'Inmate Inmate A was talking about a 52 year old man having oral sex with a 2 month old baby.' Writer | Internal quotation marks missing from transcript |
| 28 | 19 | A-1. Deputy | Unnecessary quotation mark |
| 29 | 12-13 | Jones, Inmate [redacted], Inmate [redacted], Inmate [redacted] and Inmate [redacted] regarding | Period instead of comma, and unnecessary/confusing quotation marks |
| 29 | 16-19 | were 'just trying to be proactive and do the right thing by coming forward because no one wanted to see Mr. Inmate A get hurt.' The | Internal quotation marks missing from transcript |
| 30 | 3-7 | makes 'triggers his PTSD symptoms.' Mr. Jones also discussed his frustrations with the 'false PREA allegation Mr. Inmate A made against him.' The | Internal quotation marks missing from transcript |
| 31 | 7-8 | letter 'a while ago.' Inmate | Internal quotation marks missing from transcript |
| 40 | 2 | watch? | I was seeking clarification from the attorney on what he was asking. |
| 41 | 22 | want to have | Typo (missing word) |

I, VANESSA MARTINO-FLEMING, do hereby certify that I have read the transcript of my testimony, from the above captioned deposition, and further certify under the pains and penalties of perjury that said transcript, with the above requested corrections, is a true and accurate record of said testimony.

Dated this 5th day of December, 2018.

Vanessa Martino-Fleming, LMHC

Page 1 of 1